**JOHNSON FISTEL, LLP**
Frank J. Johnson (SBN 174882)
FrankJ@johnsonfistel.com
Brett M. Middleton (SBN 199427)
BrettM@johnsonfistel.com
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Counsel for Lead Plaintiff Movant*
*Gerber Kawasaki, Inc.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GILBERTO FERREIRA, on behalf of himself and a class of similarly situated investors,<br><br>                Plaintiff,<br><br>        v.<br><br>FUNKO, INC., BRIAN MARIOTTI, RUSSELL NICKEL, and JENNIFER FALL JUNG,<br><br>                Defendants. | Case No.: 2:20-cv-02319-VAP-PJW<br><br>**GERBER KAWASAKI, INC.'S OPPOSITION TO COMPETING MOTIONS FOR APPOINTMENT AS LEAD PLAINTIFF**<br><br>DATE:        June 8, 2020<br>TIME:        2 p.m.<br>CTRM:      8A, 8th Floor<br>JUDGE:     Hon. Virginia A Phillips |
| MOHAMED NAHAS, on behalf of himself and a class of similarly situated investors,<br><br>                Plaintiff,<br><br>        v.<br><br>FUNKO, INC., BRIAN MARIOTTI, RUSSELL NICKEL, and JENNIFER FALL JUNG,<br><br>Defendants. | Case No.: 2:20-cv-03130-VAP-PJW |

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   ARGUMENT.........................................................................................................2

    A.    Gerber Kawasaki Has the Greatest Loss of the Competing Movants ......2

        1.    Gerber Kawasaki Has the Largest Financial Interest in the Relief Sought by the Class....................................................2

        2.    The FI Group May Not Aggregate Its Losses ...............................3

        3.    FI Group Member Zhibin Zhang Lacks Standing .........................6

    B.    Gerber Kawasaki Otherwise Satisfies the Requirements of Rule 23 .....10

    C.    The Presumption of "Most Adequate Plaintiff," Which Lies in Favor of Gerber Kawasaki, Cannot Be Rebutted ...............................11

    D.    The Other Lead Plaintiff Motions Should Be Denied ...........................12

III.  CONCLUSION ...................................................................................................14

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Network Assocs., Inc. Sec. Litig.*,
  76 F. Supp. 2d 1017, 1024 (N.D. Cal. 1999) ........................................................4, 5

*Apple v. LJ Int'l Inc.*,
  No. CV076076GAFJWJX,
  2008 WL 11343371 (C.D. Cal. Feb. 8, 2008) .............................................................4

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) .....................................................................................................9

*Ben v. Frontier Fin. Corp.*,
  No. 10-0696-JCC,
  2010 WL 11684329 (W.D. Wash. Aug. 3, 2010) ......................................................10

*Commercial Union Assur. Co., plc v. Milken*,
  17 F.3d 608 (2d Cir. 1994) ..........................................................................................7

*Crihfield v. CytRx Corp.*,
  No. CV1605519SJOSKX,
  2016 WL 10587938 (C.D. Cal. Oct. 26, 2016) ...........................................................6

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) ..................................................................................................8, 9

*Fragala v. 500.com*,
  No. CV 15-01463 MMM (EX),
  2015 WL 12513580 (C.D. Cal. July 7, 2015) ......................................................11, 12

*Hufnagle v. Rino Int'l Corp.*,
  No. CV 10-1754-VBFVBKX,
  2011 WL 710676 (C.D. Cal. Feb. 16, 2011) ...............................................................4

*In re Cavanaugh*,
  306 F.3d 726 (9th Cir. 2002) ........................................................................3, 7, 11, 12

*In re Cendant Corp. Litig.*,
  264 F.3d 201 (3d Cir. 2001) .......................................................................................12

*In re Donnkenny Inc. Sec. Litig.*,
  171 F.R.D. 156 (S.D.N.Y. 1997) ..................................................................................4

*In re eSpeed, Inc. Sec. Litig.*,
  232 F.R.D. 95 (S.D.N.Y. 2005) .................................................................................4, 6

*In re Gemstar-TV Guide Int'l, Inc. Sec. Litig.*,
  209 F.R.D. 447 (C.D. Cal. 2002) ..........................................................................3, 4, 6

ii

*In re IMAX Sec. Litig.*,
  No. 06CIV6128,
  2009 WL 1905033 (S.D.N.Y. June 29, 2009)...................................................................13

*In re Nat'l Australia Bank Sec. Litig.*,
  No. 03 CIV.6537 BSJ,
  2006 WL 3844465 (S.D.N.Y. Oct. 25, 2006) ......................................................................9

*In re Netflix, Inc., Sec. Litig.*,
  No. 12-0225 SC,
  2012 WL 1496171 (N.D. Cal. Apr. 27, 2012) ...............................................................5, 10

*In re Snap Inc. Sec. Litig.*,
  No. 217CV03679SVWAGR,
  2019 WL 2223800 (C.D. Cal. Apr. 1, 2019)...................................................................9, 10

*Knox v. Yingli Green Energy Holding Co. Ltd.*,
  136 F. Supp. 3d 1159 (C.D. Cal. 2015)................................................................................2

*McGee v. Am. Oriental Bioengineering, Inc.*,
  No. 2:12-CV-5476-SVW-SH,
  2012 WL 12895668 (C.D. Cal. Oct. 16, 2012) ....................................................................5

*Miller v. Thane Int'l, Inc.*,
  615 F.3d 1095 (9th Cir. 2010) .............................................................................................9

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
  96 F.3d 1151 (9th Cir. 1996)...........................................................................................7, 9

*Sokolow v. LJM Funds Mgmt., Ltd.*,
  No. 18-CV-01039,
  2018 WL 3141814 (N.D. Ill. June 26, 2018) .....................................................................11

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
  554 U.S. 269 (2008) ...........................................................................................................11

*Takara Tr. v. Molex Inc.*,
  229 F.R.D. 577 (N.D. Ill. 2005) ...........................................................................................2

*W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*,
  549 F.3d 100 (2d Cir. 2008)...............................................................................................11

*Z-Seven Fund, Inc. v. Motorcar Parts & Accessories*,
  231 F.3d 1215 (9th Cir. 2000)............................................................................................13

**Statutes**

15 U.S.C. § 78u-4(a)...............................................................................................................1

15 U.S.C. § 78u-4(a)(2)(A)......................................................................................................6

15 U.S.C. § 78u-4(a)(3) .........................................................................................................12

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)..........................................................................................11

GERBER KAWASAKI, INC.'S OPPOSITION TO COMPETING MOTIONS
FOR APPOINTMENT AS LEAD PLAINTIFF

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb) ...................................................................... 9

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc) .................................................................... 10

28 U.S.C. § 1746 ..................................................................................................... 6

**Rules**

Fed. R. Civ. P. 23(a) ............................................................................................... 11

GERBER KAWASAKI, INC.'S OPPOSITION TO COMPETING MOTIONS
FOR APPOINTMENT AS LEAD PLAINTIFF

On May 11, 2020, six movants filed motions for appointment as lead plaintiff: (1) Gerber Kawasaki, Inc. ("Gerber Kawasaki"); (2) the three-member "Funko Investor Group" ("FI Group"); (3) William Hurt; (4) the two-member Elion and Li Group ("E&L Group"); (5) Ganesh Shenoy; and (6) Angela Michl.[1]  Gerber Kawasaki respectfully submits this memorandum in opposition to the competing motions for appointment as lead plaintiff.

## I.    INTRODUCTION

These securities class actions are brought on behalf of all persons who purchased or otherwise acquired the securities of Funko, Inc. ("Funko") between August 8, 2019 and March 5, 2020, inclusive (the "Class Period"), and assert claims pursuant to the Securities Exchange Act of 1934 ("Exchange Act").  Therefore, the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a), controls the appointment of a lead plaintiff.

Gerber Kawasaki satisfies all the PSLRA's requirements and should be appointed Lead Plaintiff in this case.  Gerber Kawasaki is a Registered Investment Advisor with over $1 billion in assets under management and is exactly the type of institutional investor favored by the PSLRA.  It suffered the largest loss of any *bona fide* movant, $686,946 under a first-in, first out (FIFO) methodology and $437,037 under a last-in, first out (LIFO) methodology, and it therefore has the largest financial interest in the relief sought by the class.  Because Gerber Kawasaki has further demonstrated its "typicality" and "adequacy" under Rule 23 of the Federal Rules of Civil Procedure, it is entitled to appointment as lead plaintiff.

Of the competing movants, only the FI Group's claimed financial interest of its three members, $484,078, comes close to that of Gerber Kawasaki.  However, most courts do not allow lawyers to designate unrelated plaintiffs as a "group" to aggregate

---

[1] On May 18, 2020, Ganesh Shenoy filed a Notice of Withdrawal of Ganesh Shenoy's Motion for Consolidation of Related Actions, Appointment as Lead Plaintiff, and Approval of Lead Counsel.  ECF No. 43.

1

their financial stakes since doing so undermines the objectives of the PSLRA.  Even courts that will consider a group of unrelated investors will not do so where, as here, the group might displace an institutional investor, which is the PSLRA's preferred lead plaintiff.  Because the evidence before the Court suggests that the FI Group was cobbled together by two law firms to aggregate their clients' losses, it should be disqualified from consideration as an improper group.  The group should be disqualified for the additional reason that one of its three members, Zhibin Zang, did not suffer *any* recoverable loss and he therefore lacks standing to seek appointment under the PSLRA and the Exchange Act.

Accordingly, Gerber Kawasaki should be appointed as Lead Plaintiff and its selection of Johnson Fistel, LLP to serve as Lead Counsel should be approved.

## II.   ARGUMENT

### A.   Gerber Kawasaki Has the Greatest Loss of the Competing Movants

#### 1.   Gerber Kawasaki Has the Largest Financial Interest in the Relief Sought by the Class

Based upon the submissions before the Court, with $686,946 in FIFO losses and $437,037 in LIFO losses, Gerber Kawasaki has the largest financial interest of any of the individual movants.[2]  Considering the lower LIFO estimate, its losses are still 32% greater than the second highest individual claimed loss, William Hurt

---

[2] While the Court may also consider additional factors such as that Gerber Kawasaki purchased 76,688 shares during the Class Period, the total financial loss is generally the determinative factor.  *See Knox v. Yingli Green Energy Holding Co. Ltd.*, 136 F. Supp. 3d 1159, 1163 (C.D. Cal. 2015) ("[o]f the Olsten–Lax factors, courts consider the fourth factor, the approximate losses suffered, as most determinative in identifying the plaintiff with the largest financial loss."); *see also Takara Tr. v. Molex Inc.*, 229 F.R.D. 577, 579 (N.D. Ill. 2005) ("most courts simply determine which potential lead plaintiff has suffered the greatest total losses").  The competing movants agree.  *See, e.g.,* Dkt. 35 at p. 8 (FI Group Brief); Dkt. 30 at p. 10 (Hurt Brief).

2

($330,056), and 55% greater than the third, Huaiyu Zheng of the FI Group ($281,132):[3]

| Rank | Movant | Claimed Loss |
|---|---|---|
| 1 | Gerber Kawasaki, Inc. | $686,946 / $437,037 |
| 2 | William Hurt | $330,056 |
| 3 | Huaiyu Zheng (FI Group) | $281,132 |
| 4 | Abdul Baker (FI Group) | $151,022 |
| 5 | Jarett Elion (E&L Group) | $98,420 |
| 6 | Zhibin Zhang (FI Group) | $51,923 |
| 7 | Zheng Li (E&L Group) | $44,923 |
| 8 | Angela Michl | $3,743 |

**2.    The FI Group May Not Aggregate Its Losses**

The Court should not allow the FI Group to combine the losses of its unrelated, individual members—who retained two different law firms—to claim a greater financial interest.  Courts are clear that such gamesmanship is inconsistent with the goals of Congress in enacting the PSLRA.  *See In re Gemstar-TV Guide Int'l, Inc. Sec. Litig.,* 209 F.R.D. 447, 451 (C.D. Cal. 2002) ("Allowing Georgica Group to serve as lead plaintiff in this action and to be represented by two different law firms would defeat the purpose of choosing a lead plaintiff and undermine the objectives of the PSLRA.  'One of the principal legislative purposes of the PSLRA was to prevent

---

[3] Were the Court to allow the FI Group to aggregate the losses of its three individual, unrelated members—which it should not do (*see* section II.A.2, below)—Gerber Kawasaki's $686,946 FIFO loss is still greater that the FI Group's $484,078 claimed loss.  While LIFO is sometimes characterized as the preferred methodology for estimating losses in this District, the FI Group chose not to disclose its methodology for estimating losses.  Nor did it say whether it held Funko shares at the beginning of the Class Period.  Without this information, there is no way of knowing whether a comparison of losses with Gerber Kawasaki is a true "apples-to-apples" comparison. Since it is unknown whether the FI Group applied FIFO or LIFO, it is appropriate to compare Gerber Kawasaki's FIFO damage estimate to the group's claimed losses.  *See In re Cavanaugh*, 306 F.3d at 730 n.4. (the court "may select accounting methods that are both rational and *consistently* applied") (emphasis added).

GERBER KAWASAKI, INC.'S OPPOSITION TO COMPETING MOTIONS
FOR APPOINTMENT AS LEAD PLAINTIFF

lawyer-driven litigation. . . .  To allow lawyers to designate unrelated plaintiffs as a 'group' and aggregate their financial stakes would allow and encourage lawyers to direct the litigation.'") (quoting *In re Donnkenny Inc. Sec. Litig.*, 171 F.R.D. 156, 157–58 (S.D.N.Y. 1997)).[4]

"The emerging majority position looks askance at the appointment of a group of unrelated persons as lead plaintiff." *Hufnagle v. Rino Int'l Corp.*, No. CV 10-1754-VBFVBKX, 2011 WL 710676, at *2 (C.D. Cal. Feb. 16, 2011) (quoting Moore's Federal Practice § 23.191[3][b][vi]); *see also In re Gemstar-TV Guide Int'l*, 209 F.R.D. at 451–52 (citing cases).  This is particularly true where, as here, the unrelated individual investor group could displace the sophisticated institutional investor preferred by the PSLRA.  *See Hufnagle*, 2011 WL 710676, at *1 ("the PSLRA's legislative history expressed a preference for such institutional investors to serve as lead plaintiffs."); *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 100 (S.D.N.Y. 2005) ("a group of unrelated investors should not be considered as lead plaintiff when that group would displace the institutional investor preferred by the PSLRA").

Courts that choose to consider unrelated groups for appointment typically require evidence justifying the groups' existence and showing that they are not merely lawyer-driven assemblages.  *Apple v. LJ Int'l Inc.*, No. CV076076GAFJWJX, 2008 WL 11343371, at *3 (C.D. Cal. Feb. 8, 2008) (citing *In re Network Assocs.*, 76 F. Supp. 2d at 1026–27).  A group must provide, for example: descriptions of its members, including any preexisting relationships among them; an explanation of how it was formed and how its members would function collectively; and a description of the mechanism that its members and the proposed lead counsel have established to

---

[4] In *In re Network Assocs., Inc. Sec. Litig.,* the court rejected the aggregation of investors into groups where there was no pre-litigation relationship.  The court explained the types of "groups" contemplated by Congress to qualify under the PSLRA as follows: "a group of mutual funds managed by a single organization might qualify. It would have an internal coherency and would be capable of acting as a unified decisionmaker.  A mass of unrelated investors could not do so."  76 F. Supp. 2d 1017, 1024 (N.D. Cal. 1999).

GERBER KAWASAKI, INC.'S OPPOSITION TO COMPETING MOTIONS
FOR APPOINTMENT AS LEAD PLAINTIFF

communicate with one another about the litigation. *See In re Network Assocs.,* 76 F. Supp. 2d at 1026; *see also In re Netflix, Inc., Sec. Litig.*, No. 12-0225 SC, 2012 WL 1496171, at *4 (N.D. Cal. Apr. 27, 2012) (declining to aggregate the losses of an unrelated group of individuals as they "made no showing of former ties or current cohesion"); *McGee v. Am. Oriental Bioengineering, Inc.*, No. 2:12-CV-5476-SVW-SH, 2012 WL 12895668, at *3 (C.D. Cal. Oct. 16, 2012) ("In the instant case, one of the parties seeking appointment as lead counsel—the Bravetti Group—has summed the losses of three separate, unrelated investors in an effort to demonstrate that they have the largest financial interest in the litigation.  However, because there is no evidence of a pre-existing relationship between the three, they are not a 'group of persons' within the meaning of the PSLRA, and thus the Court will not consider the aggregated losses in determining which movant has the largest financial interest in this litigation.").

Although the members of the FI Group submitted a joint declaration in support of appointment as lead plaintiff (Dkt. 36-4) (the "Joint Decl."), the declaration does not address how the group was formed or whether its members had any preexisting relationship.  Yet, it appears that the three members of the FI Group had no preexisting relationship and that the group was formed by two different law firms with the purpose of aggregating their respective clients' losses.

The Joint Decl. suggests that at the time it was executed the members had never directly communicated with each other much less spoken to each other, and that they do not actually know one another.  The group's members, who reside in Washington, North Dakota, and California, stated only that they "were aware of each other" and "had one another's contact information."  Joint Decl. ¶¶ 2–5.  Group members Huaiyu Zheng and Zhibin Zhang both signed PSLRA certifications which stated "Plaintiff retains Bernstein Liebhard LLP," while Abdul Baker's Certification does not identify counsel, uses different language, and appears almost identical to the Certification signed by Pomerantz LLP's client, Mohamed Nahas, in the *Nahas* Action.  *See*

5

No. 2:20-cv-03130-VAP-PJW (Dkt. 1, page 25 of 27). Further, Huaiyu Zheng executed both his Certification and the Joint Decl. on the date of the lead plaintiff filing, May 11, 2020.[5] *See* Dkt. 36-3, page 2 of 8; Dkt. 36-4, page 7 of 7. Abdul Baker and Zhibin Zhang signed the Joint Decl. four days earlier on May 7, 2020. *See* Dkt. 36-4, pages 5-6 of 7. It therefore appears that the three plaintiffs were cobbled together by their respective lawyers at the very last minute.

Given the evidence before the Court which suggests that the FI Group was recruited and formed by two different law firms in order to claim a greater financial interest, this Court should "'refuse[] to appoint as lead plaintiff groups of unrelated individuals, brought together for the sole purpose of aggregating their claims in an effort to become the presumptive lead plaintiff.'" *Crihfield v. CytRx Corp.*, No. CV1605519SJOSKX, 2016 WL 10587938, at *4 (C.D. Cal. Oct. 26, 2016) (quoting *In re Gemstar-TV Guide Int'l*, 209 F.R.D. at 451). The Court should not allow such a group to displace a sophisticated, institutional investor such as Gerber Kawasaki, which is precisely the type of lead plaintiff contemplated by the PSLRA. *In re eSpeed*, 232 F.R.D. at 100 (a group may not aggregate its losses to displace an institutional investor).

### 3. FI Group Member Zhibin Zhang Lacks Standing

The FI Group should also be disqualified because one of its members, Zhibin Zhang, lacks standing under the federal securities laws to pursue his claims as alleged under the current complaints. Zhang's claimed losses of $51,923 are *entirely* attributable to shares purchased after the February 6, 2020 corrective disclosure. *See* Dkt. 36-3 at p. 8 of 8. Because Zhang does not have *any* damages attributable to the fraud under the pending complaints, he is not a proper lead plaintiff candidate and his

---

[5] Abdul Baker's Certification (Dkt. 36-3, page 5 of 8) does not include an execution date. Therefore, it does not satisfy 28 U.S.C. § 1746 and is not a proper sworn statement. Baker and the FI Group may also be disqualified on this basis. *See* 15 U.S.C. § 78u-4(a)(2)(A) (requiring a sworn certification).

claimed losses should not be considered. *See Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir. 1996) ("resulting damages" are an element of a Rule 10b-5 claim); *Commercial Union Assur. Co., plc v. Milken*, 17 F.3d 608, 613 (2d Cir. 1994) (pecuniary loss is an essential element of a Rule 10b-5 claim); *In re Cavanaugh*, 306 F.3d 726, 730 (9th Cir. 2002) ("the district court must compare the financial stakes of the various plaintiffs and determine which one has the most to gain from the lawsuit.").[6]

Here, all three complaints—including the *Nahas* Complaint which was filed by the FI Group's counsel—allege that, during the Class Period, Defendants failed to disclose: "(i) Funko was experiencing lower than expected sales; (ii) consequently, Funko was reasonably likely to incur a writedown for slower moving inventory; and (iii) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis." *See, e.g.*, *Nahas* Complaint ¶¶ 3, 22.

According to the three complaints, on February 5, 2020 the truth emerged when Funko surprised the market in announcing its "preliminary" Q4 2019 financial results. *Id.* ¶ 23. It announced lower than expected sales and a $16.8 million inventory write down—the same facts that were allegedly withheld from the market. *Id.* The Company also stated:

> Net sales are expected to be ***approximately $214 million, a decrease of 8%*** compared to $233 million in the fourth quarter of 2018. Net sales were below expectations in mature markets, including the U.S., due to the challenging retail environment, which resulted in lower than expected purchases among Funko's top customers throughout the holiday season ***as well as softness in sales*** related to certain tentpole movie releases. These factors more than offset strong growth both in Europe and the Loungefly brand during the quarter.

*Id.* (emphasis added).

---

[6] Because the class is defined as persons who purchased during the Class Period "and who were damaged thereby," Zhang is not even a member of the classes alleged in the two complaints pending in this District. *See Ferreira* Complaint (Dkt. 1) ¶ 28, *Nahas* Complaint ¶ 28.

On this news, Funko's stock price plummeted 40% from $15.49 to $9.29 per share, injuring investors. *Id.* ¶ 25. This is clearly a recoverable loss under the federal securities laws. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005) (to show loss causation, a plaintiff must allege that it purchased shares at a price artificially inflated by a misstatement and then suffered a loss when the inflation came out, for instance, when the "share price fell significantly after the truth became known").

Thereafter, in each of the complaints, the Class Period continues but there are no further alleged false or misleading statements. One month later:

> on March 5, 2020, after the market closed, Funko issued a press release announcing its fourth quarter and full year 2019 financial results. Therein, Funko affirmed that *net sales for fourth quarter had decreased 4% [8%][7] year-over-year to $213.6 million due to, among other things, "softness at retail during the holiday season which led to a decrease in orders."*

*See Nahas* Complaint ¶ 26 (emphasis added). However, this was not new news. The same disclosure had been made on February 5, 2020, with "preliminary" net sales of "approximately $214 million" now becoming final net sales of "$213.6 million." *Id.* ¶ 23.[8] It was not particularly surprising, then, that upon this disclosure Funko's stock price initially went *up* from $7.24 per share to $7.57 per share, before later closing down $0.32 per share, or 4%, at $6.92 per share. *Id.* ¶ 27; Middleton

---

[7] The March 5, 2020 press release actually states that net sales "decreased 8%." *See* Declaration of Brett M. Middleton ("Middleton Decl."), Ex. A at 2 (Mar. 5, 2020 Press Release). The mistake was apparently copied over in the *Nahas* Complaint from the first-filed *Ferreira* Complaint which also includes this error. *See Ferreira* Complaint ¶ 26. The *Dachev* Complaint correctly alleges the 8% decrease. *See Dachev v. Funko, Inc., et al.*, No. 2:20-cv-00544 (W.D. Wash.) (Dkt. 1) ¶ 32.

[8] The *Dachev* Complaint also alleges that in the March 5, 2020 press release "the Company announced that its net sales for full year 2019 were just $795.1 million, falling far short of the increased guidance of $840 to $850 million." *Id.* ¶ 33. But this too was previously announced. In an October 31, 2019 press release, the Company announced net sales of $581,571,000 for the nine months ended Sept. 30, 2019. *See* Middleton Decl., Ex. B at 4 (Oct. 31, 2019 Press Release). Adding this to the estimated $214 million in Q4 2019 net sales announced on February 5, 2020 equals full year net sales of $795,571,000.

8

Decl., Ex. C (FNKO: Historical Stock Prices).[9] Accordingly, because the alleged "corrective" information was already known and the stock price initially increased, these allegations fall short of showing loss causation for any losses experienced after the February 5, 2020 corrective disclosure. *See Dura Pharm., Inc.*, 544 U.S. at 347.

As the complaints are currently pled, Zhang has no recoverable damages since the complaints do not plausibly allege additional fraud-related inflation in the price Funko's securities at the time of his February 6 to March 3, 2020 purchases (Dkt. 36-3, p. 8 of 8), or that he was injured when any artificial inflation came out as the result of new information being disclosed on March 5, 2020. *See Dura Pharm., Inc.*, 544 U.S. at 347. Because Zhang does not have any recoverable damages and therefore lacks standing under the current complaints, he is not a proper lead plaintiff. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb) (PSLRA requires a movant to have a financial interest in the litigation); *cf. In re Nat'l Australia Bank Sec. Litig.*, No. 03 CIV.6537 BSJ, 2006 WL 3844465, at *8–*9 (S.D.N.Y. Oct. 25, 2006) (lead plaintiff lacked standing because, applying the PSLRA's 90-day look period to loss calculations, he had not incurred any losses); *Paracor Fin.*, 96 F.3d at 1157 (Rule 10b-5 claims require "resulting damages").

Some courts forego this analysis and instead disqualify a movant on "typicality" grounds if a large portion of their shares were purchased after a significant corrective disclosure. In *In re Snap Inc. Sec. Litig.*, No. 217CV03679SVWAGR, 2019 WL 2223800 (C.D. Cal. Apr. 1, 2019), the Court revisited its earlier lead plaintiff decision and, for a second time, refused to appoint the movant with largest financial interest

---

[9] Under *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988), "because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action." *See also Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1103 (9th Cir. 2010) ("A plaintiff establishes fraud on the market by demonstrating that a security is actively traded in an 'efficient market,' in which prices immediately reflect all publicly available information."). This fraud-on-the-market theory of reliance is pled in each of the complaints. *See Ferreira* Complaint ¶¶ 40-43; *Nahas* Complaint ¶¶ 40-43; *Dachev* Complaint ¶¶ 42-43.

GERBER KAWASAKI, INC.'S OPPOSITION TO COMPETING MOTIONS
FOR APPOINTMENT AS LEAD PLAINTIFF

due to typicality concerns. The court found the movant to be atypical because he "had purchased approximately 60% of his Snap stock *after* news surfaced questioning the strength of Snap's daily active user growth." *Id.* at \*2. The court was concerned that the magnitude of his post-disclosures purchase would undermine the fraud-on-the-market theory of reliance, which was necessarily relied upon in the class action complaint. *Id.* Even though a new complaint had been filed with additional corrective disclosures, "the fact relevant to the Court's prior order remain[ed] the same: A disproportionately large percentage of [the movant's] stock was purchased post-disclosure." *Id.*; *see also Ben v. Frontier Fin. Corp.*, No. 10-0696-JCC, 2010 WL 11684329, at \*4 (W.D. Wash. Aug. 3, 2010) (in addition to a movant's improper aggregation of individual losses, its purchase *after* a partial disclosure, subjecting it to a defense of non-reliance, was further reason to disqualify it from consideration); *In re Netflix Sec. Litig.*, 2012 WL 1496171, at \*5 (disqualifying a movant when there was "a substantial likelihood" that it would face a lack of standing defense).

Whether considered as a "standing" question, a "financial interest" issue, or a Rule 23 typicality problem, the FI Group does not qualify as an appropriate lead plaintiff. Even if the entire FI Group is not disqualified (which it should be if Zhang is disqualified), Gerber Kawasaki still has the largest financial interest of the competing movants with $437,037 in LIFO losses (and $686,946 in FIFO losses) compared to $432,154 in losses of the remaining two-member FI Group.

**B.     Gerber Kawasaki Otherwise Satisfies the Requirements of Rule 23**

As established in its opening papers, in addition to having the "largest financial interest" in this litigation among the lead plaintiff movants, Gerber Kawasaki also "otherwise satisfies the requirements of Rule 23." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc); *see* Gerber Kawasaki's Opening Brief, Dkt. No. 26 at pp. 6-8. [10]

_____

[10] Gerber Kawasaki is a Registered Investment Advisor with over $1 billion in assets under management. *See* Declaration of Ross Gerber ("Gerber Decl."), Dkt. No. 27-6 ¶¶ 2–3. It provides portfolio management and related services to more than 5,000

10

Thus, it has shown that its claims are typical of the class, no antagonism exists between its interests and the interests of absent class members, and that it will vigorously prosecute this action on behalf of the class.  Nothing more is required at this juncture. *See Fragala v. 500.com*, No. CV 15-01463 MMM (EX), 2015 WL 12513580, at \*7 (C.D. Cal. July 7, 2015) (finding that a wide-ranging analysis under Rule 23 is not appropriate at the lead plaintiff stage; rather the court "must rely on the presumptive lead plaintiff's complaint and sworn certification") (quoting *In re Cavanaugh*, 306 F.3d at 730).

Because Gerber Kawasaki has the largest financial interest and satisfies Rule 23's requirements, it is presumptively the "most adequate plaintiff."  *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

### C.     The Presumption of "Most Adequate Plaintiff," Which Lies in Favor of Gerber Kawasaki, Cannot Be Rebutted

The presumptive lead plaintiff, in this case Gerber Kawasaki, must be appointed unless it is ***proven*** that the movant will not satisfy the typicality and adequacy requirements of Fed. R. Civ. P. 23(a).  Once the presumptive lead plaintiff is identified, the Court "must then focus its attention on *that* plaintiff and determine, based on the information he has provided in his pleadings and declarations, whether he satisfies the requirements of Rule 23(a), in particular those of 'typicality' and

clients.  *Id.*  Gerber Kawasaki has discretionary authority to invest its clients' assets, which it did when it decided to purchase and did purchase Funko securities in its clients' accounts. *See* Gerber Kawasaki Certification, Dkt. 27-4 ¶ 5.  Thereafter, before moving for appointment as lead plaintiff, it received proper assignments of claims from each client listed on its Certification. *Id.*; Gerber Decl., Dkt. No. 27-6 ¶¶ 7–8. *See also W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 108 (2d Cir. 2008) (relying on *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269 (2008) in concluding that "an assignment of claims transfers legal title or ownership of those claims and thus fulfills the constitutional requirement of an 'injury-in-fact.'"); *Sprint Commc'ns,* 554 U.S. at 271 (an assignee who holds legal title to an injured party's claim has constitutional standing to pursue the claim, "***even when the assignee has promised to remit the proceeds of the litigation to the assignor***") (emphasis added); *Sokolow v. LJM Funds Mgmt., Ltd.*, No. 18-CV-01039, 2018 WL 3141814, at \*5–7 (N.D. Ill. June 26, 2018) (investment advisor which received assignments from 200+ clients appointed lead plaintiff).

11

GERBER KAWASAKI, INC.'S OPPOSITION TO COMPETING MOTIONS
FOR APPOINTMENT AS LEAD PLAINTIFF

'adequacy.'" *See In re Cavanaugh*, 306 F.3d at 730. "If the plaintiff with the largest financial stake in the controversy provides information that satisfies these requirements, he becomes the presumptively most adequate plaintiff." *Id.* The "question is not whether another movant might do a better job of protecting the interests of the class than the presumptive lead plaintiff; instead, the question is whether anyone can prove that the presumptive lead plaintiff will not do a fair and adequate job." *Fragala*, 2015 WL 12513580, at *10 (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 267 (3d Cir. 2001)).

Again, Gerber Kawasaki is not subject to unique defenses and has explicitly affirmed its commitment to protecting the class's interests. *See* Gerber Kawasaki Certification, Dkt. 27-4. It also submitted a Declaration demonstrating its commitment to overseeing the efficient and effective prosecution of this case and working to maximizing recovery for the class. *See* Gerber Decl., Dkt. No. 27-6 ¶¶ 9–14.

Consequently, the presumption, which lies in favor of Gerber Kawasaki, cannot be rebutted. Gerber Kawasaki should be appointed Lead Plaintiff and its selection of counsel should be approved.

## D. The Other Lead Plaintiff Motions Should Be Denied

Because Gerber Kawasaki has satisfied all requirements under the PSLRA, 15 U.S.C. § 78u-4(a)(3), its Motion should be granted. And for the reasons set forth above, the FI Group's motion should be denied.

William Hurt's lead plaintiff motion must also be denied because he possesses a financial interest which is significantly less than that of Gerber Kawasaki. Additionally, Mr. Hurt, a 93-year-old retiree, states in his declaration that "[t]o help me carry out these [lead plaintiff] duties, I have enlisted the assistance of my personal accountant, Teresa A. Boyle." *See* Dkt. 31-4 ¶¶ 2, 4. If, as this statement implies, Mr. Hurt requires assistance to carry out such duties, his adequacy would be in question. Moreover, the adequacy of the lead plaintiff will be revisited by Defendants at the

12

class certification stage of this litigation, which could easily occur 3 or more years from now when Mr. Hurt will be at least 96 years old. *See* Middleton Decl., Ex. D at 22 (NERA, *Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review* (Jan. 29, 2019)) (in 36% of PSLRA cases class certification decision occurs 3 years or more from the filing of the complaint). Similarly, one quarter of all PSLRA cases continue for at least 4 years before resolution. *Id*. at 27. And, if for any reason, Mr. Hurt was unwilling or unable to continue as a lead plaintiff, the Court would likely need to start anew with the lead plaintiff process. *See Z-Seven Fund, Inc. v. Motorcar Parts & Accessories*, 231 F.3d 1215, 1218 (9th Cir. 2000) (a "district court's order designating a lead plaintiff is not a conclusive, immutable determination of the issue," rather, "[i]t can be revisited if circumstances warrant."); *In re IMAX Sec. Litig.*, No. 06CIV6128, 2009 WL 1905033, at *2 (S.D.N.Y. June 29, 2009) (district courts have a "continuing duty to monitor whether lead plaintiffs are capable of adequately protecting the interests of the class members.").

The E&L Group's motion should be denied because the group and its members' losses are a fraction of that of Gerber Kawasaki. Like the FI Group, it is also an improper, lawyer-driven group, cobbled together to create a greater financial interest. *See* section II.A.2, above. In fact, the group members admittedly had no preexisting relationship and they were only grouped together because they both "contacted and retained [Bragar Eagel & Squire, P.C.]." *See* Dkt. 21-3 ¶ 9.

Finally, the lead plaintiff motion filed by Angela Michl should be denied because her claimed losses are significantly less than those of Gerber Kawasaki.

13

GERBER KAWASAKI, INC.'S OPPOSITION TO COMPETING MOTIONS
FOR APPOINTMENT AS LEAD PLAINTIFF

## III.   CONCLUSION

For all of the foregoing reasons, as set forth herein and in its opening papers, Gerber Kawasaki respectfully requests that it be appointed Lead Plaintiff and its choice of Lead Counsel, Johnson Fistel, be approved.

Respectfully Submitted,

Dated:  May 18, 2020

**JOHNSON FISTEL, LLP**

By: _/s/ Brett M. Middleton_
BRETT M. MIDDLETON

FRANK J. JOHNSON
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
BrettM@johnsonfistel.com
FrankJ@johnsonfistel.com

14