**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Co-Lead Counsel for Lead
Plaintiffs*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

GILBERTO FERREIRA, Individually and
On Behalf of All Others Similarly Situated,

    Lead Plaintiff,

    v.

FUNKO, INC., BRIAN MARIOTTI,
RUSSELL NICKEL, ANDREW
PERLMUTTER, JENNIFER
FALL JUNG, KEN BROTMAN, GINO
DELLOMO, ADAM KRIGER, ACON
INVESTMENTS, L.L.C., ACON FUNKO
MANAGER, L.L.C., ACON FUNKO
INVESTORS, L.L.C., ACON FUNKO
INVESTORS HOLDINGS 1, L.L.C., ACON
INVESTORS HOLDINGS 2, L.L.C.,
ACON INVESTORS HOLDINGS 3, L.L.C.,
and ACON EQUITY GENPAR, L.L.C.,

    Defendants.

**Case No. 2:20-cv-02319-VAP-PJWx**

**CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

Page(s)

I.   NATURE OF THE ACTION ...................................................................1

II.  JURISDICTION AND VENUE ............................................................4

III. PARTIES ...............................................................................................4

    A.   Plaintiffs .......................................................................................4

    B.   Defendants ....................................................................................5

IV.  SUBSTANTIVE ALLEGATIONS ......................................................10

    A.   Background ..................................................................................10

    B.   Funko's Business ........................................................................11

    C.   Defendants Knew that Funko was Carrying Massive Amounts of Excess Inventory Prior to August 2019 ...................................13

        1.   Funko's Inability to Accurately Forecast Sales and Customer Demand Resulted in Massive Amounts of Obsolete Inventory ...............................13

        2.   Defendants Knew Prior to the Class Period that the Company Had Warehouses Full of Excess Obsolete Inventory .........................................17

    D.   Defendants Knew that Funko's FY2019 Guidance Was Unachievable,  Yet Failed to Correct the Guidance Prior to the Offering and Reconfirmed the Guidance on October 31, 2019 ................................................20

        1.   Defendants Knew that Funko's Fourth Quarter Sales Forecasts Did Not Support the Company's Revised FY2019 Guidance ................................21

        2.   Defendants Take Advantage of Funko's Inflated Stock Price and Conduct the September 2019 Offering .......................................24

        3.   On October 31, 2019, Defendants Confirmed Funko's Revised FY2019 Guidance ...........................................25

    E.   Defendants' Materially False and Misleading Statements and Omissions ...........26

        1.   The August 8, 2019 False and Misleading Statements .............................26

        2.   Defendant Mariotti Fails to Correct His Inaccurate August 8, 2019 Statements and FY2019 Earnings Guidance................................32

        3.   The October 31, 2019 False and Misleading Statements........................35

F.   The Truth is Revealed.........................................................................44

    1.   February 5, 2020 - Funko Announces Disappointing Preliminary 4Q
         Results...................................................................................44

    2.   March 5, 2020 - Funko Reports 4Q and Fiscal 2019 Results ...................47

G.   Additional Allegations Regarding Materiality.......................................49

H.   Additional Scienter / Falsity Allegations ............................................49

I.   Presumption of Reliance: Fraud on the Market ....................................53

J.   Loss Causation / Economic Loss ......................................................53

K.   Class Action Allegations..............................................................55

V.   CAUSES OF ACTION .........................................................................56

COUNT I Violation of Section 10(b) of the Exchange Act and  Rule 10b-5
    Promulgated Thereunder Against all Defendants ........................................56

COUNT II  Violation of Section 20(a) of the Exchange Act Against the Individual
    Defendants and the ACON Defendants ..................................................59

COUNT III  Violation of Section 20A of the Exchange Act Against Mariotti,
    Perlmutter and the ACON Defendants ..................................................61

PRAYER FOR RELIEF .................................................................................63

JURY TRIAL DEMANDED.............................................................................64

Lead Plaintiffs, individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge. Lead Plaintiffs' information and belief is based upon, among other things, its counsels' investigation, which includes without limitation, review and analysis of filings with the United States Securities and Exchange Commission ("SEC"), press releases, news articles, analyst reports, and interviews with former Funko, Inc. ("Funko" or the "Company") employees. Lead Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.      This is a class action on behalf of persons and entities (the "Class") that purchased or otherwise acquired Funko securities between August 8, 2019 and March 5, 2020, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Funko is a pop culture consumer products company that creates vinyl figures, action toys, plush, accessories, apparel, and homewares relating to movies, TV shows, video games, musicians, and sports teams. Funko is the world's largest seller of pop culture collectibles, and is best known for its Pop! line of vinyl collectible figures, which account for over three-quarters of the Company's sales.

3.      Funko's stock price grew steadily since the Company went public in November 2017, reporting eight consecutive quarters of sales growth as of August 2019.  Defendants sought to continue this positive trend – issuing increased FY2019 guidance on August 8, 2019 (specifically, a 22% to 24% increase in sales) and reconfirming the guidance on October 31, 2019.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

1    4.    Unknown to investors however, by the beginning of September 2019 at the

2    latest, Defendants knew that their FY2019 earnings guidance was not achievable.  According to

3    a former Funko senior-level employee responsible for sales forecasting, Defendants were

4    advised that there was not enough product in the Company's pipeline to meet the guidance.

5    But Defendants never corrected their guidance, despite their duty to do so.

6    5.    In addition, this former senior-level employee, and other former Funko

7    employees, reported that by August 2019, the Company had amassed millions of dollars of

8    obsolete inventory in various Funko warehouses due to the Company's "haphazard" internal

9    sales forecasting practices.

10    6.    Rather than alert the market that the Company's sales would decrease for the

11    first time in two years and that Company was carrying massive amounts of obsolete inventory,

12    Defendants took advantage of the inflated price of Funko's securities and conducted a

13    secondary offering on September 19, 2019 (the "Offering"), consisting of personal shares being

14    sold by Defendant Mariotti and various entities controlled by ACON Investments, L.L.C.

15    ("ACON").  ACON was privy to details of Funko's situation, as it not only held the majority of

16    Class A shares of the Company, but it also had three appointments to the Company's Board of

17    Directors.  All proceeds from the offering – amounting to *over $ 100 million*  – went to

18    Defendant Mariotti and ACON.  None of the proceeds benefited the Company.

19    7.    Then, on February 5, 2020, Funko shocked the market when it announced its

20    preliminary fourth quarter 2019 financial results, revealing what Defendants knew months

21    before – that the Company would not meet its FY2019 guidance.  Instead of the 22% - 24%

22    *increase* in net sales the market was expecting, Funko reported a *decrease* in net sales of 8%

23    for the 4Q2019.  The Company also disclosed a $16.8 million write-down to "dispose of slower

24    moving inventory to increase operational capacity."

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

8.      On this news, Funko's share price plummeted 40% or $6.20, to close at $9.29 per share on February 6, 2020, on unusually heavy trading volume.

9.      Analysts were surprised by the earnings miss and took the Company to task.  A February 6, 2020 Piper Sandler report characterized the Company's miss as "shocking," noting that they "expect FNKO to trade as a 'broken stock' for a short period given credibility concerns."

10.     Similarly, a Motley Fool article dated February 6, 2020 explained that "Funko stock is being mauled today" because of "horrendous results," including the fact that "[s]ales in the U.S. and international markets are expected to *decline* by 9% and 8%, respectively. For context, Wall Street was expecting *growth* of more than 13%."

11.     A February 10, 2020 BMO Capital Markets commented on Funko's inventory write-down, pointing out the massive amount of Funko's products required for the write-down, describing it as covering the distance between New York and Washington:

> Funko ended the third quarter with $94 million of inventory on its own books, a +16% yoy increase. The $16.8 million write-down represents 18% of that ending 3Q inventory. We believe 80% of the inventory that was written down was Funko Pop! figures, roughly 2.7 million of them. ***The cubic volume of which  is enough to fill seventy-seven 40-foot shipping containers, two Olympic swimming pools, or six Boeing 747s. Laid end to end, this line of Pop!s would extend 265 miles, or the distance between New York and Washington***. (Emphasis added).

12.     On March 5, 2020, after the market closed, the Company confirmed its fourth quarter results and announced disappointing full year 2019 financial results, including a 4% decrease in net sales year-over-year to $213.6 million.

13.     On this news, Funko's share price fell to $6.92 by the close of the market on March 6, 2020, down 4% from its close the prior day.

14.     As a direct and proximate result of Defendants' fraud, Funko investors lost hundreds of millions of dollars.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

## II.   JURISDICTION AND VENUE

15.     The claims asserted herein arise under Sections 10(b), 20(a) and 20A of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this judicial district.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this judicial district. In addition, the Company has offices in this District.

18.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.   PARTIES

### A.   Plaintiffs

19.     Lead Plaintiff Abdul Baker, as set forth in the certification submitted with his motion for appointment as lead plaintiff, incorporated by reference herein, purchased Funko securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein. Plaintiff Zheng also traded contemporaneously with multiple defendants.

4
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

20.     Lead Plaintiff Zhibin Zhang, as set forth in the certification submitted with his motion for appointment as lead plaintiff, incorporated by reference herein, purchased Funko securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

21.     Lead Plaintiff Huaiyu Zheng, as set forth in the certification submitted with her motion for appointment as lead plaintiff, incorporated by reference herein, purchased Funko securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein. Plaintiff Zheng also traded contemporaneously with multiple defendants.

**B.     Defendants**

22.     Defendant Funko is incorporated under the laws of Delaware with its principal executive offices located in Everett, Washington. Funko's shares trade on the NASDAQ exchange under the symbol "FNKO."  Funko is a "controlled company" within the meaning of the listing rules of NASDAQ, as Defendant ACON, Defendant Brian Mariotti and Fundamental Capital, L.L.C have more than 50% of the voting power for the election of directors to the Funko Board of Directors (the "Board").

23.     Defendant Brian Mariotti ("Mariotti") has served as the Chief Executive Officer ("CEO") of the Company at all relevant times.  Mariotti also served as the CEO of Funko Acquisition Holdings, L.L.C. ("FAH"), the predecessor of Funko, since October 2015, and as the CEO of Funko Holdings LLC ("FHL") since May 2013. FAH is a holding company with no assets, and owns 100% of FHL, also a holding company, which in turn owns 100% of Funko, LLC, the Company's operating entity.

24.     Defendant Russell Nickel ("Nickel") served as the Chief Financial Officer ("CFO") of the Company from October 2013 until August 13, 2019.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

25.     Defendant Jennifer Fall Jung ("Jung") has served as the Company's CFO since August 13, 2019.

26.     Defendant Andrew Mark Perlmutter ("Perlmutter") has served as the Company's President since October 2017.

27.     Defendants Mariotti, Nickel, Jung, and Perlmutter are sometimes referred to herein as the "Individual Defendants."  Each of the Individual Defendants:

(a)     had intimate knowledge of every aspect of Funko's business, including the Company's inventory of obsolete products, sales forecasts and FY2019 earnings guidance;

(b)     directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at the highest levels;

(c)     were directly or indirectly involved in drafting, producing, reviewing and disseminating the false and misleading statements and information alleged herein;

(d)     were aware of or recklessly disregarded that Funko had failed to disclose that the Company had accumulated millions of dollars of obsolete inventory;

(e)     were aware of or recklessly disregarded that the Company's FY2019 earnings guidance issued on August 8, 2019 and reconfirmed on October 31, 2019 could not be met;

(f)      were aware of or recklessly disregarded the fact that false or misleading statements were being issued concerning the Company; and

(g)     approved or ratified these statements in violation of the federal securities laws.

28.     As a result, the Individual Defendants are liable for the false or misleading statements and omissions pleaded herein.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

29.     In addition, the Individual Defendants, by reason of their status as senior executives, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause, and did cause, directly or indirectly, the Company to engage in the unlawful conduct complained of herein.

30.     Defendant ACON is a Delaware Limited Liability Company.  ACON is based in Washington, D.C. and is an international private equity investment firm that manages capital through varied investment funds and special purpose partnerships.  ACON controlled other defendant entities, as detailed below (together with ACON, the "ACON Entity Defendants"), and certain individuals, as detailed below, who served on the Board on behalf of ACON. ACON acquired Funko in 2015, when the Company was still a private company.  Shortly before the IPO, an ACON-affiliate owned 100% of Funko Class A common stock.  After the IPO, ACON had over 55% of the Class A shares of Funko.  ACON therefore had significant control over Funko, as its controlling shareholder with an ability to appoint three of the Company's eight members of the Board.  In fact, Funko adopted a dual class voting structure that allowed ACON, and investor Fundamental Capital, to maintain voting control even with diminished economic interest in the Company.

31.     In the Prospectus associated with the Offering, Funko stated: "ACON has, and will continue to have following this offering, significant influence over us, including over decisions that require the approval of stockholders, and its interests, along with the interests of our other Continuing Equity Owners, may conflict with yours."

32.     The other ACON Entity Defendants are listed as follows:

a)      ACON Funko Manager, L.L.C. is a Delaware Limited Liability Company ("ACON Funko Manager").

b)      ACON Funko Investors, L.L.C is a Delaware Limited Liability Company ("ACON Funko Investors").

7
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

c) ACON Funko Investors Holdings 1, L.L.C. is a Delaware Limited Liability Company ("ACON Investors Holdings 1").

d) ACON Funko Investors Holdings 2, L.L.C. is a Delaware Limited Liability Company ("ACON Investors Holdings 2").

e) ACON Funko Investors Holdings 3, L.L.C. is a Delaware Limited Liability Company ("ACON Investors Holdings 3").

f) ACON Equity GenPar, L.L.C. is a Delaware Limited Liability Company ("ACON Equity GenPar").

33. ACON Investments controls ACON Funko Manager, which is the sole manager of, and exercises voting and investment power over, the common units of FAH held by ACON Funko Investors and ACON Investors Holdings 1. Additionally, ACON Investments controls ACON Equity GenPar, L.L.C., which is the sole manager of, and exercises voting and investment power over, the Funko Class A common stock held by ACON Investors Holdings 2, LLC and ACON Investors Holdings 3.

34. Defendant Ken Brotman ("Brotman") has served on the Board since its formation in April 2017. Designated by Defendant ACON Investments as the Chairman of the Board at the time of the IPO, Brotman continues to serve in that position. Brotman is also a founder and managing partner of ACON Investments. Brotman also controlled Funko as a member of the board of managers of ACON Funko Manager and ACON Equity GenPar.

35. Defendant Gino Dellomo ("Dellomo") has served on the Board since its formation in April 2017. Designated by Defendant ACON Investments to be a member of the Board at the time of the IPO, Dellomo continues to serve in that position. Dellomo is also a director of ACON Investments. Dellomo also controlled Funko as a member of the board of managers of ACON Funko Manager and ACON Equity GenPar.

36. Defendant Adam Kriger ("Kriger") has served on the Board since its formation in April 2017. Designated by Defendant ACON Investments to be a member of the Board at

the time of the IPO, Kriger continues to serve in that position.  Kriger is also an executive partner at ACON Investments. Kriger also served as a director of FAH, doing so at the favor of ACON Investments. Kriger also controlled Funko as a member of the board of managers of ACON Funko Manager and ACON Equity GenPar.

37.     In various company filings, Funko affirmed that the Board, which including Brotman, Dellomo, Kriger and Mariotti among others, was: "apprised of particular risk management matters in connection with its general oversight role[.]"  They also had "complete access to Company management."

38.     Additionally, Brotman, Dellomo and Kriger were the only directors on the Nominating and Corporate Governance Committee of Funko, with Brotman serving as its chair.

39.     Brotman, Dellomo, Kriger, and the ACON Entities are collectively referred to as the "ACON Defendants."

40.     Brotman, Dellomo, Kriger and the Individual Defendants were all bound by Funko's Code of Conduct.  Among other things, the Code of Conduct alerted them:

(a)     "Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability."

(b)     "*Each employee and director has an obliga tion to comply with all laws, rules and regulations  applicable to the    Company's operations* . These include, without limitation, laws covering bribery and kickbacks, the development, manufacture, marketing and sale of our products, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational

9

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

health and safety, false or misleading financial information or misuse of corporate assets. ***You are expected to understand and comply with all laws, rules and regulations that apply to your job position.***"

41.     Defendant Funko, the Individual Defendants, and the ACON Defendants are collectively referred to as "Defendants."

## IV.     SUBSTANTIVE ALLEGATION

### A.     Background

42.     Funko is a pop culture consumer products company that creates vinyl figures, action toys, plush, accessories, apparel, and homewares relating to movies, TV shows, video games, musicians, and sports teams.

43.     The Company was founded in 1998 and is headquartered in Everett, Washington.

44.     In 2005, Defendant Mariotti and a small group of investors acquired Funko, LLC.  Mariotti significantly expanded the Company's licensing deals.  In 2011, Funko began selling what is now its best known product, the Pop! line of vinyl collectible figures.  The Company expanded rapidly—known for both its sense of fun and the collectible nature of its items.  The style of the Pop! line was extremely well-publicized and became instantly recognizable:

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

45.     ACON acquired Funko in 2015.  Brotman said in a news release at the time he viewed ACON as a "partner" to "Brian [Mariotti] and the entire Funko team."

46.     On November 2, 2017, Funko went public with an initial public offering of 10,416,666 shares of Class A common stock at an offering price of $12.00 per share ("IPO").

47.     From the time of the IPO in November 2017 through October 2019, when Defendants confirmed their FY2019 guidance, the Company reported nine consecutive quarters of more than 20% net sales growth.

**B.     Funko's Business**

48.     Funko's business is dependent upon on creating products that are based on "content" that is popular with consumers.  To that end, Funko licenses with established content providers such as Disney, HBO, LucasFilms, Marvel, Blizzard Entertainment, the National Football League, and Warner Brothers.  As of August 2019, Funko had 592 different properties from which to create pop culture products.

49.     Funko's sales consist of a mixture of sales from products that are based on contemporaneous pop culture releases (e.g., new movie, television show or video game

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

releases) as well as from products that are based on older releases that are so popular that they transcend fad status (e.g. DC Comics, Harry Potter, etc.), known as "evergreen" content.

50.     Since 2018, Funko's evergreen content has typically accounted for approximately 45% of the Company's sales.  Consequently, Funko is dependent on the performance of newly released properties to generate the remainder of its sales.

51.     According to a former senior-level Funko employee who was responsible for sales forecasting and inventory planning, 90% of Funko's sales based on contemporaneous releases occur within the first three to four months of the release and are directly correlated with the success of the content upon which they are based.  If a new release is not successful, it could negatively impact Funko's sales.  However, a successful release could mean gold for Funko.

52.     For example, although Funko created products based upon 583 active properties or licenses during the 4Q2018, its products based on the wildly popular video game Fortnite (which *The Washington Post* called "the biggest pop culture phenomenon of 2018"), accounted for 12% of the Company's Q4 2018 sales, and 5% of 2018 sales overall.  Thus, it was critical that Funko understand the strength of the content it licensed (as well as the quantity of product it had tied to a specific release) when providing earnings guidance to the market.

53.     Accurate sales forecasting was also critical to Funko's business.  Since most of the Company's products based on new releases sold within the first few months, it was unlikely that unsold inventory would sell a year after a release for full price.  Further, because of the nature of Funko's business, the Company could not dispose of unsold inventory by offering deep discounts.  Selling excess inventory in a bargain bin was undesirable because doing so would damage the prestige and collectability of certain products.  Consequently, the Company needed to accurately forecast customer demand to avoid being saddled with obsolete inventory

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

that would inevitably need to be written-down.  This was particularly important because, as detailed *infra* at ¶¶ 62-63, rather than requiring customers to make binding purchase commitments, Funko allowed its customers to place pre-orders that could be canceled or changed at any time prior to the signing a purchase order.

C.  **Defendants Knew that Funko was Carrying Massive Amounts of Excess Inventory Prior to August 2019**

54.  Unbeknownst to investors, prior to and throughout the Class Period, Defendants recklessly disregarded that the Company had failed to accurately forecast sales based on customer demand, resulting in millions of dollars of obsolete inventory.  Specifically, Funko had historically ordered products primarily based on customer pre-orders, disregarding the risk that customers would cancel or reduce their orders.  This resulted in the Company habitually ordering too much product, much of which had a limited window for customer demand.

55.  Numerous former Funko employees, referred to herein as "CWs," report that by August 2019, Defendants knew that years of Funko's haphazard internal sales forecasting and purchasing practices had resulted in a stockpile of millions of dollars of obsolete inventory amassed across multiple warehouses.

1.  **Funko's Inability to Accurately Forecast Sales and Customer Demand Resulted in Massive Amounts of Obsolete Inventory**

56.  CW1 was Funko's Director of Merchandise Planning from July 2019 until June 2020.  As Director of Merchandise Planning, CW1 was responsible for developing Company-wide sales forecasts and for determining the quantity of product that needed to be ordered and developed to meet customer demand.  To calculate Funko's sales forecasts, CW1 accessed the sales data that was gathered from all of Funko's business units, which included, among other things, orders placed and expected to be placed.  CW1 was also responsible for inventory

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

management.   In this role, CW1 had first-hand knowledge of Funko's sales forecasting practices and inventory issues.

57.   CW1 reported directly to Director of Financial Planning and Analysis, Julie Leary ("Leary") until she left the Company in February 2020.  CW1 then reported to Mike Smith ("Smith"), Leary's replacement.  Leary and Smith reported directly to Funko's Chief Operating Officer, Joe Sansone ("Sansone").

58.   CW1 learned of Funko's excess inventory problems immediately upon joining the Company in July 2019.  CW1 explained that prior to CW1's hiring, Funko did not have a planning team and that they were "flying blind" with respect to ordering.  CW1 further explained that the Company had no system of checks and balances to ensure that they were ordering the right amount of inventory and that the Company was always ordering excess product.

59.   CW1 was specifically hired to streamline the planning processes and was responsible for developing sales forecasts for the Company that included managing the inventory that went with it.

60.   CW2 confirmed that the Company's inability to accurately forecast sales and customer demand and its propensity to over-order, resulted in the Company amassing a glut of excess inventory during 2018 and 2019.

61.   CW2 was the general manager of Loungefly from May 2017 through July 2019, a consumer products company acquired by Funko in May 2017.  Loungefly sells pop culture-focused accessories and handbags under various brand licenses that feature characters owned by licensed brands.  CW2 oversaw all the divisions of Loungefly and was responsible for, among other things, profit and loss, budgeting, and forecasting.  CW2 reported to Defendant

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

Perlmutter and has first-hand knowledge about Funko's sales forecasting practices and excess inventory.

62.     CW2 explained that during her tenure at Loungefly, poor internal sales forecasting resulted in large amounts of obsolete inventory being stored by the Company for years. Specifically, Funko's sales force would submit "indications of intent," essentially a pre-order, from the Company's customers, which were only "estimates" of how much product a customer intended to purchase. Funko's Senior Vice President of Sales, Johanna Gepford ("Gepford"), would gather this information from the sales teams and produce forecasts. According to CW2, these forecasts were submitted to Defendants Mariotti, Nickel and Perlmutter.

63.     However, according to CW2, Gepford did not adequately account for the risk that the Company's retail customers would not purchase all of the units they indicated they would purchase. CW2 stated that the failure to adequately account for this risk was a common problem in 2018 and 2019.

64.     CW2 further explained that the Company chose to not re-release or liquidate unsold products because it would take away from the collectability of the products, as collectors would not want to see the products they paid top dollar for on sale at a dollar store.

65.     CW3 corroborated CW1's and CW2's accounts of Funko's inability to accurately forecast customer demand, and reported that the Company's unscientific approach to forecasting had a direct impact on how much inventory it amassed.

66.     CW3 worked as an Account Manager at Funko from November 2017 to December 2019. CW3 was assigned to the Wal-Mart account and worked in Bentonville, Ark., the home of Wal-Mart's headquarters. CW3 was responsible for forecasting and planning sales

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

of Funko items at Wal-Mart and has first-hand knowledge about the Company's sales forecasting and inventory practices.

67.    CW3 reported to Funko's Vice President of Sales James "Jaime" Beckley ("Beckley").  By the time CW3 left Funko in December 2019, the Company had hired a Director of Sales, Jen Hann ("Hann"), to whom CW3 reported.  Beckley and Hann reported to Gepford.

68.    According to CW3, since most of Funko's retail customers (e.g., Target, Best Buy, Wal-Mart) did not commit to buying specific quantities of product, the Company merely engaged in a "guessing game" of predicting sales and ordering inventory.  CW3 reported that there was no methodology to the process of forecasting customer demand and managing inventory.

69.    CW4 similarly reported that internal sales forecasting at Funko "did not progress much beyond guesswork."

70.    CW4 worked at Funko from January 2018 to June 2020.  From January to June 2018, CW4 worked as a Customer Service Manager, leading a customer service department of five people that engaged with Funko customers and individuals through email and social media. In June 2018, CW4 was promoted to Customer Service and Sales Team Manager, responsible for managing an inside sales team of five sales managers and four account coordinators who worked with direct-to-consumer customers and e-commerce.  CW4 reported to Funko Vice President of Sales, Beckley and has first-hand knowledge of Funko's sales forecasting and inventory issues.

71.    CW4 confirmed that it was common for the Company's retail customers – including large buyers such as Wal-Mart, Amazon and Target – not to commit to a specific quantity of products but rather, pre-order a certain amount and then reduce their orders at a

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

later date.   According to CW4, this resulted in excess inventory that would be stored in warehouses.

72.   CW5, a former Sales Coordinator at Funko from August 2018 to September 2019, corroborated the accounts of CW1, CW2, CW3 and CW4, reporting that some of Funko's customers would pre-order products and these estimates served as the basis for Funko's internal sales forecasts.

73.   CW5 provided back-end sales support for Funko's Latin American territory, which included Mexico, Argentina, Colombia, Brazil, Peru, Ecuador and other countries.   CW5 reported to Latin America Sales Manager Mariano Hernandez ("Hernandez").   CW5 and Hernandez made up Funko's entire Latin America sales force.   Hernandez reported to Gepford. Among other things, CW5 assisted with sales development and tracked monthly sales.   CW5 worked from Funko's South Everett warehouse and has first-hand knowledge of Funko's sales and forecasting practices.

### 2.   Defendants Knew Prior to the Class Period that the Company Had Warehouses Full of Excess Obsolete Inventory

74.   Prior to the beginning to the Class Period, Defendants knew that Funko had amassed multiple warehouses full of excess obsolete inventory as a result of the Company's haphazard forecasting.   Unbeknownst to investors—but known to Company executives, including the Individual Defendants and Defendants Brotman, Dellomo, and Kriger—much of this inventory would eventually need to be written off, given that the Company could not to liquidate much of the unsold products.

75.   According to CW1, when he joined Funko in July 2019, the Company had "millions of units of inventory that needed to be dealt with" and some of the inventory was one to two years old that could not be sold.   CW1 explained that 90% of sales of a particular

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

product occur within the first three to four months and "when something did not sell it just sat there."

76.     CW1 was responsible for putting an initiative in place to deal with the existing, excess inventory issue.  CW1 told the sales team that they needed find a way to sell the excess inventory at steep discounts.

77.     According to CW1, Funko's inventory issues "were not a secret at the Company" and the Individual Defendants were aware of the excess inventory problem.  CW1 explained that the inventory issue was obvious and that it was so dire that in late summer of 2019, the Company had 200 shipping containers of product sitting in the Port of Seattle that could not be unloaded because the Company's warehouse was full of old inventory. CW1 also reported that there were shipping containers full of inventory sitting in the Company parking lot from August to end of October 2019 because Funko's warehouses were full.

78.     CW1 further explained that Defendants Jung and Perlmutter were specifically aware of the inventory issue since at least July 2019 because it was discussed during weekly sales meetings[1] where CW1, Defendant Jung, and Defendant Perlmutter were all attendees. CW1 also stated that Defendant Mariotti was a recipient of emails discussing the inventory issue in August and September 2019.

79.     CW2 confirmed CW1's account that Funko had so much excess inventory prior to the Class Period that the Company was struggling to find ways to store it.

80.      CW2 reported that in 2018 and 2019, Funko ran out of space at its warehouses and "[a]ny time they ran out of space at the warehouse, instead of doing something with the inventory, they said we'll just get another warehouse."  By the time CW2 left Funko in July

---

[1] The weekly sales meeting that CW1 attended is described in detail *infra* at ¶¶ 97-100.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

2019, CW2 reported that the Company had multiple warehouses in the Seattle area and the Company, specifically, Sansone, was still discussing how to consolidate the growing inventory.

81.     According to CW2, Funko's excess inventory was a repeated topic at Funko's quarterly Board meetings.  CW2 regularly attended Board meetings while employed at Funko and recalls missing only one meeting during CW2's tenure.  According to CW2, while attending the Board meetings:  "All I heard was we need to clear out these warehouses. . . ." CW2 reported that Defendants Mariotti, Nickel and Perlmutter, as well as Gepford and Sansone, among others, attended Board meetings, with Board members, where CW2 was present and Funko's excess inventory was discussed.

82.     CW4 corroborated CW1's and CW2's reports that Funko suffered from excess inventory and needed multiple warehouses to store all of it.

83.      CW4 recalls that, in or around October 2019, Funko opened another warehouse in Puyallup, Washington to house excess inventory that either wasn't moving quickly or wasn't going to be released.

84.     CW5 also reported that excess inventory was an issue by the end of 2018 and after that "[i]t was a regular thing that our warehouse was overstocked."

85.     CW5 also reported that the issue of excess inventory started to be discussed in weekly sales meetings that CW5 attended towards the end of 2018 and was a persistent problem after that.  CW5 stated that these sales meetings were led by Beckley and Gepford.

86.     CW6 also confirmed that Funko's warehouses were full of obsolete inventory in the spring and summer of 2019.

87.     CW6 was a former Senior Fulfillment Supervisor at Funko from March 2019 through August 2019.  CW6 worked at Funko's warehouses located in Everett, Washington. CW6 oversaw the warehouse floors and was responsible for ensuring that Funko's products

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

were being shipped to customers according to customer guidelines and for ensuring that all goods received at the warehouses were offloaded and entered into the inventory system. CW6 reported to a warehouse manager early in CW6's tenure and later to a warehouse director. CW6 has first-hand knowledge of excess inventory stored in Funko's warehouses.

88.     CW6 reported that the excess inventory problem at Funko was obvious to everyone during CW6's time at the Company.  According to CW6, as of March 2019, Funko was sitting on old product that should have been removed earlier and that the warehouses stored a lot of "dead" products that were three to four years old.

### D.     Defendants Knew that Funko's FY2019 Guidance Was Unachievable,  Yet Failed to Correct the Guidance Prior to the Offering and Reconfirmed the Guidance on October 31, 2019

89.     In addition to concealing the true state of Funko's inventory issues, Defendants further misled investors by confirming FY2019 guidance that Defendants had no basis to believe could be met.

90.     On August 8, 2019, Defendants revised its FY2019 guidance upward, stating on an earnings call with analysts that "[c]onsidering that both Q1 and Q2 results exceeded our expectations, we are raising our full year guidance at this time. We now expect net sales of $840 million to $850 million, representing year-over-year growth of 22% to 24% compared to our prior guidance of $810 million to $825 million or 18% to 20% growth."

91.     Defendant Mariotti touted the strength of the Company's product pipeline and content as the reason the Company increased its FY2019 guidance, noting that "the content year as a whole" is extremely strong, that Funko had "2 big bullets left to fire with Frozen 2 and Star Wars: Episode IX," and that the Company had "so many different ways to monetize different properties for the second half of the year."

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

92.     However, CW1, a former senior-level Funko employee, reported that by late-August/early-September 2019, Defendants had no basis to believe that the FY2019 guidance would be met.   Specifically, CW1 reports that Defendants knew by late-August/early-September 2019 that there was not enough product in the Company's pipeline to meet its FY2019 guidance (specifically, a 22% to 24% increase in sales).   Nevertheless, Defendants failed to correct the FY2019 guidance before the Offering and reconfirmed the guidance on October 31, 2019.

###      1.     Defendants Knew that Funko's Fourth Quarter Sales Forecasts Did Not Support the Company's Revised FY2019 Guidance

93.     As Director of Merchandise Planning, CW1 had first-hand knowledge of Funko's sales forecasts, customer orders, order and production timing, and the availability of content for new products.

94.     According to CW1, there were red flags that the Company would not be able to meet its fourth quarter sales targets represented to the market by late-August 2019.   CW1 explained that the success of Funko's products is directly correlated with the success of the movies, games, or shows upon which they are based.   Propelled by the success of products from "Avengers: Endgame" and "Fortnite," the first half of 2019 had been great for Funko. With "Avengers" becoming the highest grossing film of all time, sales of related products were also through the roof.   But the fourth quarter tentpole film releases did not promise such success.   And no other big videogame was on the horizon.

95.     According to CW1, Funko did not have enough new content to meet the Company's sales targets for the fourth quarter of 2019, and the content the Company had was not expected to perform as well as the previous year's content.   CW1 reported that this lack of content created a gap between the actual sales forecast based on customer orders, and the Company's sales target provided to the market.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

96.     CW1 also reported that by late-August 2019, it was too late to produce new content that could help close that gap between the sales that the Company had targeted and sales that the Company was actually on track to generate.  CW1 explained that new products needed to go into production by August in order to be shipped to customers for sale in the fourth quarter and, by late-August, it was clear no new products were coming.  CW1 further explained that customers' fourth quarter orders were placed in August and September and the orders were below what the Company was expecting.

97.     CW1 and his team began raising flags that the fourth quarter sales were "going to be rough" in the weekly sales meetings beginning in late-August/early-September 2019 and repeatedly raised concerns about the lack of content and its impact on the Company's ability to meet the fourth quarter sales targets during weekly sales meetings that took place every Tuesday or Wednesday during CW1's tenure at Funko (the "Weekly Sales Meeting").

98.     According to CW1, the purpose of the Weekly Sales Meetings was to look at the Company's topline sales and reach a consensus sales forecast for the next three to four months. CW1 also stated that attendees would discuss how to make up any shortfalls between the internal forecast and the Company's sales target that was represented to the market.

99.     CW1 reported that the Weekly Sales Meetings were attended by either Defendant Nickel or Defendant Jung, Leary, and later Smith, Director of Sales and Operations Planning, Mark Wall, Senior Director of Financial Planning and Analysis, Yves LePendeven, Gepford, Beckley, and one of CW1's direct reports.

100.    According to CW1, in response to his warnings about the lack of content and its impact on the Company's ability to meet the fourth quarter sales targets, Defendant Jung merely told him that: "we are guiding Wall Street towards the numbers" and that "we need to fix the shortfall."  CW1 explained to Defendant Jung that fixing the shortfall was not possible

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

absent "making up another movie."  According to CW1, the 4Q2019 numbers were unrealistic because they did not have enough new product to meet the goal and the product they did have customers no longer wanted.

101.    CW1 further explained that the Individual Defendants were made aware of the gap between Funko's actual customer orders and the sales targets represented to the market through emails that were sent by one of CW1's direct reports.  According to CW1, following each Weekly Sales Meeting that he attended, starting in July 2019, one of his direct reports compiled all of the information from the meeting (including the forecast and any shortfall) into one email that would be sent to the meeting attendees and senior leadership, including Defendant Mariotti.  CW1 reported that Defendants Mariotti and Perlmutter began attending the Weekly Sales Meeting in person in November 2019.

102.    CW1 further stated that Individual Defendants also knew that there was not enough content in the Company's pipeline to meet the Company's FY2019 guidance prior to October 31, 2019 because of their attendance at monthly investment meetings.

103.    According to CW1, the purpose of the monthly investment review meetings (which he attended starting in July 2019) was to review the products that Funko would be producing for the following nine to twelve months and discuss how it would impact their budgets.  According to CW1, by August/September 2019, the Company had passed the point at which it could produce new product for the fourth quarter.  The investment review meetings were attended by everyone that attended the Weekly Sales Meetings, as well as Defendants Mariotti and Perlmutter.

104.    In addition to warning that the Company would not meet its fourth quarter targets at the Weekly Sales Meetings, CW1 raised his concerns about the lack of content for the fourth quarter with Allison Dinan, a product developer at Funko who reported directly to

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

Defendant Mariotti.  Based on conversations with Dinan, CW1 believes that Dinan reported these concerns to Defendant Mariotti.

105.    CW1 also advised Funko's Chief Operating Officer Sansone, Leary, Gepford, and Beckley as early as August 2019 that the Company did not have enough content or product to meet the fourth quarter sales targets.

106.    CW5 also reported that there was no basis for Funko's FY2019 guidance with respect to its Latin American units.  CW5 recalled that Funko management issued "very ambitious" sales goals for the Latin America unit – expecting it to grow 28% for 2019. According to CW5, this goal was not based on the forecast that CW5 and his supervisor, Hernandez, reached after meeting with their customers.  CW5 recalls that "[t]hey (senior management) did the math and looked at our growth and they bumped up our growth and that was to be our forecast and our quota for the year." According to CW5, this directive came from Gepford.  CW5 believes that Defendant Mariotti was also involved in the goal-setting. Although CW5's manager, Hernandez, pushed back and told management that his team could not achieve the sales goals, Funko executives were persistent and insisted on the 28% growth.

107.    CW2 similarly confirmed that Defendants Mariotti, Nickel and Jung would have been aware of the shortfall because they each monitored sales "constantly."

108.    CW3 further corroborated CW1's and CW2's accounts that the Individual Defendants received sales forecasts and were closely tracking the Company's sales.

### 2.    Defendants Take Advantage of Funko's Inflated Stock Price and Conduct the September 2019 Offering

109.    Despite knowing that Funko's FY2019 earnings guidance was not achievable and that the Company was sitting on warehouses full of excess inventory, Defendants failed to correct their FY2019 guidance.  Instead, two of Funko's biggest shareholders sought to cash in on the inflated price of Funko's stock before these issues were disclosed to the market.  After

the close of trading on September 16, 2019—and taking advantage of the fact that shares of Funko had climbed 25% in the last month—Funko announced that there would be a secondary offering of Funko stock.

110.    On that day, according to Company SEC filings, Funko entered into an underwriting agreement pursuant to which Mariotti and the ACON Defendants would sell an aggregate of 4,000,000 shares to J.P. Morgan Securities LLC at a price of $25.42 per share. That price was very close to the peak 2019 Funko stock price.

111.    The Offering closed on September 19, 2019, netting Defendant Mariotti $10,168,000 and the ACON Defendants $91,512,000.

112.    As a result of the Offering, ACON's 54.5% ownership of Class A shares was reduced to 45.7% and Defendant Mariotti's 10% Class A stake was reduced to 8.6%.

113.    Notably, Funko received *none of the proceeds* from the Offering.

### 3.    On October 31, 2019, Defendants Confirmed Funko's Revised FY2019 Guidance

114.    On October 31, 2019, with knowledge that Funko's sales forecast did not support its previously stated sales targets and that the Company did not have the content necessary to make up the shortfall, Defendant Mariotti nevertheless confirmed Funko's revised FY2019 guidance during the Company's third quarter earnings conference call with investors. Specifically, Defendants represented to the market that they expected net sales of $840 million to $850 million, representing year-over-year growth of 22% to 24%; adjusted EBITDA of $140 million to $145 million; and adjusted earnings per diluted share of $1.15 to $1.22, which assumes a blended corporate tax rate of 25% and a weighted average diluted share count of 53.5 million shares at the end of the year.

115.    CW1 recalls listening to Funko's third quarter earnings call with investors with one of his direct reports on October 31, 2019, when Defendant Mariotti represented that the

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

1    Company had plenty of content and would continue to guide to a 15-20% growth figure and

2    stating to his subordinate: "I don't know where they are getting that from because it was not

3    feasible."

4        116.   Despite exceeding expectations for the third quarter, analysts and the market

5    were disappointed by the Company's decision to merely maintain its 2019 full-year guidance

6    and the price of Funko shares dropped.  However, the market's reaction was tempered because

7    Funko was still concealing the truth from investors – that even the confirmed FY2019 guidance

8    was not going to be met.

9

10       **E.   Defendants' Materially False and Misleading Statements and Omissions**

11           **1.   The August 8, 2019 False and Misleading Statements**

12       117.   On August 8, 2019, Funko reported an increase in net sales for 2Q2019 of 38%

13   over the same quarter 2018 and increased its previously issued guidance for the full year 2019.

14

15       118.   Specifically, on an earnings call with analysts held on August 8, 2019,

16   Defendant Mariotti stated that "[c]onsidering that both Q1 and Q2 results exceeded our

17   expectations, we are raising our full year guidance at this time. We now expect net sales of

18   $840 million to $850 million, representing year-over-year growth of 22% to 24% compared to

19   our prior guidance of $810 million to $825 million or 18% to 20% growth."

20

21       119.   During the same August 8, 2019 earnings call, Defendant Nickel commented on

22   the Company's decreased gross margin, representing that the decrease in the second quarter

23   was driven primarily "by higher reserves taken for slower-moving inventory of some old lines

24   as well as the higher Loungefly tariffs."

25       120.   Defendant Nickel's statement that reserves were being taken for "slower-

26   moving" inventory set forth in ¶ 119 was misleading because he failed to disclose the true state

27   of the Company's inventory at that time – that the Company had warehouses full of obsolete

28

26

inventory that would need to be written down.  As set forth in ¶¶ 74-88, numerous former Funko employees reported that by August 8, 2019, Funko's failure to accurately forecast sales and customer demand resulted in millions of dollars of obsolete inventory being stored in multiple warehouses.  For example:

(a)   **CW1:** CW1 reported that by July 2019, the Company had "millions of units of excess inventory," some of which was years old and could not be sold. CW1 further explained that everyone, including the Individual Defendants, knew of the excess inventory problem because in late-summer of 2019, the Company had 200 shipping containers of product sitting at the Port of Seattle that could not be unloaded because the Company's warehouses were full with old inventory. CW1 also reported that during his tenure, there were shipping containers full of inventory sitting in the Company parking lot for months because Funko's warehouses were full. According to CW1, the excess inventory was the result of Funko "flying blind" with respect to ordering and was always ordering too much product prior to CW1 being hired in July 2019.

(b)   **CW2:**  CW2 confirmed that Funko's failure to accurately forecast sales and customer demand resulted in over-ordering and a glut of excess inventory during 2018 and 2019.  CW2 reported that large amounts of obsolete inventory was being stored at multiple warehouses for years because of over-ordering and because the Company could not discount or resell old inventory as it would take away from the collectability of the products.  According to CW2, Funko's practice of allowing customers to submit "indications of intent" (which were only estimates of what a customer would order) and subsequently allowing customers to reduce their orders contributed to the over-ordering and excess

27

inventory issue.  CW2 explained, that Gepford (Funko's Senior Vice President of Sales in charge of producing internal sales forecasts), failed to take into account the risk that customers would not purchase all of the product they initially indicated they would.

(c)   **CW3:**   CW3 corroborated CW1's and CW2's accounts that Funko failed to accurately forecast sales and customer demand.  CW3 described Funko's internal sales planning process as "almost like guesswork," stating that the Company engaged in a "guessing game" of predicting sales and ordering inventory.

(d)   **CW4:**   CW4 similarly reported that because of the Company's practice of allowing customers to change their pre-orders, Funko had a large amount of excess inventory being stored in various warehouses.

(e)   **CW5:**  CW5 reported that the issue of excess inventory was discussed at weekly sales meetings towards the end of 2018 and was a persistent problem after that, noting that "[i]t was a regular thing that our warehouse was overstocked."  Like CW2 and CW4, CW5 blamed Funko's excess inventory on the fact that Funko's customers had the ability to reduce orders prior to purchase but that their pre-order estimates were used for internal sales forecasting purposes.

(f)   **CW6:**  CW6 reported that by the spring/summer of 2019, Funko's warehouses were full of obsolete inventory and that the warehouses were full of "dead" products that were three to four years old.

Accordingly, Defendant Nickel's statements regarding Funko's unspecified increase to the Company's inventory reserve did not alert the market to the fact that Funko was currently sitting on millions of units of long obsolete inventory.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

121.     Defendants' failure to disclose that the Company was currently sitting on millions of dollars of obsolete inventory misled investors into believing that the Company's inventory levels were under control.  Indeed, an August 11, 2019 BMO Capital Markets Report noted that the Company's increase to its inventory reserves was only a potential future concern, stating "higher reserves were called out as being tied to old product lines, but something to keep an eye on moving forward as the Pop! brand matures."

122.     On August 8, 2019, Funko filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2019, affirming the Company's financial results.  The 10-Q contained the following risk language with respect to the Company's inventory:

> ***Our success depends, in part, on our ability to successfully man age our inventories.***
>
> We must maintain sufficient inventory levels to operate our business successfully, but we must also avoid accumulating excess inventory, which increases working capital needs and lowers gross margin. We obtain substantially all of our inventory from third-party manufacturers located outside the United States and must typically order products well in advance of the time these products will be offered for sale to our customers. As a result, it may be difficult to respond to changes in consumer preferences and market conditions, which, for pop culture products, can change rapidly. If we do not accurately anticipate the popularity of certain products, then we may not have sufficient inventory to meet demand. ***Alternatively, if demand or future sales do not reach forec asted levels, we could have excess inventory that we may need to  hold for a long peri od of time, write down, sell at prices low er than expected or discard*** . If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected. (Emphasis added).
>
> We may also be negatively affected by changes in retailers' inventory policies and practices. As a result of the desire of retailers to more closely manage inventory levels, there is a growing trend to make purchases on a "just-in-time" basis. This requires us to more closely anticipate demand and could require us to carry additional inventory. Policies and practices of individual retailers may adversely affect us as well, including those relating to access to and time on shelf space, price demands, payment terms and favoring the products of our competitors. Our retail customers make no binding long-term commitments to us regarding purchase volumes and make all purchases by delivering purchase orders. Any retailer can therefore freely reduce its overall purchase of our products, including the number and variety of our products that it carries, and reduce the shelf space allotted for our products. ***If deman d or future sales do not reach fo     recasted***

***levels, we could have excess inventory tha  t we may need  to hold fo  r a long period of time, write down, sell at prices lower than expected or discard.***   If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected. (Emphasis added).

123.    The warnings regarding the Company's inventory practices set forth in ¶ 122 were false and misleading.  By August 8, 2019, Defendants knew that the "risk" that the Company could have excess inventory as a result of customer demand not reaching forecasted levels had already materialized.  As set forth in ¶¶ 74-88, numerous former Funko employees reported that Funko's failure to accurately forecast sales and customer demand resulted in millions of dollars of obsolete inventory being stored in multiple warehouses by August 8, 2019:

(a)    **CW1:** CW1 reported that by July 2019, the Company had "millions of units of excess inventory," some of which was years old and could not be sold. CW1 further explained that everyone, including the Individual Defendants, knew of the excess inventory problem because in late-summer of 2019, the Company had 200 shipping containers of product sitting at the Port of Seattle that could not be unloaded because the Company's warehouses were full with old inventory. CW1 also reported that during his tenure, there were shipping containers full of inventory sitting in the Company parking lot for months because Funko's warehouses were full. According to CW1, the excess inventory was the result of Funko "flying blind" with respect to ordering and was always ordering too much product prior to CW1 being hired in July 2019.

(b)    **CW2:**  CW2 confirmed that Funko's failure to accurately forecast sales and customer demand resulted in over-ordering and a glut of excess inventory during 2018 and 2019.  CW2 reported that large amounts of obsolete inventory was being stored at warehouses for years because of over-ordering and because the

Company could not discount or resell old inventory as it would take away from the collectability of the products.  According to CW2, Funko's practice of allowing customers to submit "indications of intent" (which were only estimates of what a customer would order) and subsequently allowing customers to reduce their orders contributed to the over-ordering and excess inventory issue.  CW2 explained, that Gepford (Funko's Senior Vice President of Sales in charge of producing internal sales forecasts), failed to take into account the risk that customers would not purchase all of the product they initially indicated they would.

(c)     **CW3:**  CW3 corroborated CW1's and CW2's accounts that Funko failed to accurately forecast sales and customer demand.  CW3 described Funko's internal sales planning process as "almost like guesswork," stating that the Company engaged in a "guessing game" of predicting sales and ordering inventory.

(d)     **CW4:**  CW4 similarly reported that because of the Company's practice of allowing customers to change their pre-orders, Funko had a large amount of excess inventory being stored in various warehouses.

(e)     **CW5:**  CW5 reported that the issue of excess inventory was discussed at weekly sales meetings towards the end of 2018 and was a persistent problem after that, noting that "[i]t was a regular thing that our warehouse was overstocked."  Like CW2 and CW4, CW5 blamed Funko's excess inventory on the fact that Funko's customers' had the ability to reduce orders prior to purchase but that their pre-order estimates were used for internal sales forecasting purposes.

(f)     **CW6:**  CW6 reported that by the spring/summer of 2019, Funko's warehouses

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

were full of obsolete inventory and that the warehouses were full of "dead" products that were three to four years old.

### 2. Defendant Mariotti Fails to Correct His Inaccurate August 8, 2019 Statements and FY2019 Earnings Guidance

124. As set forth above, Funko revised its FY2019 earnings guidance upward on August 8, 2019. On an August 8, 2019 earnings call with analysts, Defendant Mariotti stated that "[c]onsidering that both Q1 and Q2 results exceeded our expectations, we are raising our full year guidance at this time. We now expect net sales of $840 million to $850 million, representing year-over-year growth of 22% to 24% compared to our prior guidance of $810 million to $825 million or 18% to 20% growth."

125. Defendant Mariotti touted the strength of the Company's product pipeline and content as the reason the Company increased its FY2019 guidance on August 8, 2019, noting that "the content year as a whole" is extremely strong, that Funko had "2 big bullets left to fire with Frozen 2 and Star Wars: Episode IX," and that the Company had "so many different ways to monetize different properties for the second half of the year."

126. The revised guidance and statements regarding Funko's content for the remainder of the year were material to investors and analysts took note, as Defendant Mariotti's optimism regarding the Company's second-half content was one of the reasons cited by analysts for raising their price targets for Funko. For example, an August 9, 2019 J.P. Morgan report stated that they believe Defendants' guidance increases "***could prove to be conservative given the strong content pipeline*** slated this year" (emphasis added) and that one of their key takeaways that contributed to their decision to raise their estimates was that "[m]anagement remains optimistic about the 2H content pipeline, especially in light of a more impressive character lineup for Star Wars IX and Frozen 2."

127.   Analysts from Piper Jaffray, SunTrust, and Robinson Humphrey also raised their estimates and price targets as a result of Funko's increased guidance.

128.   However, unknown to investors, Defendant Mariotti learned shortly after the statements in ¶¶ 124-125 were made that there was no basis for the Company's FY2019 guidance because, contrary to his representations, there was not enough content in the Company's pipeline to support the guidance.  Defendant Mariotti had a duty to correct his statements regarding the Company's content and the inaccurate FY2019 guidance provided to the market on August 8, 2019.  His failure to do so was misleading, as it omitted material information from the market.  Specifically, as set forth in ¶¶ 94-105, CW1 reported that by late-August/early-September 2019, there were red flags that the Company would not meet its guidance and that Defendants were advised that the numbers would not be met.  For example CW1 reported the following:

(a)   Although the first half of 2019 was highly successful for Funko due to the releases of "Avengers: Endgame" and "Fortnite," the releases scheduled for the fourth quarter were not, in fact, as promising and nothing additional was on the horizon.

(b)   Funko did not have enough new content to meet the Company's sales targets for the fourth quarter of 2019 and the content the Company had, was not expected to perform as well as the previous year's content.  This lack of content created a gap between the actual sales forecast based on customer orders, and the Company's sales target provided to the market.

(c)   By late-August 2019, it was too late to produce new content that could help close that gap between the sales that the Company had targeted and sales that the Company was actually on track to generate.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

(d)    CW1 and his team began raising flags that the fourth quarter sales were "going to be rough" in the Weekly Sales Meetings beginning in late-August/early-September 2019 and repeatedly raised concerns about the lack of content and its impact on the Company's ability to meet the fourth quarter sales targets during Weekly Sales Meetings that took place every Tuesday or Wednesday. The Weekly Sales Meetings were attended by Defendant Nickel or Defendant Jung, as well as others.

(e)    CW1 warned Defendant Jung of the lack of content and its impact on the Company's ability to meet the fourth quarter sales targets but she told him that: "we are guiding Wall Street towards the numbers" and that "we need to fix the shortfall." CW1 explained to Defendant Jung that fixing the shortfall was not possible absent "making up another movie."

(f)    The Individual Defendants were also made aware of the gap between Funko's actual customer orders and the sales targets represented to the market through emails that were sent to the attendees of the Weekly Sales Meetings and Funko senior leadership, including Defendant Mariotti.

(g)    The Individual Defendants' attendance at monthly investment meetings also alerted them that there was not enough content in the Company's pipeline to meet the Company's FY2019 guidance prior to October 31, 2019. The purpose of the monthly investment review meetings was to review the products that Funko would be producing for the following nine to twelve months and discuss how it would impact their budgets. By August/September 2019, the Company had passed the point at which it could produce new product for the fourth quarter. The investment review meetings were attended by everyone that

attended the Weekly Sales Meetings, as well as Defendants Mariotti and Perlmutter.

(h)    CW1 also raised his concerns about the lack of content for the fourth quarter with Allison Dinan, a product developer at Funko who reported directly to Defendant Mariotti.   Based on conversations with Dinan, CW1 believes that Dinan reported these concerns to Defendant Mariotti.

(i)    CW1 also advised Funko's Chief Operating Officer Sansone, Leary, Gepford, and Beckley as early as August that the Company did not have enough content or product to meet the fourth quarter sales targets.

### 3.    The October 31, 2019 False and Misleading Statements

129.    On October 31, 2019, Funko issued a press release reporting positive results for the 3Q2019, including a 26% increase in net sales as compared to the same quarter in the prior year and reiterated its fiscal 2019 outlook:

**2019 Outlook**

The Company is reiterating its outlook for the full year 2019. The Company expects net sales to be in a range of $840 million to $850 million. Adjusted EBITDA is expected to be in a range of $140 million to $145 million. Adjusted Earnings per Diluted Share is expected to be in a range of $1.15 per share to $1.22 per share and is based on estimated adjusted average diluted shares outstanding of 53.5 million for the full year 2019.

130.    Funko held an earnings call with analysts on October 31, 2019 to discuss the 3Q2019 results wherein Defendant Jung reiterated the Company's FY2019 guidance:

[W]e are maintaining our guidance ranges we laid out on the second quarter conference call, which are:   net sales of $840 million to $850 million, representing year-over-year growth of 22% to 24%; adjusted EBITDA of $140 million to $145 million; and adjusted earnings per diluted share of $1.15 to $1.22, which assumes a blended corporate tax rate of 25% and a weighted average diluted share count of 53.5 million shares at the end of the year.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

131.    The Company's October 31, 2019 press release referenced in ¶ 129 and Defendant Jung's statements in ¶ 130 confirming the Company's FY2019 guidance were false and misleading.  At the time these statements were made, the Individual Defendants knew that the FY2019 guidance was unachievable because there was not enough product in the Company's pipeline to meet the guidance.  As set forth in ¶¶ 94-105, CW1 reported that by late-August 2019, there were red flags that the Company would not meet its fourth quarter sales guidance and Defendants were advised that the numbers would not be met.  For example CW1 reported the following:

(a)    Although the first half of 2019 was highly successful for Funko due to the releases of "Avengers: Endgame" and "Fortnite," the releases scheduled for the fourth quarter were not, in fact, as promising and nothing additional was on the horizon.

(b)    Funko did not have enough new content to meet the Company's sales targets for the fourth quarter of 2019 and the content the Company had, was not expected to perform as well as the previous year's content.  This lack of content created a gap between the actual sales forecast based on customer orders, and the Company's sales target provided to the market.

(c)    By late-August 2019, it was too late to produce new content that could help close that gap between the sales that the Company had targeted and sales that the Company was actually on track to generate.

(d)    CW1 and his team began raising flags that the fourth quarter sales were "going to be rough" in the Weekly Sales Meetings beginning in late-August/early-September 2019 and repeatedly raised concerns about the lack of content and its impact on the Company's ability to meet the fourth quarter sales targets during

Weekly Sales Meetings that took place every Tuesday or Wednesday.   The Weekly Sales Meetings were attended by Defendant Nickel or Defendant Jung, as well as others.

(e)   CW1 warned Defendant Jung of the lack of content and its impact on the Company's ability to meet the fourth quarter sales targets but she told him that: "we are guiding Wall Street towards the numbers" and that "we need to fix the shortfall."   CW1 explained to Defendant Jung that fixing the shortfall was not possible absent "making up another movie."

(f)   The Individual Defendants were also made aware of the gap between Funko's actual customer orders and the sales targets represented to the market through emails that were sent to the attendees of the Weekly Sales Meetings and Funko senior leadership, including Defendant Mariotti.

(g)   The Individual Defendants' attendance at monthly investment meetings also alerted them that there was not enough content in the Company's pipeline to meet the Company's FY2019 guidance prior to October 31, 2019.   The purpose of the monthly investment review meetings was to review the products that Funko would be producing for the following nine to twelve months and discuss how it would impact their budgets.   By August/September 2019, the Company had passed the point at which it could produce new product for the fourth quarter.   The investment review meetings were attended by everyone that attended the Weekly Sales Meetings, as well as Defendants Mariotti and Perlmutter.

(h)    CW1 also raised his concerns about the lack of content for the fourth quarter with Allison Dinan, a product developer at Funko who reported directly to

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

Defendant Mariotti.  Based on conversations with Dinan, CW1 believes that Dinan reported these concerns to Defendant Mariotti.

(i)    CW1 also advised Funko's Chief Operating Officer Sansone, Leary, Gepford, and Beckley as early as August that the Company did not have enough content or product to meet the fourth quarter sales targets.

132.    Similarly, like CW1, CW5 similarly reported that the Funko's FY2019 guidance was unachievable with respect to the Company's sales goals for Funko's Latin American unit. CW5 reported that the guidance was not based on the sales forecast that CW5 and his supervisor reached after meeting with their customers.  Although CW5's supervisor told Funko management that they could not achieve the sales goals, Funko executives were persistent with their guidance.

133.    On the same October 31, 2019 earnings call, in response to a question from Andrew Crum, an analyst from Stifel, Nicolaus & Company, Inc., with respect to why the Company was not raising revenue guidance for the year after experiencing such a positive 3Q, Defendant Jung falsely represented that the 4Q would be the Company's "biggest quarter ever as a company":

> I'll start with the guidance question. So coming out of Q2, the company re-guided to $840 million to $850 million on an annualized basis.  And as you know, we do give annual guidance. We feel really good that to date, we've grown 28%, and for Q3, we're at 26%.  But the range within that guidance is a little over 1%, so it's already a pretty tight spread there.  As we look forward, though, as well, Q4, we are coming up against a very high Q4 last year, it was approaching 38% in a growth rate.  ***And even with our current gui    dance, Q4 will be our    biggest quarter ever as a company.***
>
> So we're feeling really good about where we are right now.  And overall, you have to remember that a lot of the Frozen and Star Wars shipments did come into 3Q, and we did have that $3 million in FOB that also came into Q3.  So although we're very positive on Q4, I think if you look at the 2-year stack, it's a very healthy build.

134.    Defendant Jung's statements regarding the Company's 4Q guidance set forth in ¶ 133 were false and misleading when made.   At the time these statements were made, Defendant Jung knew that the FY2019 guidance was unachievable because there was not enough product in the Company's pipeline to meet the guidance.   As set forth in ¶¶ 94-105, CW1 reported that by late-August 2019, there were red flags that the Company would not meet its fourth quarter sales guidance and Defendants were advised that the numbers would not be met.  For example CW1 reported the following:

(a)     Although the first half of 2019 was highly successful for Funko due to the releases of "Avengers: Endgame" and "Fortnite," the releases scheduled for the fourth quarter were not, in fact, as promising and nothing additional was on the horizon.

(b)     Funko did not have enough new content to meet the Company's sales targets for the fourth quarter of 2019 and the content the Company had, was not expected to perform as well as the previous year's content.  This lack of content created a gap between the actual sales forecast based on customer orders, and the Company's sales target provided to the market.

(c)     By late-August 2019, it was too late to produce new content that could help close that gap between the sales that the Company had targeted and sales that the Company was actually on track to generate.

(d)     CW1 and his team began raising flags that the fourth quarter sales were "going to be rough" in the Weekly Sales Meetings beginning in late-August/early-September 2019 and repeatedly raised concerns about the lack of content and its impact on the Company's ability to meet the fourth quarter sales targets during Weekly Sales Meetings that took place every Tuesday or Wednesday.   The

39
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

Weekly Sales Meetings were attended by Defendant Nickel or Defendant Jung, as well as others.

(e)     CW1 warned Defendant Jung of the lack of content and its impact on the Company's ability to meet the fourth quarter sales targets but she told him that: "we are guiding Wall Street towards the numbers" and that "we need to fix the shortfall." CW1 explained to Defendant Jung that fixing the shortfall was not possible absent "making up another movie."

(f)     The Individual Defendants were also made aware of the gap between Funko's actual customer orders and the sales targets represented to the market through emails that were sent to the attendees of the Weekly Sales Meetings and Funko senior leadership, including Defendant Mariotti.

(g)     The Individual Defendants' attendance at monthly investment meetings also alerted them that there was not enough content in the Company's pipeline to meet the Company's FY2019 guidance prior to October 31, 2019. The purpose of the monthly investment review meetings was to review the products that Funko would be producing for the following nine to twelve months and discuss how it would impact their budgets. By August/September 2019, the Company had passed the point at which it could produce new product for the fourth quarter. The investment review meetings were attended by everyone that attended the Weekly Sales Meetings, as well as Defendants Mariotti and Perlmutter.

(h)     CW1 also raised his concerns about the lack of content for the fourth quarter with Allison Dinan, a product developer at Funko who reported directly to Defendant Mariotti. Based on conversations with Dinan, CW1 believes that

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

Dinan reported these concerns to Defendant Mariotti.

(i)    CW1 also advised Funko's Chief Operating Officer Sansone, Leary, Gepford, and Beckley as early as August that the Company did not have enough content or product to meet the fourth quarter sales targets.

135.    Similarly, like CW1, CW5 similarly reported that the Funko's FY2019 guidance was unachievable with respect to the Company's sales goals for Funko's Latin American unit. CW5 reported that the guidance was not based on the sales forecast that CW5 and his supervisor reached after meeting with their customers.  Although CW5's supervisor told Funko management that they could not achieve the sales goals, Funko executives were persistent with their guidance.

136.    On the same day, Funko filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2019, affirming the previously reported financial results. Regarding inventory levels, the report stated, in relevant part:

> ***Our success depends, in part, on our ability to successfully man        age our inventories.***
>
> We must maintain sufficient inventory levels to operate our business successfully, but we must also avoid accumulating excess inventory, which increases working capital needs and lowers gross margin. We obtain substantially all of our inventory from third-party manufacturers located outside the United States and must typically order products well in advance of the time these products will be offered for sale to our customers. As a result, it may be difficult to respond to changes in consumer preferences and market conditions, which, for pop culture products, can change rapidly. If we do not accurately anticipate the popularity of certain products, then we may not have sufficient inventory to meet demand. Alternatively, ***if demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to  hold for a long peri od of time, write down, sell at prices low er than expected or discard.***  If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected.
>
> We may also be negatively affected by changes in retailers' inventory policies and practices. As a result of the desire of retailers to more closely manage inventory levels, there is a growing trend to make purchases on a "just-in-time" basis. This requires us to more closely anticipate demand and could require us to carry

41

additional inventory. Policies and practices of individual retailers may adversely affect us as well, including those relating to access to and time on shelf space, price demands, payment terms and favoring the products of our competitors. Our retail customers make no binding long-term commitments to us regarding purchase volumes and make all purchases by delivering purchase orders. Any retailer can therefore freely reduce its overall purchase of our products, including the number and variety of our products that it carries, and reduce the shelf space allotted for our products. *If demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard.* If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected. (Emphasis added).

137.    The warnings regarding the Company's inventory practices set forth in ¶ 136 were false and misleading.  By October 31, 2019, Defendants knew that the "risk" that the Company could have excess inventory as a result of customer demand not reaching forecasted levels had already materialized.  As set forth in ¶¶ 74-88, numerous former Funko employees reported that Funko's failure to accurately forecast sales and customer demand resulted in millions of dollars of obsolete inventory being stored in multiple warehouses prior to August 8, 2019:

(a)    **CW1:** CW1 reported that by July 2019, the Company had "millions of units of excess inventory," some of which was years old and could not be sold. CW1 further explained that everyone, including the Individual Defendants, knew of the excess inventory problem because in late-summer of 2019, the Company had 200 shipping containers of product sitting at the Port of Seattle that could not be unloaded because the Company's warehouses were full with old inventory. CW1 also reported that during his tenure, there were shipping containers full of inventory sitting in the Company parking lot for months because Funko's warehouses were full. According to CW1, the excess inventory was the result of Funko "flying blind" with respect to ordering and was always ordering too much product prior to CW1 being hired in July 2019.

(b)   **CW2:**  CW2 confirmed that Funko's failure to accurately forecast sales and customer demand resulted in over-ordering and a glut of excess inventory during 2018 and 2019.  CW2 reported that large amounts of obsolete inventory was being stored at warehouses for years because of over-ordering and because the Company could not discount or resell old inventory as it would take away from the collectability of the products.  According to CW2, Funko's practice of allowing customers to submit "indications of intent" (which were only estimates of what a customer would order) and subsequently allowing customers to reduce their orders contributed to the over-ordering and excess inventory issue.  CW2 explained, that Gepford (Funko's Senior Vice President of Sales in charge of producing internal sales forecasts), failed to take into account the risk that customers would not purchase all of the product they initially indicated they would.

(c)   **CW3:**  CW3 corroborated CW1's and CW2's accounts that Funko failed to accurately forecast sales and customer demand.  CW3 described Funko's internal sales planning process as "almost like guesswork," stating that the Company engaged in a "guessing game" of predicting sales and ordering inventory.

(d)   **CW4:**  CW4 similarly reported that because of the Company's practice of allowing customers to change their pre-orders, Funko had a large amount of excess inventory being stored in various warehouses.

(e)   **CW5:** CW5 reported that the issue of excess inventory was discussed at weekly sales meetings towards the end of 2018 and was a persistent problem after that, noting that "[i]t was a regular thing that our warehouse was overstocked."  Like

CW2 and CW4, CW5 blamed Funko's excess inventory on the fact that Funko's customers' had the ability to reduce orders prior to purchase but that their pre-order estimates were used for internal sales forecasting purposes.

(f)     **CW6:**  CW6 reported that by the spring/summer of 2019, Funko's warehouses were full of obsolete inventory and that the warehouses were full of "dead" products that were three to four years old.

## F.     The Truth is Revealed

### 1.     February 5, 2020 - Funko Announces Disappointing Preliminary 4Q Results

138.    On February 5, 2020, after the market closed, Funko shocked the market when it announced its preliminary fourth quarter 2019 financial results, revealing that instead of the expected *increase* of 22% to 24% in net sales, Funko experienced a *decrease* in net sales of 8% for the 4Q2019 due to lower than expected purchases among Funko's top customers and decreased sales related to movie releases.  The Company also disclosed a $16.8 million write-down to "dispose of slower moving inventory to increase operational capacity." The press release stated, in relevant part:

> Net sales are expected to be approximately $214 million, a decrease of 8% compared to $233 million in the fourth quarter of 2018. Net sales were below expectations in mature markets, including the U.S., due to the challenging retail environment, which resulted in lower than expected purchases among Funko's top customers throughout the holiday season as well as softness in sales related to certain tentpole movie releases. These factors more than offset strong growth both in Europe and the Loungefly brand during the quarter.

> For the fourth quarter of fiscal 2019, Funko estimates:

> •     Net sales in the U.S. will decrease approximately 9%, while net sales internationally will decrease approximately 8%, reflecting declines in mature international markets, including Australia and Canada, partially offset by continued double digit growth in Europe.

> •     On a product category basis, net sales of figures will decrease approximately 10% and net sales of other products will decrease

approximately 3% versus the year ago period, respectively. Net sales of Loungefly items, included in other products, are expected to show continued double digit growth in the fourth quarter offset by declines in other branded products.

- The Company will incur a one-time $16.8 million charge related to the write-down of inventory as a result of the Company's decision to dispose of slower moving inventory to increase operational capacity. This charge is incremental to normal course reserves and will have an unfavorable impact to gross profit, gross margin, net loss and net loss per diluted share in the fourth quarter.

- Gross profit will be in the range of $62.3 million to $62.8 million, while gross margin will be 29.2% to 29.4%. Gross margin excluding the one-time inventory write-down will be 37.0% to 37.3%.

- The Company will have a net loss in the range of $6.7 million to $6.0 million and net loss per diluted share of $0.12 to $0.11.

- Adjusted EBITDA will be in the range of $24.7 million to $25.7 million.

- Adjusted Net Income will be in the range of $8.1 million to $8.9 million and Adjusted Earnings per Diluted Share will be in the range of $0.16 to $0.18.

139.    Moreover, the Company expected that sales trends would not improve until the second half of fiscal 2020, stating in the same press release:

The Company expects its 2020 net sales growth rate to be in the high-single-digits to low-double-digits. Additionally, the Company anticipates that top line trends will improve gradually throughout 2020 and will be largely weighted toward the second half of the year, with net sales in the first half expected to be down low-single-digits to flat compared to the first half of 2019. Funko plans to provide expanded guidance for 2020 in connection with the release of fourth quarter and full year 2019 financial results on March 5, 2020.

140.    On this news, Funko's share price fell $6.20, or 40%, to close at $9.29 per share on February 6, 2020, on unusually heavy trading volume.

141.    Analysts punished Funko as a result of the February 5th announcement, slashing price targets and downgrading the stock.

142.     A February 6, 2020 J.P. Morgan report downgraded Funko to Underweight from Overweight, and expressed significant concerns about Funko moving forward, citing a "content cliff" in 2020 and "potential investor concerns that FNKO's Pop! format has seen its best days."  The same report noted that the stock "looks to be in the penalty box for an extended period" and there are "significantly lowered growth expectations following an outsized earnings miss."

143.     Similarly, a February 6, 2020 Piper Sandler report characterized the Company's miss as "shocking," that they "are reducing our estimates handily" in response, and that they "expect FNKO to trade as a 'broken stock' for a short period given credibility concerns."

144.     On the same day, a Motley Fool article explained that "Funko stock is being mauled today" because of "horrendous results," including the fact that "[s]ales in the U.S. and international markets are expected to *decline* by 9% and 8%, respectively. For context, Wall Street was expecting *growth* of more than 13%."

145.     On February 10, 2020, SunTrust Robinson Humphrey also lowered their 2019-2021 estimates and price target on Funko, stating "FNKO is likely to remain in the 'penalty box' for the next few quarters."  On the same day BMO Capital Markets reduced its full-year 2020 sales estimate to $794 million, down from $846 million, a 6% decrease, and dropped its 2020 EPS estimate 41%, from $1.29 to $0.76.

146.     Additionally, a February 6, 2020 report from D.A. Davidson took management to task for failing to provide the market the data necessary to analyze the Company's future, stating:

> Management was reluctant to talk about whether evergreen figure sales were up or down in 4Q19, a key data point in determining whether Pop! figures have staying power or are suffering from waning popularity.  We also did not get any clear answers regarding how closely retail POS growth was tracking shipment growth in recent quarters.  We thought FNKO's explanations were weak regarding

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

why growth should accelerate in a "hockey stick" fashion in 2H20 – easier prior-year comparisons was a key reason.

147.   A February 10, 2020 BMO Capital Markets report was particularly critical of Funko's handling of the Company's inventory and the need for such a large inventory write-down, stating:

> Funko ended the third quarter with $94 million of inventory on its own books, a +16% yoy increase. The $16.8 million write-down represents 18% of that ending 3Q inventory. *We belie ve 80% of the invento   ry that was   written do  wn was Funko Pop! figures, roughly 2.7 million of them. The cubic volume of which is enough to fill seventy-seven 4       0-foot shipping containers, two Olympic swimming pools, or six Boeing 747s. Laid   end to end, this line of Pop!s would extend 265 miles, or the distance between New York and Washington*. (Emphasis added).

### 2.   March 5, 2020 - Funko Reports 4Q and Fiscal 2019 Results

148.   On March 5, 2020, after the market closed, Funko issued a press release confirming its preliminary announced fourth quarter results and announcing its full year 2019 financial results.  The Company confirmed that net sales for the fourth quarter had decreased 8% year-over-year to $213.6 million due to, among other things, "softness at retail during the holiday season which led to a decrease in orders."

149.   As a result of the disappointing 4Q results, the Company reported fiscal 2019 results that were well below Defendants' FY2019 guidance issued on August 8, 2019 and confirmed on October 31, 2019.  For example, the Company reported net sales of $795.1 million, as opposed to the $840 million to $850 million previously estimated, and adjusted EBITDA of $123 million, compared to the $140 million to $145 million previously estimated. The Company also reported a decrease in gross margin of 170 basis points to 35.5% compared to 37.2% in 2018, primarily due to the write-down of $16.8 million in inventory.

150.   Funko had continued to increase its licenses, but its sales did not similarly increase.  According to the March 5 Earnings Presentation, sales per active property were down

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

as compared to the 4Q2018 and FY2018.  For example, for 4Q 2019, Funko had 84 more active properties than it had during the same quarter the prior year.  However, net sales per active property decreased 20%.

151.    On an earnings call with analysts on March 5, 2020 to discuss the Company's financial results, Defendant Mariotti blamed unexpected market conditions for the Company's disappointing 4Q results: "As Q4 unfolded, orders from many of our top retail customers came in below expectations due to the softness surrounding the holiday shopping season. At the same time, key tentpole releases underperformed."

152.    Defendant Jung similarly commented on the sales miss, blaming the decline on a weak holiday season, lower-than-expected repurchase orders from Funko's top customers, underperformance in the key tentpole properties, and "difficult comparisons to Fortnite, which was a significant sales driver in Q4 of last year."

153.    With respect to the Company's $16.8 million inventory write-down, Defendant Mariotti conceded that the Company's forecasting and inventory management practices were in need of refinement, representing that:

> We are laser-focused on increasing operational efficiency across the organization to support our growth and build scale for the future.  A critical component of this is retooling our supply chain.  We're taking a measured approach here and have already begun implementing new sales and inventory management processes that are expected to enhance our ability to plan, purchase inventory, forecast, fulfill and manage our operations.

154.    Defendant Jung likewise commented on the Company's inventory write-down, noting that the Company was "implementing initiatives around sourcing, demand planning and inventory management."  Defendant Jung further stated that the Company expected gross margins to strengthen in 2020 due to the continued reduction in customer noncompliance chargebacks and strengthened inventory management practices.

155.   On this news, Funko's share price fell $0.32, or over 4%, to close at $6.92 on March 6, 2020, causing additional damage to investors.

### G.   Additional Allegations Regarding Materiality

156.   There is a substantial likelihood that that a reasonable shareholder would consider Defendants' misstatements and omissions regarding Funko's FY2019 forecasts and the Company's inventory important because it altered the total mix of information made available.  Various factors indicate the materiality of these misstatements and omissions.

157.   *Funko's core business is the sale of pop culture-related products.*  Defendants' misstatements and omissions about Funko's FY2019 forecasts and its backlog of unsold inventory related to the heart of the Company's business and played a significant role in operations and profitability.

158.   Funko's misstatements and omissions masked a change in sales, earnings and other trends.

159.   Funko's stock price experienced extreme volatility and plunged over 40% after its February 5, 2020 disclosure, and a further 4% following its March 5, 2020 disclosure.

160.   *Funko's misstatements and omissions     ultimately hid a failure to mee    t analysts' consensus expectations*. A February 5, 2020 Market Watch article noted that "Funko stock plummet[ed] on [a] surprise sales downturn." On the same day, a Motley Fool article explained that "Funko stock is being mauled today" because of "horrendous results", including the fact that "[s]ales in the U.S. and international markets are expected to *decline* by 9% and 8%, respectively. For context, Wall Street was expecting *growth* of more than 13%."

### H.   Additional Scienter / Falsity Allegations

161.   As alleged herein, the Individual Defendants acted with scienter since they knew that the public documents and statements issued or disseminated in the name of the Company

were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Funko, their control over, and/or receipt and/or modification of Funko's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Funko, participated in the fraudulent scheme alleged herein.

162.   Specifically, the Individual Defendants were aware that Funko had warehouses full of obsolete inventory that would need to be written down.  As set forth in ¶¶ 74-88, former Funko employees reported that, prior to and throughout the Class Period, the Individual Defendants were personally included on Company communications or present at meetings where the Company's inventory issues were discussed, and that the inventory condition was so severe that it was readily apparent:

(a)   **CW1:** CW1 reported that Funko's inventory issues "were not a secret at the Company" during his tenure.  CW1 explained that the issue was obvious in July 2019 when CW1 began working for Funko, CW1 further reported that there were shipping containers full of inventory sitting in the Company parking lot from August through October 2019.  CW1 reported that each of Individual Defendants were aware that the Company was sitting on "millions of units of inventory" and that the Company's warehouses were full.  CW1 explained that Defendants Nickel and Jung were aware of the Company's inventory issue because it was discussed during Weekly Sales Meetings, described *supra* at ¶¶ 97-100, which Nickel, and later Jung attended.  Additionally,

CW1 reported that Individual Defendants were all recipients of an email that CW1 also received summarizing the Weekly Sales Meetings, including discussions of Funko's inventory issue.

(b)    **CW2:**  CW2 confirmed that the Individual Defendants were aware of Funko's glut of excess inventory during 2018 and 2019.   CW2, who reported directly to Defendant Perlmutter during CW2's tenure, reported that in 2018 and 2019 Funko expanded into multiple warehouses to house unsold inventory.   According to CW2, the Company's excess inventory was frequently discussed during quarterly Board meetings that CW2 attended along with Defendants Mariotti, Nickel, and Perlmutter and Board members.

163.    The Individual Defendants were also aware that the Company's FY2019 guidance was unachievable.  As set forth in ¶¶ 89-108, numerous former Funko employees reported that Defendants were aware that the quantity and quality of the Company's second half FY2019 content was not as strong as the first half content, and Funko's internal sales projections did not support the Company's FY2019 guidance:

(a)    **CW1:** CW1 reported that by late August 2019, there were red flags that the Company would not be able to hit its fourth quarter sales projections because Funko did not have enough content.  According to CW1, the lack of content and the gap between the Company's sales projection and sales target began to be discussed during the Weekly Sales Meeting starting in late-August/early-September 2019.  CW1 repeatedly voiced concerns about the lack of content and its impact on the Company's ability to hit its number during the Weekly Sales Meetings, which were attended by Defendants Nickel or Jung.  CW1 reported that the Individual Defendants, including Mariotti and Perlmutter, would have also been made aware of the current sales forecast, including any

shortfall, through emails summarizing the Weekly Sales Meetings that were sent by his direct-report. CW1 further stated that the Individual Defendants were aware that there was not enough content in the Company's pipeline to meet the Company's FY2019 guidance prior to October 31, 2019, because they attended monthly investment meetings where the products Funko would be producing for the following nine to twelve months were discussed.

(b)     **CW2:**  CW2 confirmed that Defendants Mariotti, Nickel, and Jung monitored sales "constantly."

(c)     **CW3:** CW3 corroborated CW2's account that Defendants Mariotti, Nickel, and Jung were aware of Funko's sales, reporting that weekly sales updates were emailed to Defendants Mariotti, Nickel or Jung throughout CW2's tenure at Funko.

164.    The significant amount of insider sales in the Class Period, and the timing of those sales, also provides indicia of scienter. In the seven months prior to the Class Period, Defendant Mariotti sold 150,000 shares for $3.3 million in proceeds. During the approximately seven months of the Class Period, he sold 500,000 shares for $12 million in proceeds.

165.    As detailed *infra* at ¶¶ 109-113, ACON and Mariotti unloaded a significant amount of their Funko shares pursuant to the Offering – ***nearly $100 million*** . Defendant Perlmutter also sold personal shares during the Class Period, on October 1, 2019, netting $1,159,200.

166.    Other than one sale of 50,000 shares by Defendant Mariotti, each of these sales took place when Funko stock was over $20 per share, approximately three times what it was at the end of the Class Period.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

### I.   Presumption of Reliance: Fraud on the Market

167.   At all relevant times, the market for Funko securities was efficient for the following reasons, among others:   (1) the securities were listed and actively traded on the NASDAQ, a highly efficient and automated market; (2) as an issuer, Funko filed periodic public reports on Form 10-K and Form 10-Q with the SEC; (3) Funko regularly issued press releases that were carried by the national news wires, were publicly available, and entered the public marketplace; and (4) Funko was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

168.   As a result, the market for Funko securities promptly digested current information regarding Funko from all publicly available sources and reflected such information in Funko's share price.

169.   Under these circumstances, all purchasers of Funko securities during the Class Period suffered similar injury through their purchase of Funko securities at artificially inflated prices and a presumption of reliance applies.

### J.   Loss Causation / Economic Loss

170.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Funko securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.   The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Funko's business, operations, and prospects as alleged herein.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

171.     During the Class Period, as detailed herein, Funko securities were artificially inflated due to Defendants' misleading statements and omissions.   When Defendants' prior misrepresentations and omissions were disclosed and became apparent to the market, the price of Funko securities fell as the prior artificial inflation came out.

172.     As a result of their purchases of Funko securities during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, i.e., damages, under the securities laws.

173.     The decline in the price of Funko securities after the corrective disclosures on February 5, 2020 and March 5, 2020 was a direct result of Defendants' misrepresentations being revealed to investors and the market.

174.     The corrective disclosures on February 5, 2020 and March 5, 2020 revealed that the Company was actually experiencing reduced sales and had a growing mass of obsolete inventory.

175.     After the February 5, 2020 disclosure, Funko shares fell $6.20, or 40%, to close at $9.29 per share on February 6, 2020, on unusually heavy trading volume.

176.     After the March 5, 2020 disclosure, Funko shares fell $0.32, or over 4%, to close at $6.92 on March 6, 2020, thereby injuring investors further.

177.     Analysts' statements after the February 5, 2020 and March 5, 2020 disclosures show the importance of Defendants' revelations about Funko's slower sales and masses of unsold inventory. *See* February 6, 2020 Piper Sandler report ("Shocking Q4 Pre-Announce Coupled With Inventory Write Off"); February 5, 2020 SunTrust report ("More Sting than Pop; 4Q Well Below Expectations"); March 5, 2020 BMO report (while Funko's "new toy lines and games portfolio looks promising, we doubt it will be enough to offset what we expect to be a continuation of declining Pop! brand sales"); March 6, 2020 Piper Sandler report (commenting

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

1    on the need for Funko management to "rebuild credibility"); March 6, 2020 J.P. Morgan report

2    (wondering if "FNKO's Pop! format may have seen its best days" following its "outsized

3    earnings miss").

4        **K.      Class Action Allegations**

5        178.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of

6    Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that

7    purchased or otherwise acquired Funko securities between August 8, 2019 and March 5, 2020,

8    inclusive, and who were damaged thereby (the Class).    Excluded from the Class are

9    Defendants, the officers and directors of the Company, at all relevant times, members of their

10   immediate families and their legal representatives, heirs, successors, or assigns, and any entity

11   in which Defendants have or had a controlling interest.

12       179.    The members of the Class are so numerous that joinder of all members is

13   impracticable.  Throughout the Class Period, Funko common shares actively traded on the

14   NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiffs at this

15   time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that

16   there are at least hundreds or thousands of members in the proposed Class.  Millions of shares

17   of Funko common stock were traded publicly during the Class Period on the NASDAQ.

18   Record owners and other members of the Class may be identified from records maintained by

19   Funko or its transfer agent and may be notified of the pendency of this action by mail, using the

20   form of notice similar to that customarily used in securities class actions.

21       180.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as

22   all members of the Class are similarly affected by Defendants' wrongful conduct in violation of

23   federal law that is complained of herein.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

181.     Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

182.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Funko; and

(c)     to what extent the members of the Class have sustained damages, and the proper measure of damages.

183.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## V.     CAUSES OF ACTION

### COUNT I
### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against all Defendants

184.     Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

185.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase Funko securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each Defendant, took the actions set forth herein.

186.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Funko securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

187.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Funko's financial well-being and prospects, as specified herein.

188.   Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Funko's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Funko and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a

course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

189.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

190.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Thus, Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing material problems with Funko's business and financial results from the investing public and supporting the artificially inflated price of its securities.

191.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of

Funko securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired Funko securities during the Class Period at artificially high prices and were damaged thereby.

192.    At the time of said misrepresentations and/or omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Funko was experiencing, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Funko securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

193.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

194.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### COUNT II
### Violation of Section 20(a) of the Exchange Act Against
### the Individual Defendants and the ACON Defendants

195.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

196.    The Individual Defendants and the ACON Defendants acted as controlling persons of Funko within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

197.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.   The ACON Defendants, on the basis of stock ownership and Board control, had significant access to information and control over Funko.

198.    As set forth above, Funko, the Individual Defendants and the ACON Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.   By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

1
2

**COUNT III**
**Violation of Section 20A of the Exchange Act Against**
**Mariotti, Perlmutter and the ACON Defendants**

3
4
5
6
7
8

199.   Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  Count III is brought pursuant to §20A of the Exchange Act against Defendants Mariotti, Perlmutter and the ACON Defendants, on behalf of Plaintiffs Zheng and Baker and members of the Class who were damaged by the insider trading of Defendants Mariotti, Perlmutter and the ACON Defendants (the "Insider Trading Defendants").

9
10

200.   As detailed herein, the Insider Trading Defendants committed an underlying violation by violating Section 10(b) and Rule 10b-5.

11
12
13
14
15
16
17

201.   As further detailed herein, the Insider Trading Defendants were in possession of material non-public information concerning Funko, including its excessive inventory. Confidential witnesses have reported that these matters were discussed at meetings of the Board, which the ACON Defendants attended, either individually or through representatives or members. The ACON Defendants took advantage of this inside knowledge to obtain ***over $90 million*** in insider trading profits during the Class Period.

18
19
20
21
22

202.   This also was a violation of Funko's Code of Conduct, which stated explicitly that: "the Company's employees and directors are prohibited from trading in the stock or other securities of the Company while in possession of material nonpublic information about the Company."

23
24

203.   During the Class Period, Defendant Mariotti sold shares contemporaneously with Plaintiffs Zheng and Baker.  Specifically, Defendant Mariotti's relevant sales were:

25
26
27
28

| Date of Sale | Amount | Price |
|---|---|---|
| 9/19/19 | 400,000 | $25.42 |
| 9/20/19 | 50,000 | $22.69 |

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

204.    Defendant Mariotti's shares were sold for $11,302,542 in profit.

205.    The ACON Defendants also sold on September 19, 2019 at the price of $25.42 as follows:

| Selling Entity | Amount |
|---|---|
| ACON Investors Holdings 2 | 322,288 |
| ACON Investors Holdings 1 | 764,357 |
| ACON Investors Holdings 3 | 899,788 |
| ACON Funko Investors | 1,613,567 |

206.    The ACON Defendants' shares were sold for $91,520,000 in profit.

207.    Plaintiffs Zheng and Abdul made purchases contemporaneous with these sales by Defendant Mariotti and the ACON Defendants.

Plaintiff Zheng made the following purchases contemporaneous with those sales:

| Date of Purchase | Amount | Price |
|---|---|---|
| 9/19/19 | 4,797 | $25.80 |
| 9/19/19 | 20,000 | $25.58 |
| 9/26/19 | 4,808 | $21.25 |

Plaintiff Abdul made the following purchases contemporaneous with those sales:

| Date of Purchase | Amount | Price |
|---|---|---|
| 9/20/19 | 1,371 | $21.82 |
| 9/23/19 | 985 | $20.35 |
| 9/24/19 | 741 | $20.25 |
| 9/25/19 | 507 | $19.73 |

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

208.    The Board members appointed by ACON filed Form 4s related to these sales, as did the ACON Entities.

209.    Plaintiffs Zheng and Abdul traded contemporaneously with the ACON Defendants as detailed above.

210.    On October 1, 2019, Defendant Perlmutter sold 56,250 shares at $20.61 per share.  On October 7, 2019, Plaintiff Zheng purchased 5,558 shares at $19 per share.

211.    Plaintiffs Abdul and Zheng and members of the Class who purchased shares of Funko common stock contemporaneously with sales by the Insider Trading Defendants suffered damages because: (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as alleged herein; and (2) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

212.    Accordingly, under Section 20A of the Exchange Act, the Insider Trading Defendants are liable to Plaintiffs Abdul and Zheng and the Class for all profits gained and losses avoided by them as a result of their stock sales.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

(A)    Determining that this action is a proper class action and certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(B)    Awarding damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the Securities Exchange Act of 1934, in an amount to be proven at trial, including interest thereon;

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

1        (C)      Awarding Lead Plaintiffs and the Class their reasonable costs and expenses

2    incurred in this action, including counsel fees and expert fees; and

3        (D)      Such other and further relief as the Court may deem just and proper.

4    **JURY TRIAL DEMANDED**

5        Lead Plaintiffs hereby demand a trial by jury.

6

7    DATED: July 31, 2020               Respectfully submitted,

8                                 **POMERANTZ LLP**

9                                 By:/s/*Jeremy A. Lieberman*

10                                Jeremy A. Lieberman

                             (admitted *pro hac vice*)

11                                Cara David

                             (admitted *pro hac vice*)

12                                600 Third Ave., 20th Fl.

13                                New York, NY 10016

14                                (212) 661-1100

15                                jalieberman@pomlaw.com

                             cdavid@pomlaw.com

16

17                                **POMERANTZ LLP**

                             Jennifer Pafiti (SBN 282790)

18                                1100 Glendon Avenue, 15th Floor

                             Los Angeles, CA 90024

19                                Telephone: (310) 405-7190

20                                Email:  jpafiti@pomlaw.com

21                                *Co-Lead Counsel for Lead*

22                                *Plaintiffs*

23                                **BERNSTEIN LIEBHARD LLP**

                             Stanley D. Bernstein

24                                 (*pro hac vice* forthcoming)

25                                Stephanie Beige

                             (*pro hac vice* forthcoming)

26                                Laurence J. Hasson

27                                (*pro hac vice* forthcoming)

                             Peter J. Harrington

28                                (*pro hac vice* forthcoming)

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
Email: bernstein@bernlieb.com
beige@bernlieb.com
lhasson@bernlieb.com
pharrington@bernlieb.com

*Co-Lead Counsel for Lead Plaintiffs*

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Email: peretz@bgandg.com

*Additional Counsel for Lead Plaintiffs*

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx

1  
2  
3  
4  
5  
6  
7  
8  
9  
10  
11  
12  
13  
14  
15  
16  
17  
18  
19  
20  
21  
22  
23  
24  
25  
26  
27  
28  

**CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/  Jeremy A. Lieberman*
Jeremy A. Lieberman

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-02319-VAP-PJWx