LATHAM & WATKINS LLP
    Benjamin A. Naftalis (*pro hac vice*)
    *benjamin.naftalis@lw.com*
    Kevin M. McDonough (*pro hac vice*)
    *kevin.mcdonough@lw.com*
885 Third Avenue
New York, New York  10022-4834
Telephone: +1.212.906.1200
Facsimile: +1.212.751.4864

LATHAM & WATKINS LLP
    Meryn C. N. Grant (State Bar No. 291315)
    *meryn.grant@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California  90071-1560
Telephone: +1.213.485.1234
Facsimile: +1.213.891.8763

Attorneys for the Funko Defendants

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GILBERTO FERREIRA, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> FUNKO, INC., BRIAN MARIOTTI, RUSSELL NICKEL, ANDREW PERLMUTTER, JENNIFER FALL JUNG, KEN BROTMAN, GINO DELLOMO, ADAM KRIGER, ACON INVESTMENTS, L.L.C., ACON FUNKO MANAGER, L.L.C., ACON FUNKO INVESTORS, L.L.C., ACON FUNKO INVESTORS HOLDINGS 1, L.L.C., ACON INVESTORS HOLDINGS 2, L.L.C., ACON INVESTORS HOLDINGS 3, L.L.C., and ACON EQUITY GENPAR, L.L.C., <br><br> Defendants. | Case No. 2:20−cv−02319−VAP−PJW <br><br> **FUNKO DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br><br> Hearing <br> Date: January 25, 2021 <br> Time: 2:00 PM <br> Courtroom: 8A <br> Judge: Hon. Virginia A. Phillips |

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD**:

PLEASE TAKE NOTICE  that on January 25, 2021, at 2:00 PM in Courtroom

8A of the Honorable Virginia A. Phillips, located at 350 West First Street, Los

Angeles, California, Defendants Funko, Inc., Brian Mariotti, Russell Nickel, Andrew Perlmutter, Jennifer Fall Jung, Ken Brotman, Gino Dellomo, and Adam Kriger (the "Funko Defendants") will move for an order dismissing lead plaintiffs Abdul Baker, Zhibin Zhang, and Huaiyu Zheng's ("Plaintiffs") Consolidated Amended Class Action Complaint ("CAC" or "Complaint") for failure to state a claim upon which relief can be granted pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act.

Plaintiffs fail to state a claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 because the CAC: (i) fails to adequately plead that the Funko Defendants made a material misrepresentation or omission, and (ii) fails to adequately plead that any of the Funko Defendants acted with scienter. Absent a predicate violation of the Exchange Act, Plaintiffs' Section 20A claims must necessarily fail, and Plaintiffs also cannot establish control-person liability under Section 20(a).

This motion is based on this Notice of Motion and Motion to Dismiss, the accompanying Memorandum of Points and Authorities, the Declaration of Kevin M. McDonough and exhibits thereto, the Funko Defendants' Request for Judicial Notice, the CAC, the Court's record on this matter, the arguments of counsel, and other evidence and argument that may be presented prior to the Court's decision on this motion.

**Compliance with Local Rule 7-3**. This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on September 1, 2020. The parties were unable to resolve the issues raised by this motion.

LATHAM&WATKINSᴸᴸᵖ
ATTORNEYS AT LAW
LOS ANGELES

CASE NO. 2:20−cv−02319−VAP−PJW
DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS

Respectfully submitted,

Dated:  October 2, 2020          **LATHAM & WATKINS LLP**

By:  /s/ Kevin M. McDonough
         Benjamin A. Naftalis
         (admitted *pro hac vice*)
         Kevin M. McDonough
         (admitted *pro hac vice*)
         885 Third Avenue
         New York, New York  10022
         Telephone: +1.212.906.1200
         Facsimile: +1.212.751.4864
         Email: benjamin.naftalis@lw.com
                   kevin.mcdonough@lw.com

         Meryn C. N. Grant
         (State Bar No. 291315)
         355 South Grand Avenue, Suite 100
         Los Angeles, California  90071
         Telephone: +1.213.485.1234
         Facsimile: +1.213.891.8763
         Email: meryn.grant@lw.com


*Counsel for Funko, Inc., Brian Mariotti, Russell Nickel, Andrew Perlmutter, Jennifer Fall Jung, Ken Brotman, Gino Dellomo, Adam Kriger*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

CASE NO. 2:20−cv−02319−VAP−PJW
DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS

## **TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ..................................................................... 1

II.   FACTUAL BACKGROUND ....................................................................... 3

    A.    The Parties ....................................................................................... 3

    B.    Funko's 2019 Sales Forecasts ........................................................ 4

    C.    Funko's Inventory Disclosures To Investors .................................. 6

III.  APPLICABLE LEGAL STANDARDS ...................................................... 7

IV.   ARGUMENT ............................................................................................. 8

    A.    The CAC Fails To Plead A Section 10(b) Claim ............................ 8

        1.    Plaintiffs Do Not Allege An Actionable Misstatement Or Omission ......................................................... 8

        2.    The CAC Does Not Support A "Strong Inference" Of Scienter ................................................................. 18

        3.    There Is No Viable Section 10(b) Claim Against The Non-Speaking Defendants ................................................ 25

    B.    Plaintiffs' Section 20(a) And 20A Claims Fail .............................. 25

V.    CONCLUSION ......................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Accuray, Inc. Sec. Litig.*,
757 F. Supp. 2d 936 (N.D. Cal. 2010)........................................................20, 21

*Alaska Elec. Pension Fund v. Adecco S.A.*,
434 F. Supp. 2d 815 (S.D. Cal. 2006), *aff'd*, 256 F. App'x 74 (9th
Cir. 2007)..................................................................................................18, 24

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002).............................................................................16

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align
Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017)..........................................................................9, 15

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) .............................................................14

*Colyer v. Acelrx Pharm. Inc.*,
2015 WL 7566809 (N.D. Cal. Nov. 25, 2015)....................................................16

*In re Copper Mountain Sec. Litig.*,
311 F. Supp. 2d 857 (N.D. Cal. 2004)...............................................................23

*Curry v. Yelp Inc.*,
875 F.3d 1219 (9th Cir. 2017).........................................................................8, 24

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010).........................................................................9, 11

*In re Downey Sec. Litig.*,
2009 WL 2767670 (C.D. Cal. Aug. 21, 2009).....................................................19

*Gompper v. VISX, Inc.*,
298 F.3d 893 (9th Cir. 2002).................................................................................8

*In re Hansen Natural Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007)..............................................................22

*IMPAC Secured Assets Corp. v. SNR Denton US LLP*,
    2013 WL 12139422 (C.D. Cal. Feb. 13, 2013) ............................................ 10, 11

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011) ..................................................................................... 25

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ..................................................................... 25

*Loftus v. Primero Mining Corp.*,
    230 F. Supp. 3d 1209 (C.D. Cal. 2017) ....................................................... 10

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ......................................................................... 7

*M&M Hart Living Tr. v. Glob. Eagle Entm't, Inc.*,
    2017 WL 5635424 (C.D. Cal. Aug. 20, 2017) ............................................... 9

*McGovney v. Aerohive Networks, Inc.*,
    367 F. Supp. 3d 1038 (N.D. Cal. 2019) ....................................................... 19

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) .................................................................. 7, 22

*Miller v. PCM Inc.*,
    2018 WL 5099722 (C.D. Cal. Jan. 3, 2018) ................................................... 8

*In re Nektar Therapeutics*,
    2020 WL 3962004 (N.D. Cal. July 13, 2020) ............................................... 25

*In re Netflix, Inc. Sec. Litig.*,
    647 F. App'x 813 (9th Cir. 2016) ................................................................. 25

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ....................................................................... 7

*Okla. Firefighters Pension & Ret. Sys. v. Ixia*,
    2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) ............................................... 22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension
    Fund*,
    575 U.S. 175 (2015) ................................................................................. 9, 15

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

iii

CASE NO. 2:20−cv−02319−VAP−PJW
MEMORANDUM OF POINTS AND AUTHORITIES

*Osher v. JNI Corp.*,
308 F. Supp. 2d 1168 (S.D. Cal. 2004), *aff'd in part, vacated in part on other grounds*, 183 F. App'x 604 (9th Cir. 2006) ................................. 16

*Paddock v. Dreamworks Animation SKG, Inc.*,
2015 WL 12711653 (C.D. Cal. Apr. 1, 2015), *aff'd sub nom. Roofers Local No. 149 Pension Fund v. DreamWorks Animation SKG, Inc.*, 677 F. App'x 376 (9th Cir. 2017) ....................................................... 14

*In re Pivotal Sec. Litig.*,
2020 WL 4193384 (N.D. Cal. July 21, 2020) ........................................................ 9

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
2012 WL 1868874 (N.D. Cal. May 22, 2012), *aff'd*, 759 F.3d 1051 (9th Cir. 2014) ....................................................................................................... 23

*In re Rackable Sys., Inc. Sec. Litig.*,
2010 WL 199703 (N.D. Cal. Jan. 13, 2010) ......................................................... 16

*In re Rackable Sys., Inc. Sec. Litig.*,
2010 WL 3447857 (N.D. Cal. Aug. 27, 2010) ...................................................... 14

*In re Read-Rite Corp. Sec. Litig.*,
115 F. Supp. 2d 1181 (N.D. Cal. 2000), *aff'd*, 335 F.3d 843 (9th Cir. 2003) ................................................................................................................. 23

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) .................................................................. 14, 21, 22

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) ................................................................................ 18

*In re Silicon Storage Tech., Inc., Sec. Litig.*,
2006 WL 648683 (N.D. Cal. Mar. 10, 2006) ....................................................... 18

*In re Silicon Storage Tech., Inc., Sec. Litig.*,
2007 WL 760535 (N.D. Cal. Mar. 9, 2007) ......................................................... 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ............................................................................................... 7

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) ......................................................................... 21, 23

*Waterford Twp. Police v. Mattel, Inc.*,
  321 F. Supp. 3d 1133 (C.D. Cal. 2018), *aff'd*, 794 F. App'x 669
  (9th Cir. 2020) ....................................................................................................*passim*

*Wozniak v. Align Tech., Inc.*,
  2011 WL 2269418 (N.D. Cal. June 8, 2011) ...............................................9, 12

*Xiaojiao Lu v. Align Tech., Inc.*,
  417 F. Supp. 3d 1266 (N.D. Cal. 2019) ............................................................23

*In re Yahoo! Inc. Sec. Litig.*,
  611 F. App'x 387 (9th Cir. 2015)......................................................................10

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009)..........................................................8, 19, 20, 21

**STATUTES**

15 U.S.C. § 78u-4(b)(1)(B) ....................................................................................7

15 U.S.C. § 78u-4(b)(2) ........................................................................................18

15 U.S.C. § 78u-5(c)(1)(A)-(B)............................................................................11

15 U.S.C. § 78u-5(c)(1)(B).............................................................................9, 12

15 U.S.C. § 78u-5(d)..............................................................................................10

15 U.S.C. § 78u-5(i)(1) ...........................................................................................9

**RULES**

Rule 9(b) ............................................................................................................7, 8

Defendants Funko, Inc. ("Funko" or the "Company"), Brian Mariotti, Russell Nickel, Andrew Perlmutter, Jennifer Fall Jung, Ken Brotman, Gino Dellomo, and Adam Kriger (collectively, the "Individual Defendants," and together with Funko, the "Funko Defendants") submit this memorandum of law in support of their motion to dismiss the Consolidated Amended Complaint ("CAC" or "Complaint") (Ex. 1, cited as "¶ _").[1]

## I.    PRELIMINARY STATEMENT

Plaintiffs' claims are based on (i) a single quarter in which Funko's sales fell short of expectations (for the first time ever); and (ii) the Company's decision to take an inventory write-down in that same quarter—both of which Funko promptly disclosed to investors.  Neither of these theories can support a claim for securities fraud, and the allegations in the CAC fail to satisfy the demanding pleading standards that apply to Plaintiffs' claims.  The CAC therefore should be dismissed.

Funko is a Washington-based company that creates and sells unique products that allow consumers to express their affinity for their favorite pop culture icons. *See* ¶¶ 2, 22.  After its November 2017 IPO, Funko produced "nine consecutive quarters of more than 20% net sales growth."  ¶ 47.  In the midst of that period of impressive growth, Funko announced in August 2019 that it was increasing its 2019 full year sales guidance from a range of $810 to $825 million to a range of $840 to $850 million. ¶ 90.  The increased projection reflected, among other things, Funko's banner performance through the first two quarters of 2019, and its expectations for strong sales of merchandise tied to two highly anticipated holiday-season movies from blockbuster franchises, *Star Wars: Episode IX* and *Frozen 2*.  ¶¶ 90, 91.  In October 2019, Funko announced that its sales in the third quarter grew by 26%, "exceeding expectations" as Plaintiffs admit, and the Company therefore reaffirmed its full year sales guidance. ¶ 116.  However, Funko experienced disappointing sales

---

[1] Unless otherwise indicated, all internal citations and quotations are omitted, emphasis is added, and citations to "Ex. __" refer to exhibits attached to the Declaration of Kevin M. McDonough.

in the fourth quarter, largely due to softness in holiday season sales and, as a result, the Company fell short of its 2019 sales goals. ¶ 90.  After the fourth quarter closed, Funko accelerated its financial reporting timeline to give investors prompt notice of the disappointing results, and its stock price suffered a sharp decline.  ¶¶ 138, 140.

Plaintiffs now seek to turn Funko's one-quarter stumble into a fraud case against the Company, senior management, and three board members.  Plaintiffs allege that by late August or early September (*i.e.*, in the midst of a strong third quarter and nine-quarter streak of at least 20% sales growth), the Funko Defendants somehow knew that fourth quarter sales would disappoint and an inventory write-down would be needed.  Plaintiffs further claim that Defendants concealed their alleged knowledge of these future events so that two Individual Defendants and a private equity firm (ACON) could sell fractions of their stockholdings at supposedly inflated prices while continuing to hold very substantial amounts of Funko stock through the end of the putative class period.  Based on these allegations, Plaintiffs assert claims against Defendants under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 on behalf of a putative class of investors during the period of August 8, 2019 through March 5, 2020 (the "Class Period").  But the CAC lacks any coherent theory of fraud, and it fails to state a claim for multiple reasons.

*First*, Plaintiffs fail to plead an actionable misstatement or omission.  Plaintiffs' primary theory of falsity is based on Funko's sales projections.  Such statements are quintessential forward-looking statements and thus are protected by the PSLRA's safe harbor for such statements because (i) they were accompanied by meaningful cautionary language, and (ii) in any event, the CAC is devoid of any particularized allegations that Defendants made the projections with actual knowledge that they were false.  Indeed, as this Court has held, the "PSLRA's safe harbor is designed to protect companies and their officials from suit when optimistic projections" like Funko's "are not borne out by events."  *Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1150 (C.D. Cal. 2018), *aff'd*, 794 F. App'x 669

(9th Cir. 2020). Further, the Funko Defendants' statements regarding their expectations and optimism are non-actionable under the doctrines that apply to opinions and corporate puffery. Plaintiffs' attempt to manufacture a false statement from Defendants' inventory disclosures fares no better. Indeed, Funko made quarterly disclosures regarding the value and period-to-period fluctuations of its inventory, and Plaintiffs do not challenge *any* of those disclosures.

*Second*, Plaintiffs do not allege particularized facts to support a compelling inference that any Defendant acted with scienter. Plaintiffs' scienter theory relies heavily on six confidential witnesses ("CWs"), but none of their allegations supports an inference that the Funko Defendants made any false statements intentionally or with deliberate recklessness. The only CW who alleges direct contact with any of the Individual Defendants (CW1) was a new employee when the Class Period started, and he had no experience with Funko's fourth quarter sales process (which delivered strong results in the past). Further, CW1's allegations amount to nothing more than subjective disagreement with management's expectations regarding future sales, and that does not remotely demonstrate any of the Funko Defendants acted with fraudulent intent. Plaintiffs' allegations regarding stock sales by two of the seven Individual Defendants likewise fail to support a strong inference of scienter. The sales were made early in the Class Period, before Funko reaffirmed its increased sales projections, and long before Funko announced—or possibly could have known—its fourth quarter results. Moreover, the same Individual Defendants who sold shares during the Class Period retained huge quantities of Funko stock, which undercuts any inference of motive to commit fraud. Accordingly, the CAC fails to state a claim for securities fraud and it should be dismissed.

## II.   FACTUAL BACKGROUND

### A.   The Parties

Plaintiffs are three individual investors, each of whom alleges purchases of Funko stock during the Class Period. They assert claims against Funko, CEO Brian

Mariotti, Russell Nickel, who served as CFO until August 13, 2019, current CFO Jennifer Fall Jung, President Andrew Perlmutter, and board members Ken Brotman, Gino Dellomo, and Adam Kriger.  ¶¶ 22-26, 34-36.  Plaintiffs allege no materially false or misleading statements by Perlmutter, Brotman, Dellomo, or Kriger.

**B.     Funko's 2019 Sales Forecasts**

Funko creates products based on popular movie and television characters, entertainers and sports figures (among others) through licenses with major content providers, such as Disney, the NFL, and Warner Brothers.  ¶¶ 48-49.  When Funko announced its 2019 outlook in February, the Company disclosed that it was projecting full year net sales of $810 to $825 million.  *See* ¶ 124.  On August 8, 2019, Funko held its second quarter 2019 earnings call and announced that it was increasing its sales projections for 2019.   As then-CFO Nickel explained: "Considering that both Q1 and Q2 results exceeded our expectations, we are raising our full year guidance at this time.  We now expect net sales of $840 million to $850 million . . . ." Ex. 20, Q2 2019 Earnings Call Tr. at 9; *see also* ¶ 124.  Mariotti added, regarding a year that Plaintiffs admit included the highest grossing film of *all time*: "I would continue to say the content year as a whole, it's extremely strong.  And we have 2 big bullets left to fire with *Frozen 2* and *Star Wars: Episode IX* . . . We still have . . . so many different ways to monetize different properties for the second half of this year.  We're excited.  We think the content is extremely strong." *See* Ex. 20, Q2 2019 Earnings Call Tr. at 11; ¶¶ 91, 94, 125.

Funko's optimism was validated by its third quarter performance, which "exceed[ed] expectations," with net sales of $233 million and year-over-year growth of 26%.  ¶¶ 116, 129.  The third quarter of 2019 marked the Company's *ninth consecutive quarter of more than 20% sales growth*:

|  | Net Sales | Y-O-Y Growth | Source[2] |
|---|---|---|---|
| **Q3 2017** | $142.8M | 21% | Ex. 5 at 5 |
| **Q4 2017** | $169.5M | 28% | Ex. 6 at 4 |
| **Q1 2018** | $137.2M | 38.5% | Ex. 7 at 4 |
| **Q2 2018** | $138.7M | 32% | Ex. 8 at 4 |
| **Q3 2018** | $176.9M | 24% | Ex. 9 at 4 |
| **Q4 2018** | $233.2M | 38% | Ex. 10 at 4 |
| **Q1 2019** | $167.1M | 22% | Ex. 18 at 8 |
| **Q2 2019** | $191.2M | 38% | Ex. 19 at 4 |
| **Q3 2019** | $223.3M | 26% | Ex. 27 at 4 |

During Funko's third quarter earnings call in October, the Company's new CFO, Jung, explained that the better-than-expected sales were driven in large part by repeatable factors such as the strong performance of Funko's "evergreen" content, the diversification of its retail customers, and the increasing number of its "active" properties. Ex. 28, Q3 2019 Earnings Call Tr. at 7. Funko's third quarter sales positioned the Company to achieve its full year sales goal, and Funko reaffirmed the sales projections it provided to the market in August. Ex. 27, Q3 2019 Form 8-K at 6. As the above chart demonstrates, prior to the fourth quarter of 2019, Funko was averaging year-over-year sales growth of *over 29%* across all quarters and *over 32%* growth in the fourth quarter. With sales of $581 million through the first three quarters of 2019, Funko needed to achieve only 11-15% year-over-year growth in the fourth quarter of 2019 to achieve its goal of $840 to $850 million in total annual net sales.

However, the strong holiday season Funko anticipated did not materialize; fourth quarter sales fell short of expectations; and Funko in turn missed its full year sales projections. ¶¶ 138, 151-52. Funko promptly disclosed those disappointing results in a preliminary fourth quarter earnings release issued on February 5, 2020—accelerating its customary financial reporting timeline and disclosing its results more than a month *earlier* than required by SEC regulations. ¶ 138. On March 5, 2020,

---

[2] *See also* ¶ 47.

Funko issued a press release announcing its final fiscal 2019 results and explaining that the fourth quarter results were based on unexpected market conditions, including "orders from [Funko's] top retail customers [that] came in below expectations due to the softness surrounding the holiday shopping season," and weaker-than-expected sales tied to the major fourth quarter movie releases, *Star Wars* and *Frozen 2* (*i.e.*, "tentpole properties"). ¶¶ 148, 151-52; Ex. 31, Q4 2019 Earnings Call Tr. at 8.

### C.  Funko's Inventory Disclosures To Investors

As a consumer products business, Funko maintained inventory to fill orders from major retailers and other customers.  In its periodic SEC filings, Funko disclosed its inventory balance and the amount by which inventory had increased or decreased from prior periods.[3]  In addition, Funko warned investors that its unique business required the Company to order inventory from third party manufacturers well before the inventory could be sold to customers, which created risk because it was sometimes "difficult to respond to changes in consumer preferences and market conditions, which, for pop culture products, can change rapidly."  *See, e.g.*, ¶ 122 (quoting Ex. 18, Q2 2019 Form 10-Q at 42).  Accordingly, Funko "maintain[ed] reserves for excess and obsolete inventories to reflect the inventory balance at the lower of cost or net realizable value," a process that required the Company to "make judgments," including "estimat[ing] obsolescence based on assumptions regarding future demand." *E.g.*, Ex. 13, 2018 Form 10-K at 80-81.  Funko adjusted its reserve when necessary, such as at year-end 2018, when the Company announced a $1.4 million reserve increase to account for a rise in inventory it might not be able to sell. *Id.* at 66.  Further, the Company warned investors that, notwithstanding its reserve, a write-down of inventory remained possible. *See, e.g.*, *id.* at 26.

On August 8, 2019, Defendant Nickel disclosed that inventory was "up to $75.3 million," which he said represented an "increase of about 17%" compared to the second quarter of 2018 but a decrease of "13% compared to year-end 2018." Ex.

---

[3] *See, e.g.*, Ex. 13, 2018 Form 10-K at 88, 90; Ex. 18, Q2 2019 Form 10-Q at 4, 5.

20, Q2 2019 Earnings Call Tr. at 9. Nickel also disclosed that Funko had recorded another increase to its reserve for "slower-moving inventory of some old lines" of products. ¶¶ 119-20. While they do not challenge Funko's disclosed inventory balance for the second quarter of 2019 or the accounting judgments underlying that figure, Plaintiffs allege that Nickel and Funko made misleading statements about inventory principally because six months later—in February 2020—Funko disclosed a $16.8 million write-down to dispose of slower-moving inventory. *Id.* ¶¶ 7, 138.

## III.    APPLICABLE LEGAL STANDARDS

To plead securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must allege facts showing: (1) a material misrepresentation or omission in connection with the purchase or sale of a security; (2) scienter; (3) reliance; (4) economic loss; and (5) loss causation. *Loos v. Immersion Corp.*, 762 F.3d 880, 886-87 (9th Cir. 2014). Such claims must satisfy the heightened and "formidable pleading requirements" of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008). Rule 9(b) requires plaintiffs to "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). The PSLRA requires Plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B).

The PSLRA also requires plaintiffs to state with particularity facts giving rise to a strong inference of scienter—*i.e.*, that defendants acted with an "intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313, 319 (2007). To plead scienter, plaintiffs "must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Mattel, Inc.*, 321 F. Supp. 3d at 1151. The recklessness standard is "much closer to one of intent," *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d

1046, 1053 (9th Cir. 2014); each statement must constitute an "extreme departure from the standards of ordinary care" that "presents a danger of misleading . . . that is either known to the defendant or is so obvious that the actor must have been aware of it." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Curry v. Yelp Inc.*, 875 F.3d 1219, 1226 (9th Cir. 2017); *Miller v. PCM Inc.*, 2018 WL 5099722, at *5 (C.D. Cal. Jan. 3, 2018) (Phillips, J.). To determine whether there is a strong inference of scienter, "the court must consider all reasonable inferences . . . including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002).

## IV.   ARGUMENT

### A.   The CAC Fails To Plead A Section 10(b) Claim

Plaintiffs allege that the Funko Defendants committed fraud by making materially false statements and omissions regarding Funko's future sales and its inventory. But the CAC fails to state a claim under Section 10(b) and Rule 10b-5, because it does not present particularized allegations establishing falsity or scienter under Rule 9(b) and the PSLRA.

#### 1.   Plaintiffs Do Not Allege An Actionable Misstatement Or Omission

##### a.   The August 8, 2019 Sales Projections Were Not False

On August 8, 2019, Funko issued a press release announcing its second quarter results and stating that the Company "now *expects* net sales to be in a range of $840 million to $850 million." Ex. 19, Q2 2019 Form 8-K at 6. Then-CFO Nickel reiterated those sales projections on Funko's earnings call later that day, and Mariotti offered general commentary on Funko's optimism for the rest of 2019. Ex. 20, Q2 2019 Earnings Call Tr. at 4, 9; ¶ 125. Plaintiffs do not allege that any of these

statements were false when made, nor could they, because the August 8 statements regarding future sales are protected from liability under well-settled doctrines.

Nickel's statement regarding Funko's projected sales, which Plaintiffs wrongly attribute to Mariotti (¶ 124), is by definition a forward-looking statement and is therefore exempt from liability under the PSLRA safe harbor for such statements. 15 U.S.C. § 78u-5(i)(1) (forward-looking statements include, *inter alia*, "projection[s]" and "statement[s] of future economic performance"); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (a projection is "by definition a forward-looking statement"); *Mattel*, 321 F. Supp. 3d at 1150-51 (statements regarding full-year outlook were forward-looking statements).[4]  Plaintiffs make no attempt whatsoever to satisfy the exacting requirements for avoiding application of the PSLRA safe harbor, and accordingly, the August 2019 sales projection is not actionable.  15 U.S.C. § 78u-5(c)(1)(B); ¶¶ 90, 114, 118, 124, 129, 133.

The sales projection is not actionable for the additional reason that it is an opinion statement regarding what Funko and Nickel expected to happen, and Plaintiffs do not state allegations sufficient to meet the high bar for pleading falsity of opinions under the federal securities laws.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 176 (2015); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615 (9th Cir. 2017); *see also In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *14 (N.D. Cal. July 21, 2020) (finding that "opinions related to [the company's] financial projections" were non-actionable under *Omnicare*).  Further, Mariotti's August 8, 2019 statements—that the content in 2019 was "extremely strong," Funko was optimistic that the major fourth quarter movie releases would drive sales, and it had many ways to monetize its properties—are statements of corporate puffery, which

_____

[4] *See also M&M Hart Living Tr. v. Glob. Eagle Entm't, Inc.*, 2017 WL 5635424, at *11 & n.5 (C.D. Cal. Aug. 20, 2017) (holding statements about projections, goals, and future economic performance are forward-looking statements under the PSLRA); *Wozniak v. Align Tech., Inc.*, 2011 WL 2269418, at *5-6 (N.D. Cal. June 8, 2011) (holding upwards revisions of "future economic performance" "qualify as forward looking").

are not actionable under the federal securities laws. *See Mattel*, 321 F. Supp. 3d at 1148-49 (statements regarding confidence in Q3 results were non-actionable).

### b. Mariotti Had No Duty To Correct The August Statements

Unable to point to any actionable false statement in the August 8, 2019 sales projections and related statements, Plaintiffs allege that Mariotti violated the federal securities laws by not correcting those prior statements after he supposedly learned in late August or early September that "there were red flags that the Company would not meet its guidance." ¶ 128. This theory fails for multiple reasons.

*First*, there is no "duty to correct" or "duty to update" forward-looking statements under the PSLRA or Ninth Circuit law. 15 U.S.C. § 78u-5(d) ("Nothing in this section shall impose upon any person a duty to update a forward-looking statement."); *In re Yahoo! Inc. Sec. Litig.*, 611 F. App'x 387, 389-90 (9th Cir. 2015) (noting that "[n]either the Supreme Court nor the Ninth Circuit has recognized a duty to correct," and declining to do so); *see also Loftus v. Primero Mining Corp.*, 230 F. Supp. 3d 1209, 1233 (C.D. Cal. 2017) (same). Nor is there a duty to correct Mariotti's August 2019 puffery statements—because no reasonable investor would rely on such vague expressions of corporate optimism. *Mattel*, 321 F. Supp. 3d at 1148 (explaining that "investors do not rely on vague statements of optimism").

*Second*, and in any event, the CAC contains no particularized allegations that Mariotti learned in late August or early September that the August 8 statements were materially false when made. *IMPAC Secured Assets Corp. v. SNR Denton US LLP*, 2013 WL 12139422, at *3 (C.D. Cal. Feb. 13, 2013) (explaining that if a "duty to correct" existed, it could only arise if the speaker later discovers that the statement was untrue or misleading *when made*). Relying on allegations from CW1,[5] Plaintiffs claim that, by late August, Mariotti learned that "there was no basis for the

---

[5] As discussed in more detail in Section IV.A.2.a *infra*, at the time CW1 claims to have known Funko's senior management's predictions were wrong, he had been at Funko for approximately one month. ¶ 120(a) (alleging CW was "hired in July 2019").

Company's FY2019 guidance" because there was insufficient "content" in Funko's "pipeline to support the guidance." ¶ 128. But CW1 does not identify any specific interactions with Mariotti in August or September in which CW1—or anyone else—provided information to Mariotti showing that the earlier forward-looking, opinion, and puffery statements (or any other statements) were false when made. CW1 alleges that he "raised concerns" about the fourth quarter sales targets in weekly sales meetings, but admits that Mariotti did not attend such meetings until *November 2019*. ¶¶ 97, 101. Further, CW1's speculation that others may have relayed his vague and subjective concerns to Mariotti *at some point*—and his claim that Mariotti received emails with sales data—fall far short of a particularized allegation that the CEO discovered in late August or early September that his August 8 statements were somehow untrue when made. ¶¶ 101, 104; *IMPAC*, 2013 WL 12139422, at *3. Moreover, Plaintiffs admit that Funko's sales in the third quarter of 2019 "exceed[ed] expectations," ¶ 116, which belies the contention that Mariotti knew—in the middle of that strong quarter—that Funko would fall short of its full year projections or that "the content year as a whole" was not strong. ¶¶ 91, 125.

### c.    The October 31, 2019 Statements Are Not Actionable, And Were Not False Or Misleading In Any Event

Plaintiffs' allegations regarding the October 31, 2019 statements by Funko and Jung reiterating the outlook for FY2019 fare no better. *See* ¶¶ 129-31. As explained in Section IV.A.1.a, *supra*, such statements projecting future performance are forward-looking statements. Forward-looking statements are immunized from liability under the PSLRA's safe harbor if they (i) are identified as forward-looking and accompanied by meaningful cautionary language, *or* (ii) Plaintiffs fail to demonstrate that the statements were made "with actual knowledge" of falsity. 15 U.S.C. § 78u-5(c)(1)(A)-(B); *In re Cutera Sec. Litig.*, 610 F.3d at 1113 & n.5 (holding that the PSLRA safe harbor "should be read in the disjunctive"); *Mattel*,

321 F. Supp. 3d at 1149-50.  The October 31 statements qualify for protection under *both* prongs of the PSLRA's safe harbor.

*First*, in their October 31 communications, Funko and its management clearly invoked the safe harbor for forward-looking statements and referred investors to the Company's extensive risk factor disclosures.  Ex. 27, Q3 2019 Form 8-K at 7-8; Ex. 28, Q3 2019 Earnings Call Tr. at 4.  The robust cautionary language in Funko's risk disclosures described the very factors that later materialized in the lower-than-expected fourth quarter sales, including the "seasonal nature" of Funko's business and the potential harm that would result if the holiday season were "adversely affected . . . by unforeseen events" such as economic "harm [to] the retail environment;" the need to develop products tied to movie franchises "before demand for the underlying content is known" and that could underperform; and potentially "significant[]" quarterly and yearly fluctuations in sales resulting from tying products "to a particular content release."  *Compare* Ex. 26, Q3 2019 Form 10-Q at 42, 45-46 and Ex. 18, Q2 2019 Form 10-Q at 41, 44-45 *with* ¶¶ 138, 149, 151-52 (explaining that FY2019 net sales were below expectations due to "lower than expected purchases among Funko's top customers throughout the holiday season," and underperformance by tentpole movie releases); *see also* Ex. 3, Key Risk Disclosures Appendix.  That is precisely the type of cautionary language that courts routinely find sufficient for application of the safe harbor.  *See, e.g.*, *Wozniak*, 2011 WL 2269418, at *7 ("These cautionary statements identified the risks plaintiff alleges ultimately materialized . . . .").

*Second*, Plaintiffs have not pleaded with particularity that the October projections were made with actual knowledge that they were false or misleading.  *See* 15 U.S.C. § 78u-5(c)(1)(B).  Plaintiffs allege that the October 31 statements are false for the very same reasons (repeated word-for-word in the CAC) they say Mariotti should have corrected the August 8 statements.  *Compare* ¶ 128 *with* ¶ 131.  Plaintiffs rely heavily on CW1's allegations that (i) he harbored and expressed

"concerns" about the quality of Funko's "content" and fourth quarter sales targets; (ii) he viewed products tied to the major fourth quarter 2019 movie releases (*Star Wars* and *Frozen 2*) as less promising than content from 2018; and (iii) there was a "gap," at some unspecified point, between customer orders for the fourth quarter and Funko's projections. But those speculative allegations and subjective views lack the factual content required under the PSLRA to support an inference that Jung, or any other Defendant, knew—with two months left in the fourth quarter—that Funko would fall short of its sales projections. *See Mattel*, 321 F. Supp. 3d at 1154-55 (discounting former employee allegations based on "hearsay and conjecture"). And Plaintiffs ignore the critical context in which the October 31 statements were made.

When Funko reaffirmed its projections, the Company had just recorded its *ninth* consecutive quarter of more than 20% sales growth, and with a better-than-expected third quarter in the books, the Company needed growth of only 11-15% in the fourth quarter to achieve its 2019 sales projections. *See supra* Section II.B. Contrary to CW1's subjective views about the available "content," the CAC admits that, in 2019, Funko had more properties from which to develop products and generate sales—not less—than the number it had in 2018. *Compare* ¶ 48 (592 properties as of August 2019) *with* ¶ 52 (583 properties in 2018). Although CW1 may have believed that *Star Wars: Episode IX* and *Frozen 2* were not as "promising" as the movies released in the fourth quarter of 2018 and thus might not generate strong sales, he does not allege that senior management shared that view. *See Mattel*, 321 F. Supp. 3d at 1154-55. In any event, Plaintiffs do not and cannot offer any facts suggesting that Defendants knew or could have known that the fourth quarter 2019 tentpole movie releases would fail to generate the expected level of sales.

Further, Plaintiffs fail to allege (as they must) when the supposed gap developed between internal forecasts and Funko's projections, the size of the gap, and the reasons (if any) why it could not be closed, through increased sales and marketing efforts or an uptick in demand in the two months remaining in 2019. *See*

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) (dismissing fraud claims where plaintiff did not allege "how far [product] sales were below the company's goals"); *In re Rackable Sys., Inc. Sec. Litig.*, 2010 WL 3447857, at *5 (N.D. Cal. Aug. 27, 2010) (dismissing claims where plaintiffs could not show the company believed its strategy to meet projections would be ineffective).  Plaintiffs' undated allegation that Jung stressed the "need to fix the shortfall," *see* ¶ 100, demonstrates the continued belief among Funko's senior management that the full-year sales projections remained achievable by the end of the holiday shopping season.

At bottom, the CAC does not articulate any basis to conclude that Jung, or anyone else, had actual knowledge on October 31 that Funko would not achieve its full year sales guidance.  And Plaintiffs' attempt to reverse engineer the falsity of a forward-looking projection by pointing to Funko's February and March 2020 announcements that holiday season sales did not materialize as expected and that products tied to fourth quarter tentpole releases had underperformed, ¶¶ 138, 151-52, is impermissible "fraud by hindsight" pleading, *Mattel*, 321 F. Supp. 3d at 1150 ("The PSLRA's safe harbor is designed to protect companies and their officials from suit when optimistic projections of growth in revenues and earnings are not borne out by events."); *see also Ronconi v. Larkin*, 253 F.3d 423, 430 n.12, 432 (9th Cir. 2001) ("honest optimism followed by disappointment is not the same as lying or misleading"); *Paddock v. Dreamworks Animation SKG, Inc.*, 2015 WL 12711653, at *5, *7 (C.D. Cal. Apr. 1, 2015) (dismissing claim based on "fraud-by-hindsight . . . , which the Ninth Circuit describes as when a complaint simply contrast[s] a defendant's past optimism with less favorable actual results"), *aff'd sub nom. Roofers Local No. 149 Pension Fund v. DreamWorks Animation SKG, Inc.*, 677 F. App'x 376 (9th Cir. 2017).[6]

---

[6] Further, and in any event, the October 31, 2019 reiteration of the August sales projections is not actionable for the additional reason that the sales projections are subject to the stringent *Omnicare*

####        d.        Plaintiffs Have Not Adequately Alleged That Funko's Disclosures About Inventory Were Misleading

Plaintiffs allege that Nickel and Funko made materially misleading statements regarding inventory by allegedly concealing that a significant amount of Funko's inventory purportedly had become "obsolete" as early as August 2019.  ¶¶ 119-20, 122-23, 136-37.  However, the CAC fails to state particularized allegations demonstrating that the inventory statements were materially false or misleading.

####        (1)        Nickel's Statement Regarding Funko's Inventory Reserves Is Not Actionable

Plaintiffs contend that Nickel's August 8, 2019 statement (in response to a question about gross margin) that Funko had increased its reserves for "slower-moving inventory" was materially false because Funko allegedly "had warehouses full obsolete inventory that would need to be written down."  ¶¶ 119-120; Ex. 20, Q2 2019 Earnings Call Tr. at 8; Ex. 18, Q2 2019 Form 10-Q at 24-25.  This theory of falsity fails for multiple reasons.

*First*, Plaintiffs' allegations that Funko held large amounts of inventory and "overstocked" warehouses merely plead that Funko maintained a high level of inventory, which is *exactly* what the Company disclosed to investors.  ¶¶ 120, 123, 137; *see also* ¶¶ 75, 77, 80, 84, 86.  On the very same August 8 call in which Nickel made the inventory statement Plaintiffs challenge, he disclosed that inventory was "up to $75.3 million," at the end of the second quarter of 2019, which represented an "increase of about 17%."  Ex. 20, Q2 2019 Earnings Call Tr. at 9.  In the third quarter of 2019, Funko disclosed that its inventory balance had risen to $94 million.  *See* ¶ 11.  Plaintiffs tellingly do not challenge the accuracy of these disclosures, which informed investors of Funko's inventory levels.

*Second*, inventory obsolescence and write-downs to inventory valuation are highly subjective accounting determinations, *e.g.*, Ex. 13, 2018 Form 10-K at 80-81,

test for falsity of opinion statements, which, again, Plaintiffs have made no attempt to satisfy.  *See Omnicare*, 575 U.S. at 185-85, 189-90; *City of Dearborn Heights*, 856 F.3d at 615.

and the CAC does not contain a single particularized allegation that Funko, as of August 8, 2019, "failed to account properly for excess or obsolete inventory or that the decision to write off inventory should have been made earlier." *In re Rackable Sys., Inc. Sec. Litig.*, 2010 WL 199703, at *6 (N.D. Cal. Jan. 13, 2010) (rejecting CW allegations that company "appeared to have a lot of excess inventory"); *Osher v. JNI Corp.*, 308 F. Supp. 2d 1168, 1193 (S.D. Cal. 2004) (allegations that company "was left with excess product in the fourth quarter" insufficient to allege that GAAP required a write down in that quarter"), *aff'd in part, vacated in part on other grounds*, 183 F. App'x 604 (9th Cir. 2006).

*Third*, to the extent Plaintiffs contend that Nickel was required to provide more detail about Funko's slower-moving inventory, ¶ 120, that is not the law, *see Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (holding challenged statements about potential investor interest that omitted actual proposals that already existed were not misleading). Nickel did not assert or imply that no inventory write-downs would occur in the future and, moreover, his statement that Funko had increased its reserve for slower-moving inventory undercuts Plaintiffs' theory that he fraudulently concealed potentially adverse information regarding Funko's inventory as of August 2019. Nickel's statement and Funko's disclosed inventory balance were literally true—Plaintiffs do not contend otherwise—and no further disclosure was required. *See Colyer v. Acelrx Pharm. Inc.*, 2015 WL 7566809, at *6 (N.D. Cal. Nov. 25, 2015) (Section 10(b) and Rule 10b-5 "prohibit only misleading and untrue statements, not statements that are incomplete").

### (2) Plaintiffs Have Not Adequately Alleged That Funko's Form 10-Q Risk Disclosures Were Misleading

Plaintiffs also challenge the following "Risk Factor" disclosure from Funko's Forms 10-Q for the second and third quarter: "[I]f demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold

for a long period of time, write down, sell at prices lower than expected or discard." ¶¶ 122, 136. Plaintiffs contend that Risk Factor was materially misleading because "Defendants" supposedly knew that "Funko's failure to accurately forecast sales and customer demand resulted in millions of dollars of obsolete inventory . . . ." ¶ 123. That is the same theory of falsity Plaintiffs offered with respect to Nickel's August 8 statement—indeed, the CAC cites the same allegations verbatim for both statements, *compare* ¶¶ 123, 137 *with* ¶ 120—and it fares no better the second time.

The Risk Factor disclosure is framed in terms of potential adverse consequences based on *future* events, *e.g.*, "demand or future sales" falling below "forecasted levels." ¶¶ 122, 136. The Risk Factor did not state that Funko presently had no excess or obsolete inventory. And far from concealing the present state of the Company's inventory, Funko disclosed (i) its inventory valuation and the period-to-period fluctuations, *see supra* Sections II.C & IV.A.1.d.(1); (ii) that it maintained "reserves for *excess and obsolete* inventories," Ex. 13, 2018 Form 10-K at 80, 92 (emphasis added); and (iii) when the Company increased those reserves and why, *e.g.*, ¶ 120.[7] Further, as noted above, Plaintiffs do not challenge the accuracy of the inventory balances that Funko disclosed in the second and third quarter of 2019 or Funko's subjective accounting judgments and assumptions regarding obsolescence which, by definition, are incorporated into the Company's disclosed inventory balance. *See generally* CAC; Ex. 13, 2018 Form 10-K at 80-81 ("This valuation requires us to make *judgments*, based on currently available information, about the likely method of disposition, such as through sales to customers, or liquidation, and expected recoverable value of each disposition category. We *estimate* obsolescence based on *assumptions* regarding future demand.") (emphasis added).

At bottom, Funko warned investors that declines in future demand or sales

---

[7] Funko also disclosed that its inventory valuations and estimates of obsolescence were made *without* the benefit of binding, long-term commitments from customers, given market conditions. ¶¶ 122, 136 ("As a result of the desire of retailers to more closely manage inventory levels, there is a growing trend to make purchases on a 'just-in-time' basis. . . . Our retail customers make no binding long-term commitments to us regarding purchase volumes . . . .").

could result in inventory write-downs.  That is precisely what occurred, according to the CAC itself:  demand and sales unexpectedly dipped in the fourth quarter of 2019, and Funko took a write-down to inventory.  Plaintiffs' inventory theory relies on the hindsight speculation that because Funko took a write-down in the fourth quarter of 2019, the write-down should have been taken in an earlier period and/or some of the Funko Defendants must have known that a write-down was necessary prior to the fourth quarter of 2019.  Such fraud by hindsight pleading cannot state a claim for federal securities fraud.[8] *In re Silicon Storage Tech., Inc., Sec. Litig.*, 2006 WL 648683, at *7 (N.D. Cal. Mar. 10, 2006) (rejecting as "a classic example of pleading fraud by hindsight" the allegation that, in essence, "because [the company] wrote down its inventory in December 2004, the statements about inventory made prior to that time must have been false").

### 2.    The CAC Does Not Support A "Strong Inference" Of Scienter

The CAC also must be dismissed because it fails to plead particularized facts to support a strong inference of scienter.  15 U.S.C. § 78u-4(b)(2).  Plaintiffs must allege scienter in "great detail," through "facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct."  *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974, 979 (9th Cir. 1999) (plaintiffs must "state *specific facts* indicating no less than a degree of recklessness that strongly suggests actual intent").  Plaintiffs' scienter allegations do not meet this standard.

---

[8] Plaintiffs do not even attempt to allege that Funko was required to take a write-down in excess of its "obsolete inventory" reserve in the second or third quarter.  *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 823-26 (S.D. Cal. 2006) (dismissing claim where plaintiffs failed to allege that the purportedly necessary write-down was not covered by reserves), *aff'd*, 256 F. App'x 74 (9th Cir. 2007); *In re Silicon Storage Tech., Inc., Sec. Litig.*, 2007 WL 760535, at *17 (N.D. Cal. Mar. 9, 2007) (rejecting alleged inventory overstatement where "plaintiffs fail[ed] to provide particularized information regarding the relationship between the cost and market prices of specific [company] products").

### a.    The CW Allegations Do Not Support A "Strong Inference" Of Scienter

Confidential witness allegations do not suffice to plead scienter unless they: (i) are described with sufficient particularity to establish their reliability and personal knowledge of the matters alleged; and (ii) offer statements that are "indicative of scienter." *Zucco*, 552 F.3d at 995. Plaintiffs' CW allegations fail to satisfy that test.

**CW1.**  CW1 allegedly served as Funko's Director of Merchandise Planning, from July 2019 until June 2020.  ¶ 56.  Therefore, at the time he claimed to be providing vague "warnings" and "raising flags" to management in August, September, and October 2019, he had been on the job for less than a quarter.  ¶¶ 96-100.  That CW1 had not been with Funko for a full reporting cycle—let alone the all-important holiday season—provides ample reason to discount his claims of prescience.  Moreover, his purported warnings that Funko lacked enough content (as opposed to product) to meet its sales targets were nothing more than disagreements with more experienced senior management, ¶¶ 94-105, who had overseen nine consecutive quarters of sales growth, ¶ 47.  Such disagreements are not indicative of scienter.  *See Zucco*, 552 F.3d at 998 (CW allegations amounting to disagreement with the corporation and its accounting processes were not indicative of scienter); *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1054 (N.D. Cal. 2019) (discounting CW's statement based on personal opinion); *In re Downey Sec. Litig.*, 2009 WL 2767670, at *11 (C.D. Cal. Aug. 21, 2009) ("the second-guessing of management decisions by [CWs] does not provide a basis for securities fraud").

**CW2 and CW6.**  Neither CW2 (who left Funko's Loungefly division in July 2019) nor CW6 (who left Funko on an unidentified date in August 2019) were employed at Funko during the Class Period, and their allegations fail to support an inference of scienter for that reason alone.  ¶¶ 61, 87; *see Mattel*, 321 F. Supp. 3d at 1154 (holding CW could not have personal knowledge because he left before the class period); *see also Zucco*, 552 F.3d at 996-97 (same).  Moreover, their vague and

speculative allegations about what certain Defendants "would have" known and that Funko had a lot of inventory (as the Company disclosed) do not demonstrate that Defendants' accounting and valuation judgments regarding Funko's inventory were wrong, or that Defendants made knowingly or recklessly false statements about inventory or future sales.  ¶¶ 79-81, 86-88, 107.

**CW3 and CW5.**  Plaintiffs' failure to allege that either CW3 or CW5 had any meaningful contact with the Individual Defendants confirms that they were simply not "in a position to be personally knowledgeable of the information alleged" to raise a strong inference of scienter.  *Zucco*, 552 F.3d at 996; *see also In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 948-49 (N.D. Cal. 2010) (no inference of scienter where defendants "had no personal interactions with any of the CWs").  Indeed, both worked in roles that necessarily provided them with a myopic view of the matters on which they purport to opine.  CW3 was an Account Manager assigned to a *single* account (Wal-Mart) and worked in Bentonville, Arkansas—thousands of miles away from Funko's headquarters in Washington.  ¶ 66.  CW5 "provided back-end sales support" for Funko's Latin America territory only and did not interact with any of the Individual Defendants.[9]  ¶¶ 72, 73.  *Mattel*, 321 F. Supp. 3d at 1154 (holding "relatively junior marketing analyst who focused entirely on one large client" did not have access to global retail inventory levels and did not allege meaningful contact with executives to support an inference of scienter).[10]  Further, the criticisms from CW3 and CW5 of Funko's sales forecasting process and conclusory allegations that the Individual Defendants received sales forecasts and data come nowhere close to demonstrating that any Defendant knew of information that contradicted any of

[9] Plaintiffs allege that CW5 attended "weekly sales meetings," ¶ 85, but they do not allege that any of the Individual Defendants attended.

[10] CW5 appears to conflate internal "sales goals" for his unit with earnings forecasts, *see* ¶ 132, which demonstrates just how detached from management he was and how ill-equipped he is to second-guess Funko's executives.  Further, CW5 does not allege that his unit fell short of its 2019 growth targets.  In any event, setting (and even missing) ambitious sales goals does not equate to fraud.  *See In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 949 (N.D. Cal. 2010) (rejecting attempt to link internal sales targets to public revenue forecasts where plaintiffs had not alleged particularized facts about "whether the sales targets were incorporated into the forecast").

his or her statements during the Class Period. ¶¶ 68, 72, 85, 108; *Mattel*, 321 F. Supp. 3d at 1154 (former employee's allegations regarding "Defendants' access to sales and inventory data, and knowledge of the financial state of the company lack credibility since these issues appear to be well outside [of his] job description").

**CW4.** CW4 lacked any alleged reporting duties to the Individual Defendants, ¶ 70, and CW4 does not allege that he reported any of his beliefs about Funko's inventory or sales forecasting to any Individual Defendant at any time. *See, e.g.*, ¶¶ 69, 71, 120, 123, 137. CW4's allegations thus are irrelevant to the scienter analysis. *See Accuray*, 757 F. Supp. 2d at 948-49. Accordingly, none of the CW allegations gives rise to a strong inference of scienter.

### b. The Class Period Stock Sales Do Not Establish Scienter

Plaintiffs' reliance on Class Period stock sales by two Individual Defendants likewise fails to support an inference of scienter because the sales were not "unusual" or "suspicious." ¶¶ 109-13, 164-66; *Zucco*, 552 F.3d at 1005; *see also In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) ("Insider stock sales are not inherently suspicious."). To be "suspicious," sales must be "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Zucco*, 552 F.3d at 1005. Three factors are considered: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001). Applying these factors, none of the alleged Class Period sales was unusual or suspicious.

**Perlmutter.** Plaintiffs provide no factual context for Perlmutter's single Class Period sale (*e.g.*, the amount of shares he held prior to the sale, and his prior trading history). That pleading deficiency, standing alone, is fatal to their attempt to draw an inference of scienter from Perlmutter's sale. *Zucco*, 552 F.3d at 1006 ("[S]ince there is no allegation within the [complaint] that [defendants'] stock sales,

though significant, are inconsistent with their usual trading patterns, no inference of scienter can be gleaned from Zucco's stock sale assertions."). Moreover, Perlmutter's trading history *rebuts* an inference of scienter: the October 1, 2019 sale of 56,250 shares was consistent with his pattern of selling roughly the same amount on the first day of each quarter for three straight quarters—all pursuant to a Rule 10b5-1 trading plan. *See* Ex. 4, A. Perlmutter Holdings Analysis Appendix; *Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008) ("Sales according to pre-determined plans may rebut an inference of scienter."). Perlmutter, who is not even alleged to have made a false statement, also ended the Class Period in possession of almost double the amount of Class A shares he had at the beginning of the Class Period. That likewise negates an inference of scienter. *See* Ex. 4, A. Perlmutter Holdings Analysis Appendix; *Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 2015 WL 1775221, at *38 (C.D. Cal. Apr. 14, 2015) ("that [defendant] ultimately maintained more stock than [he] sold during the class period . . . strongly rebuts an inference of scienter").

**Mariotti.** Mariotti's sale of 450,000 shares—reducing his ownership of Funko from 10% to approximately 8.5%—likewise does not support a strong inference of fraudulent intent. *See* ¶¶ 109-112. Indeed, Mariotti's sale of a modest percentage of his holdings while continuing to hold a substantial equity stake in Funko through the end of the Class Period defeats an inference of scienter. *See, e.g., Corinthian Colls.*, 540 F.3d at 1067 (class period sales in excess of 37% of a defendant's total stock holdings are typically required "to allow insider trading to support scienter"); *Ronconi*, 253 F.3d at 435-36 (affirming dismissal of a complaint alleging that seven defendants had sold at least 69% of holdings and an eighth defendant had sold 98%); *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1160 (C.D. Cal. 2007) (retention of pre-class holdings defeated scienter because defendants would "suffer the same losses as other investors" if stock price fell). Furthermore, the size of Mariotti's sales is not suspicious in absolute terms;

courts have found much larger sales not to be indicative of scienter. *See In re Vantive*, 283 F.3d at 1092-95 (collective sales of 1.39 million shares over a 15-month period were not suspicious); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 2012 WL 1868874, at *22 (N.D. Cal. May 22, 2012) ("Under Ninth Circuit law, the absolute value of the stock sale does not on its own give rise to an inference of scienter."), *aff'd*, 759 F.3d 1051 (9th Cir. 2014).

The timing of Mariotti's sales also counters Plaintiffs' allegations that the sales were unusual or suspicious.  The large majority (400,000) were part of a long-anticipated secondary offering of shares that were registered with the SEC in April 2019.  *See generally* Ex. 12, Apr. 19, 2019 Form S-3.  The remainder of the sales on which Plaintiff relies (50,000 shares) were made pursuant to a 10b5-1 plan and consistent with Mariotti's regular pattern of selling exactly 50,000 shares on a monthly basis for at least five straight months starting before the Class Period.  *See* Ex. 14, June 12, 2019 Form 4; Ex. 17, July 11, 2019 Form 4; Ex. 21, Aug. 14, 2019 Form 4; Ex. 22, Sept. 24, 2019 Form 4; Ex. 25, Oct. 23, 2019 Form 4.  Further, Plaintiffs do not allege that Mariotti (or Perlmutter) sold shares in temporal proximity to the alleged corrective disclosures in February and March 2020.  ¶ 109; *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 874-75 (N.D. Cal. 2004) (stock sales early in the class period and before the corrective disclosure did not raise a strong inference of scienter); *see also Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1281 (N.D. Cal. 2019) (timing of sales not indicative of scienter where sales occurred at least two months before unfavorable disclosure of financial results); *In re Read-Rite Corp. Sec. Litig.*, 115 F. Supp. 2d 1181, 1183 (N.D. Cal. 2000) (sales "occurring many months prior to the announcement which triggered the stock price correction . . . do not amount to a strong implication of the requisite scienter"), *aff'd*, 335 F.3d 843 (9th Cir. 2003).

**Remaining Defendants.**  Plaintiffs do not allege that the other Funko Defendants sold any shares during the Class Period.  The absence of sales by five of

the seven Individual Defendants weighs heavily against an inference of scienter. *See Adecco S.A.*, 434 F. Supp. 2d at 834 (stock sales did not support scienter where other "equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made"). Accordingly, none of the stock sales Plaintiffs identify in the Complaint supports a strong inference of scienter.

### c.   Plaintiffs' Allegations, Viewed Holistically, Do Not Create A Strong Inference Of Scienter

Taken together, Plaintiffs' scienter allegations do not support the necessary "strong inference of intentional conduct or deliberate recklessness." *Yelp Inc.*, 875 F.3d at 1226. Instead, Plaintiffs' "allegations are much more amenable to a benign explanation," *Mattel*, 321 F. Supp. 3d at 1156., *i.e.*, that Defendants, in the midst of nine consecutive quarters of greater than 20% sales growth, believed in good faith that they would achieve the 2019 sales projections and that no inventory write-downs were necessary prior to the end of 2019—notwithstanding that some employees may not have shared Defendants' optimism.

This logical, non-fraudulent inference is supported by the following undisputed points, among others: (i) Funko's sales in the first two quarters of 2019 exceeded expectations, and the year's content included the highest grossing film of all time and two highly anticipated holiday season movies, ¶¶ 90, 91, 94; (ii) third quarter 2019 sales "exceed[ed] expectations," ¶ 116, thus reinforcing the belief that Funko's full year sales projections were achievable; (iii) Funko generated huge sales growth in its prior two fourth quarters, *see supra* Section II.B; (iv) the Company correctly disclosed its inventory balance and fluctuations during the Class Period and increased its inventory reserve (as disclosed to investors), *see supra* Section II.C; (iv) Defendants did not conceal Funko's disappointing fourth quarter sales, but instead disclosed those results and the inventory write-down, and did so more than a month before Funko's earnings were due to be released under SEC rules, ¶ 7;

(v) only two Individual Defendants sold stock during the Class Period, and those sales took place early in the period, before Funko reaffirmed its increased sales guidance and many months before the alleged corrective disclosures, ¶¶ 110-11, 165; and (vi) the Individual Defendants retained large amounts of Funko stock through the end of the Class Period, even after the fourth quarter results were known internally, *see* ¶ 112; Ex. 4, A. Perlmutter Holdings Analysis Appendix.  That does not support *any* inference that Defendants committed fraud, let alone a cogent and compelling one.

### 3.    There Is No Viable Section 10(b) Claim Against The Non-Speaking Defendants

In any event, the Section 10(b) claims against Perlmutter, Dellomo, Kriger, and Brotman fail because Plaintiffs do not state particularized allegations that any of them made a false or misleading statement or had "ultimate authority" over the content and communication of the challenged statements.  *See* Ex. 2, Alleged Misstatements Appendix; *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011); *In re Nektar Therapeutics*, 2020 WL 3962004, at *9 (N.D. Cal. July 13, 2020) (dismissing 10(b) claims as to the non-speaking defendants).

### B.    Plaintiffs' Section 20(a) And 20A Claims Fail

Because Plaintiffs have not adequately pleaded a predicate violation of the Exchange Act, their Section 20(a) control-person claims and Section 20A claims necessarily fail.  *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002) ("[T]o prevail on their claims for violations of § 20(a) and § 20A, plaintiffs must first allege a violation of § 10(b) or Rule [10b-5]."); *In re Netflix, Inc. Sec. Litig.*, 647 F. App'x 813, 816 (9th Cir. 2016) ("Because we hold that Plaintiffs have not adequately alleged an underlying violation of federal securities law, Plaintiffs' claims under § 20(a) . . . and § 20A . . . necessarily fail.").

## V.    CONCLUSION

For these reasons, the CAC should be dismissed as to the Funko Defendants.

Respectfully submitted,

Dated:  October 2, 2020                    **LATHAM & WATKINS LLP**

By:  /s/ Kevin M. McDonough
      Kevin M. McDonough

*Attorneys for the Funko Defendants*