**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Co-Lead Counsel for Lead Plaintiffs*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GILBERTO FERREIRA, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> FUNKO, INC., et al., <br><br> Defendants. | Case No. 2:20-cv-02319-VAP-PJW <br><br> **LEAD PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT** |

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ....................................................................................1

I.   STATEMENT OF FACTS...............................................................................4

    A.   Background ...........................................................................................4

    B.   Defendants Misled Investors About Funko's Excess Inventory.............4

    C.   Defendants Misled Investors About Funko's 4Q2019 And FY2019 Guidance ...............................................................................................5

    D.   Defendants Took Advantage of Funko's Inflated Stock Price ...............6

    E.   The Truth Is Revealed...........................................................................6

II.  LEGAL STANDARD .....................................................................................7

III. ARGUMENT ................................................................................................8

    A.   Plaintiffs Adequately Plead Misrepresentations and Omissions ............8

    B.   Defendants' Materially Misleading Inventory Statements .....................9

        1.   Defendants Misled the Market as to the True State of Funko's Inventory...................................................................................9

        2.   Defendants' Materially False and Misleading Risk Warnings...12

            a.   The Safe Harbor Does Not Protect Defendants' Risk Warnings...................................................................13

                i.   Defendants' Cautionary Language Was Not Meaningful..............................................................13

                ii.   Defendants Knew Their Risk Disclosures Were False and Misleading ............................................14

    C.   Defendants' Materially Misleading Statements Regarding Funko's FY2019 Earnings Guidance.................................................................14

i

1. Defendant Mariotti Had a Duty to Correct His False and Misleading August 8, 2019 Statements .......................................14

   a. Defendant Mariotti's Statements Are Actionable ...........16

2. Defendants' October 31, 2019 Statements Concerning FY2019 Guidance Were False and Misleading.........................17

   a. Defendants' Guidance Statements are Actionable ..........20

      i. Defendants' Forward-Looking Statements are Not Protected by the Safe Harbor Provision.........20

      ii. Defendants' Forward-Looking Statements are Not Protected Opinions...........................................20

D. The Complaint Raises a Strong Inference of Scienter.........................22

1. Scienter is Sufficiently Pled Regarding Defendants' Misrepresentations..................................................................22

2. Plaintiffs' Allegations are Based on Reliable Sources..............26

3. Defendants' Stock Sales Further Support an Inference of Scienter .................................................................................28

4. Holistically, Plaintiffs' Allegations Demonstrate That the Inference Of Scienter is at Least As Compelling as the Innocent Inference .................................................................32

E. The Individual Defendants and the ACON Defendants Are Control Persons of Funko...............................................................................33

F. The Complaint Sufficiently Alleges 20A Claims ................................35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Elec. Pension Fund v. Adecco S.A.*,
434 F. Supp. 2d 815 (S.D. Cal. 2006), *aff'd sub nom. In re Adecco
S.A. Sec. Litig.*, 256 F. App'x 74 (9th Cir. 2007) ...............................................32

*Azar v. Yelp*,
2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ......................................28, 29, 32

*Batwin v. Occam Networks, Inc.*,
No. 07-2750 CAS, 2008 WL 2676364 (C.D. Cal. July 1, 2008) .................31, 32

*Bell v. Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .............................................................................................7

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .....................................................................*passim*

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) .....................................................21

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ..............................................................................12

*City of Royal Oak Ret. Sys. v. Juniper Networks*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) ..............................................................19

*Cutler v. Kirchner*,
696 F. App'x 809 (9th Cir. 2017) ..................................................................13, 25

*Doyun Kim v. Advanced Micro Devices, Inc.*,
2019 WL 2232545 (N.D. Cal. May 23, 2019) ....................................................13

*Flynn v. Sientra, Inc.*,
2016 WL 3360676 (C.D. Cal. June 9, 2016) .......................................................13

*Golub v. Gigamon Inc.*,
372 F. Supp. 3d 1033 (N.D. Cal. 2019) ..............................................................34

*Hollinger v. Titan Capital Corp.*,
914 F.2d 1564 (9th Cir. 1990) (en banc) ............................................................24

iii

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

*Howard v. Everex Sys., Inc.*,
   228 F.3d 1057 (9th Cir. 2000) ..................................................................... 23, 34

*Huddleston v. Herman & MacLean*,
   640 F.2d 534 (5th Cir. 1981) ............................................................................. 13

*IMPAC Secured Assets Corp. v. SNR Denton US LLP*,
   2013 WL 12139422 (C.D. Cal. Feb. 13, 2013) ............................................. 16, 27

*In re Accuray, Inc. Sec. Litig.*,
   757 F. Supp. 2d 936 (N.D. Cal. 2010) ................................................................ 28

*In re Advanta Corp. Sec. Litig.*,
   180 F.3d 525 (3d Cir. 1999) ............................................................................... 22

*In re Alstom SA*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005) ................................................................. 34

*In re Am. Apparel, Inc. S'holder Litig.*,
   2013 WL 10914316 (C.D. Cal. Aug. 8, 2013) ..................................................... 35

*In re Amgen Inc. Sec. Litig.*,
   2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ..................................................... 22

*In re Apple Inc., Sec. Litig.*,
   2020 WL 2857397 (N.D. Cal. June 2, 2020) ....................................................... 12

*In re Atossa Genetics Inc. Sec. Litig.*,
   868 F.3d 784 (9th Cir. 2017) ........................................................................ 12, 21

*In re ChinaCast Educ. Corp. Sec. Litig. (Costa Brava P'ship III LP v. ChinaCast Educ. Corp.)*,
   809 F.3d 471 (9th Cir. 2015) ............................................................................. 33

*In re Coinstar Inc. Sec. Litig.*,
   2011 WL 4712206 (W.D. Wash. Oct. 6, 2011) ............................................... 25, 26

*In re Convergent Techs. Sec. Litig.*,
   948 F.2d 507 (9th Cir. 1991) ............................................................................. 12

*In re Copper Mountain Sec. Litig.*,
   311 F. Supp. 2d 857 (N.D. Cal. 2004) ........................................................... 31, 36

*In re Countrywide Fin. Corp. Deriv. Litig.*,
   554 F. Supp. 2d 1044 (C.D. Cal. 2008) .............................................................. 26

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2009)...............................................................25

*In re Cutera Sec. Litig.*,
    610 F.3d 1103 (9th Cir. 2010)............................................................................13

*In re Daou Sys., Inc.*,
    411 F. 3d 1006 (9th Cir. 2005)...........................................................................35

*In re Downey Sec. Litig.*,
    2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)....................................................27

*In re Facebook, Inc. Sec. Litig.*,
    2020 WL 4569443 (N.D. Cal. Aug. 7, 2020)......................................................13

*In re Gilead Scis. Sec Litig.*,
    536 F.3d 1049 (9th Cir. 2008).............................................................................8

*In re Gupta Corp. Sec. Litig.*,
    900 F. Supp. 1217 (N.D. Cal. 1994)...................................................................34

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
    791 F.3d 90 (D.D.C. Cir. 2015)..........................................................................14

*In re Hienergy Techs., Inc. Sec. Litig.*,
    2005 WL 3071250 (C.D. Cal. Oct. 25, 2005).....................................................24

*In re Immune Response Sec. Litig.*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005)............................................................8, 23

*In re Intuitive Surgical Sec. Litig.*,
    2014 WL 7146215 (N.D. Cal. Dec. 15, 2014).....................................................25

*In re Intuitive Surgical Sec. Litig.*,
    65 F. Supp. 3d 821 (N.D. Cal. 2014)..............................................................8, 30

*In re LDK Solar Sec. Litig.*,
    2018 WL 4369987 (N.D. Cal. Sept. 24, 2008).....................................................15

*In re Petco Animal Supplies Inc. Sec. Litig.*,
    2006 WL 6829623 (S.D. Cal. 2006) ...................................................................25

*In re Quality Sys. Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017)..................................................................*passim*

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

*In re Questcor Sec. Litig.*,
  2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ....................................................... 32

*In re Rackable Sys.*,
  2010 WL 3447857 (N.D. Cal. Aug. 27, 2010)..................................................... 19

*In re Rackable Sys. Inc. Sec. Litig.*,
  2010 WL 199703 (N.D. Cal. Jan. 13, 2010) ........................................................ 9

*In re Read-Rite Corp. Sec. Litig.*,
  115 F. Supp. 2d 1181 (N.D. Cal. 2000).............................................................. 31

*In re Secure Computing Corp. Sec. Litig.*,
  184 F. Supp. 2d 980 (N.D. Cal. 2001)................................................................ 30

*In re SeeBeyond Tech. Corp. Sec. Litig.*,
  266 F. Supp. 2d 1150 (C.D. Cal. 2003).............................................................. 30

*In re Silicon Storage Tech., Inc., Sec., Litig.*,
  2006 WL 648683 (N.D. Cal. Mar. 10, 2006) ..................................................... 19

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
  2000 WL 1727405 (N.D. Cal. Sept. 29, 2000).................................................... 34

*In re Twitter, Inc. Sec. Litig.*,
  2020 WL 4187915 (N.D. Cal. Apr. 17, 2020)..................................................... 11

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009)................................................................ 18

*In re Vantive Corp. Sec. Litig.*,
  283 F.3d 1079 (9th Cir. 2002) ...................................................................... 24, 30

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
  2017 WL 66281 (N.D. Cal. Jan. 4, 2017) .......................................................... 25

*In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*,
  694 F. Supp. 2d 1192 (W.D. Wash. 2009) ......................................................... 25

*Jackson v. Microchip Tech. Inc.*,
  2020 WL 1170843 (D. Ariz. March 11, 2020)................................................... 24

*Janus Capital Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) ........................................................................................... 33

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018), *cert. denied sub nom. Hagan v. Khoja,*
   139 S. Ct. 2615 (2019) ......................................................................7, 8, 10

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
   416 F.3d 940 (9th Cir. 2005) .....................................................................11

*Loftus v. Primero Mining Corp.*,
   230 F. Supp. 3d 1209 (C.D. Cal. 2017)......................................................16

*Matrixx Initiatives Inc. v. Siracusano*,
   563 U.S. 27 (2011) .....................................................................................33

*McGovney v. Aerohive Networks, Inc.*,
   367 F. Supp. 3d 1038 (N.D. Cal. 2019)......................................................27

*Metzler Inv. GMBH v. Corinthian Colls.*,
   540 F.3d 1049 (9th Cir. 2008) ...................................................................30

*N.M. State Inv. Council v. Ernst & Young LLP*,
   641 F.3d 1089 (9th Cir. 2011).....................................................................33

*No. 84 Employer-Teamster Jt. Council Pension Trust Fund v. Am. W.
   Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ................................................................31, 34

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004)...............................................................25, 30

*Oaktree Principal Fund V LP v. Warburg Pincus LLC*,
   2018 WL 6137169 (C.D. Cal. Aug. 29, 2018) ...........................................16

*Okla. Firefighters Pension & Ret. Sys. v. Ixia*,
   2015 WL 1775221 (C.D. Cal. Apr. 14, 2015)............................................30

*Omnicare, Inc., v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) ..............................................................................20, 21

*Osher v. JNI Corp.*,
   308 F. Supp. 2d 1168 (S.D. Cal. 2004), *aff'd in part, vacated in
   part*, 183 F. App'x 604 (9th Cir. 2006) ........................................................9

*Paddock v. Dreamworks Animation SKG, Inc.*,
  2015 WL 12711653 (C.D. Cal. Apr. 1, 2015), *aff'd sub nom.
  Roofers Local No. 149 Pension Fund v. DreamWorks Animation
  SKG, Inc.*, 677 F. App'x 376 (9th Cir. 2017) .......................................................19

*Paracor Finance, Inc. v. General Electric Capital Corporation*,
  96 F.3d 1151 (9th Cir. 1996) ........................................................................35

*Pirani v. Slack Techs., Inc.*,
  445 F. Supp. 3d 367 (N.D. Cal. 2020)...............................................................34

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) .......................................................................13

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014), *overruled by City of Dearborn
  Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856
  F.3d 605 (9th Cir. 2017) ..........................................................................8, 21

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) ........................................................................30

*S. Ferry LP, # 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) .....................................................................22, 24

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016) .....................................................................10, 22

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010) .........................................................................14

*Sudunagunta v. NantKwest, Inc.*,
  2017 WL 8811116 (C.D. Cal. May 16, 2017)........................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ........................................................................8, 22, 23, 28

*Todd v. STAAR Surgical Co.*,
  2016 WL 6699284 (C.D. Ca. Apr. 12, 2016).............................................15, 17, 21

*Turocy v. El Pollo Loco Holdings, Inc.*,
  2017 WL 3328543 (C.D. Cal. Aug. 4, 2017) .........................................................25

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

*United States v. Smith*,
    155 F.3d 1051 (9th Cir. 1998) .................................................................... 11

*Vignola v. FAT Brands, Inc.*,
    2019 WL 6888051 (C.D. Cal. Dec. 17, 2019)............................................ 21

*Waterford Twp. Police v. Mattel, Inc.*,
    321 F. Supp. 3d 1133 (C.D. Cal. 2018), *aff'd sub nom. Castro v. Mattel, Inc.*, 794 F. App'x 669 (9th Cir. 2020) ...................................... 17, 19, 28

*Webb v. Solarcity Corp.*,
    884 F.3d 844 (9th Cir. 2018) ..................................................................... 28

*Weiss v. Mentor Graphics Corp.*,
    1999 WL 985141 (D. Or. Oct. 6, 1999) ..................................................... 22

*Xiaojiao Lu v. Align Tech., Inc.*,
    417 F. Supp. 3d 1266 (N.D. Cal. 2019)...................................................... 31

*Zaghian v. Farrell*,
    675 F. App'x 718 (9th Cir. 2017) ............................................................... 18

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ..................................................................... 27

**Statutes**

15 U.S.C. §78j(b)........................................................................................... 8

15 U.S.C. §78t(b)........................................................................................ 2, 3

15 U.S.C. § 78u-4(b)................................................................................. 8, 22

15 U.S.C. § 78u-5(c)(1) .......................................................................... 14, 20

PSLRA ..................................................................................................... 14, 22

**Rules**

Fed. R. Civ. P. 8.......................................................................................... 34

Fed. R. Civ. P. 12(b)(6) ................................................................................ 7

**Other Authorities**

17 C.F.R. § 230.405...................................................................................... 34

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

Lead Plaintiffs Abdul Baker, Zhibin Zhang, and Huaiyu Zheng submit this memorandum of law in support of their opposition to the Funko Defendants' and the ACON Defendants' motions to dismiss the Consolidated Amended Compliant ("CAC").[1]

## PRELIMINARY STATEMENT

This is a simple case. Defendants ignored Company data and warnings showing that their FY2019 earnings guidance could not be met, and downplayed the risks associated with their increasing inventory reserves, thereby artificially inflating the price of Funko stock throughout the Class Period and allowing certain of the Individual Defendants and the ACON Defendants to unload over $100 million of stock. That is securities fraud.

The CAC alleges detailed facts, provided by a former senior Funko employee, who was responsible for developing Company-wide sales forecasts based on Funko's customer sales data ("CW1"), demonstrating Defendants' knowledge that the FY2019 guidance was not attainable. CW1 repeatedly warned Defendants of the shortfall between their public guidance and the Company's internal sales data throughout the Class Period. Specifically, beginning in late-August/early-September 2019, CW1 advised Defendants of the shortfall at weekly sales meetings attended by Defendants Nickel, Jung, and Perlmutter, through emails sent to Defendant Mariotti summarizing each weekly sales meeting, and at monthly investment review meetings attended by Defendants Mariotti and Perlmutter.

[1] For the convenience of the Court, Plaintiffs adopt the definitions used in the Funko Defendants' motion ("MTD") and the ACON Defendants' motion ("ACON MTD"). The "Individual Defendants" are Brian Mariotti, Russell Nickel, Andrew Perlmutter, Jennifer Fall Jung, Ken Brotman, Gino Dellomo and Adam Kriger. The "ACON Defendants" are ACON Investments, L.L.C., ACON Funko Manager, L.L.C, ACON Funko Investors, L.L.C., ACON Funko Investors Holdings 1, L.L.C., ACON Funko Investors Holdings 2, L.L.C., ACON Funko Investors Holdings 3, L.L.C., and ACON Equity GenPar, L.L.C.

Rather than revise the guidance downward in accordance with actual customer demand, Defendants knowingly misled Funko investors by confirming the guidance on October 31, 2019 and falsely representing that the fourth quarter of 2019 was going to be Funko's "biggest ever as a company."

Defendants also deceived investors by downplaying the risks associated with the Company's increased inventory reserves. Instead of simply disclosing that the Company was increasing its reserves, Defendants created the impression that the increase was nothing to be concerned about by attributing it to older inventory lines that were not selling as expected. In truth, numerous CWs detailed that the Company was suffering from a glut of excess, obsolete inventory that had become such a problem that it was discussed at the weekly sales meetings attended by Defendants Nickel, Jung, and Perlmutter, discussed in the emails sent to Defendant Mariotti summarizing each weekly sales meeting, and was discussed at quarterly Board of Directors meetings that were attended by Defendants Mariotti, Nickel, Jung, Perlmutter, Brotman, Dellomo, Kriger and others.

Defendants' false and misleading statements had their intended effect, as the price of Funko stock rose throughout the Class Period to its peak trading price of $27.86 on September 16, 2019. Taking advantage of the artificially inflated value, Defendant Mariotti and the ACON Defendants (Funko's controlling shareholder) sold *nearly $105 million* in privately owned Funko stock in connection with Funko's secondary public offering on September 19, 2019. Defendants Mariotti and Perlmutter sold additional shares before the truth about Defendants' false and misleading statements was revealed, netting an additional $10.1 million and $1,159,200 respectively. Plaintiffs have adequately alleged that these sales took place while the Individual Defendants and the ACON Defendants were in possession of material, non-public information and thus, give rise to Section 20A claims.

When the market learned the truth about Funko's sales shortfall and inventory build-up, the stock dropped $6.20 per share, or 40%. Specifically, on February 5, 2019, Funko announced that instead of the projected 22% to 24% increase, net sales actually fell 8% for the fourth quarter. While Defendants attempt to characterize the massive earnings miss as a mere "one quarter stumble," analysts covering the stock saw it as far more damning, referring to it as an "outsized" miss that would cause Funko to trade as "broken stock" because of "credibility concerns."

Defendants go to great lengths to avoid answering to investors, claiming their statements are protected forward-looking statements, nonactionable opinions, and nonactionable statements of optimism. However, none of these "defenses" insulate Defendants in the face of the detailed, plausible allegations demonstrating Defendants' actual knowledge that their Class Period statements were false and misleading.

Lastly, Defendants try to exculpate themselves – not by asserting that they did not know of the guidance shortfall, but by attacking CW1 and proffering the improper factual hypothesis that they are not liable to investors because they could have just disagreed with CW1. First, this argument fails because the CAC does not allege facts suggesting that Defendants and CW1 had a disagreement concerning what the underlying sales data meant. Second, this is not summary judgment or trial and the question at this preliminary stage of the litigation is whether there are sufficient facts to allow this case to proceed past the pleadings. The answer is a resounding yes. The CAC provides a cogent and compelling inference that Defendants knew or recklessly disregarded that their statements were materially false and misleading. That is all that is required at the pleading stage, where Plaintiffs' allegations must be accepted as true.

Plaintiffs have also sufficiently pled that the Individual Defendants and the ACON Defendants are control persons of Funko pursuant to Section 20(a). None of

3

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

the Individual Defendants contest their control person status, and the ACON Defendants' arguments regarding lack of control and lack of knowledge fail because ACON had considerable power over Funko and was kept abreast of financial information.

For these reasons, and the reasons set forth herein, Defendants' motions should be denied in their entirety.

## I.    STATEMENT OF FACTS

### A.    Background

Founded in 1998, Funko is a pop culture consumer products company that creates products relating to movies, TV shows, video games, musicians, and sports teams. ¶¶ 42-43.  ACON Investments, L.L.C., part of a network of entities (the "ACON Defendants") that form an international private equity investment firm, announced that it was acquiring Funko in 2015.  ¶ 30.  Following Funko's initial public offering in 2017, the ACON Defendants owned over 55% of Funko's Class A shares and had the ability to appoint three of eight members to its Board of Directors, including its Chairman.  ¶¶ 30, 46.

### B.    Defendants Misled Investors About Funko's Excess Inventory

Leading up to the Class Period, Funko had amassed millions of dollars of obsolete inventory across multiple warehouses as a result of its inability to properly forecast customer demand.  ¶¶ 53-55; 62-88.  CW1, Funko's Director of Merchandise Planning, was hired to address Funko's internal forecasting problems, which included developing sale forecasts using Company data and inventory management.  ¶¶ 56, 59.  CW1 explained that Funko did not have a reliable system to ensure that it was ordering the right amount of inventory and, as a result, the Company was always ordering excess product.  ¶ 58. Multiple other CWs similarly reported that excess inventory was a well-known problem at the Company.  ¶¶ 62-88.  Defendants Nickel, Jung and Perlmutter knew of the inventory issue since at

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

least July 2019, through their attendance at weekly sales meetings. ¶ 78. The excess inventory problem was also discussed at Funko Board meetings attended by Defendants Mariotti, Nickel, Perlmutter, Brotman, Dellomo and Kriger. ¶ 81. Defendant Marriotti was also advised of the inventory issues via emails summarizing each weekly sales meeting. ¶ 101.

Rather than disclose the true state of Funko's inventory condition, Defendants misled investors by stating that Funko was increasing its inventory reserves for some older product lines, falsely giving investors the impression that the increase was nothing to be concerned about because it was related to older products that were just not selling quickly. ¶ 121.

### C.    Defendants Misled Investors About Funko's 4Q2019 And FY2019 Guidance

On August 8, 2019, in support of the Company's increased FY2019 guidance, Defendant Mariotti touted the strength of Funko's content for the second half of the year, as well as the Company's ability to monetize its properties.[2] ¶ 92. However, by late-August/early-September 2019, Defendant Mariotti knew that the FY2019 guidance would not be met and that his statements in support of the guidance were false and misleading. ¶ 92. By that time, CW1 had told Defendants Mariotti, Jung and Perlmuter that customer demand for the fourth quarter releases was below what was needed to reach the guidance because there was not enough product related to the fourth quarter releases to meet Funko's sales projections. ¶¶ 93-95. CW1 further advised that it was too late to make up the shortfall. ¶¶ 96-100. The sales shortfall was discussed at weekly sales meetings attended by Defendant Jung. ¶¶ 97-100. Defendant Mariotti knew of the shortfall because he received email summaries of the weekly sales meetings where the sales shortfall was discussed. ¶ 104. Defendants Mariotti, Perlmutter and Jung were also aware

---

[2] Defendants increased its FY2019 guidance, projecting net sales of $840 million to $850 million, representing year-over-year growth of 22% to 24%." ¶ 90.

there was not enough product related to the fourth quarter releases, because they attended monthly investment committee meetings where the Company's upcoming products, and how they would impact the Company's budget, were discussed. ¶¶ 102-103. Defendants Mariotti and Jung also knew of the shortfall because they both monitored sales constantly. ¶¶ 107-108.

On October 31, 2019, with knowledge that Funko's internal sales forecast did not support its public guidance and that the Company did not have enough new content to make up the shortfall, Defendant Jung nevertheless confirmed Funko's FY2019 guidance, representing to the market that "Q4 will be our biggest quarter ever as a company." ¶¶ 114, 133.

**D.    Defendants Took Advantage of Funko's Inflated Stock Price**

Funko's share price rose throughout the Class Period as a result of Defendants' false and misleading statements. ¶ 3. Seeking to capitalize on Funko's artificially inflated share price, Defendants conducted a Secondary Public Offering (the "SPO") on September 19, 2019, while Funko's stock was trading near its peak. ¶ 110. Indeed, by the time of the SPO, Funko's stock had climbed 25% since the beginning of the Class Period. ¶ 109. Defendant Mariotti and the ACON Defendants (through their Board appointees Defendants Brotman, Dellomo and Kriger) collectively profited *over $101 million* from selling their stock in the SPO. ¶ 111. Defendant Mariotti made an additional $10.1 million from selling his personal shares outside of the SPO during the Class Period and Defendant Perlmutter netted $1,159,200 from his Class Period sales. ¶¶ 203, 210.

**E.    The Truth Is Revealed**

On February 5, 2020, after the market closed, Funko shocked the market by revealing that instead of an expected *increase* of 22% to 24% in net sales, Funko experienced a *decrease* in net sales of 8% for 4Q2019. ¶ 138. The Company also disclosed a $16.8 million write-down to "dispose of slower moving inventory to

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

increase operational capacity." ¶ 138. On this news, Funko's share price fell $6.20, or 40%, to close at $9.29 per share on February 6, 2020, on unusually heavy trading volume. ¶ 140.

Analysts were blindsided by the shortfall, characterizing the sales miss as "shocking," commenting that Funko had hit a "content cliff," that it would be "in the penalty box for the next few quarters" and would trade as a "broken stock" due to "credibility concerns." ¶¶ 141-146. Analysts were additionally surprised by the size of Funko's inventory write-down, noting that the number of products the Company was writing down could fill six Boeing 747s, or span the distance between New York and Washington. ¶ 147.

On March 5, 2020, after the market closed, Funko issued a press release confirming that sales decreased 8% year-over-year to $213.6 million – well below expectations. ¶¶ 148-49. The Company also reported a decrease in gross margin of 170 basis points to 35.5%, compared to 37.2% in 2018, primarily due to the write-down of $16.8 million in inventory. ¶ 149. On a related earnings call, Defendant Mariotti conceded that the Company's forecasting and inventory management practices were in need of refinement. ¶ 153. On this news, Funko's share price fell $0.32, or over 4%, to close at $6.92 on March 6, 2020, causing additional damage to investors. ¶ 155.

## II. LEGAL STANDARD

Dismissal pursuant to Rule 12(b)(6) "is appropriate only where the complaint lacks a cognizable theory or sufficient facts to support a cognizable theory." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (citation omitted), *cert. denied sub nom. Hagan v. Khoja*, 139 S. Ct. 2615 (2019). A complaint must only allege "enough facts to state a claim to relief that is plausible on its face." *Bell v. Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[A] district court ruling on a motion to dismiss is not sitting as a trier of fact … so

long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). In applying this standard, courts accept as true all factual allegations and draw all reasonable inferences in plaintiff's favor. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).

To state a claim under Section 10(b) of the Exchange Act, a plaintiff must plead: (1) a material misstatement or omission; (2) scienter; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Khoja*, 899 F.3d at 1008. Here, Defendants contest only falsity and scienter. However, both elements are adequately alleged and Defendants' motions should be denied.

## III.  ARGUMENT

### A.  Plaintiffs Adequately Plead Misrepresentations and Omissions

A complaint adequately alleges falsity by "specify[ing] each statement alleged to have been misleading" and the "reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B); *Reese v. Malone*, 747 F.3d 557, 568 (9th Cir. 2014), *overruled by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). A statement is false or misleading if it "would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). The allegations need only "raise a plausible inference" that a statement was misleading. *See In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 834 (N.D. Cal. 2014). "Whether a statement is misleading and whether adverse facts are adequately disclosed are generally questions that should be left to the trier of fact." *See In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1039 (S.D. Cal. 2005).

**B.        Defendants' Materially Misleading Inventory Statements**

**1.        Defendants Misled the Market as to the True State of Funko's Inventory**

On an August 8, 2019 earnings call, Defendant Nickel reported that Funko had taken "higher reserves for slower-moving inventory of some old lines." ¶ 119. This statement was misleading because it created the impression that the increase in reserves was nothing to be concerned about because it was related to older inventory that was just not selling as expected. ¶ 121. In reality, Funko was suffering from a glut of excess, obsolete inventory as a result of the Company's inability to accurately forecast customer demand. *See Berson*, 527 F.3d at 985 (omissions that "give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists" are actionable).

The CAC details the accounts of multiple CWs who reported that Funko's habitual over-ordering caused the Company to amass multiple warehouses full of obsolete inventory. ¶¶ 75, 77, 80, 83, 86, 88. According to CW1, the inventory glut was so severe that 200 shipping containers of new product sat at the Port of Seattle, and more sat idle in the Company parking lot. ¶ 77. CW2, who was General Manager of Funko's Loungefly brand, reported that the inability to store inventory was routinely discussed at Company board meetings that CW2 attended. ¶ 81. CW4 (a former Customer Service Manager with first-hand knowledge of Funko's sales forecasting and inventory), CW5 (a former Sales Coordinator, who tracked monthly sales and orders), and CW6 (a former Senior Fulfillment Supervisor, who had first-hand knowledge of Funko's inventory system) each gave corroborating accounts of Funko's inventory situation. ¶¶ 82-88. The CAC includes specific details about the inventory, such as the estimated amount of excess inventory and the age of the inventory. ¶¶ 77, 79-80 82-84, 87-88.[3] These

---

[3] These detailed allegations go beyond the vague statements advanced in *In re Rackable Sys. Inc. Sec. Litig.*, 2010 WL 199703, at *6 (N.D. Cal. Jan. 13, 2010) (defendants "appeared to have a lot of excess inventory") and *Osher v. JNI Corp.*, 308 F. Supp. 2d 1168, 1193 (S.D. Cal. 2004)

9

facts conflict with the impression created by Defendant Nickel's statement, which downplayed the risk associated with the Company's increased reserves by attributing the increase to merely "some slow-moving inventory." Once Defendant Nickel spoke to the reason why the Company was increasing its reserves, he was required to do so in a manner that did not mislead.[4] Here, the inventory was not "slow moving" – it was the result of reckless forecasting and ordering and there was no reasonable basis to anticipate it could ever be sold.

The Ninth Circuit's decision in *Berson* is instructive. The plaintiffs in *Berson* alleged that the defendants disclosed the company's "backlog" in a materially misleading manner by failing to delineate what portion of the company's "backlog" included "stopped work" that would not generate revenue. *Berson*, 527 F.3d at 986-87. The Ninth Circuit held that even though it was possible that an investor "could have decoded" the true meaning of the defendants' statements, the failure to disclose that the backlog included work that had been halted was misleading. *Id*. at 987. Likewise here, the representation that Funko was increasing its reserves for slower-moving products did not disclose that Funko had amassed millions of units of excess inventory that would likely never be sold as a result of the Company's inability to forecast customer demand.[5] ¶ 147.

That Funko was struggling to warehouse excess, obsolete inventory was material. Investors would have viewed Defendant Nickel's statement with "more skepticism" had they known that the Company was suffering from a glut of excess

(defendants were "left with excess product"), *aff'd in part, vacated in part*, 183 F. App'x 604 (9th Cir. 2006). *See* MTD at 16. Further, Plaintiffs do not claim that Defendants improperly failed to write down inventory – claims that necessarily require details of exact inventory figures.

[4] *See Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016) (defendants required to disclose adverse results of a study once they represented that they had favorable results on all studies); *Khoja*, 899 F.3d at 1009-10 (defendants were required to disclose that the 25% interim results of its testing were unreliable after they chose to disclose the results).

[5] The market was clearly misled by Defendants Nickel's statement, as even the analysts following the Company believed that the increase in reserves related to a potential future problem. ¶ 121.

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

inventory attributable to a reckless inability to anticipate customer demand. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005) ("[A] misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed."); *Sudunagunta v. NantKwest, Inc.*, 2017 WL 8811116, at *7 (C.D. Cal. May 16, 2017) (omission was material because had defendants disclosed the information "reasonable investors would . . . view the IPO with substantially more skepticism"). Indeed, Funko's inventory build-up resulted in a $16.8 million inventory write-down at the end of the Class Period, negatively impacting Funko's 4Q2019 gross profit and gross margin. *See United States v. Smith*, 155 F.3d 1051, 1064 n.20 (9th Cir. 1998) ("Investors are concerned, perhaps above all else, with future cash flows of the companies in which they invest."); *see also In re Twitter, Inc. Sec. Litig.*, 2020 WL 4187915, at *9 (N.D. Cal. Apr. 17, 2020) (declining user engagement trends were material because its suggests a decline in financial performance).[6]

Further, Funko's reported inventory figures did not distinguish between new or obsolete inventory, and thus, did not alert investors to the Company's true inventory condition.[7] *See* MTD at 15. Similarly, Defendants did not clearly state by *how much* it was increasing its reserves, making it nearly impossible for investors to appreciate the true risk of the increased reserves. *See Berson*, 527 F.3d at 987 (even if an investor "could have decoded" the true meaning of the defendants' backlog disclosure, it was still misleading).

---

[6] Defendants conceded the materiality of its inventory management in their SEC disclosures. *See e.g.* ¶ 136 ("Our success depends, in part, on our ability to successfully manage or inventories").

[7] *See* McDonough Decl., Ex. 20 (Q2 2019 Earnings Call Tr. at 9) ("Inventory was up to $75.4 million); Ex. 28 (Q3 2019 Earnings Call Tr. at 8) ("Inventory was $94.3 million).

Lastly, even if Defendant Nickel's statement was "literally true," it is not insulated from liability.  *See* MTD at 16.  "[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."  *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 513 (9th Cir. 1991); *see In re Atossa Genetics Inc. Sec. Litig*., 868 F.3d 784, 797 (9th Cir. 2017) (holding that literally true statements are actionable if they mislead investors due to the omission of material information).[8]

### 2.    Defendants' Materially False and Misleading Risk Warnings

Defendants' Class Period disclosures concerning the Company's risk of accumulating excess inventory were also misleading.  ¶¶ 122-23; 136-37.  While Defendants warned investors that "if demand or future sales do not reach forecasted levels" the Company "***could*** have excess inventory" that the Company "***may*** need" to write down or discard (¶¶ 122, 133), that risk had already materialized.  Numerous CWs reported that Funko's inability to accurately forecast customer demand had resulted in millions of units of excess inventory. *See* ¶¶ 58, 60-63, 65-68, 69, 71, 75, 77, 79, 80, 83-88. Thus, the accumulation of excess inventory was not a *future* risk dependent on the strength of *future* sales – it was a risk that had already materialized.  *See Berson,* 527 F.3d at 987 (knowing that a risk "might" occur "is quite different from knowing [it was] in fact [occurring]"). By presenting the risk as a future possibility, instead of a present reality, Defendants "create[d] an impression of a state of affairs that differs in a material way from one that exists."  *Brody*, 280 F.3d at 1006; *In re Apple Inc., Sec. Litig.*, 2020 WL 2857397, at *16 (N.D. Cal. June 2, 2020) (when risks have already

---

[8] Unlike here, the omitted information in *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) did not create an impression that differed from the defendants' disclosure. MTD at 16. *See Brody*, 280 F.3d at 1006 (the failure to disclose takeover proposals was not misleading because investors were told there was potential interest in a takeover).

materialized, disclosing them "in the abstract" while omitting that they have "already come to fruition" is misleading).[9]

### a. The Safe Harbor Does Not Protect Defendants' Risk Warnings

The PSLRA provides a "safe harbor" for forward-looking statements accompanied by "meaningful cautionary language", or where a plaintiff fails to prove that the defendant made the forward-looking statement "with actual knowledge that the statement was false or misleading." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014). The safe harbor does not apply to Defendants' risk language because Defendants' cautionary language was not meaningful, and they knew their statements were misleading.

### i. Defendants' Cautionary Language Was Not Meaningful

The Ninth Circuit has long held that cautioning of supposed future problems that in fact already exist is not meaningful. *Cutler v. Kirchner*, 696 F. App'x 809, 813 (9th Cir. 2017) (disclosing a risk "in the abstract" but omitting the fact that it had "already...come to fruition" is not meaningful) (citation omitted).[10] The reason is clear – cautioning of a risk that has already occurred is "deceit[ful]." *See Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981).

Defendants' inventory risk disclosures were not meaningful for the same reasons that they were misleading.[11] Defendants knew that the "risk" that the

---

[9] *See also In re Facebook, Inc. Sec. Litig.*, 2020 WL 4569443, at *25 (N.D. Cal. Aug. 7, 2020) (risk disclosure is misleading if the risk warned of was "already affecting" the defendant); *Doyun Kim v. Advanced Micro Devices, Inc.*, 2019 WL 2232545, at *7 (N.D. Cal. May 23, 2019) (same).

[10] *See also In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) (purported risk warnings are insufficient when the "future risk [] ha[d] already transpired."); *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *10-11 (C.D. Cal. June 9, 2016) (same).

[11] Funko's risk disclosures "warned" that "if demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard[,]" and "[i]f demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard." ¶¶ 122, 136.

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

Company could have excess inventory as a result of customer demand not reaching forecasted levels had already materialized. *See supra* at III(B)(1).[12]

### ii.    Defendants Knew Their Risk Disclosures Were False and Misleading

Defendants' risk warnings are also not protected because they were made with actual knowledge that they were false and misleading. *See* 15 U.S.C. § 78u-5(c)(1). The CAC pleads facts showing that Defendants knew by August 8, 2019 that Funko had amassed millions of units of excess inventory as a result of the Company's inability to forecast customer demand. *See supra* at III(B)(1).

### C.    Defendants' Materially Misleading Statements Regarding Funko's FY2019 Earnings Guidance

#### 1.    Defendant Mariotti Had a Duty to Correct His False and Misleading August 8, 2019 Statements

On August 8, 2019, Funko increased its guidance for FY2019.[13]  ¶ 124. In support of the guidance, Defendant Mariotti touted the strength of Funko's content, stating that "the content year as a whole, it's extremely strong" and that the Company had "2 big bullets left to fire with Frozen 2 and Star Wars: Episode IX." ¶ 125. Defendant Mariotti also supported the guidance by stating that the Company had "many different ways to monetize different properties for the second half of the year." ¶ 125.

However, by late-August/early-September 2019, Defendant Mariotti knew that the Company could not meet its projections. By that time, CW1 advised

---

[12] The fact that Funko's cautionary language remained the same – verbatim – before and throughout the Class Period, despite the Company's growing inventory problems, shows it was not meaningful. *See Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010) ("consistency of the defendants' language over time despite the new information … belies any contention that the cautionary language was "tailored to the specific future projection."); *see also In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 107-08 (D.D.C. Cir. 2015) (same).

[13] Because there are so many other actionable misstatements and omissions, Plaintiffs will not contest that there was no duty to correct Defendants' August 8, 2019 FY2019 earnings guidance, which was a forward-looking statement under the PSLRA. *See* MTD at 10-11. However, Plaintiffs continue to assert that Defendant Mariotti had a duty to correct his August 8, 2019 statements issued in support of the guidance, which were not forward-looking statements.

Defendants that, based upon the Company's underlying sales data, there was not enough customer demand or products in the Company's pipeline to meet the FY2019 guidance.  ¶ 92.  CW1 reported that demand for the Company's fourth quarter releases (or content) was weaker than what Defendant Mariotti represented.  ¶ 95.  CW1 advised that there was a shortfall between the internal sales forecasts based on actual customer demand and the public guidance.  *Id.*  CW1 explained that the gap/shortfall could not be closed in time for Defendants to meet the Company's guidance because by late-August 2019 it was too late to create new products for the fourth quarter (even if demand were suddenly to increase or the Company was able to obtain new properties).[14]  ¶ 96.  CW5 also stated that the FY2019 guidance was unattainable. ¶ 132.

Defendants Mariotti, Jung and Perlmutter knew of the sales forecast shortfall through weekly sales meetings starting in late-August/early-September 2019. ¶ 97. ¶¶ 92, 97-99.  Defendants Jung and Perlmutter attended meetings where the shortfall was discussed. ¶¶ 78, 97-99.  Defendant Mariotti received emails summarizing each weekly sales meeting, which included information regarding the shortfall.  ¶ 101.  In addition, Defendants Mariotti, Jung and Perlmutter knew of the shortfall through their participation in monthly investment meetings.  ¶¶ 102, 103.

Once Defendant Mariotti learned that his statements were no longer accurate – that demand for the Company's tentpole projects would not carry them to their target, and that the Company did not have many different ways to make up the earnings shortfall – he had a duty to correct his earlier statements.  *In re LDK Solar Sec. Litig.*, 2018 WL 4369987, at *10 (N.D. Cal. Sept. 24, 2008); *see also Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *1, *11 (C.D. Ca. Apr. 12, 2016).

---

[14] Contrary to Defendants' claim (MTD at 19), CW1 reported that Funko lacked enough "product" to meet its sales guidance.  *See* ¶ 92 ("there was not enough product in the Company's pipeline"); ¶ 96 ("no new products were coming").

Contrary to Defendants' assertion, whether there is a duty to correct an earlier misstatement is an open question in the Ninth Circuit. *See Oaktree Principal Fund V LP v. Warburg Pincus LLC*, 2018 WL 6137169, at *1, *13 (C.D. Cal. Aug. 29, 2018). MTD at 10. In *Oaktree*, Judge Gutierrez rejected arguments similar to those raised by Defendants here. *Id.* at *13. After analyzing the case law in the Ninth Circuit and elsewhere, Judge Gutierrez agreed with the plaintiffs "and the many other courts to have considered this issue" that a defendant can be held liable for failing to correct an earlier statement when the failure would render the statement misleading. *Id.* at *13.[15] There is also no requirement that Defendant Mariotti's earlier statements be false at the time they were made. MTD at 8-10. To trigger a duty to correct, the statement at issue need only be "believed to be true, but as revealed by subsequently discovered information, actually was not." *Oaktree*, WL 6137169, at *12.[16]

### a.    Defendant Mariotti's Statements Are Actionable

Defendant Mariotti's August 8, 2019 statements do not constitute puffery. MTD at 10. While his statements were optimistic, they set forth his rationale for raising the Company's sales guidance ("the content year as a whole" is extremely strong) and addressed specific aspects of Funko's business (Funko had "many different ways to monetize different properties during the second half of the year") and, therefore, were capable of objective verification. *See In re Quality Sys. Inc. Sec. Litig.*, 865 F.3d 1130, 1143-44 (9th Cir. 2017) (statements of optimism that

---

[15] Judge Gutierrez distinguished *Loftus v. Primero Mining Corp.*, 230 F. Supp. 3d 1209 (C.D. Cal. 2017) (MTD at 10) and noted that later decisions, including Judge Fitzgerald's decision in *STARR*, permitted a claim to proceed under the duty to correct theory. *See Oaktree*, 2018 WL 6137169, at *13.

[16] Defendants' reliance on *IMPAC Secured Assets Corp. v. SNR Denton US LLP*, 2013 WL 12139422, at *1, *3 (C.D. Cal. Feb. 13, 2013) is unpersuasive, as more recent case law from this District makes clear that the duty to correct exists even if the speaker did not know their statements were false and misleading when made. *See Oaktree*, 2018 WL 6137169, at *13 (analyzing cases and rejecting the argument that the statement had to be false when made).

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

"address specific aspects of a company's operation that the speaker knows to be performing poorly" are actionable); *STAAR*, 2016 WL 6699284, at *8 (optimistic statements that are capable of objective verification do not constitute puffery).[17]

### 2. Defendants' October 31, 2019 Statements Concerning FY2019 Guidance Were False and Misleading

On October 31, 2019, Funko issued a press release reporting its results for 3Q2019 and reiterating its earlier FY2019 guidance, stating in part "[t]he Company expects net sales to be in a range of $840 million to $850 million."  ¶129.  On an earnings call the same day, Defendant Jung reiterated the guidance, stating "we are maintaining our guidance ranges we laid out on the second quarter conference call, which are: net sales of $840 million to $850 million, representing year-over-year growth of 22% to 24% . . . ." ¶130.  In response to a question as to why the Company was not increasing its guidance, Defendant Jung assured the market that "even with our current guidance, Q4 [2019] will be our biggest ever as a company." ¶ 133.

These statements were false and misleading when made for the reasons set forth in Section III(C)(1) *supra*.  Specifically, Defendants knew that: (1) the FY2019 guidance was not achievable because there was not enough product based on fourth quarter content/properties in the Company's pipeline to meet the guidance (¶ 92); (2) the products based on the content the Company had for the fourth quarter were not expected to generate the sales needed to meet the guidance based on customer demand (¶ 95); and (3) it was too late to produce new products to make up for the shortfall, even if demand increased. ¶ 96.  Defendants knew of

---

[17] These statements are distinguishable from those addressed by the Court in *Mattel*. *See Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1148-49 (C.D. Cal. 2018) (finding that the defendant's vague positive assessments that did not explain why the defendants held confidence in the Company's Q32016 results or provide details about the methodology Defendants used to assess Q32016 results constituted puffery), *aff'd sub nom. Castro v. Mattel, Inc.*, 794 F. App'x 669 (9th Cir. 2020).

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

the shortfall through their attendance at weekly sales meetings (¶ 97), through emails sent to Defendant Mariotti summarizing the weekly sales meetings (¶ 101), and through their participation in monthly investment meetings. ¶ 103. Further, CW1 told Defendant Jung of the shortfall personally. ¶¶ 99-100. These facts, taken as true, as they must be at this stage, establish that Defendants' statements concerning the Company's FY2019 guidance were false and misleading.

Forecasts that contradict internal company data are misleading. *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 972-73 (N.D. Cal. 2009) (by alleging examples of internal issues including declining demand, plaintiffs established that the defendants were aware of undisclosed facts undermining their financial guidance). Here, Defendant Jung even admitted that Defendants were ignoring the internal sales data that conflicted with their public statements. After being advised of the shortfall, Defendant Jung told CW1 that Funko was nevertheless "guiding Wall Street towards the numbers." ¶ 100. The fact that Defendants ignored the Company's internal sales data was further corroborated by CW5, who reported that the sales projections for the Latin American unit were not based on customer demand. ¶ 106. The CAC's allegations that Defendants knew of – but ignored – sales data indicating the guidance would not be met are sufficient to show knowledge. *See Zaghian v. Farrell*, 675 F. App'x 718, 720 (9th Cir. 2017) (forecasts built for "desired but unachievable…outcome" in the face of reliable information conflicting with the desired forecasts are misleading).[18]

Faced with these detailed allegations, Defendants lodge unavailing arguments against CW1. Each of these arguments fails. For example, CW1's analysis of Funko's fourth quarter sales projection was not "speculative" or

---

[18] Defendants' claim that Defendant Jung's insistence that they "need to fix the shortfall" suggests that she believed the guidance could be met is not supported by the facts. MTD at 14. CW1 told Defendant Jung that there was no way to close the gap and there are no facts suggesting that Jung disagreed with CW1 or indicated how she believed the gap could be closed.

"subjective" (MTD at 13), it was based on Funko's internal sales data and customer orders. ¶ 56. CW1 was specifically hired to create sales forecasts and had first-hand knowledge of the Company's sales data because he was responsible for gathering all of the data to formulate the Company's forecasts. ¶ 56. Thus, CW1's detailed account of the information he provided directly to the Defendants is nothing like the confidential witness account this Court found insufficient in *Mattel*. *See Mattel*, 321 F. Supp. 3d at 1154-55 (rejecting facts based on a witness who was not employed in sales or marketing and had no personal knowledge of Mattel's retail inventory levels).

Similarly, Defendants incorrectly claim that the CAC fails to describe how Defendants knew that the shortfall could not be closed during the fourth quarter. MTD at 13. However, CW1 explained that: (1) Funko's customers placed fourth quarter orders in August and September (¶ 96); (2) products needed to be put into production by August/September in order to be shipped to customers for sale in the fourth quarter (*id.*); and (3) it was discussed at monthly investment review meetings that by August/September 2019, the Company had passed the point at which it could produce new product for the fourth quarter. ¶ 103.[19]

---

[19] These facts provide the "analytical link" that was lacking in *City of Royal Oak Ret. Sys. v. Juniper Networks*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) (the setbacks alleged by plaintiffs did not show how defendants would be precluded from meeting their projections) and distinguishes this case from *In re Rackable Sys.*, 2010 WL 3447857, at *5 (N.D. Cal. Aug. 27, 2010) (plaintiffs did not allege any facts to show that defendants' past strategy would not be effective in the future).

For the same reasons, the CAC's allegations are not "fraud by hindsight." *See* MTD at 14, 18. (citing *Ronconi v. Larkin*, 253 F.3d 423, 430 n.12, 432 (9th Cir. 2001) (plaintiffs failed to allege specific "contemporaneous statements or conditions" that demonstrated the statements were misleading); *Paddock v. Dreamworks Animation SKG, Inc.*, 2015 WL 12711653, at *5, *7 (C.D. Cal. Apr. 1, 2015) (projections not misleading absent an allegation that defendants' internal data did not support projections), *aff'd sub nom. Roofers Local No. 149 Pension Fund v. DreamWorks Animation SKG, Inc.*, 677 F. App'x 376 (9th Cir. 2017); *In re Silicon Storage Tech., Inc., Sec., Litig.*, 2006 WL 648683, at *7 (N.D. Cal. Mar. 10, 2006) (plaintiffs did not allege "contemporaneous conditions" regarding inventory valuations or internal reports contradicting the valuations).

19

###### a.    Defendants' Guidance Statements are Actionable

###### i.    Defendants' Forward-Looking Statements are Not Protected by the Safe Harbor Provision

The safe harbor does not protect Defendants' statements concerning the Company's FY2019 guidance because Defendants had actual knowledge that Funko's FY2019 guidance was not achievable at the time the statements were made. *See supra* at III(C)(1); 15 U.S.C. § 78u-5(c)(1).

###### ii.    Defendants' Forward-Looking Statements are Not Protected Opinions

Defendants' FY2019 guidance statements are not protected opinions under *Omnicare, Inc., v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185, 189-190 (2015). MTD at 14, n.6. First, Defendant Jung's statement regarding Funko's FY2019 guidance was not an opinion at all. *See* ¶ 130. Defendant Jung did not say she "believed" or "thought" Funko would have net sales of $840 million to $850 million, she said "we are maintaining our guidance ranges laid out on the second quarter conference call, which are: net sale of $840 million to $850 million." ¶ 130. The difference is significant. *See Omnicare*, 575 U.S. at 185-86. (investors "recognize[] the import of words like 'I think' or 'I believe,' and grasps that they convey some lack of certainty as to the statement's content"). Defendants cannot simply "wish" Defendant Jung's forward-looking statement into one of opinion.

Second, even if Defendants' guidance statements were deemed opinions, they are still actionable because *Omnicare* does not insulate Defendants from knowing misstatements. A plaintiff can also plead a material misrepresentation under *Omnicare* by alleging that the speaker did not hold the belief professed and that the belief was untrue. *Id.* at 184. Plaintiffs have alleged that the Defendants' guidance statements were not honestly believed because they knew the guidance would not be met based on the Company's underlying sales data. ¶¶ 94-103. Actual knowledge that an opinion is false is sufficient to show a speaker's state of mind. *See*

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

*Omnicare*, 575 U.S. at 184 (explaining that "the CEO's statement about product quality would be an untrue statement of fact – namely, the fact of her own belief – if she knew that her company's TVs only placed second.").

Plaintiff can also plead falsity by alleging "facts going to the basis for the issuer's opinion ... whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 188.[20] The Supreme Court held that if a defendant "made [a] statement in the face of . . . contrary advice . . . the investor again has cause to complain:  he expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time. *Id*.  Here, Defendants knew that their FY2019 projections did not "align" with the Company's internal sales and customer order data.  *See* ¶¶ 56, 93, 97-103. The omitted facts – that the Company's internal sales and customer data did not support the FY2019 projections – go directly to Defendants' knowledge concerning their projections and conflict with what a reasonable investor would take away from the projection itself. 575 U.S. at 188; *see also City of Dearborn*, 856 F.3d at 615-16.[21]

---

[20] A plaintiff can also establish falsity of opinion statements that contain embedded statements of fact by pleading facts showing that the speaker did not hold the belief and that the supporting fact was untrue. *Id*. at 185-186.

[21] *See also In re Atossa Genetics*, 868 F.3d at 802 (opinion that the defendant believed that FDA clearance risk had been "achieved" was misleading when defendant knew that the FDA had expressed concerns about the clearance); *STARR*, 2016 WL 6699284, at *10 (opinion that the defendant substantially complied with FDA regulations was misleading without disclosure of FDA observations to the contrary); *Vignola v. FAT Brands, Inc.*, 2019 WL 6888051, at *10 (C.D. Cal. Dec. 17, 2019) (opinion that  management had the track record to achieve future growth misleading without disclosure that the same team had previously overseen the delisting of the company and run the company into bankruptcy as a result of a similar acquisition spree); *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *8 (N.D. Cal. Aug. 7, 2020) (opinion that Uber "expect[ed] … growth to continue" misleading without disclosing that the company had sustained, but not disclosed its largest losses to date and was planning layoffs and restructuring).

### D.    The Complaint Raises a Strong Inference of Scienter

The PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).  In the Ninth Circuit, the "required state of mind" is "a mental state that not only covers "'intent to deceive, manipulate, or defraud,' but also 'deliberate recklessness.'"  *Schueneman*, 840 F.3d at 705.[22]  When analyzing scienter, the court must determine whether the facts collectively give rise to a strong inference of scienter, "not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S. at 310; *see also S. Ferry LP, # 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  *Tellabs*, 551 U.S. at 309-10, 324.  Rather, "it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Id*.  In sum, a "tie goes to the plaintiff."  *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014).

It is well-settled that plaintiffs can plead a strong inference of scienter through circumstantial evidence.  *See, e.g.*, *Quality Sys.*, 865 F. 3d at 1146. As discussed below, Plaintiffs plead detailed information providing a strong inference of scienter, including first-hand knowledge and circumstantial evidence from CWs, as well as nearly $105 million in suspicious insider sales.

### 1.    Scienter is Sufficiently Pled Regarding Defendants' Misrepresentations

For each of the alleged misrepresentations, Plaintiffs have pled that Defendants had access to and/or actual knowledge of undisclosed facts undermining the accuracy of the statements.  *See supra* at III(B)(1), III(C)(1).  This is sufficient for scienter. *Weiss v. Mentor Graphics Corp.*, 1999 WL 985141, at

---

[22] *See also In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 535 (3d Cir. 1999) (important to allow recklessness to serve as a sufficient basis for liability because it "promotes the policy objective[ ] of discouraging deliberate ignorance").

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

*16-19 (D. Or. Oct. 6, 1999) (where defendants made predictions knowing facts which seriously undermined those predictions, actual knowledge was alleged); *see also Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000) (where defendants "'had reasonable grounds to believe material facts existed that were misstated or omitted' . . . cast doubt on Everex's optimistic outlook and support a finding of scienter"); *In re Immune*, 375 F. Supp. 2d at 1022 ("that the defendants published statements when they knew facts suggesting the statements were inaccurate . . . is classic evidence of scienter").

The CAC contains detailed allegations from numerous CWs showing that by August 8, 2019, the Company was suffering from a glut of excess, obsolete inventory as a result of the Company's inability to accurately forecast sales. *See* ¶¶ 74-88, 123. CW1 reported that Defendant Nickel knew about Funko's inventory issues since at least July 2019 because it was discussed at the weekly sales meeting that Defendant Nickel and CW both attended. ¶¶ 78, 99. CW1 reported that Defendant Mariotti received emails summarizing each weekly sales meeting discussing the excess inventory issue (¶¶ 78, 101), and the inventory issues "were not a secret at the Company." ¶ 77. CW2 reported that Funko's excess inventory condition was so serious that it was discussed at Funko's quarterly Board of Directors meetings that CW2 attended along with Defendants Mariotti, Nickel, Pelrmutter, Brotman, Dellomo and Kriger. ¶ 81.

Likewise, the CAC pleads facts supporting an inference that Defendants knew, or with deliberate recklessness disregarded, that Funko's fourth quarter sales could not support the Company's FY2019 projection. Indeed, CW1's detailed allegations alone demonstrate an inference of scienter that is as least as strong as any non-culpable inference. *Tellabs*, 551 U.S. at 310. CW1's allegations, which include repeated interaction at regular meetings with Individual Defendants, are compelling:

- Beginning in late-August/early-September 2019, CW1 repeatedly advised Defendants about Funko's inability to meet 4Q sales targets in weekly sales meetings. ¶ 97. ***Defendant Jung attended these meetings***. ¶99.[23]

- ***CW1 told Defendant Jung that Funko could not meet its 4Q2019 sales targets and that fixing the shortfall was impossible***. ¶ 100.

- Defendant Mariotti knew of the sales shortfall through emails he received summarizing each weekly sales meeting. ¶ 101.[24]

- Defendants knew before October 2019 that Funko did not have enough products based on new fourth quarter content in its pipeline to meet FY2019 guidance from ***attending monthly investment meetings***. ¶¶ 102-103.[25]

CW1's allegations are strong, detailed, and well-founded. The inference of scienter is even stronger because Plaintiffs also plead compelling allegations from other CWs regarding Defendants' unattainable guidance. Like CW1, CW5 reported that the Defendants were more concerned with reaching ambitious sales goals provided to the market than they were with providing forecasts based on actual customer demand. ¶ 106. CW5 reported that Funko senior management set growth

---

[23] The Individual Defendants' scienter can be imputed to Funko and the ACON Defendants. The Ninth Circuit recognizes "corporate scienter" or respondeat superior liability for a corporation under 10(b) and 10b-5 based on common law agency principles. *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1576-78 (9th Cir. 1990) (en banc) (imputing individual officer's knowledge to the company); *Jackson v. Microchip Tech. Inc.*, 2020 WL 1170843, at *11 (D. Ariz. March 11, 2020) ("Plaintiff's allegations are sufficient for the Court to find that Microchip had constructive knowledge of the facts known by the individual Defendants *and other corporate officers*"); *In re Hienergy Techs., Inc. Sec. Litig.*, 2005 WL 3071250, at *8 (C.D. Cal. Oct. 25, 2005).

[24] Plaintiffs also provide details about the summary emails, including who wrote them (¶ 101), who received them (all attendees of the meeting and Defendant Mariotti (*id.*), and what information they contained. *See* ¶¶ 99, 101. *Cf. In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087-88 (9th Cir. 2002), *abrogation on other grounds by S. Ferry*, 542 F.3d 776.

[25] *See also* ¶ 105 (CW1 told Funko's COO Sansone, Leary, Gepford, and Beckley as early as August 2019 that Funko did not have enough content or product to meet the 4Q sales targets); ¶ 104 (CW1 raised concerns about lack of content for the 4Q19 sales projections with Allison Dinan, a Funko product developer who reported directly to Defendant Mariotti. Based on conversations with Dinan, CW1 believes that Dinan reported these concerns to Mariotti).

targets that ignored the sales forecast that CW5 and his manager provided to Defendants based on customer demand. *Id.* In addition, CW2, who had first-hand knowledge of Funko's sales forecasting practices, explained that Defendants Mariotti and Jung were constantly monitoring sales data which showed that Defendants' public forecasts were unattainable. ¶¶ 61-62.

Courts have repeatedly found that first-hand knowledge, regular reports or regular meetings provide a strong inference of scienter. *See, e.g., Quality Sys.*, 865 F.3d at 1145 (CW statements that "established the existence of 'funnel reports' and sales forecasts" that were available to executives raised a strong inference of scienter); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230–32 (9th Cir. 2004) ("contemporaneous reports or data, available to the party, which contradict the statement" can demonstrate scienter); *Cutler*, 696 F. App'x at 815 ("detailed and specific allegations about management's exposure to factual information within the company" probative of scienter); *In re Intuitive Surgical Sec. Litig.*, 2014 WL 7146215 (N.D. Cal. Dec. 15, 2014) (strong inference of scienter pled where CW interacted with the defendants, attended meetings with them where adverse events were discussed and had first-hand knowledge of what the defendants knew); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1191 (C.D. Cal. 2009) (statements by CWs "who could allege first-hand knowledge of the CEO and CFO's practices" probative of scienter).[26] Accordingly, the CAC's allegations

[26] *See also, Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *17-18 (C.D. Cal. Aug. 4, 2017) (defendants' access to the disputed information sufficient to plead that the defendants knew of the information); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 WL 66281, at *15 (N.D. Cal. Jan. 4, 2017) (attendance at meetings where "diesel issue" was discussed provided strong inference of scienter); *In re Petco Animal Supplies Inc. Sec. Litig.*, 2006 WL 6829623, at *14 (S.D. Cal. 2006) (attendance at regular meetings where financial results were discussed provided circumstantial evidence of scienter); *In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192 at 1216 (W.D. Wash. 2009) (CW accounts that the CFO was aware of problems based on attendance at monthly meetings where the issues were discussed raised a strong inference of scienter); *In re Coinstar Inc. Sec. Litig.*, 2011 WL 4712206, at *9 (W.D. Wash. Oct. 6, 2011) (CWs testimony of defendants' awareness of sales data and attendance at monthly meetings supported a strong inference of scienter).

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

concerning Defendants' knowledge that their inventory statements and FY2019 projections were false and misleading support a strong inference of scienter.[27]

### 2.    Plaintiffs' Allegations are Based on Reliable Sources

In the face of well-pled plausible allegations showing that the Defendants knew that their Class Period statements were false and misleading, Defendants attempt to discredit each CW's account.  However, the fact that the CWs span different levels of hierarchy at Funko and tell essentially the same story from different angles bolsters their credibility and supports a strong inference of scienter. *See In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1058-59 (C.D. Cal. 2008).  Moreover, the CAC amply details the personal knowledge of each CW that is consistent with their positions at Funko and each of the CWs' statements are "themselves [] indicative of scienter." *See Quality Sys.*, 865 F.3d at 1144-45.

Defendants aim most of their attacks at CW1 (for obvious reasons), claiming that he is unreliable because CW1 began his employment at Funko one month before the Class Period began.  MTD at 19.  In so doing, they ignore that CW1 was specifically hired to address Funko's sales forecasting issues, that CW1 relied on the Company's underlying data to conclude that the Company's projections were not achievable (data that would have been the same whether CW1 was employed for one month or one year), and that CW1's analysis of the data did not change throughout the Class Period. *See* ¶¶ 51, 59, 76, 94-101.[28]  Defendants' attempt to

[27] That Funko's 3Q2019 sales "exceed[ed] expectations" (¶ 116) does not undercut Defendants' scienter because Plaintiffs allege that Defendants ignored the sales data for the *fourth* quarter – data that showed that the guidance could not be met  *See* MTD at 13.  Likewise, the fact that Funko had more properties to develop in 2019 than in 2018 does not negate Defendants' scienter. *Id*.  Funko relied on the sales of new properties to generate the majority of its sales (¶¶ 50-51). Thus, the fact that its products based on fourth quarter releases were not expected to perform well was significant – regardless of how many overall properties Funko had. *See* ¶ 94.

[28] Defendants wrongly argue that CW1's allegations do not demonstrate Defendant Mariotti's scienter because CW1 did not identify any interactions with him. MTD at 11.  First, CW1 attended monthly investment review meetings with Defendant Mariotti. ¶ 103.  Second, CW1 directed that emails be sent to Defendant Mariotti summarizing the weekly sales meetings. ¶ 101. *See Quality*

write off CW1's detailed allegations as "speculative" and a mere "subjective disagreement" with Funko's senior management (MTD at 11, 13, 19) also fails. CW1's finding that the Company would not meet its sales guidance was not based on subjective factors, but rather was based on the Company's underlying sales data – specifically, customer demand for available products (¶ 95) and the lack of additional content (i.e. other new properties) from which to develop new products to meet the Company's stated guidance (¶¶ 97, 101).[29]

Defendants also wrongly claim that CW3's and CW5's accounts should be disregarded because neither had personal contact with the Individual Defendants. MTD at 20. However, both CW3 and CW5 were in a position to know the information they provided regarding Company practices.[30] *See* ¶ 66 (CW3 had first-hand knowledge about the Company's sales forecasting and inventory practices); ¶ 72 (CW5 was a former Sales Coordinator at Funko). Further, each CW corroborated information provided by other CWs who did have personal interaction with the Individual Defendants. ¶¶ 65, 72, 108.[31]

*Systems*, 865 F.3d at 1145 (allegations that CW "compiled sales reports…and arranged for sales reports to be automatically delivered" weekly or monthly to CFO's office was probative of scienter). Defendants' reliance on *IMPAC*, 2013 WL 12139422, at *3, is misplaced as *IMPAC* concerned the duty to correct and what it means to "make" a statement under the securities laws.

[29] Defendants' cases are distinguishable. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 (9th Cir. 2009) (finding CW disagreed with the defendants over subjective accounting judgments); *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1054 (N.D. Cal. 2019) (the CW did not mention named defendants, and was not "in a position to be personally knowledgeable about the defendants actions"); *In re Downey Sec. Litig.*, 2009 WL 2767670, at *11 (C.D. Cal. Aug. 21, 2009) (rejecting CW's account that management wrongly approved the use of third-party brokers as "second-guessing", where the CW failed to include any facts concerning the requirements for qualifying brokers).

[30] Defendants attack CW3, a former Account Manager (¶ 66), because CW3 was assigned to only one account, Walmart. MTD at 20. However, CW3 had "first-hand knowledge about the Company's sales forecasting and inventory practices" (*id.*) and that is the type of information the CAC attributes to CW3.

[31] Defendants incorrectly suggest that CW5 conflates "internal 'sales goals' for his unit with earnings forecasts." MTD at 20. Rather, CW5 stated that Funko management ignored the forecast reached by CW5 and his supervisor after meeting with their customers and instead projected

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

Defendants wrongly claim that CW2's and CW6's allegations do not support scienter because CW2 left in July 2019 and CW6 left in August 2019. *See* MTD at 20. However, the Ninth Circuit has held that courts should consider witnesses employed before a class period because "[i]nformation from before the class period is relevant because it can 'confirm what a defendant should have known during the class period.'" *Webb v. Solarcity Corp.*, 884 F.3d 844, 851 n.1 (9th Cir. 2018) (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001)).

### 3. Defendants' Stock Sales Further Support an Inference of Scienter

Unusual or suspicious stock sales are probative of scienter. Here, although motive is not necessary to plead scienter (*Tellabs*, 551 U.S. at 323) and Plaintiffs' CW allegations alone demonstrate a strong inference of scienter, certain Defendants' insider sales further strengthen that inference. The Ninth Circuit has identified three factors relevant in determining whether insider sales are probative of scienter – the amount of shares sold, the timing of the sales, and whether the sales were consistent with prior trading. *Azar v. Yelp*, 2018 WL 6182756, at *18 (N.D. Cal. Nov. 27, 2018). Here, Defendants Mariotti and Perlmutter and the ACON Defendants (through Defendants Brotman, Dellomo and Kriger) sold ***nearly $105 million*** in Funko stock during the Class Period. ¶¶ 110, 111, 164-166. In Funko's SPO alone, Defendant Mariotti reaped $10.1 million and the ACON Defendants netted $91.5 million at $25.42 per share – very close to the peak 2019 Funko stock price – ***totaling over $100 million***. ¶¶ 110-111. Defendant Perlmutter also sold

unachievable sales quotas and growth for Funko's Latin American unit. ¶ 106. This is not *Mattel*, 321 F. Supp. 3d at 1154, in which a former employee's allegations regarding "Defendants' access to sales and inventory data, and knowledge of the financial state of the company lack credibility since these issues appear to be well outside [of his] job description"—CW5 was speaking to something within his job description. Nor is it *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 949 (N.D. Cal. 2010), in which the court held that the complaint lacked facts regarding how an "optimistic internal target" related to the relevant public statements. Here, the CAC specifically pleads that Funko executives ignored data reached from customer meetings when stating their guidance. ¶ 132.

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

personal shares during the Class Period, on October 1, 2019, netting $1,159,200. ¶ 165.



These considerable sales were suspicious in timing and amount and were out of line with prior sales. For example, in the seven months before the Class Period, Defendant Mariotti sold 150,000 shares for $3.3 million. ¶ 164. In contrast, during the approximately seven-month Class Period, he sold 500,000 shares for $12 million in proceeds – *over three times as much stock for almost four times as much money*. *Id*. Other than one sale of 50,000 shares, each of the sales took place when Funko stock was over $20 per share, approximately three times what it was at the end of the Class Period. ¶ 166. Courts have found similar sales probative of scienter. *See, e.g., Yelp*, 2018 WL 6182756, at *18, *20 ("sales of 250,000 shares at below $40 per share did not align with…pattern of selling allotments of 13,000 shares when prices were above $40"; "one…sale of 263,000 shares less than six months before the class period began" dwarfed by "750,000 total shares" sold during class period); *see also In re Intuitive*, 65 F. Supp. 3d at 838-39 (sales of $124

million that were out of line with pre-class period sales probative of scienter). Additionally, this was the ACON Defendants' first sale ever—and it happened to be at almost the peak stock price, netting them over $91.5 million, making the sale especially probative of scienter. *See In re Secure Computing Corp. Sec. Litig.*, 184 F. Supp. 2d 980, 990 (N.D. Cal. 2001) (noting that being the first sale of stock was among the factors that made the sale suspicious).

That Defendant Mariotti and the ACON Defendants did not unload the majority of their shares does not defeat an inference of scienter. MTD at 22-23; ACON MTD at 4. When defendants receive a "truly astronomical figure" from their sales, "less weight should be given to the fact that they may represent a small portion of the defendant's holdings. *Oracle Corp.*, 380 F.3d at 1232; *In re SeeBeyond Tech. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003) ("While [defendant] may not have sold a large percentage of his shares . . . the amount of income he generated through his sales, $18 million, is significant."). Here, Defendant Mariotti and the ACON Defendants made ***over $100 million*** from their stock sales in the SPO alone. Insider trades must only be unusual in timing and amount. Here, they are.[32]

Defendants claim that most of the sales by Defendant Mariotti and the ACON Defendants were in the "long-anticipated" SPO. MTD at 23; ACON MTD at 4-5. The Court should not credit this sleight of hand. While those shares were registered in April 2019, a company's shares are often registered well before sale, sometimes years before. Funko only announced the SPO, including details of who would be

---

[32] Defendants' sales are very different than the sales in their cited cases. *See Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 2015 WL 1775221, at *36 (C.D. Cal. Apr. 14, 2015) (defendants only sold total of $9 million during two year class period); *Metzler Inv. GMBH v. Corinthian Colls.*, 540 F.3d 1049, 1067 (9th Cir. 2008) ($33 million sold during 11-month class period – and "in a manner consistent with their pre-Class Period sales"); *Ronconi*, 253 F.3d at 435-36 (price increase "occurred after they sold, and the price at which they sold is close to where the stock traded after the alleged false statements were corrected"); *In re Vantive*, 283 F.3d at 1092-95 (collective sales of $36 million over 15-month period).

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

selling and the amount of artificially inflated shares that would be dumped on the market, on September 16, 2019 – three days before the SPO was conducted – taking advantage of the fact that Funko shares had climbed 25% in the last month. ¶ 109.

Likewise, Defendants' claim that insider sales are only probative of motive when made later in a class period is wrong – sales can be suspicious in timing and amount at any time while a defendant's statements are artificially inflating the subject stock – particularly where the stock, like here, was trading near its peak price.[33]  ¶ 110; MTD at 22-23; ACON MTD at 4. *See Am. W. Holding Corp.*, 320 F.3d at 939 (finding insider sales occurring in succession over a three month period near the peak stock price are suspicious).  *Batwin v. Occam Networks, Inc.*, No. 07-2750 CAS (SHx), 2008 WL 2676364 (C.D. Cal. July 1, 2008) is also instructive. There, a defendant sold only a small percentage of his holdings, but that sale occurred a few months before the company "first projected flat revenues" and the court found that "[t]his projection was allegedly part of an effort to 'condition the market' to the restatement, the issuance of which, according to plaintiff, triggered the steep decline of [defendant company's] stock." *Id.* at *15.  Here, it is telling that all the sales took place shortly before Funko announced to the market on October 31, 2019 that it was maintaining its 2019 full-year guidance.  ¶ 116.  The maintenance of that guidance itself was a misrepresentation because Defendants

___

[33] Defendants' cases on timing are inapposite. *See* MTD at 23. Two of Defendants' cited cases involve defendants that did not sell close to the peak of the stock price. *See In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 874-75 (N.D. Cal. 2004) (stock sales were only at 43% to 72% of peak price); *see also Xiaojiao Lu v. Align Tech., Inc.,* 417 F. Supp. 3d 1266, 1281 (N.D. Cal. 2019) ("all-time high stock price [was] $392.98 per share" – in stark contrast to insider sales at "$252.75 per share…for…corporate insiders [] and $263.675 per share…for the individual defendants"). Here, Defendant Mariotti and the ACON Defendants sold at 92% of Funko's peak price during the Class Period. *See* https://finance.yahoo.com/quote/FNKO/chart.  In *In re Read-Rite Corp. Sec. Litig.*, 115 F. Supp. 2d 1181, 1183 (N.D. Cal. 2000), the defendants' sales occurred many months before any drop in stock price, whereas here, Defendants knew that Funko's shares would likely lose some value when they failed to increase their FY2019 guidance on October 31, 2019, even though the ultimate market reaction was tempered by Defendants' failure to disclose the full truth. ¶ 116.

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

knew the guidance was unattainable. But Defendants also knew the market would react negatively to its failure to increase the guidance, even though the full truth (and inevitable price decline) was still withheld from the market. *Id; see also In re Questcor Sec. Litig.,* 2013 WL 5486762, at *17 (C.D. Cal. Oct. 1, 2013) (finding that the inference of scienter was not negated by defendants insider sales occurring 10 months prior to the end of the Class Period, where they were made following jumps in the stock price).

Defendants also argue that Defendant Mariotti's and Defendant Perlmutter's non-SPO sales are not probative of scienter because their sales were pursuant to 10b5-1 trading plans. MTD at 22-23. First, a 10b5-1 plan does "not provide an absolute defense to a claim of insider trading[;] [r]ather, it requires an additional factual finding of good faith, which a court cannot make when considering a motion to dismiss." *Yelp,* 2018 WL 6182756, at *4 (*citing In re UTStarcom*, 617 F. Supp. 2d at 976 n.16). Moreover, it is unclear when Defendant Mariotti established his trading plan, and if or when he amended it. Such information is necessary to determine whether the plan can undercut the inference from any stock sale. *See, e.g., Yelp*, 2018 WL 6182756, at *18 ("Defendants assert that the trading plan was "executed prior to the alleged fraud [] but nothing before the Court establishes when precisely the trading plan was adopted").[34]

### 4.  Holistically, Plaintiffs' Allegations Demonstrate That the Inference Of Scienter is at Least As Compelling as the Innocent Inference

The CAC pleads detailed allegations, including statements by six corroborative CWs who describe similar problems with Funko's excess inventory,

---

[34] The fact that Defendants Mariotti and Perlmutter are the only officers to have sold stock is of no moment. *See Yelp*, 2018 WL 6182756, at *18 (finding scienter for individual defendants where others did not sell). *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 834 (S.D. Cal. 2006), *aff'd sub nom. In re Adecco S.A. Sec. Litig.*, 256 F. App'x 74 (9th Cir. 2007) is not on point as the plaintiffs did not allege that the selling defendant reaped any personal gain from the sale.

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

CW1's first-hand account of Defendants' knowledge that their FY2019 guidance was unachievable, and approximately $105 million in suspicious insider sales. "The Supreme Court has emphasized that courts 'must review all the allegations holistically' when determining whether scienter has been sufficiently pled." *Matrixx Initiatives Inc. v. Siracusano*, 563 U.S. 27, 48-9 (2011).  When analyzed in the aggregate, Plaintiffs' scienter allegations meet or exceed any competing innocent inference.  *See N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1102-1103 (9th Cir. 2011) ("[w]hen viewed in totality, there is no doubt the allegations, at this early phase of the proceedings, present at least as strong an inference of scienter as any competing innocent inference").[35]

### E.    The Individual Defendants and the ACON Defendants Are Control Persons of Funko

None of the Individual Defendants contest their control person status. Instead, they wrongly claim that Plaintiffs have not pled a predicate violation. MTD at 25.  Because Plaintiffs have pled a predicate violation, the 20(a) claim against the Individual Defendants should necessarily stand.

The ACON Defendants argue that they were not control persons – an argument that fails. [36]  To establish a *prima facie* case of control person liability, a plaintiff must plead a predicate violation and that the defendant directly or indirectly controlled the person or entity committing the primary violation. *See,*

---

[35] Because Plaintiffs have pled scienter for the Defendants who did make statements during the Class Period, it is inconsequential whether the non-speaking Defendants can also be held liable for violations of Section 10(b) under *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). *See* MTD at 25.  As stated below, Plaintiffs have stated a claim under Section 20A against the non-speaking Defendants.

[36] In the first instance, this argument fails because the knowledge and power of the Individual Defendants that were appointed by the ACON Defendants is imputed to ACON, as entities can only act through their agents. *In re ChinaCast Educ. Corp. Sec. Litig. (Costa Brava P'ship III LP v. ChinaCast Educ. Corp.)*, 809 F.3d 471, 475 (9th Cir. 2015).  As the Individual Defendants do not dispute their control person status, it naturally follows that the ACON Defendants are also control persons.

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

*e.g., Howard*, 228 F.3d at 1065. A control person claim does not need to meet the heightened pleading standard of a 10(b) claim, but rather the more lenient standard of Fed. R. Civ. P. 8. *See, e.g., Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 392–93 (N.D. Cal. 2020). Plaintiffs need not prove the individual defendant's scienter or "culpable participation" in the alleged wrongdoing. *Id.* (quoting *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396 (9th Cir. 1993)). Control person liability, however, is "an intensely factual question." *Howard*, 228 F.3d at 1065.

In the Code of Federal Regulations, control is defined as meaning "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. Here, the ACON Defendants owned a majority of Class A shares of Funko.[37] ¶ 30. They had the power to appoint three of the eight members of the Board, including the Chairman of the Board. ¶ 30. Thus, this case is distinguishable from Defendants' cited authority.[38] ACON MTD at 7. Further, Funko stated in its IPO that the ACON Defendants "will have significant influence over [Funko]. . . including over decisions that require the approval of the stockholders." ¶ 31. *See also No. 84 Employer-Teamster Jt. Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936-37 (9th Cir. 2003) (reversing a lower court when a defendant had all the "traditional indicia of control," such as a prior relationship, owning stock and having a seat on the board).

---

[37] ACON Investments, L.L.C. is the entity that announced the purchase of Funko and claims the property on its website, but Plaintiffs concede that ACON Funko Investors, L.L.C. is named on the Prospectus (ACON MTD at 9), and will correct the CAC accordingly after the Court issues its ruling on Defendants' current motions.

[38] *See Golub v. Gigamon Inc.*, 372 F. Supp. 3d 1033, 1053 (N.D. Cal. 2019) (stating in dicta that a 20(a) claim would fail when defendants owned 15.3% of a company); *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1243 (N.D. Cal. 1994) (status as minority shareholder with one agent on the board); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727405, at *16 (N.D. Cal. Sept. 29, 2000) (dismissal when shareholder started at 20% interest and the position lessened); *In re Alstom SA*, 406 F. Supp. 2d 433, 492 (S.D.N.Y. 2005) (discussion of a 24% shareholder).

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

The ACON Defendants held the majority of Class A shares and were by far Funko's single largest shareholder.[39]  The ACON Defendants' founder, Defendant Brotman, was Chairman of the Board – a Board that was kept well abreast of the Company's financial circumstances.  *See, e.g.,* ¶¶ 81, 197.  Defendant Brotman also stated that he viewed the ACON Defendants as a "partner" to Funko, and Defendant Mariotti made similar comments.  ¶ 45.

The ACON Defendants' reliance on *Paracor Finance, Inc. v. General Electric Capital Corporation*, 96 F.3d 1151, 1162 (9th Cir. 1996), for the assertion that control person liability in the Ninth Circuit is based on a "scrutiny of the defendant's participation in the day-to-day affairs of the corporation", is misplaced.  ACON MTD at 6.  *Paracor* addressed control person liability at summary judgement after discovery, not what is required at the pleading stage.  *Id.* at 1156.[40]

The allegations in the CAC, viewed holistically and in a light most favorable to Plaintiffs, establish a prima facie case that the Individual Defendants and ACON Defendants were control persons of Funko.[41]

**F.    The Complaint Sufficiently Alleges 20A Claims**

The Individual Defendants again rely on their argument that Plaintiffs have failed to plead a predicate act.  MTD at 25. Thus it must follow that if this Court

---

[39] The ACON Defendants argue that they were a minority shareholder because cumulatively their Class A shares and Class B shares was 48%, just under 50%.  ACON MTD at 7.  However, the ACON Defendants held 55% of Class A shares.  ¶ 30.  They were also by far the Company's most significant shareholder. The ACON Defendants cite no case where a court addressed an investor with nearly as much of an investment in a company as the ACON Defendants had in Funko.

[40] While *In re Daou Sys., Inc.*, 411 F. 3d 1006, 1024 (9th Cir. 2005), cited by the ACON Defendants (ACON MTD at 5), references a director's involvement in "day-to-day operations" in the context of a motion to dismiss, that was solely with regard to a 10(b) claim.  *Id.*  The Ninth Circuit remanded to the lower court for evaluation of the control person claims.

[41] *See In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 10914316, at *34 (C.D. Cal. Aug. 8, 2013) (claims allowed to proceed when defendant held 20% ownership stake and designated two Board members who were aware of disclosures).

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

allows the 10(b) claim to progress, it too should allow the 20A claim to progress against the Individual Defendants.

It is hard to imagine then that the ACON Defendants would not be liable for 20A because they sold through their board representatives. Nevertheless, the ACON Defendants assert that they were not in possession of material non-public information at the time of their sale. ACON MTD at 8. However, ACON's founder and managing partner serves as Chairman of the Board of Funko, and his knowledge is certainly imputed to ACON. *See ¶*34; *see also supra* at III(D)(1). The ACON Defendants also have two additional ACON board members/partners on the Funko Board, and their knowledge can be imputed to the ACON Defendants as well. The CAC clearly alleges that the Board was kept abreast of all financial information about Funko, including, specifically, inventory and sales figures. ¶¶ 81, 197. The ACON Defendants misrepresent the allegations in the CAC, citing a standard established in *In re Copper Mountain Securities Litigation* (which does not address 20A claims) and implying that the CAC does not plead the necessary factors for a 20A claim. ACON MTD at 8. However, the CAC does everything the complaint in *Copper Mountain* did not: it alleges "(1) when and where the alleged communications took place" (during quarterly board meetings), "(2) who was present" (board members and certain named executives), "(3) how [plaintiff] learned what was said during such conversation" (from a confidential witness, whose title and course of employment is pled) and "what, specifically, was said at those meetings" (details about needing to "clear out" warehouses, and financial information). *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d at 871; *see also ¶* 81, 162. The ACON Defendants, through their agents on the Board, were clearly in possession of material non-public information that contradicted publicly available information at the time they decided to sell their stock.

Accordingly, the CAC states a 20A claim against Defendants Mariotti, Perlmutter and the ACON Defendants.

## CONCLUSION

For the foregoing reasons, the Court should deny the Motions to Dismiss in their entirety.

DATED: December 1, 2020                    Respectfully submitted,

**POMERANTZ LLP**

By:/s/ *Cara David*
Jeremy A. Lieberman
(admitted *pro hac vice*)
Cara David
(admitted *pro hac vice*)
600 Third Ave., 20th Fl.
New York, NY 10016
(212) 661-1100
jalieberman@pomlaw.com
cdavid@pomlaw.com

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
Email:  jpafiti@pomlaw.com

*Co-Lead Counsel for Lead
Plaintiffs*

**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein
 (*pro hac vice* forthcoming)
Stephanie Beige
(admitted *pro hac vice*)
Laurence J. Hasson
(*pro hac vice* forthcoming)
Peter J. Harrington

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW

(*pro hac vice* forthcoming)
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
Email: bernstein@bernlieb.com
beige@bernlieb.com
lhasson@bernlieb.com
pharrington@bernlieb.com

*Co-Lead Counsel for Lead Plaintiffs*

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Email: peretz@bgandg.com

*Additional Counsel for Lead Plaintiffs*

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
THE AMENDED COMPLAINT  Case No. 2:20-cv-02319-VAP-PJW