UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
**CIVIL MINUTES – GENERAL**

| Case No. | **LACV 20-02319-VAP (PJWx)** | Date | February 25, 2021 |
|---|---|---|---|
| Title | ***Gilberto Ferreira v. Funko Inc., et al.*** | | |

Present: The Honorable VIRGINIA A. PHILLIPS, UNITED STATES DISTRICT JUDGE

| Christine Chung | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:** **MINUTE ORDER GRANTING MOTIONS TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT (IN CHAMBERS)**

Before the Court are two Motions to Dismiss the Consolidated Amended Complaint ("Motions"), filed on October 2, 2020. The Motions were filed by two groups of Defendants, the first group consisting of Defendants Funko Inc., Brian Mariotti, Russell Nickel, Andrew Perlmutter, Jennifer Fall Jung, Ken Brotman, Gino Dellomo, and Adam Kriger (hereinafter referred to as "Funko Defendants") and the second group consisting of Defendants ACON Investments, LLC, ACON Funko Manager, LLC, ACON Funko Investors, LLC, ACON Funko Investors Holdings 1, LLC, ACON Funko Investors Holdings 2, LLC, ACON Funko Investors Holdings 3, LLC, and ACON Equity GenPar, LLC (hereinafter referred to as "ACON Defendants"). Having considered the papers filed in support of, and in opposition to, the two Motions, the Court finds this matter appropriate for resolution without oral argument pursuant to Local Rule 7-15. For the following reasons, the Court GRANTS the Motions.

## I. Procedural History

On March 10, 2020, Plaintiff Gilberto Ferreira, individually and on behalf of all others similarly situated, initiated this action by filing a Complaint against Defendants Funko, Inc., Brian Mariotti, Russell Nickel, and Jennifer Fall Jung and alleging the following claims: (1) violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5; and (2) violation of Section 20(a) of the Securities Exchange Act.

On April 3, 2020, Plaintiff Mohamed Nahas, individually and on behalf of all others similarly situated, initiated a related action in Case No. 2:20-cv-03130-VAP-PJWx by filing a

Complaint against Defendants Funko, Inc. Brian Mariotti, Russell Nickel, and Jennifer Fall Jung and alleging the following claims: (1) violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5; and (2) violation of Section 20(a) of the Securities Exchange Act.

On June 11, 2020, the Court granted several motions filed by Plaintiffs Abdul Baker, Zhibin Zhang, Huaiyu Zheng, Gerber Kawasaki, Inc., William Hurt, Jarett Elion, and Zheng Li to consolidate this case and Mohamed Nahas v. Funko, Inc., Case No. 2:20-cv-03130-VAP-PJWx, and appointed Plaintiffs Abdul Baker, Zhibin Zhang, and Huaiyu Zheng as the lead Plaintiffs and Pomerantz LLP and Bernstein Liebhard LLP as co-lead counsel for the putative class.

On July 31, 2020, lead Plaintiffs Zhibin Zhang, Abdul Baker, and Huaiyu Zheng ("Plaintiffs") filed a Consolidated Amended Complaint ("CAC") against Defendants Funko Inc., Jennifer Fall Jung, Brian Mariotti, Russell Nickel, Andrew Perlmutter, Ken Brotman, Gino Dellomo, Adam Kriger, ACON Investments LLC, ACON Funko Manager, LLC, ACON Funko Investors, LLC, ACON Funko Investors Holdings 1, LLC, ACON Funko Investors Holdings 2, LLC, ACON Funko Investors Holdings 3, LLC, and ACON Equity GenPar LLC. In the CAC, lead Plaintiffs allege the following claims: (1) violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 against all Defendants; (2) violation of Section 20(a) of the Securities Exchange Act against Defendants Jennifer Fall Jung, Brian Mariotti, Russell Nickel, Andrew Perlmutter, and the ACON Defendants; and (3) violation of Section 20A of the Securities Exchange Act against Defendants Brian Mariotti, Andrew Perlmutter, and the ACON Defendants. Plaintiffs bring this putative class action on behalf of persons or entities that purchased or otherwise acquired Funko securities between August 8, 2019 and March 5, 2020 (hereinafter referred to as the "Class Period"). (CAC ¶ 1.)

The Funko Defendants filed their Motion to Dismiss the CAC (hereinafter referred to as "Funko Motion") on October 2, 2020. In support of the Funko Motion, the Funko Defendants filed the Declaration of Kevin M. McDonough, attaching Exhibits 1 through 33, and a Request for Judicial Notice (hereinafter referred to as "Funko RJN").

The ACON Defendants filed their Motion to Dismiss the CAC (hereinafter referred to as "ACON Motion") on October 2, 2020. The ACON Defendants filed a joinder to the Funko RJN.

After being granted leave to file a single opposition to both Motions that exceeded the page limits set by the Court's Local Rules, Plaintiffs filed an omnibus Opposition to the Motions on December 1, 2020.

The Funko Defendants filed their Reply to the Opposition on December 30, 2020. The ACON Defendants also filed their Reply to the Opposition on December 30, 2020.

On January 8, 2021, Plaintiffs filed an ex parte application, seeking leave to file a corrected omnibus Opposition brief because a section of the brief filed on December 1, 2020 had been omitted unintentionally. The Court granted the relief requested on January 12, 2021, ordered Plaintiffs to file the corrected brief by January 14, 2021, and granted Defendants leave to file supplemental reply briefs addressing only the new arguments raised in the corrected

Opposition. Plaintiffs filed their corrected omnibus Opposition[1] on January 14, 2021. The Funko Defendants filed a Supplemental Reply to the corrected Opposition on January 22, 2021. The Court then took the Motions under submission.

On January 26, 2021, the Court ordered the parties to file supplemental briefing on the impact of the Ninth Circuit's decision in Friedman v. Tesla, Inc., No. 19-15672, 2021 WL 246210 (9th Cir. Jan. 26, 2021), on the issues raised in the Motions. The parties filed timely supplemental briefing on January 29, 2021.

## II. Factual Allegations

Defendant Funko, Inc. ("Funko") is a "pop culture consumer products company that creates vinyl figures, action toys, plush, accessories, apparel, and homewares relating to movies, TV shows, videogames, musicians, and sports teams." (CAC ¶ 2.) Funko "licenses with established content providers such as Disney, HBO, LucasFilms, Marvel, Blizzard Entertainment, the National Football League, and Warner Brothers." (Id. ¶ 48.) Funko's sales "consist of a mixture of sales from products that are based on contemporaneous pop culture releases . . . as well as from products that are based on older releases that are so popular that they transcend fad status . . . , known as 'evergreen' content." (Id. ¶ 49.) Since 2018, Funko's 'evergreen' content has accounted for about 45% of Funko's sales. (Id. ¶ 50.)

Defendant Brian Mariotti ("Mariotti") has served as the Chief Executive Officer of Funko since he and a group of investors acquired Funko in 2005. (Id. ¶¶ 23, 44.) Mariotti also served as the Chief Executive Officer of Funko Acquisition Holdings, LLC, the predecessor company to Funko, and of Funko Holdings LLC, which is a "holding company, which . . . owns 100% of Funko, LLC, the Company's operating entity." (Id.)

Defendant Russell Nickel ("Nickel") served as Funko's Chief Financial Officer from October 2013 to August 13, 2019 and Defendant Jennifer Fall Jung ("Jung") has served as Funko's Chief Financial Officer since August 13, 2019. (Id. ¶¶ 24-25.) Defendant Andrew Perlmutter ("Perlmutter") has served as Funko's President since October 2017. (Id. ¶ 26.) Defendants Ken Brotman ("Brotman"), Gino Dellomo ("Dellomo"), and Adam Kriger ("Kriger") have served on Funko's Board of Directors since April 2017. (Id. ¶¶ 34-36.)

Defendant ACON Investments, LLC acquired Funko in 2015. (Id. ¶¶ 30, 45.) Funko "went public in November 2017," and the initial public offering ("IPO") made available 10,416,666 shares of Class A common stock of Funko at a price of $12 per share. (Id. ¶¶ 3, 46.) Shortly before Funko's IPO, "an ACON-affiliate owned 100% of Funko Class A common stock. After the IPO, ACON had over 55% of the Class A shares of Funko." (Id. ¶ 30.) "Defendant ACON, [] Mariotti and Fundamental Capital LLC have more than 50% of the voting power for the election of directors to the Funko Board of Directors." (Id. ¶ 22.)

Funko "conducted a secondary [public] offering on September 19, 2019 . . . , consisting of personal shares being sold by Defendant Mariotti and various entities controlled by ACON

1 All citations to Plaintiffs' Opposition throughout this Order are to the corrected omnibus Opposition, filed on January 14, 2021.

Investments, LLC." (Id. ¶ 6.) Mariotti and the ACON Defendants profited over $101 million from selling their stock during the secondary public offering. (Id. ¶¶ 111, 213-210.)

Plaintiffs purchased Funko securities between August 8, 2019 and March 5, 2020. (Id. ¶ 1.) Aside from the secondary public offering, Mariotti earned $10.1 million from the sale of his personal shares during this time period and Perlmutter earned $1.1 million from the sale of his personal shares during this period as well.

According to several former Funko employees, "by August 2019, [Funko] had amassed millions of dollars of obsolete inventory in various Funko warehouses due to [Funko's] 'haphazard' internal sales forecasting practices." (Id. ¶ 5.) Funko did not have a reliable internal system to forecast accurately consumer demand of its products, resulting in Funko ordering significant excess, which was a well-known problem among Funko employees, senior management including Defendants Mariotti, Nickel, Jung, and Perlmutter, and members of Funko's Board of Directors including Defendants Brotman, Dellomo, and Kriger. (Id. ¶¶ 58, 62-88, 101.) The excess inventory problem was discussed at weekly sales meetings, and summarized thereafter in emails, and at meetings of the Funko Board of Directors. (Id. ¶¶ 78, 81, 101.)

Since Funko went public, it reported nine consecutive quarters of sales growth that exceeded 20%. (Id. ¶¶ 3, 47.) Funko issued guidance on August 8, 2019 regarding its projected earnings for Fiscal Year 2019 ("FY2019"), in which it revised its projected sales upwards to between 22% and 24% year over year, i.e., projected net sales of $840 to $850 million. (Id. ¶¶ 3, 90, 124.) Also on August 8, 2019, Mariotti explained during an earnings call with investors the strength of Funko's product pipeline warranted the upward revision because of the strong content that would be released in the second half of 2019, including products relating to the upcoming films Frozen 2 and Star Wars: Episode IX. (Id. ¶¶ 92, 124-25.)

Funko issued a press release on October 31, 2019 regarding its third quarter 2019 earnings performance. In the press release, Funko reported a 26% increase in net sales compared to the third quarter of 2018 and repeated its positive sales outlook for FY2019. (Id. ¶¶ 116, 129.) Also on October 31, 2019, Jung discussed the third quarter 2019 results during an earnings call with investors, in which she reiterated Funko's earnings guidance for FY2019 and stated the fourth quarter of 2019 would be Funko's "biggest quarter ever as a company." (Id. ¶¶ 114, 130, 133.)

Funko filed a Form 10-Q quarterly report for the third quarter of 2019 with the SEC. (Id. ¶ 136.) On the Form 10-Q, Funko including warnings about possible excess inventory "if demand or future sales do not reach forecasted levels," but it did not disclose the excess inventory it already held. (Id.)

By at least September 2019, however, Funko knew its "FY2019 earnings guidance was not achievable" because "there was not enough product in [its] pipeline to meet the guidance." (Id. ¶ 4, 128, 131, 134.) Mariotti, Jung, and Perlmutter were aware of the insufficient amount of products to meet Funko's sales projections for FY2019. (Id. ¶¶ 92-100, 102-104, 107-108.) Funko did not correct its guidance to indicate a projected decrease in sales, nor did it disclose

publicly the excess inventory it held. (Id. ¶¶ 6, 121-123.) Funko's public statements were false and misleading. (Id. ¶¶ 128, 131, 134, 137.)

On February 5, 2020, Funko publicly announced its preliminary fourth quarter 2019 financial results, reflecting a net sales decrease of 8%, and disclosed a write-down of $16.8 million "to 'dispose of slower moving inventory to increase operational capacity.'" (Id. ¶¶ 7, 138.) On February 6, 2020, Funko's share price decreased by 40% and closed at $9.29. (Id. ¶¶ 8, 140.)

On March 5, 2020, Funko issued a press release, disclosing its fourth quarter 2019 earnings and FY2019 financial results which reflected a 4% decrease in net sales year over year. (Id. ¶¶ 12, 148-149.) On an earnings call with investors, Mariotti admitted Funko's forecasting and inventory management practices needed to be revised but blamed the poor results for the fourth quarter of 2019 on "unexpected market conditions." (Id. ¶¶ 151, 153.) On March 6, 2020, Funko's share price closed at $6.92. (Id. ¶¶ 13, 155.)

In setting forth the factual allegations in the CAC, Plaintiffs rely on the accounts of several confidential witnesses, as follows.

CW1 was Funko's Director of Merchandise Planning from July 2019 to June 2020. (Id. ¶ 56.) CW1 was responsible for "developing Company-wide sales forecasts and for determining the quantity of product that needed to be ordered and developed to meet customer demand" and for "inventory management." (Id.) According to CW1, Funko did not have a "system of checks and balances to ensure that [it] w[as] ordering the right amount of inventory" before CW1 was hired and Funko "was always ordering excess product." (Id. ¶ 58.) CW1 stated Funko's inventory issues were well-known by employees and management alike at Funko. (Id. ¶ 77.) CW1 explained "the inventory issue was obvious and [] was so dire that in late summer of 2019, [Funko] had 200 shipping containers of product sitting in the Port of Seattle that could not be unloaded because [Funko's] warehouse was full of old inventory." (Id.) There were also "shipping containers full of inventory sitting in [Funko's] parking lot from August to the end of October 2019 because Funko's warehouses were full." (Id.) CW1 represents Defendants Jung and Perlmutter were aware of the inventory issues since July 2019 because "it was discussed during weekly sales meetings" where CW1, Defendant Jung, and Defendant Perlmutter were present. (Id. ¶ 78.) CW1 stated Defendant Mariotti was aware of the issue because he "was a recipient of emails discussing the inventory issue in August and September 2019." (Id.)

CW1 believed there were "red flags" suggesting Funko "would not be able to meet its fourth quarter sales targets represented to the market by late-August 2019." (Id. ¶ 94.) Although the first half of 2019 had been "great for Funko" because of the success of products from Avengers: Endgame and Fortnite, "no other big videogame was on the horizon" and "the fourth quarter tentpole film releases did not promise such success." (Id.) CW1 held the opinion that "Funko did not have enough new content to meet [its] sales targets for the fourth quarter of 2019, and the content [Funko] had was not expected to perform as well as the previous year's content." (Id. ¶ 95.) "This lack of content created a gap between the actual sales forecast based on customer orders, and [Funko's] sales target provided to the market." (Id.) CW1 believed by late August 2019, "it was too late to produce new content to close the gap," as "new products needed

to go into production by August in order to be shipped to customers for sale in the fourth quarter and, by late-August, it was clear no new products were coming." (Id. ¶ 96.) This issue was discussed at monthly investment meetings, which were attended by Defendants Nickel, Jung, Mariotti, and Perlmutter. (Id. ¶ 103.) The orders for the fourth quarter "were placed in August and September and [they] were below what [Funko] was expecting." (Id.) CW1 and his team "repeatedly raised concerns about the lack of content and its impact on [Funko's] ability to meet the fourth quarter sales targets during weekly sales meetings." (Id. ¶ 97.) Defendants Nickel or Jung attended these meetings and beginning in November 2019, Defendants Mariotti and Perlmutter attended in person. (Id. ¶¶ 99, 101.) "One of [CW1's] direct reports compiled all of the information from the [weekly sales] meeting (including the forecast and any shortfall) into one email that would be sent to the meeting attendees and senior leadership, including Defendant Mariotti." (Id. ¶ 101.) CW1 believed the projected numbers for fourth quarter 2019 "were unrealistic because they did not have enough new product to meet the goal and the product they did have customers no longer wanted." (Id. ¶ 100.) CW1 "raised his concerns about the lack of content for the fourth quarter with Allison Dinan, a product developer at Funko who reported directly to Defendant Mariotti," and he believed she conveyed his concerns to Defendant Mariotti; CW1 also raised this concern with Funko's Chief Operating Officer, Joe Sansone, the Director of Financial Planning and Analysis, Julie Leary, the Senior Vice President of Sales, Johanna Gepford, and the Vice President of Sales, James Beckley "as early as August 2019." (Id. ¶¶ 104, 105.)

CW2 was the general manager of Loungefly, "a consumer products company acquired by Funko in May 2017," from May 2017 through July 2019. (Id. ¶ 61.) Loungefly sold "pop culture-focused accessories and handbags . . . that featured characters owned by licensed brands." (Id.) CW2 "oversaw all the divisions of Loungefly and was responsible for, among other things, profit and loss, budgeting, and forecasting." (Id.) According to CW2, "poor internal sales forecasting resulted in large amounts of obsolete inventory being stored by [Funko] for years." (Id. ¶ 62.) Funko's sales forecasts "did not adequately account for the risk that [Funko's] retail customers would not purchase all of the units they indicated they would purchase" and CW2 stated this failure "was a common problem in 2018 and 2019." (Id. ¶ 63.) CW2 explained Funko "chose not to re-release or liquidate unsold products because it would take away from the collectability of the products, as collectors would not want to see the products they paid top dollar for on sale at a dollar store." (Id. ¶ 64.) CW2 explained by July 2019, Funko "had multiple warehouses in the Seattle area" and Funko "was still discussing how to consolidate the growing inventory." (Id. ¶ 80.) CW2 regularly attended Funko's quarterly Board meetings and the excess inventory was discussed frequently; Defendants Mariotti, Nickel, and Perlmutter attended these Board meetings as well. (Id. ¶ 81.)

CW3 was an account manager at Funko from November 2017 until December 2019. (Id. ¶ 66.) CW3 worked in Arkansas and was assigned to Funko's account with Wal-Mart. (Id.) CW3 was "responsible for forecasting and planning sales of Funko items at Wal-Mart." (Id.) According to CW3, Funko's retail customers "did not commit to buying specific quantities of product" so Funko "merely engaged in a 'guessing game' of predicting sales and ordering inventory." (Id. ¶ 68.) Funko did not have a "methodology to the process of forecasting customer demand and managing inventory." (Id.)

CW4 worked at Funko from January 2018 to June 2020, first as a customer service manager from January to June 2018, at which time CW4 was promoted to a customer service and sales team manager. (Id. ¶ 70.) As a manager, CW4 was "responsible for managing an inside sales team of five sales managers and four account coordinators who worked with direct-to-consumer customers and e-commerce." (Id.) CW4 explained "it was common for [Funko's] retail customers . . . not to commit to a specific quantity of products but rather, pre-order a certain amount and then reduce their orders at a later date" which "resulted in excess inventory that would be stored in warehouses." (Id. ¶ 71.) According to CW4, "around October 2019, Funko opened another warehouse in Puyallup, Washington to house excess inventory that either wasn't moving quickly or wasn't going to be released." (Id. ¶ 83.)

CW5 worked at Funko from August 2018 to September 2019 as a sales coordinator. (Id. ¶ 72.) CW5 "provided back-end sales support for Funko's Latin American territory," and "assisted with sales development and tracked monthly sales" from "Funko's South Everett warehouse." (Id. ¶ 73.) CW5 explained by the end of 2018, "'[i]t was a regular thing that our warehouse was overstocked'" and the excess inventory was discussed at weekly sales meetings CW5 attended. (Id. ¶¶ 84, 85.) CW5 stated Funko management set a sales growth goal of 28% for the Latin American units for 2019, which he concluded "was not based on the forecast that CW5 and his supervisor . . . reached after meeting with their customers." (Id. ¶ 106.) CW5's manager "pushed back and told management his team could not achieve the sales goals, [but] Funko executives were persistent and insisted on the 28% growth. (Id.)

CW6 worked as a senior fulfillment supervisor at Funko from March to August 2019 from Funko's warehouse in Everett, Washington. (Id. ¶ 87.) CW6 was responsible "for ensuring that Funko's products were being shipped to customers according to customer guidelines and for ensuring that all goods received at the warehouses were offloaded and entered into the inventory system. (Id.) According to CW6, Funko's excess inventory problem was "obvious to everyone" and he explained "the warehouses stored a lot of 'dead' products that were three to four years old." (Id. ¶ 88.)

## III. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows a party to bring a motion to dismiss for failure to state a claim upon which relief can be granted. Rule 12(b)(6) is read along with Rule 8(a), which requires a short, plain statement upon which a pleading shows entitlement to relief. Fed. R. Civ. P. 8(a)(2); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). A motion to dismiss can be based on the failure to allege a cognizable legal theory or the failure to allege sufficient facts under a cognizable legal theory. Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 534 (9th Cir. 1984).

When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint – as well as any reasonable inferences to be drawn from them – as true and construe them in the light most favorable to the nonmoving party. See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of the Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005); Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994).

To survive a motion to dismiss, a plaintiff must allege facts that state a claim for relief that is plausible, not merely conceivable. Twombly, 550 U.S. at 556, 570. "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). Then, for all well-pled factual allegations, the court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. "[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009) (applying Iqbal's two-step analysis).

A complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively" and "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." Starr v. Baca, 652 F. 3d 1202, 1216 (9th Cir. 2011). "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." Id.

Although the scope of review is limited to the contents of the complaint, the Court may also consider exhibits submitted with the complaint, Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n.19 (9th Cir. 1990), and "take judicial notice of matters of public record outside the pleadings," Mir v. Little Co. of Mary Hosp., 844 F.2d 646, 649 (9th Cir. 1988).

## IV. Judicial Notice

The Funko RNJ asks the Court to take judicial notice of the following Exhibits attached to the McDonough Declaration: Exhibit 2 (table summarizing allegedly false or misleading statements attributable to Funko Defendants); Exhibit 3 (table summarizing cautionary language and risk disclosures accompanying Funko's statements); Exhibit 4 (table showing Funko stock holdings of Perlmutter); Exhibit 5 (Funko's Form 8-K and press release announcing financial results for third quarter of 2017); Exhibit 6 (Funko's Form 8-K and press release announcing financial results for fourth quarter of 2017); Exhibit 7 (Funko's Form 8-K and press release announcing financial results for first quarter of 2018); Exhibit 8 (Funko's Form 8-K and press release announcing financial results for second quarter of 2018); Exhibit 9 (Funko's Form 8-K and press release announcing financial results for third quarter of 2018); Exhibit 10 (Funko's Form 8-K and press release announcing financial results for fourth quarter of 2018); Exhibit 11 (Perlmutter's Form 4 filed with the SEC on April 3, 2019); Exhibit 12 (Funko's Form S-3 filed with the SEC on April 19, 2019); Exhibit 13 (excerpts from Funko's Form 10-K for 2018); Exhibit 14 (Mariotti's Form 4 filed with the SEC on June 12, 2019); Exhibit 15 (Perlmutter's Form 4 filed with the SEC on July 1, 2019); Exhibit 16 (Perlmutter's Form 4 filed with the SEC on July 3, 2019); Exhibit 17 (Mariotti's Form 4 filed with the SEC on July 11, 2019); Exhibit 18 (excerpts from Funko's Form 10-Q for second quarter 2019); Exhibit 19 (Funko's Form 8-K and press release announcing financial results for second quarter of 2019); Exhibit 20 (transcript of Funko's August 8, 2019 earnings call for second quarter of 2019); Exhibit 21 (Mariotti's Form 4 filed with the SEC on August 14, 2019); Exhibit 22 (Mariotti's Form 4 filed with the SEC on September 24, 2019); Exhibit 23 (Perlmutter's Form 4 filed with the SEC on October 2, 2019);

Exhibit 24 (Perlmutter's Form 4 filed with the SEC on October 3, 2019); Exhibit 25 (Mariotti's Form 4 filed with the SEC on October 23, 2019); Exhibit 26 (Funko's Form 10-Q for third quarter 2019); Exhibit 27 (Funko's Form 8-K and press release announcing financial results for third quarter of 2019); Exhibit 28 (transcript of Funko's October 31, 2019 earnings call for third quarter of 2019); Exhibit 29 (Funko's Form 8-K and press release announcing preliminary financial results for fourth quarter of 2019, filed with the SEC on February 5, 2020); Exhibit 30 (Funko's Form 8-K and press release announcing financial results for fourth quarter of 2019, filed with the SEC on March 5, 2020); Exhibit 31 (transcript of Funko's March 5, 2020 earnings call for fourth quarter of 2019); Exhibit 32 (Perlmutter's Form 4 filed with the SEC on March 6, 2020); and Exhibit 33 (Funko's Prospectus Supplement filed with the SEC on September 18, 2019).

According to the Funko Defendants, the foregoing Exhibits are subject to judicial notice for several reasons: Exhibits 14, 17-18, and 20-33 are incorporated by reference in the CAC; Exhibits 5-13, 15-16, 19 are Funko's SEC filings, press releases, and earnings call transcripts, which are judicially noticeable; and Exhibits 2-4 are the subject of judicial notice because they are defense counsel's summaries of relevant statements made in the documents that were incorporated by reference in the CAC. As mentioned supra, the ACON Defendants join in the Funko RJN. Plaintiffs do not oppose the Funko RJN.

A court may properly take judicial notice of: (1) material which is included as part of the complaint or relied upon by the complaint; and (2) matters in the public record. See Marder v. Lopez, 450 F.3d 445, 448 (9th Cir. 2006). A court may take judicial notice of a public record not for the truth of the facts recited in the document, but for the existence of the matters therein that cannot reasonably be questioned. See Fed. R. Evid. 201. The court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992) (citation omitted). The Court also may take judicial notice of material incorporated by reference into the Complaint. See Coto Settlement v. Eisenberg, 593 F.3d 1031, 1038 (9th Cir. 2010); Intri-Plex Tech., Inc. v. Crest Grp., Inc., 499 F.3d 1048, 1052 (9th Cir. 2007). Documents are properly incorporated into the complaint by reference "in situations where the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint, the document's authenticity is not in question and there are no disputed issues as to the document's relevance." Coto Settlement, 593 F.3d at 1038; see also United States v. Corinthian Coll., 655 F.3d 984, 999 (9th Cir. 2011).

In Khoja v. Orexigen Therapeutics, the Ninth Circuit clarified the judicial notice rule and incorporation by reference doctrine. Khoja v. Orexigen Therapeutics, 899 F.3d 988, 998-1003 (9th Cir. 2018). It explained a court may take "judicial notice of matters of public record," but "cannot take judicial notice of disputed facts contained in such public records." Khoja, 899 F.3d at 999 (citation and quotations omitted). If a court takes judicial notice of a document, it must specify what facts it judicially noticed from the document. Id. Separately, the incorporation by reference doctrine is a judicially-created doctrine that allows a court to consider certain documents as though they were part of the complaint itself. Id. at 1002. This is to prevent plaintiffs from cherry-picking certain portions of documents that support their claims, while omitting portions that weaken their claims. Id. It is improper to consider documents "only

to resolve factual disputes against the plaintiff's well-pled allegations in the complaint." Id. at 1014. "[U]nlike judicial notice, a court may assume [an incorporated document's] contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." Id. at 1003. The Khoja court warned, "the unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery. This risk is especially significant in SEC fraud matters, where there is already a heightened pleading standard, and the defendants possess materials to which the plaintiffs do not yet have access." Id. at 998.

Applying Khoja here, the Court concludes most of the documents submitted by the Funko Defendants are not subject to judicial notice.

Exhibits 2 through 4 are tables summarizing data from Exhibits 5 through 33 and the tables identify the source of each data point. Although these summary tables are of some assistance to the Court in considering the matters raised in the Motions, the Court need not take judicial notice of these tables, especially because they include information from documents of which the Court declines to take judicial notice. Cf. Okla. Firefighters Pension & Ret. Sys. v. Ixia, No. CV 13-08440 MMM (SHx), 2015 WL 1775221, at *17 (C.D. Cal. Apr. 14, 2015) (taking judicial notice of spreadsheets and tabulations prepared by defense counsel that summarized the trading activity of certain defendants before and during the class period); Fed. R. Evid. 1006 (a party submitting voluminous data to the Court may present the data in the form of "a summary, chart, or calculation" as long as the original data is made available). The Funko RJN is DENIED as to these documents.

Exhibits 5-10, 12, and 13 are Funko's SEC forms for quarters or years outside the Class Period, which are not relevant to the Court's analysis. The Funko RJN is DENIED as to these documents.

Exhibits 11, 14-17, 19, 21-25, and 32 are SEC forms filed by Defendants Perlmutter and Mariotti. These documents are not relevant to the Court's analysis, as the Court's consideration of the sufficiency of Plaintiffs' allegations of suspicious stock sales and insider trading are limited to the allegations themselves, as discussed herein. The CAC does not incorporate these forms by reference and the Court concludes they are not the appropriate subject of judicial notice here. The Funko RJN is DENIED as to these documents.

Exhibits 29-31 and 33 are SEC forms filed by Funko and a transcript of a March 5, 2020 earnings call. These documents are not relevant to the Court's analysis here, as none contain any alleged false or misleading statement and they do not form the basis of any claims raised by Plaintiffs. The Funko RJN is DENIED as to these documents.

The Court takes judicial notice of Exhibit 18, excerpts from Funko's Form 10-Q for the second quarter of 2019. This document is referenced in the CAC, there is no dispute as to its authenticity, and there is no dispute as to its relevance. See Coto Settlement, 593 F.3d at 1038; Corinthian Colleges, 655 F.3d at 999. Specifically, the Court GRANTS the RJN as to Exhibit 18 and takes judicial notice of pages 40-46 of Exhibit 18 concerning Funko's risk disclosures.

The Court takes judicial notice of Exhibit 20, the transcript of Funko's August 8, 2019 earnings call for the second quarter of 2019. This document is quoted in the CAC, there is no dispute as to its authenticity, and there is no dispute as to its relevance. Id. Specifically, the Court GRANTS the RJN as to Exhibit 20 and takes judicial notice of Defendant Nickel's statements on pages 4, 8, and 9, and Defendant Mariotti's statement on page 11.

The Court takes judicial notice of Exhibit 26, excerpts from Funko's Form 10-Q for the third quarter of 2019. This document is quoted in the CAC, there is no dispute as to its authenticity, and there is no dispute as to its relevance. Id. Specifically, the Court GRANTS the RJN as to Exhibit 26 and takes judicial notice of pages 41-47 concerning Funko's risk disclosures.

The Court takes judicial notice of Exhibit 27, Funko's Form 8-K announcing its financial results for the third quarter of 2019. This document is referenced in the CAC, there is no dispute as to its authenticity, and there is no dispute as to its relevance. Id. Specifically, the Court GRANTS the RJN as to Exhibit 27 and takes judicial notice of pages 6 and 7 concerning Funko's risk disclosures.

The Court takes judicial notice of Exhibit 28, the transcript of Funko's October 31, 2019 earnings call for the third quarter of 2019. This document is quoted in the CAC, there is no dispute as to its authenticity, and there is no dispute as to its relevance. Id. Specifically, the Court GRANTS the RJN as to Exhibit 28 and takes judicial notice of Andrew Harless' statement on page 4, and Defendant Jung's statements on pages 8 and 13.

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART the Funko RJN.

## V. Discussion

The Funko Defendants move to dismiss the CAC for several reasons. They argue the CAC fails to state a Section 10(b) claim because Plaintiffs do not allege an actionable misstatement or omission; the CAC's allegations do not support a strong inference of scienter; and, in any event, no such claim can be alleged against Defendants Perlmutter, Dellomo, Kriger, and Brotman because they did not make a false or misleading statement nor did they have "ultimate authority" over the alleged false or misleading statements that were made by others. According to the Funko Defendants, because Plaintiffs fail to state a Section 10(b) claim, their Section 20(a) and 20(A) claims must fail as well.

The ACON Defendants move to dismiss the CAC on similar grounds. Namely, the ACON Defendants contend Plaintiffs fail to plead a Section 10(b) claim against them because the CAC is devoid of any allegations of a false or misleading statement made by the ACON Defendants. In addition, the ACON Defendants argue Plaintiffs plead insufficient facts to support a strong inference of the ACON Defendants' scienter. The ACON Defendants also argue Plaintiffs fail to state a Section 20(a) claim for control person liability because they fail to plead a Section 10(b) claim against the Funko Defendants and they fail to allege the ACON Defendants exercised actual power or control over the Funko Defendants. According to the ACON Defendants, Plaintiffs fail to state a Section 20(A) claim for insider trading because the CAC

contains no allegation that the ACON Defendants possessed material, nonpublic information when selling Funko stock. Finally, the ACON Defendants argue the claims against Acon Investments, LLC should be dismissed because Plaintiffs named the wrong corporate entity and should have named ACON Funko Investors, LLC instead.

In Opposition, Plaintiffs argue the CAC states a Section 10(b) claim because it alleges sufficient materially misleading statements regarding Funko's inventory holdings and FY2019 earnings guidance. Plaintiffs also contend the allegations in the CAC raise a strong inference of scienter, as the allegations are based on accounts from reliable sources, and Defendants' stock sales support the inference. According to Plaintiffs, the Funko Defendants and ACON Defendants are control persons of Funko. Finally, Plaintiffs argue the CAC sufficiently alleges Section 20(a) and Section 20A claims.

The Court discusses each argument, in turn.

### A. Claim 1: Violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for "any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Securities Exchange Commission Rule 10b-5 provides that "[i]t shall be unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b).

"There are six elements to a securities fraud claim under § 10(b) and Rule 10b-5: (1) a material misrepresentation or omission; (2) scienter (i.e., a wrongful state of mind); (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance upon the misrepresentation (often established in 'fraud-on-the-market' cases via a presumption that the price of publicly-traded securities reflects all information in the public domain); (5) economic loss; and (6) loss causation." Loos v. Immersion Corp., 762 F.3d 880, 886-87 (9th Cir. 2014). These elements are "strenuous but well established." Curry v. Yelp Inc., 875 F.3d 1219, 1224 (9th Cir. 2017).

Through the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Congress imposed heightened pleading standards on federal securities fraud actions. See 15 U.S.C. §§ 78u-4(b)(1)-(2). "At the pleading stage, a complaint stating claims under section 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009). Under Federal Rule of Civil Procedure 9(b), a plaintiff must plead fraud claims "with particularity" but may allege "[m]alice, intent, knowledge, and other conditions of a person's mind . . . generally." Rule 9(b) requires "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations," and that the allegations "be specific enough to give defendants notice of the particular misconduct which is alleged to

constitute the fraud charged." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (internal citations omitted). Similarly, the PSLRA requires "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B); Tellabs, Inc. v. Maker Issues & Rights, Ltd., 551 U.S. 308, 321 (2007). Under the PSLRA, both falsity and scienter must be pled with particularity. Zucco Partners, LLC, 552 F.3d at 990.

### 1. Material Misrepresentation or Omission

As stated supra, the Funko Defendants argue Plaintiffs fail to allege an actionable material misrepresentation or omission. Likewise, the ACON Defendants contend Plaintiffs do not attribute any alleged misrepresentation or omission to them, so this claim must be dismissed against them.

For a misstatement or omission made by a defendant to be actionable, it must concern material facts. Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988); TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. See TSC Indus., Inc., 426 U.S. at 449; Schueneman v. Arena Pharm., Inc., 840 F.3d 698, 705-06 (9th Cir. 2016). A material misrepresentation or omission is adequately alleged "when a plaintiff points to [the] defendant's statements that directly contradict what the defendant knew at that time." Khoja, 899 F.3d at 1008 (citing In re Astossa Genetics Inc. Sec. Litig., 868 F.3d 784, 794-96 (9th Cir. 2017)).

Liability can arise not only from affirmative representations but also from failures to disclose material information. SEC v. Dain Rauscher, 254 F.3d 852, 855-56 (9th Cir. 2001). "Omissions are actionable under [§ 10(b)] and Rule 10b-5 thereunder only if the party omitting the fact had a duty to disclose that fact." In re Amgen Inc. Sec. Litig., 544 F. Supp. 2d 1009, 1029-30 (C.D. Cal. 2008) (citing Chiarella v. United States, 445 U.S. 222, 230 (1980)). The antifraud provisions impose "'a duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading.'" SEC v. Fehn, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996) (quoting Hanon v. Dataproducts Corp., 976 F.2d 497, 504 (9th Cir. 1992)). "To be actionable under securities law, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." Brody v. Transnat'l Hosp. Corp., 280 F.3d 997, 1006 (9th Cir. 2002). Once a party chooses to speak on a subject, they must disclose facts necessary to make the statements "not misleading" in light of the circumstances under which they were made. Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 43 (2011). "[W]hen a plaintiff relies on a theory of omission, the plaintiff must allege 'facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc., 856 F.3d 605, 615-16 (9th Cir. 2017) (quoting Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 194 (2015)). It is not sufficient that an investor merely "consider[ed] the omitted information significant." Markette v.

XOMA Corp., No. 15-CV-3425 (HSG), 2017 WL 4310759, at *7 (N.D. Cal. Sept. 28, 2017) (internal quotation marks omitted).

To assert a claim under the PSLRA, the plaintiff must plead with particularity, inter alia, the element of falsity. Zucco Partners, LLC, 552 F.3d at 990-91. "The PSLRA has exacting requirements for pleading 'falsity.'" Metzler Inv. GMBH v. Corinthian Coll., Inc., 540 F.3d 1049, 1070 (9th Cir. 2008). To satisfy these "exacting requirements," a plaintiff must plead "specific facts indicating why" the statements at issue were false. Id.; Ronconi v. Larkin, 253 F.3d 423, 434 (9th Cir. 2001) ("Plaintiffs' complaint was required to allege specific facts that show" how statements were false). Moreover, to be actionable, a statement must be false "at [the] time by the people who made them." Ronconi, 253 F.3d at 430. "The fact that [a] prediction proves to be wrong in hindsight does not render the statement untrue when made." In re VeriFone Sec. Litig., 11 F.3d 865, 871 (9th Cir. 1993).

The PSLRA creates a safe harbor for certain "forward-looking statements." "A forward-looking statement is 'a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items.'" In re Cutera Sec. Litig., 610 F.3d 1103, 1111 (9th Cir. 2010) (quoting 15 U.S.C. § 78u-5(i)(1)(A)). The safe harbor provision applies to two types of forward-looking statements: (1) those "identified as a forward-looking statement and accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" and (2) statements that the plaintiff fails to prove were made with actual knowledge that they were false or misleading. 15 U.S.C. § 78u-5(c)(1). "These statements cannot be a basis for liability – even if they are untrue or deceptive when made." In re Arrowhead Pharm., Inc. Sec. Litig., No. CV 16-08505 PSG (PJWx), 2017 WL 5635422, at *4 (C.D. Cal. Sept. 20, 2017). "This safe harbor 'is designed to protect companies and their officials' when they merely fall short of their 'optimistic projections.'" Friedman v. Tesla, Inc., No. 19-15672, 2021 WL 246210, at *5 (9th Cir. Jan. 26, 2021) (quoting In re Quality Sys., Inc. Sec. Litig., 865 F.3d 1130, 1142 (9th Cir. 2017)). "Forward-looking language includes statements that a company 'expects,' 'believes,' or 'is confident' that certain projections will be realized in the future." Oaktree Principal Fund V, LP v. Warburg Pincus LLC, No. CV 15-8574 PSG (MRWx), 2017 WL 3187688, at *9 (C.D. Cal. Jan. 17, 2017) (citations omitted). "[W]here defendants make mixed statements containing non-forward-looking statements as well as forward-looking statements, the non-forward-looking statements are not protected by the safe harbor of the PSLRA." In re Quality Sys., Inc. Sec. Litig., 865 F.3d at 1142.

A statement that is not capable of objective verification is considered "puffery" and does not constitute a material misrepresentation under the PSLRA. Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 606 (9th Cir. 2014). "When valuing corporations . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers . . . [most investors] know how to devalue the optimism of corporate executives." In re Cutera Sec. Litig., 610 F.3d at 1111 (internal quotations omitted). "But even 'general statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." In re Quality Sys., Inc. Sec. Litig., 865 F.3d at 1143-44 (quoting Warshaw v.

Xoma Corp., 74 F.3d 955, 959 (9th Cir. 1996)). Puffing language includes vague statements of optimism like "business couldn't be better" and "industry-leading," as well as words like "strong," "robust," "well positioned," "solid," and "improved." See In re Wet Seal, Inc. Sec. Litig., 518 F. Supp. 2d 1148, 1168 (C.D. Cal. 2007). "[A]n optimistic, subjective assessment hardly amounts to a securities violation." Apollo Grp. Inc., 774 F.3d at 606.

Here, Plaintiffs allege Defendants made at least eight materially false and misleading statements and omissions relating to Funko's sales performance and the amount of inventory it held in the second and third quarters of 2019. The Court discusses each alleged misstatement or omission in turn.

**i. Statement No. 1**

During the August 8, 2019 earnings call with investors, Plaintiffs allege Defendant Mariotti stated:

> Considering that both Q1 and Q2 results exceeded our expectations, we are raising our full year guidance at this time. We now expect net sales of $840 million to $850 million, representing year-over-year growth of 22% to 24% compared to our prior guidance of $810 million to $825 million or 18% to 20% growth.

(CAC ¶¶ 118, 124.) Plaintiffs allege after Defendant Mariotti made this statement, he learned "there was no basis for [Funko's] FY2019 guidance because, contrary to his representations, there was not enough content in [Funko's] pipeline to support the guidance." (CAC ¶ 128.) Plaintiffs allege Defendant Mariotti had a duty to correct his August 8, 2019 statement and "[h]is failure to do so was misleading, as it omitted material information from the market." (Id.)

In the Motion, the Funko Defendants argue Funko's sales projections and second quarter 2019 results were not false and, in any event, were forward-looking statements protected by the PSLRA. (See Funko Mot. at 8-9.) In Opposition, Plaintiffs concede this statement was forward-looking and not actionable under the PSLRA; Plaintiffs also concede there was no duty to correct this statement. (See Opp'n at 14, n.13.)

The Court construes Plaintiffs' position as non-opposition to granting the Funko Motion as to this statement. Accordingly, as the parties do not dispute statement no. 1 is not actionable under the PSLRA, the Court concludes statement no. 1 does not provide a basis for Plaintiffs' Section 10(b) or Rule 10b-5 claim.

**ii. Statement No. 2**

During the same August 8, 2019 earnings call, Plaintiffs allege Defendant Nickel stated:

> Gross margin, which excludes depreciation and amortization, decreased 90 basis points from Q2 of last year to 37.2%. The decrease in gross margin this quarter compared to Q2 of last year was driven primarily by higher reserves taken for slower-moving inventory of some old lines as well as the higher Loungefly tariffs I discussed earlier, which was partially offset by lower product costs and royalty costs as a percentage of net sales.

> These favorable trends in product and royalty costs should help offset the impact of higher tariffs.

(CAC ¶ 119; see also McDonough Decl. ¶ 22, Exh. 20 at 8.) Plaintiffs allege this statement was misleading because it "did not alert the market to the fact that Funko was currently sitting on millions of units of long obsolete inventory" and "misled investors into believing that [Funko's] inventory levels were under control." (CAC ¶¶ 120-121.)

The Funko Defendants argue Nickel's statement was not false or misleading and, instead, was actually true and no further disclosures were necessary. (Funko Mot. at 15-16.) The Funko Defendants point out during the same earnings call, Nickel also explained Funko's inventory was "up to $75.3 million" at the end of the second quarter of 2019, which was an "increase of about 17%." (See McDonough Decl. ¶ 22, Exh. 20 at 9.) They contend inventory obsolescence and write-downs to inventory valuation are highly subjective accounting determinations and Plaintiffs do not allege Funko as of August 8, 2019 failed to account for the excess inventory or that the write-down decision should have been made earlier. (Funko Mot. at 15-16.)

In Opposition, Plaintiffs argue Nickel's statements were misleading because the inventory was not slow moving, "it was the result of reckless forecasting and ordering and there was no reasonable basis to anticipate it could ever be sold." (Opp'n at 10.) Plaintiffs recite the CAC's allegations from six confidential witnesses, each of whom attested to Funko's excess inventory problems and the reason for it from their perspectives. Plaintiffs argue Funko's struggle to warehouse excess obsolete inventory was material because, had it been disclosed, investors would have viewed the statement with more skepticism. (Id.) Plaintiffs contend Nickel's and Funko's further statements about its inventory values did not distinguish between new or obsolete inventory, which did not alert investors to Funko's true inventory condition. (Id. at 11.) According to Plaintiffs, Funko also failed to disclose how much it was increasing its reserves, which made it nearly impossible for investors to appreciate the true risk of the increased reserves. (Id.) Plaintiffs argue even if Nickel's statement was literally true, it is actionable because it was misleading. (Id.)

Plaintiffs rely primarily on the Ninth Circuit's decision in Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 986 (9th Cir. 2008). There, the defendant allegedly received several stop-work orders from its government clients. Id. at 983. Such orders typically signaled that the work would never be completed, thus leading to an immediate loss of revenue. Id. One stop-work order "halted between $10 and $15 million of work on the company's largest contract with one of its most important customers;" another "halted $8 million of work;" and another "caused the company to reassign 50-75 employees." Id. at 988 n.5. Yet, the defendants counted those orders in its "backlog report" of work to be completed and touted that report publicly. Id. at 985-86. The backlog report noted the "customers' rights to 'cancel' or 'modify' existing contracts," but said "nothing about the right to simply stop work and thus immediately interrupt the company's revenue stream." Id. at 986 (quotation marks omitted). The defendants spoke "entirely of as-yet-unrealized risks and contingencies," and failed to alert the investors that "some of these risks may already have come to fruition." Id. The Berson court concluded "[h]ad defendants released no backlog reports, their failure to mention the stop-work orders might not have misled anyone.

But once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of." Id. at 987.

Here, unlike in Berson, Nickel's statement did not tout Funko's earnings in a way that misleadingly accounted for purchase orders that had been canceled. Instead, the relevant portion of Nickel's statement was that Funko had taken "higher reserves [] for slower-moving inventory of some old lines." The language Nickel used was vague and could be construed as referencing the very excess or obsolete inventory Plaintiffs contend Funko tried to hide from investors. See, e.g., Apollo Grp. Inc., 774 F.3d at 606 (concluding vague statements are not actionable because they do not "induce the reliance of a reasonable investor."). Moreover, taken together with Nickel's other statements made during the August 8, 2019 earnings call about the valuation of Funko's inventory, the CAC does not contain sufficient allegations to show the market was misled as to the true state of Funko's inventory, in contrast to Berson. If anything, it appears Nickel's statement highlighted Funko's problem of maintaining a high volume of inventory; Plaintiffs even allege an analyst after the August 8, 2019 earnings call wrote an article calling out Nickel's statement about Funko's inventory and warning it was an issue to "keep an eye on moving forward as the Pop! brand matures." (CAC ¶ 121.) As such, Plaintiffs' own allegations undermine their argument that the market was misled by Nickel's statement. Furthermore, Plaintiffs do not allege an objectively-verifiable amount, percentage, or value of the excess or obsolete inventory Nickel should have disclosed on the August 8, 2019 earnings call. See, e.g., Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co., 845 F.3d 1268, 1275 (9th Cir. 2017) ("To be misleading, a statement must be capable of objective verification."). The Court cannot conclude, even drawing all reasonable inferences in Plaintiffs' favor, that the CAC contains sufficient allegations to demonstrate statement no. 2 was misleading.

Accordingly, statement no. 2 is not actionable and cannot form the basis for Plaintiffs' securities fraud claims.

**iii. Statement No. 3**

During the same August 8, 2019 earnings call, Plaintiffs allege Defendant Mariotti stated:

> I would continue to say the content year as a whole, it's extremely strong. And we have 2 big bullets left to fire with Frozen 2 and Star Wars: Episode IX. . . . We still have ways to -- we have so many different ways to monetize different properties for the second half of this year. We're excited. We think the content is extremely strong.

(CAC ¶ 125; see also McDonough Decl. ¶ 22, Exh. 20 at 11.) Plaintiffs allege Defendant Mariotti had a duty to correct these statements when, in late August or early September 2019, he learned Funko would not meet its sales projections for the fourth quarter of 2019. (CAC ¶ 128.)

In the Motion, the Funko Defendants argue Plaintiffs have failed to allege any actionable misstatement relating to the August 8, 2019 sales projections and guidance for FY2019, Mariotti's statement is not actionable because it is a forward-looking statement or statement of corporate puffery under the PSLRA, and there is no duty to correct forward-looking statements or puffery in the Ninth Circuit. (See Funko Mot. at 10-11.)

In Opposition, Plaintiffs argue Defendant Mariotti's statements are actionable; they are "not forward-looking statements;" and they are not puffery. (Opp'n at 14 n.13, 16-17.) As alleged in the CAC, Plaintiffs also claim Defendant Mariotti had a duty to correct his statement after he learned in late August or early September 2019 that Funko would not meet its FY2019 projections. (Opp'n at 14-16.)

The Court first determines whether there is a duty to correct an earlier statement under Rule 10b-5. Plaintiffs rely heavily on a decision entered by Chief Judge Gutierrez of this District in Oaktree Principal Fund V, L.P. v. Warburg Pincus LLC, No. CV 15-8574 PSG (MRWx), 2018 WL 6137169, at *11-13 (C.D. Cal. Aug. 29, 2018). In that case, the plaintiffs alleged the defendants reported on an earnings call their earnings before interest, tax, depreciation, and amortization ("EBITDA") was $70.1 million, a number signaling the company narrowly could avoid bankruptcy. Id. at 4. The defendants learned approximately one month later that the EBITDA figure was actually $55 million and they did not take action to correct the statement on the earnings call immediately or within a reasonable time. Id. In determining whether the plaintiffs alleged sufficient facts to show the defendant had a duty to correct its statement, Chief Judge Gutierrez considered authority from the First, Second, Third, Seventh, and Eleventh Circuits, as well as opinions from District Courts in California and a non-precedential decision issued by the Ninth Circuit in In re Yahoo! Sec. Litig., 611 F. App'x 387 (9th Cir. 2015). As Chief Judge Gutierrez explained, the Ninth Circuit has not expressly found a duty to correct exists in this context; in the In re Yahoo! Sec. Litig. decision, the Ninth Circuit stated neither it nor the Supreme Court has recognized a duty to correct and, even if it were to recognize such a duty, the appellees in the case did not violate it because they corrected their prior statements within a reasonable time. See In re Yahoo! Sec. Litig., 611 F. App'x at 389-90. Chief Judge Gutierrez explained he found the reasoning of the Eleventh Circuit's decision in Fried v. Stiefel Lab., Inc., 814 F.3d 1288, 1294 (11th Cir. 2016) persuasive. In Fried, the Eleventh Circuit stated, "[a]n individual has a duty 'to update prior statements if the statements were true when made, but misleading or deceptive if left unrevised,' and a failure to update is an 'omission' under [Rule 10b-5(b)]." Fried, 814 F.3d at 1294 (quoting Finnerty v. Stiefel Lab., Inc., 756 F.3d 1310, 1316-17 (11th Cir. 2014)). Chief Judge Gutierrez ultimately concluded the plaintiffs' duty to correct theory was "legally viable" and "an individual can be held liable for failing to correct an earlier statement when the failure to correct would itself render the statement misleading." Oaktree Principal Fund V., L.P., 2018 WL 6137169 at *13. Having found the plaintiffs' duty to correct theory was viable, Judge Gutierrez concluded the plaintiffs had stated a claim against a third-party consultant for its failure to correct the EBITDA statement made on the earnings call. Id. at 13 ("As FTI, like the Warburg Defendants, can be held liable for making false statements under Rule 10b-5, the Court sees no reason why FTI, like the Warburg Defendants, cannot also have a duty under Rule 10b-5 to correct prior statements.").

The Court is persuaded by Chief Judge Gutierrez's thoughtful reasoning and analysis. The Court, however, does not conclude Plaintiffs have stated a viable duty to correct theory here. Unlike in Oaktree Principal Fund V., L.P., here, statement no. 3 was not "a historical statement that, at the time made, [Mariotti] believed to be true, but as revealed by subsequently discovered information actually was not." In re Yahoo! Inc. Sec. Litig., 611 F. App'x at 389-90 (quoting Stransky v. Cummins Engine Co., Inc., 51 F.3d 1329, 1331 n.1 (7th Cir. 1995)) (quotation marks

omitted). Mariotti did not make a material "historical statement;" instead, Mariotti's statement was forward-looking and a statement expressing corporate puffery, as discussed below. There is no "duty to update a forward-looking statement." 15 U.S.C. § 78u-5(d).

In only a brief reference in a footnote in the Opposition, Plaintiffs argue statement no. 3 was not forward-looking. (See Opp'n at 14 n.13 ("However, Plaintiffs continue to assert that Defendant Mariotti had a duty to correct his August 8, 2019 statements issued in support of the [FY2019] guidance, which were not forward-looking statements.").) The Court disagrees.

Each sentence of statement no. 3 concerns Funko's performance in FY2019 as a whole or the reasons why Funko believed the second half of 2019 would be profitable. Although some of the sentences employ language in the present tense, this does not take statement no. 3 outside the scope of the PSLRA safe harbor. See, e.g., Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc., 759 F.3d 1051, 1058 (9th Cir. 2014) (finding "we continue to expect dVP procedures to grow approximately 40%" forward-looking); In re Facebook, Inc. Sec. Litig., 405 F. Supp. 3d 809, 835 (N.D. Cal. 2019) (finding "[w]e believe [GDPR impacts on ads] will be relatively minor" forward-looking); City of Roseville Emps. Ret. Sys. v. Sterling Fin. Corp., 963 F. Supp. 2d 1092, 1123 (E.D. Wash. 2013), aff'd, 691 F. App'x 393 (9th Cir. 2017) (similar "we believe" statement forward-looking). Moreover, Mariotti's statement discussed "the assumptions underlying or relating to" Funko's FY2019 sales projections, which is defined expressly as a forward-looking statement. See 15 U.S.C. § 78u-5(i)(1)(D); see also Friedman v. Tesla, Inc., 2021 WL 246210 at *7-8 (distinguishing between assumptions about future events, which are forward-looking, and "a concrete factual assertion about a specific present or past circumstance," which is not). Further, when examined as a whole, the Court finds statement no. 3 is forward-looking because it is "related to future expectations and performance" of Funko. Intuitive Surgical, Inc., 759 F.3d at 1059.

Statement no. 3 was also "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1). At the outset of the August 8, 2019 earnings call, Defendant Nickel stated the following:

> Management's remarks on this call may contain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These may include statements regarding our business goals, plans, abilities and opportunities; industry and consumer trends; growth, momentum and investment initiatives; collaboration and license relationships; consumer engagement and brand awareness; acquisitions and related expenses; potential tariffs; and anticipated financial performance. Actual results may differ materially from those discussed in the Risk Factors section of our Form 10-Q for the quarter ended June 30, 2019, and our other filings with the SEC. Any forward-looking statements made on this call represent our views only as of today, and we undertake no obligation to update them.

(See McDonough Decl. ¶ 22, Exh. 20 at 4.) The referenced Form 10-Q for the second quarter of 2019 contained a detailed discussion about the risks and uncertainties that could cause Funko's results to differ materially from those in the forward-looking statements made during the August

8, 2019 earnings call. (See McDonough Decl. ¶ 20, Exh. 18 at 40-46.) "Courts have found that this [type of] language triggers the PSLRA safe harbor for forward-looking statements." Oaktree Principal Fund V, LP, 2017 WL 3187688 at *10 (citing City of Royal Oak Ret. Sys. v. Juniper Networks, Inc., 880 F. Supp. 2d 1045, 1062 (N.D. Cal. 2012) and In re Musicmaker.com Sec. Litig., CV 00-2018 CAS (MANx), 2001 WL 34062431, at *23 (C.D. Cal. June 4, 2001)). Accordingly, the Court concludes statement no. 3 is a forward-looking statement accompanied by sufficient cautionary language such that it is shielded by the PSLRA safe harbor.

Likewise, statement no. 3 is a statement of corporate puffery or opinion that is not actionable under the PSLRA. "[S]tatements projecting 'excellent results,' a 'blowout winner' product, 'significant sales gains,' and '10% to 30% growth rate over the next several years'" have been held to constitute mere puffery. In re Cornerstone Propane Partners, L.P. Sec. Litig., 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005); see also In re Copper Mountain Sec. Litig., 311 F. Supp. 2d 857, 868-69 (N.D. Cal. 2004) ("[R]un-of-the-mill" statements such as "business remained 'strong'" are not actionable under § 10(b)); In re LeapFrog Enter., Inc. Sec. Litig., 527 F. Supp. 2d 1033, 1050 (N.D. Cal. 2007) (vague statements such as "[t]his is going to be a very big second half for us" were not actionable under § 10(b)); City of Royal Oak Ret. Sys. v. Juniper Networks, Inc., 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) (statements that "[b]oth Verizon and AT&T are strong partners," company has "strong demand metrics and good momentum" and "our demand indicators are strong, our product portfolio is robust" are nonactionable statements of corporate optimism). Mariotti described Funko's projected performance as "extremely strong," without any detailed support for these vague statements of optimism. He stated Funko had "so many different ways to monetize different properties" yet he did not explain what ways or which properties of which he was referring. Statement no. 3 employs subjective and emotive terms and are not capable of objective verification. Statement no. 3 would not give a reasonable investor an impression of a state of affairs that differed in a material way from the one that actually existed. Despite Plaintiffs' arguments to the contrary, Mariotti's statement was "an optimistic, subjective assessment" of Funko's projected performance for the remaining quarters of 2019 and FY2019 overall and it "hardly amounts to a securities violation." Apollo Group Inc., 774 F.3d at 606; see also In re Quality Sys. Inc. Sec. Litig., 865 F.3d at 1142 (the safe harbor is "designed to protect companies and their officials" when they merely fall short of their "optimistic projections.").

Accordingly, statement no. 3 is not actionable and cannot form the basis for Plaintiffs' securities fraud claims.

**iv. Statement No. 4**

In Funko's second quarter 2019 Form 10-Q, Plaintiffs allege Defendant Funko stated, in pertinent part:

> **Our success depends, in part, on our ability to successfully manage our inventories.** We must maintain sufficient inventory levels to operate our business successfully, but we must also avoid accumulating excess inventory, which increases working capital needs and lowers gross margin. We obtain substantially all of our inventory from third-party manufacturers located outside the United States and must typically order products well in advance of the time these products will be offered for sale to our customers. As a result,

> it may be difficult to respond to changes in consumer preferences and market conditions, which, for pop culture products, can change rapidly. If we do not accurately anticipate the popularity of certain products, then we may not have sufficient inventory to meet demand. **Alternatively, if demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard.** If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected. We may also be negatively affected by changes in retailers' inventory policies and practices. As a result of the desire of retailers to more closely manage inventory levels, there is a growing trend to make purchases on a "just-in-time" basis. This requires us to more closely anticipate demand and could require us to carry additional inventory. Policies and practices of individual retailers may adversely affect us as well, including those relating to access to and time on shelf space, price demands, payment terms and favoring the products of our competitors. Our retail customers make no binding long-term commitments to us regarding purchase volumes and make all purchases by delivering purchase orders. Any retailer can therefore freely reduce its overall purchase of our products, including the number and variety of our products that it carries, and reduce the shelf space allotted for our products. **If demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard.** If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected.

(CAC ¶ 122 (emphasis in original); see also McDonough Decl. ¶ 20, Exh. 18 at 42.) Plaintiffs allege this statement was misleading because "[b]y August 8, 2019, Defendants knew that the 'risk' that [Funko] could have excess inventory as a result of customer demand not reaching forecasted levels had already materialized . . . [as] numerous former Funko employees reported that Funko's failure to accurately forecast sales and customer demand resulted in millions of dollars of obsolete inventory being stored in multiple warehouses . . . ." (CAC ¶ 123.) Plaintiffs rely on the statements of its confidential witnesses to support this allegation. (See CAC ¶¶ 74-88, 123(a)-(f).)

In the Motion, the Funko Defendants argue this disclosure was not misleading because it was "framed in terms of potential adverse consequences based on future events" and it "did not state that Funko presently had no excess or obsolete inventory." (Funko Mot. at 17 (emphasis in original).) They contend Funko disclosed its inventory valuation and fluctuations in its inventory over periods of time, that Funko maintained "reserves for excess and obsolete inventories," and when and why it increased its reserves. (Id. (emphasis in original).) They claim Plaintiffs' theory is an impermissible one of fraud by hindsight, i.e., because Funko took a write-down to its inventory in the fourth quarter of 2019, it must have known it was necessary to do before the fourth quarter or should have been taken earlier. (Id. at 18.)

In Opposition, Plaintiffs argue Funko's "accumulation of excess inventory was not a future risk dependent on the strength of future sales – it was a risk that had already materialized" and Funko's failure to disclose that then-present reality was misleading and material to investors. (Opp'n at 12.) Plaintiffs acknowledge the risk disclosure statement is forward-looking;

according to Plaintiffs, however, the PSLRA safe harbor does not shield the risk disclosure because it failed to include meaningful cautionary language and Defendants knew their statements were misleading. (Id. at 13.)

Typically, "where a company's filings contain abundant and specific disclosures regarding the risks facing the company, as opposed to terse, generic statements, the investing public is on notice of these risks and cannot be heard to complain that the risks were masked as mere contingencies." In re Violin Memory Sec. Litig., No. 13-CV-5486 YGR, 2014 WL 5525946, at *12 (N.D. Cal. Oct. 31, 2014) (quoting Plevy v. Haggerty, 38 F. Supp. 2d 816, 832 (C.D. Cal. 1998)). When the risks have already materialized, however, disclosing them "in the abstract" while omitting that they have "already come to fruition" can be misleading. Siracusano v. Matrixx Initiatives, Inc., 585 F.3d 1167, 1181 (9th Cir. 2009), aff'd, 563 U.S. 27 (2011) (finding risk disclosures warning of product liability claims "in the abstract" were misleading when company was already facing multiple such lawsuits); Berson, 527 F.3d at 986 (finding risk disclosure of hypothetical contract cancellations did not immunize statements touting backlog orders that included canceled orders because the risk disclosure did not "alert[] the reader that some of the[] risks may already have come to fruition.").

Recently in Friedman v. Tesla, Inc., the Ninth Circuit addressed this issue. Friedman v. Tesla, Inc., 2021 WL 246210 at *10. In that case, the plaintiffs alleged Tesla, Inc., its Chairman and Chief Executive Officer Elon Musk, and another officer misled the market about Tesla's progress in building its capacity to produce the Model 3, an all-electric mass mass-market vehicle. Id. at *1. The plaintiffs alleged fifteen of the defendants' public statements to investors conveying and reaffirming Tesla's production goal of manufacturing 5,000 vehicles per week by the end of 2017 were misleading because they alleged the defendants "were aware that, due to a variety of logistical issues," including "problems with battery manufacture at the Gigafactory throughout 2017," meant the production goal was "unattainable." Id. at *2. The Ninth Circuit concluded the plaintiffs "failed to plead sufficient facts to avoid the PSLRA's safe harbor or to establish falsity." Id. at *6.

Most pertinent to the Court's analysis of statement no. 4 here, the Ninth Circuit considered Tesla's statements made in its Form 10-Q filed with the SEC in August 2017 to determine whether the statements were actionable. Id. at *9-10. In that Form 10-Q, Tesla reported: it may experience delays in realizing its production goal timeline that could harm its business; it believed the issues at its Gigafactory would be overcome and would not create a hindrance to reaching the production targets, but mentioned its "ultimate ability to do so will require us to resolve the types of challenges . . . that we have experienced to date, including at Gigafactory 1;" and disclosed its inexperience at producing lithium-ion cells at Gigafactory 1, which experienced challenges in ramping up production, and stated "[w]hile we currently believe that we will reach our production targets, if we are unable to resolve ramping challenges and expand Gigafactory 1 production in a timely manner and at reasonable prices, . . . our ability to supply battery power packs to our vehicles, especially Model 3, and other products could be negatively impacted." Id. The Ninth Circuit found each of these statements described "the future challenges Tesla might confront over the remaining months of 2017" and "'assumptions underlying or relating to' the announced year-end goal and therefore fall squarely within the [PSLRA's] definition of a forward-looking statement." Id. at *10. The Ninth Circuit rejected

the plaintiffs' argument that these statements were "misleading omissions about current or past challenges" because they failed "to disclose that some of these types of risks had already been experienced." Id. (emphasis in original). The Ninth Circuit instead concluded these statements contained "no explicit or implicit representation that Tesla had not already experienced such issues" and the last statement "affirmatively acknowledged that Tesla has 'experienced to date' the sort of 'challenges' that it would have to overcome in order to achieve its stated objective." Id. (emphasis in original). The court distinguished its decision in Berson, because there were no such affirmative statements in the Tesla action, like there were in Berson about backlog figures. Id.

Here, as in Friedman, all of the pertinent sentences within the risk disclosure are forward-looking under the PSLRA because they discuss the possibility of future challenges, which may interfere with Funko's ability to meet its projected sales and earnings projections. Plaintiffs do not dispute that the risk disclosure was forward-looking. (See Opp'n at 13.) Plaintiffs argue, however, statement no. 4 was not accompanied by meaningful cautionary language, as required by the PSLRA. (Id.)

The Court concludes Plaintiffs have alleged sufficient facts to support its plausible allegation that this risk disclosure was misleading and was not meaningful. While the Court agrees with the Funko Defendants that the risk disclosure only discussed possible future risks and did not affirmatively state Funko had no excess or obsolete inventory, the disclosure is misleading and not meaningful because it sets forth various hypothetical risks associated with maintaining excess inventory without disclosing that this risk had materialized, as alleged by Plaintiffs. This is exactly the circumstance under which the Ninth Circuit has found this type of statement to be misleading. See Siracusano v. Matrixx Initiatives, Inc., 585 F.3d at 1181; Berson, 527 F.3d at 986.

Moreover, contrary to the Funko Defendants' argument that Funko actually disclosed it maintained reserves for excess and obsolete inventories (see Funko Mot. at 17), such a disclosure was not made in this Form 10-Q.[2] Without any disclosures about Funko's excess or obsolete inventory holdings, Plaintiffs sufficiently allege facts to show this case is distinguishable materially from Friedman on this ground, in as much as Tesla actually disclosed the types of

2 Instead, Funko apparently made that disclosure in its 2018 Form 10-K, not in the Form 10-Q for the second quarter of 2019. (See McDonough Decl. ¶ 15, Exh. 13 at 80, 92.) As stated supra, the Court has not taken judicial notice of the 2018 Form 10-K nor found it to have been incorporated by reference in the CAC. The Court notes the second quarter 2019 Form 10-Q refers to contains the 2018 Form 10-K: the Form 10-Q states the unaudited condensed consolidated financial statements should be read in conjunction with the 2018 Form 10-K's audited consolidated financial statements and notes. (See McDonough Decl. ¶ 20, Exh. 18 at 6.) The relevant disclosure about excess and obsolete inventory is made in two sections of the 2018 Form 10-K, one of which is in the notes to the audited consolidated financial statements. (See McDonough Decl. ¶ 15, Exh. 13 at 92.) In any event, as discussed supra, the Court has only taken judicial notice of the risk disclosures set forth between pages 40 and 46 in the second quarter 2019 Form 10-Q, which does not include the reference to the 2018 Form 10-K.

challenges it had experienced in connection with ramping up its production of the Model 3 among its risk disclosures. See Friedman v. Tesla, Inc., 2021 WL 246210 at *10.

Accordingly, the Court concludes statement no. 4 is actionable because Plaintiffs sufficiently have alleged particularized facts to show the statement was misleading and the accompanying cautionary language was not meaningful.

**v. Statement No. 5**

In its third quarter 2019 Form 8-K, Plaintiffs allege Defendant Funko stated as follows:

> The Company is reiterating its outlook for the full year 2019. The Company expects net sales to be in a range of $840 million to $850 million. Adjusted EBITDA is expected to be in a range of $140 million to $145 million. Adjusted Earnings per Diluted Share is expected to be in a range of $1.15 per share to $1.22 per share and is based on estimated adjusted average diluted shares outstanding of 53.5 million for the full year 2019.

(CAC ¶ 129; McDonough Decl. ¶ 29, Exh. 27 at 6.) Plaintiffs allege this statement was false and misleading because at the time the statement was made, the Defendants "knew that the FY2019 guidance was unachievable because there was not enough product in [Funko's] pipeline to meet the guidance." (CAC ¶ 131.) Plaintiffs rely on the statements of CW1 and CW5 to support this allegation. (Id. ¶¶ 94-105, 131(a)-(i), 132.)

In the Motion, the Funko Defendants argue statement no. 5 is forward-looking and protected by the PSLRA. (See Funko Mot. at 11-12.) They point out the third quarter 2019 Form 8-K referred investors to Funko's "extensive risk factor disclosures." (Id. at 12.) The Funko Defendants also argue Plaintiffs have failed to plead with particularity that statement no. 5 was made with actual knowledge that it was false or misleading. (Id. at 12-14.)

In Opposition, Plaintiffs argue statement no. 5 was made with actual knowledge that it was false or misleading. (See Opp'n at 17-19.) Plaintiffs also contend the PSLRA safe harbor does not protect statement no. 5 because it was not accompanied by meaningful cautionary language. (Id. at 20-22.) Specifically, Plaintiffs state Funko's cautionary language did not address the specific concerns raised by CW1, namely that there was not enough product in Funko's pipeline to meet the fourth quarter sales projections, Funko only warned of risks that had already materialized, and it consisted only of boilerplate warnings that were "all too generic to be considered meaningful." (Id.)

The Court first considers whether statement no. 5 is protected by the PSLRA safe harbor. The parties do not dispute that the statement was forward-looking. (See Opp'n at 20-21; Funko Supp. Reply at 1, n.2.) The only dispute is whether the CAC alleges sufficient facts to demonstrate Funko's cautionary language was not meaningful.

Funko's third quarter 2019 Form 8-K contained the following cautionary language:

> This press release contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. All statements contained in this press release

> that do not relate to matters of historical fact should be considered forward-looking statements, including statements regarding our anticipated financial results, the underlying trends in our business, growing demand for our products, our potential for growth, plans for investments in our business and future opportunities . . . . These forward-looking statements are based on management's current expectations. These statements are neither promises nor guarantees, but involve known and unknown risks, uncertainties and other important factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements, including, but not limited to, the following: our ability to maintain and realize the full value of our license agreements; the ongoing level of popularity of our products with consumers; changes in the retail industry and markets for our consumer products; our ability to maintain our relationships with retail customers and distributors; our ability to compete effectively; fluctuations in our gross margin; our dependence on content development and creation by third parties; our ability to develop and introduce products in a timely and cost-effective manner; . . . the possibility or existence of global and regional economic downturns . . . . These and other important factors discussed under the caption 'Risk Factors' in our quarterly report on Form 10-Q for the quarter ended September 30, 2019 and our other filings with the Securities and Exchange Commission could cause actual results to differ materially from those indicated by the forward-looking statements made in this press release. Any such forward-looking statements represent management's estimates as of the date of this press release. While we may elect to update such forward-looking statements at some point in the future, we disclaim any obligation to do so, even if subsequent events cause our views to change. These forward-looking statements should not be relied upon as representing our views as of any date subsequent to the date of this press release.

(McDonough Decl. ¶ 29, Exh. 27 at 7.)

As the Form 8-K referred to Funko's third quarter 2019 Form 10-Q's risk disclosures, the Court considers those as well to determine whether the CAC contains sufficient allegations that the cautionary language was not meaningful. Within Funko's third quarter 2019 Form 10-Q, several risks were disclosed in detail, as referenced supra with respect to the Court's discussion of Funko's second quarter 2019 Form 10-Q, which contained identical disclosures. (See McDonough Decl. ¶ 28, Exh. 26 at 41-47.) Funko made detailed disclosures that its projected sales could be affected in multiple ways. In its risk disclosures, it provided discussion under each of the following headings:

- "We have experienced rapid growth in recent periods. If we fail to manage our growth effectively, our financial performance may suffer."
- "Our gross margin may not be sustainable and may fluctuate over time."
- "Our business is largely dependent on content development and creation by third parties."
- "We may not realize the full benefit of our licenses if the properties we license have less market appeal than expected or if sales from the products that use those properties are not sufficient to satisfy the minimum guaranteed royalties."

- "Our success depends, in part, on our ability to manage our inventories."
- "An inability to develop and introduce products in a timely and cost-effective manner may damage our business."
- "If we are unable to obtain, maintain and protect our intellectual property rights, in particular trademarks and copyrights, or if our licensors are unable to maintain and protect their intellectual property rights that we use in connection with our products, our ability to compete could be negatively impacted."
- "Our business depends on our ability to operate our business without infringing, misappropriating or otherwise violating the trademarks, copyrights and proprietary rights of other parties."
- "Our operating results may be adversely affected and damage to our reputation may occur due to production and sale of counterfeit versions of our products."
- "Our success is critically dependent on the efforts and dedication of our officers and other employees, and the loss of one or more key employees, or our inability to attract and retain qualified personnel and maintain our corporate culture, could adversely affect our business."
- "Our operating results may fluctuate from quarter to quarter and year to year due to the seasonality of our business, as well as due to the timing of new product releases."
- "Our use of third-party manufacturers to produce our products presents risks to our business."
- "Our substantial sales and manufacturing operations outside the United States subject us to risks associated with international operations."

(McDonough Decl. ¶ 29, Exh. 26 at 41-47.)

Having considered the cautionary language contained in both Funko's third quarter 2019 Forms 8-K and 10-Q, despite Plaintiffs' arguments to the contrary, the Court finds the allegations in the CAC fail to show such language was not meaningful. See Oaktree Principal Fund V, LP, 2017 WL 3187688 at *10; City of Royal Oak Ret. Sys., 880 F. Supp. 2d at 1062; In re Musicmaker.com Sec. Litig., 2001 WL 34062431 at *23. The Court rejects Plaintiffs' arguments in as much as they attempt to blur the distinction between 15 U.S.C. §78u-5(c)(1)(A), which protects forward-looking statements that are accompanied by meaningful cautionary statements, and 15 U.S.C. §78u-5(c)(1)(B), which protects forward-looking statements that the plaintiff fails to prove "w[ere] made with actual knowledge by that person that the statement[s] w[ere] false or misleading." See Friedman v. Tesla, Inc., 2021 WL 246210 at *5 ("the use of the disjunctive term 'or' between subclauses (A) and (B) confirms that 'a defendant will not be liable for a false or misleading statement if it is forward-looking and either is accompanied by cautionary language or is made without actual knowledge that it is false or misleading.' Consequently, where a defendant has made a sufficient showing that a challenged forward-looking statement was accompanied by meaningful cautionary statements . . ., a plaintiff cannot defeat that invocation of § 21E's safe harbor merely by alleging, for example, that the company knew the announced forward-looking objective was unlikely to be achieved. Rather, the plaintiff must plead additional facts that would vitiate an element of that version of the safe harbor – such as, for example, facts indicating that the 'cautionary statements' cited by the defendant were not 'meaningful.'") (internal citations omitted) (emphasis in original).

In Friedman v. Tesla, the Ninth Circuit pointed out the plaintiffs did not challenge the sufficiency of Tesla's cautionary statements before the district court or on appeal. See Friedman v. Tesla, Inc., 2021 WL 246210 at *8. The plaintiffs, however, did challenge the district court's assumption that if plaintiffs "had adequately pleaded that the relevant Tesla officer knew that 'it was impossible' to meet the company's forward-looking projections, and 'not merely highly unlikely,' then any accompanying 'cautionary' language that failed to reveal this impossibility would not be 'meaningful.'" Id. (emphasis in original). Without deciding whether the district court's assumption was correct, the Ninth Circuit agreed the plaintiffs failed to plead a known impossibility during the time period over which the alleged misstatements and omissions were made. Id. The plaintiffs alleged that two employees told Tesla's co-founder Musk in 2016 that the goal of producing 5,000 cars by the end of 2017 was impossible, yet the court found the allegation insufficient for two reasons: (1) the plaintiffs "failed to plead any facts showing that Musk ever accepted those employees' views that the goal was impossible;" and (2) the plaintiffs "failed to plead facts showing that [d]efendants adopted the conservative timeline for production on which these employees' pessimism was based." Id. at 9. The court also found insufficient the plaintiffs' allegation that suppliers had informed Tesla that its production timelines were impossible because those allegations did "not establish that [d]efendants . . . shared that gloomy view." Id. (emphasis in original). As such, the court found "[b]ecause [p]laintiffs therefore failed to plead that [d]efendants knew their year's end goal was impossible to achieve, there is no basis for concluding that any of their cautionary statements were supposedly deficient on that ground." Id. (emphasis in original).

The Friedman decision is distinguishable on this issue, as Plaintiffs here challenge the sufficiency of Funko's cautionary statements on several grounds. The Court is persuaded by its reasoning, however; as in this case, like Friedman, Plaintiffs have not alleged particularized facts to show Defendants knew their FY2019 guidance was impossible to meet. Plaintiffs allege CW1 identified several "red flags" that Funko would not meet its fourth quarter sales targets and "Defendants had no basis to believe that the FY2019 guidance would be met." (CAC ¶¶ 92, 94-105.) CW1 allegedly informed various Defendants that he believed it was not possible to meet the FY2019 guidance. (Id.) As in Friedman, Plaintiffs' allegations fail to show Defendants shared CW1's "pessimism" or "gloomy view." Friedman v. Tesla, Inc., 2021 WL 246210 at *9. As such, the CAC fails to allege Defendants knew Funko's FY2019 guidance was impossible to achieve and, as in Friedman, "there is no basis for concluding that any of [Funko's] cautionary statements were supposedly deficient on that ground." Id. On this basis, the Court also rejects Plaintiffs' argument that Funko was required to disclose CW1's concerns as a risk factor in order for the cautionary statements to be meaningful.

Moreover, the Court disagrees with Plaintiffs that Funko's cautionary statements were "too generic to be considered meaningful." (See Opp'n at 22 (citing Yanek v. Starr Surgical Co., 388 F. Supp. 2d 1110, 1123 (C.D. Cal. 2005).) In Yanek, the court found the defendant's cautionary statements were not meaningful because they only addressed generic risks, such as "[t]he FDA approval process is typically lengthy and expensive, and approval is never certain" and "[n]oncompliance with applicable United States regulatory requirements can lead to . . . denial or withdrawal of pre-marketing approvals." Yanek, 388 F. Supp. 2d at 1123 (internal quotation marks omitted). The Yanek court found this "cautionary language d[id] not meaningfully address the risks related to [the defendant's] pending FDA approval" including

"any factors related to its existing manufacturing facilities, such as the risk that noncompliance with the FDA's Medical Device Reporting regulations for one product could hold up the pre-market application submission for another product." Id. The Yanek court also found other cautionary language employed by the defendant regarding the "risk associated with the 'acceptance of new products' by consumers and 'general domestic and international economic conditions,' for instance, [were] factors that are so broad that they apply to any business that sells products to consumers." Id. (emphasis in original). Unlike the cautionary language used by the defendant in Yanek, here, Funko's risk disclosures did not only warn of generic risks. Instead, Funko provided detailed warnings of several factors that were specific and unique to its business model that could undermine its sales projections.

Given the detailed and meaningful cautionary language found in Funko's third quarter 2019 Forms 8-K and 10-Q, including express cautionary statements about future predictions, the Court concludes statement no. 5 is a forward-looking statement accompanied by sufficient cautionary language such that it is shielded by the PSLRA safe harbor.

As the Court concludes statement no. 5 is shielded by the PSLRA safe harbor, the Court need not address the parties' arguments about whether Plaintiffs sufficiently pleaded that the statement was made with actual knowledge that it was false or misleading. See Friedman v. Tesla, Inc., 2021 WL 246210 at *5.

**vi. Statement No. 6**

During an earnings call with investors on October 31, 2019, Plaintiffs allege Defendant Jung stated as follows:

> [W]e are maintaining our guidance ranges we laid out on the second quarter conference call, which are: net sales of $840 million to $850 million, representing year-over-year growth of 22% to 24%; adjusted EBITDA of $140 million to $145 million; and adjusted earnings per diluted share of $1.15 to $1.22, which assumes a blended corporate tax rate of 25% and a weighted average diluted share count of 53.5 million shares at the end of the year.

(CAC ¶ 130; see also McDonough Decl. ¶ 30, Exh. 28 at 8.) Plaintiffs allege this statement was false and misleading because, by late August 2019, Defendant Jung "knew that the FY2019 guidance was unachievable because there was not enough product in [Funko's] pipeline to meet the guidance" and "CW1 reported that by late-August 2019, there were red flags that [Funko] would not meet its fourth quarter sales guidance and Defendants were advised that the numbers would not be met." (CAC ¶ 131.) Plaintiffs rely on the statements of CW1 and CW5 to support this allegation. (Id. ¶¶ 94-105, 131(a)-(i), 132.)

In the Motion, the Funko Defendants argue statement no. 6 is forward-looking and protected by the PSLRA. (See Funko Mot. at 11-12.) They point out Funko's management referred investors to Funko's "extensive risk factor disclosures" during the earnings call. (Id. at 12.) The Funko Defendants also argue Plaintiffs have failed to plead with particularity that statement no. 6 was made with actual knowledge that it was false or misleading. (Id. at 12-14.)

In Opposition, Plaintiffs argue statement no. 6 was made with actual knowledge that it was false or misleading for the same reasons as statement no. 5 and it was not accompanied by meaningful cautionary language, so it is not protected by the PSLRA safe harbor. (See Opp'n at 17-22.)

The Court first considers whether statement no. 6 is protected by the PSLRA safe harbor. The parties do not dispute that the statement was forward-looking. (See Opp'n at 20-21; Funko Supp. Reply at 1, n.2.) The only dispute is whether the CAC alleges sufficient facts to demonstrate Funko's cautionary language was not meaningful.

At the outset of the October 31, 2019 earnings call, Andrew Harless, Funko's Manager of Investor Relations, stated the following:

> Management's remarks on this call may contain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These may include statements regarding our business goals, plans, abilities and opportunities; industry and consumer trends; growth, momentum and investment initiatives; collaboration and license relationships; consumer engagement and brand awareness; acquisitions and related expenses; potential tariffs; and anticipated financial performance. Actual results may differ materially from those discussed in the Risk Factors section of our Form 10-Q for the quarter ended September 30, 2019, and our other filings with the SEC. Any forward-looking statements made on this call represent our views only as of today, and we undertake no obligation to update them.

(McDonough Decl. ¶ 30, Exh. 28 at 4.) Harless's statement incorporated by reference the risk disclosures from Funko's third quarter 2019 Form 10-Q, which the Court discussed supra with respect to statement no. 5.

For the same reasons the Court found the cautionary statements regarding statement no. 5 to be meaningful, the Court also finds the cautionary statements regarding statement no. 6 to be meaningful as well. See Oaktree Principal Fund V, LP, 2017 WL 3187688 at *10; City of Royal Oak Ret. Sys., 880 F. Supp. 2d at 1062; In re Musicmaker.com Sec. Litig., 2001 WL 34062431 at *23. Funko's risk disclosures were specific and robust, contrary to Plaintiffs' arguments. "Because [Funko] began . . . its [October 31, 2019 earnings call] with a statement of caution about future predictions, a reasonable investor would have given little credence to [] predictive statements during the call." Oaktree Principal Fund V, LP, 2017 WL 3187688 at *11. The CAC fails to allege particularized facts sufficient to demonstrate the cautionary language was not meaningful.

As the Court concludes statement no. 6 is shielded by the PSLRA safe harbor, the Court need not address the parties' arguments about whether Plaintiffs sufficiently pleaded that the statement was made with actual knowledge that it was false or misleading. See Friedman v. Tesla, Inc., 2021 WL 246210 at *5.

**vii. Statement No. 7**

During the same October 31, 2019 earnings call, Plaintiffs allege Defendant Jung stated:

> I'll start with the guidance question. So coming out of Q2, the company re-guided to $840 million to $850 million on an annualized basis. And as you know, we do give annual guidance. We feel really good that to date, we've grown 28%, and for Q3, we're at 26%. But the range within that guidance is a little over 1%, so it's already a pretty tight spread there. As we look forward, though, as well, Q4, we are coming up against a very high Q4 last year, it was approaching 38% in a growth rate. **And even with our current guidance, Q4 will be our biggest quarter ever as a company.**
>
> So we're feeling really good about where we are right now. And overall, you have to remember that a lot of the Frozen and Star Wars shipments did come into 3Q, and we did have that $3 million in FOB that also came into Q3. So although we're very positive on Q4, I think if you look at the 2-year stack, it's a very healthy build.

(CAC ¶ 133 (emphasis in original); see also McDonough Decl. Exh. 28 at 13.) As with statement no. 6, Plaintiffs allege this statement was false and misleading because by late August 2019, Defendant Jung "knew that the FY2019 guidance was unachievable because there was not enough product in [Funko's] pipeline to meet the guidance" and "CW1 reported that by late-August 2019, there were red flags that [Funko] would not meet its fourth quarter sales guidance and Defendants were advised that the numbers would not be met." (CAC ¶ 134.) Plaintiffs rely on the statements of CW1 and CW5 to support this allegation. (Id. ¶¶ 94-105, 134(a)-(i), 135.)

In the Motion, the Funko Defendants argue statement no. 7 is forward-looking and protected by the PSLRA. (See Funko Mot. at 11-12.) As with statement no. 6, they point out Funko's management referred investors to Funko's "extensive risk factor disclosures" during the earnings call. (Id. at 12.) The Funko Defendants also argue Plaintiffs have failed to plead with particularity that statement no. 6 was made with actual knowledge that it was false or misleading. (Id. at 12-14.)

In Opposition, Plaintiffs argue statement no. 7 was made with actual knowledge that it was false or misleading for the same reasons as statement nos. 5 and 6 and it was not accompanied by meaningful cautionary language, so it is not protected by the PSLRA safe harbor. (See Opp'n at 17-22.) Plaintiffs also contend statement no. 7 was not a protected opinion based on the language Defendant Jung used and, even if it was an opinion, statement no. 7 is actionable because it was a knowing misstatement. (Id. at 22-23.)

The Court first considers whether statement no. 7 is protected by the PSLRA safe harbor. The parties do not dispute that the statement was forward-looking. (See Opp'n at 20-21; Funko Supp. Reply at 1, n.2.) The only dispute is whether the CAC alleges sufficient facts to demonstrate Funko's cautionary language was not meaningful.

The Court notes the same disclosures and cautionary language discussed with respect to statement no. 6 also accompanied statement no. 7, as Defendant Jung made both statements during the same October 31, 2019 earnings call. Thus, for the same reasons the Court found statement no. 6 was accompanied by meaningful cautionary language, the Court also concludes statement no. 7 was as well. As the Court finds statement no. 7 protected by the PSLRA safe

harbor, the Court will not address the parties' remaining arguments about whether statement no. 7 was a protected corporate opinion of optimism. Accordingly, statement no. 7 is not actionable.

**viii. Statement No. 8**

Plaintiffs allege Funko's third quarter 2019 Form 10-Q stated the following:

> **Our success depends, in part, on our ability to successfully manage our inventories.** We must maintain sufficient inventory levels to operate our business successfully, but we must also avoid accumulating excess inventory, which increases working capital needs and lowers gross margin. We obtain substantially all of our inventory from third-party manufacturers located outside the United States and must typically order products well in advance of the time these products will be offered for sale to our customers. As a result, it may be difficult to respond to changes in consumer preferences and market conditions, which, for pop culture products, can change rapidly. If we do not accurately anticipate the popularity of certain products, then we may not have sufficient inventory to meet demand. Alternatively, **if demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard.** If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected. We may also be negatively affected by changes in retailers' inventory policies and practices. As a result of the desire of retailers to more closely manage inventory levels, there is a growing trend to make purchases on a "just-in-time" basis. This requires us to more closely anticipate demand and could require us to carry additional inventory. Policies and practices of individual retailers may adversely affect us as well, including those relating to access to and time on shelf space, price demands, payment terms and favoring the products of our competitors. Our retail customers make no binding long-term commitments to us regarding purchase volumes and make all purchases by delivering purchase orders. Any retailer can therefore freely reduce its overall purchase of our products, including the number and variety of our products that it carries, and reduce the shelf space allotted for our products. **If demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard**. If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected.

(CAC ¶ 136 (emphasis in original); see also McDonough Decl. ¶ 28, Exh. 26 at 43.) Plaintiffs allege this statement was misleading because "[b]y October 31, 2019, Defendants knew that the 'risk' that [Funko] could have excess inventory as a result of customer demand not reaching forecasted levels had already materialized." (CAC ¶ 137.) Plaintiffs rely on the statements of confidential witnesses to support this allegation. (Id. ¶ 137(a)-(f).)

In the Motion, the Funko Defendants argue this disclosure was not misleading because it was drafted to discuss possible consequences due to future events and did not state Funko had no excess or obsolete inventory. (Funko Mot. at 17.) They contend Funko disclosed its inventory valuation and fluctuations in its inventory over periods of time, that Funko maintained reserve

inventory, and when and why it increased its reserves. (Id.) They also claim Plaintiffs' theory is an impermissible one of fraud by hindsight. (Id. at 18.)

In Opposition, Plaintiffs argue Funko's amassing of excess and obsolete inventory had already materialized, so Funko's failure to disclose that reality was misleading. (Opp'n at 12.) Plaintiffs acknowledge statement no. 8 is forward-looking; according to Plaintiffs, however, the PSLRA safe harbor does not shield statement no. 8 because it failed to include meaningful cautionary language and Defendants knew their statements were misleading. (Id. at 13.)

For the same reasons the Court concluded statement no. 4 was not protected by the PSLRA and is actionable, the Court concludes statement no. 8 is actionable as well. Accordingly, the Court concludes statement no. 8 is actionable because Plaintiffs sufficiently have alleged the statement was misleading and the accompanying cautionary language was not meaningful.

**ix. Non-Speaking Defendants**

The Funko Defendants argue Plaintiffs do not state a viable Section 10(b) claim against Defendants Perlmutter, Dellomo, Kriger, or Brotman because none made any false or misleading statement, nor did they allegedly have "ultimate authority" over any of the challenged statements. (Funko Mot. at 25.) Likewise, the ACON Defendants argue Plaintiffs have failed to state a Section 10(b) or Rule 10b-5 claim against them because Plaintiffs do not allege any of the ACON Defendants made any actionable statement. (See ACON Mot. at 2-3.)

In their Opposition, Plaintiffs appear to concede they have not stated a Section 10(b) claim against the non-speaking Defendants. (See Opp'n at 35, n.37 ("Because Plaintiffs have pled scienter for the Defendants who did make statements during the Class Period, it is inconsequential whether the non-speaking Defendants can also be held liable for violations of Section 10(b)" and "Plaintiffs have stated a claim under Section 20A against the non-speaking Defendants.").) Plaintiffs do not argue either the Funko Motion or the ACON Motion should be denied as to the non-speaking Defendants. The Court, thus, construes Plaintiffs' non-opposition on this matter as their consent to granting the Motions as to the non-speaking Defendants for Plaintiffs' first claim.

**2. Scienter**

As the Court has concluded Plaintiffs have alleged two actionable statements, i.e., statement nos. 4 and 8, the Court next determines whether the CAC contains sufficient particularized allegations to demonstrate scienter.

"Scienter is 'a mental state embracing intent to deceive, manipulate, or defraud.'" Intuitive Surgical, Inc., 759 F.3d at 1061 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12 (1976)). To plead scienter, the plaintiff must "allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." In re Daou Systems, 411 F.3d 1006, 1014-15 (9th Cir. 2005). "A securities fraud complaint will survive 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Curry, 875 F.3d at 1226 (quoting Tellabs, 551 U.S. at 324). "The inference that the defendant acted with scienter need not be

irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences' . . . [y]et the inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling." Tellabs, 551 U.S. at 324; see also In re Iso Ray, Inc. Sec. Litig., 189 F. Supp. 3d 1057, 1075 (E.D. Wash. 2016) ("A plaintiff must show that a defendant engaged in knowing or intentional conduct.") (citing South Ferry LP, No. 2. v. Killinger, 542 F.3d 776, 784 (9th Cir. 2008)).

To allege that a defendant acted with scienter in omitting information, a plaintiff must plead "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Zucco Partners, LLC, 552 F.3d at 991. This requires the pleading of particularized facts that give rise to a strong inference that the defendant intended to mislead the plaintiff through its omission or knew that the plaintiff would be misled by the omission. See Amgen, 544 F. Supp. 2d at 1028-29 (denying motion to dismiss § 10(b) claim where the plaintiff had alleged facts giving rise to the inference that defendants had "actual knowledge" that its statements would mislead the public).

A court reviewing a complaint's scienter allegations conducts a two-part inquiry: first, it "determine[s] whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter," and second, if no individual allegation is sufficient, it "conduct[s] a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." Curry, 875 F.3d at 1226 (quoting New Mexico State Inv. Council v. Ernst & Young LLP, 641 F.3d 1089, 1095 (9th Cir. 2011)). The court must also "'take into account [any] plausible opposing inferences.'" Zucco Partners, LLC, 552 F.3d at 990 (quoting Tellabs, 551 U.S. at 323).

**i. Statements of Confidential Witnesses**

The Funko Defendants argue Plaintiffs' allegations based on statements from confidential witnesses do not support a strong inference of scienter. In Opposition, Plaintiffs argue the detailed accounts alleged by the confidential witnesses are reliable and sufficient to support an inference of scienter.

A complaint relying upon the statements of confidential witnesses to prove scienter must satisfy two requirements: (1) "'the confidential witnesses . . . must be described with sufficient particularity to establish their reliability and personal knowledge'"; and (2) "'those statements which are reported . . . must themselves be indicative of scienter.'" Cutler v. Kirchner, 696 F. App'x 809, 815 (9th Cir. 2017) (quoting Zucco Partners, LLC, 552 F.3d at 995).

As stated supra, Plaintiffs rely on the statements of six confidential witnesses to plead scienter. (See CAC ¶¶ 74-88, 161-166.)

Plaintiff describes each of these confidential witnesses with specificity by numbering each witness and describing their job titles and responsibilities. See Zucco Partners, LLC, 552 F.3d at 996; In re Daou Sys., Inc., 411 F.3d at 1016; In re Quality Sys., Inc. Sec. Litig., 865 F.3d at 1145. According to the CAC, CW1 was Funko's Director of Merchandise Planning from July

2019 to June 2020. (CAC ¶ 56.) CW1 was responsible for "developing Company-wide sales forecasts and for determining the quantity of product that needed to be ordered and developed to meet customer demand" and for "inventory management." (Id.) CW2 was the general manager of Loungefly, a company Funko acquired in May 2017, and CW2 worked at Loungefly from May 2017 through July 2019. (Id. ¶ 61.) CW2 "oversaw all the divisions of Loungefly and was responsible for, among other things, profit and loss, budgeting, and forecasting." (Id.) CW3 was an account manager at Funko from November 2017 until December 2019. (Id. ¶ 66.) CW3 worked in Arkansas and was assigned to Funko's account with Wal-Mart. (Id.) CW3 was "responsible for forecasting and planning sales of Funko items at Wal-Mart." (Id.) CW4 worked at Funko from January 2018 to June 2020, as a customer service manager from January to June 2018, and then as a customer service and sales team manager. (Id. ¶ 70.) As a manager, CW4 was "responsible for managing an inside sales team of five sales managers and four account coordinators who worked with direct-to-consumer customers and e-commerce." (Id.) CW5 worked at Funko from August 2018 to September 2019 as a sales coordinator. (Id. ¶ 72.) CW5 "provided back-end sales support for Funko's Latin American territory," he "assisted with sales development and tracked monthly sales" from "Funko's South Everett warehouse." (Id. ¶ 73.) CW6 worked as a senior fulfillment supervisor at Funko from March to August 2019 from Funko's warehouse in Everett, Washington. (Id. ¶ 87.) CW6 was responsible "for ensuring that Funko's products were being shipped to customers according to customer guidelines and for ensuring that all goods received at the warehouses were offloaded and entered into the inventory system. (Id.)

Plaintiffs' allegations must also indicate each confidential witness had personal knowledge that would support a strong inference of scienter. The Court concludes the CAC's allegations are insufficient to meet this requirement as to each confidential witness, except CW1, as discussed below.

As to CW2 and CW6, neither were employed by Funko during the Class Period. As such, the Court considers their statements only to the extent they can confirm what the Defendants allegedly knew or should have known during the Class Period. See Webb v. Solarcity Corp., 884 F.3d 844, 851 n.1 (9th Cir. 2018). CW2 attested to the excess and obsolete inventory held by Funko and explained the issue was discussed frequently at quarterly Board meetings CW2 attended and which were also attended by Defendants Mariotti, Nickel, and Perlmutter. (See CAC ¶¶ 62-64, 80-81.) Similarly, CW6 attested to Funko's excess inventory problem and claimed it was "obvious to everyone." (Id. ¶ 88.) While the Court considers these statements as some evidence as to the alleged state of Funko's excess inventory holdings before the Class Period, as neither CW2 nor CW6 were employed during the Class Period, they did not have personal knowledge of the levels of Funko's inventory at the time of the alleged false or misleading statements, discussed supra. See Zucco Partners, LLC, 552 F.3d at 996 (questioning the credibility of two confidential witnesses who were not employed by the defendant company during the time period in question); In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1062 (9th Cir. 2014) (statements by confidential witnesses about the defendant company's history of delaying known problems did not contribute to an inference of scienter in part because the witnesses were not employed by the defendant company during the relevant time period); cf. Webb, 884 F.3d at 851 n.1. Moreover, the threadbare allegation that CW2 was present at Funko Board meetings that were also attended by three Defendants and where excess inventory was

discussed do not state with particularity sufficient facts to raise a strong inference of scienter on behalf of Defendants Mariotti, Nickel, and Perlmutter.

The Court next considers the statements of CW3, CW4, and CW5, each of whom were employed by Funko during the Class Period. The CAC alleges facts showing CW3 and CW5 each had a narrow scope of responsibilities and contains no allegations that through their positions either understood or were familiar with Funko's global operations and had a complete understanding of Funko's inventory holdings in relation to its business operations. Moreover, the CAC fails to allege CW3, CW4, or CW5 had direct contact with any of the Defendants, let alone that they could opine competently and with personal knowledge as to what any of the Defendants knew about Funko's inventory levels or sales projections during the Class Period. See Waterford Twp. Police v. Mattel, Inc., 321 F. Supp. 3d 1133, 1154 (C.D. Cal. 2018), aff'd, 794 F. App'x. 669 (9th Cir. 2020) ("Plaintiff's allegations do not support an inference that FE2 had access to global retail inventory levels that would give FE2 knowledge that Mattel had unusually high levels of retail inventory during the Class Period. Also, since Plaintiff does not allege that FE2 had any meaningful contact with Defendants, the allegations related to FE2 do not support an inference that Defendants had any knowledge of the same inventory reports to which FE2 had access."). Due to these pleading failures, the Court finds the statements offered by CW3, CW4, and CW5 are insufficient to support a strong inference of scienter.[3] See Zucco Partners, LLC, 552 F.3d at 998 ("These generalized claims about corporate knowledge are not sufficient to create a strong inference of scienter, since they fail to establish that the witness reporting them has reliable personal knowledge of the defendants' mental state.").

Next, the Court considers whether CW1's allegations support a strong inference of scienter. In the CAC, Plaintiffs allege CW1 told the following people about his concerns that Funko could not meet its FY2019 guidance: Allison Dinan, a product developer at Funko who reported directly to Defendant Mariotti; Joe Sansone, Funko's Chief Operating Officer; Julie Leary, the Director of Financial Planning and Analysis; Johanna Gepford, the Senior Vice President of Sales; and James Beckly, the Vice President of Sales. (Id. ¶¶ 104, 105.) The CAC also alleges CW1 was present at sales meetings with Defendants Nickel, Jung, Mariotti, and Perlmutter where Funko's excess inventory and CW1's concerns about Funko's inability to meet the fourth quarter 2019 sales projections were discussed; the CAC also alleges summaries of these sales meetings were sent to Defendant Mariotti by email. (CAC ¶¶ 78, 97, 99, 101 103.) Although the CAC does not allege CW1 had contact and raised his concerns with each Defendant in this action, the Court finds Plaintiffs have met the first Zucco Partners, LLC prong, i.e., a showing of CW1's reliability and personal knowledge.

The Court next considers whether CW1's statements themselves are indicative of scienter. The Court concludes they are not. Although the Friedman opinion did not address

3 In Opposition, Plaintiffs did not address the Funko Defendants' argument that CW4's statement is irrelevant to the scienter analysis because CW4 "lacked any alleged reporting duties to the Individual Defendants" and did not claim he "reported any of his beliefs about Funko's inventory or sales forecasting to any Individual Defendant at any time." (Funko Mot. at 21.) The Court construes Plaintiffs' failure to oppose this contention about CW4 as Plaintiffs' consent to granting the Motion on this basis.

scienter, see Friedman v. Tesla, Inc., 2021 WL 246210 at *4 ("In addressing the adequacy of the operative SAC, we find the issue of falsity to be dispositive, and we therefore do not reach the issues of scienter or loss causation with respect to that complaint."), the Court applies the Friedman opinion's reasoning to this question. As discussed supra with respect to Plaintiffs' alleged misstatement no. 5, the Friedman court found dispositive that the plaintiffs had failed to allege particularized facts to demonstrate the defendants knew their goal of producing 5,000 Model 3 vehicles per month by the end of 2017 was impossible to achieve. For the same reasons the Friedman court found the plaintiffs' allegations insufficient to demonstrate Tesla's cautionary language was not meaningful, the Court finds Plaintiffs' allegations about what CW1 reported to various Defendants likewise is not sufficient to raise a strong inference of scienter. Although CW1 allegedly raised "red flags" with several Defendants and other members of Funko's management, Plaintiffs fail to allege sufficient particularized facts to show Defendants shared CW1's "pessimism" or "gloomy view" that Funko could not meet its FY2019 guidance or sales projections for the fourth quarter of 2019. Friedman v. Tesla, Inc., 2021 WL 246210 at *9. Instead of raising a strong inference of scienter, CW1's allegations seem more reasonably interpreted as his disagreement with Funko's management about their sales projections for FY2019, especially for the fourth quarter of 2019, based on CW1's own reading and interpretation of Funko's sales data. (See CAC ¶ 97, 101.) "[T]he second-guessing of management decisions by confidential witnesses does not provide a basis for securities fraud." In re Downey Sec. Litig., No. CV 08-3261-JFW (RZx), 2009 WL 2767670, at *11 (C.D. Cal. Aug. 21, 2009); Ronconi, 253 F.3d at 437 ("Calling executives bad managers, or bad forecasters, does not plead fraud"). Accordingly, the Court concludes CW1's allegations do not support a strong inference of scienter.

**ii. Stock Sales During Class Period**

The Funko Defendants contend the stock sales by Defendants Perlmutter and Mariotti during the class period do not support a strong inference of scienter. (Funko Mot. at 21-24.) Likewise, the ACON Defendants argue Plaintiffs' allegations about their collective stock sale during the second stock offering in September 2019 are not sufficient to plead scienter. (ACON Mot. at 3-5.) In Opposition, Plaintiffs argue Defendants' stock sales clearly demonstrate scienter because they sold nearly $105 million in stock during the Class Period and the sales were "suspicious in timing and amount and were out of line with prior sales." (Opp'n at 31-34.)

"Although 'unusual' or 'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter, insider trading is suspicious only when it is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" Zucco Partners, LLC, 552 F.3d at 1005 (quoting Silicon Graphics, 183 F.3d at 986). Courts must consider three factors to determine if stock sales constitute circumstantial evidence of scienter: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." Id. As to the second factor, "courts have held the timing of stock sales may weigh in favor of scienter where 'calculated to maximize the personal benefit,' or where occurring 'just before . . . a steep drop in stock price.'" Xiaojiao Lu v. Align Tech., Inc., 417 F. Supp. 3d 1266, 1281 (N.D. Cal. 2019) (quoting No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp., 320 F.3d 920, 938 (9th Cir. 2003) and In re OmniVision Techs., Inc. Sec. Litig., 937 F. Supp. 2d 1090, 1110 (N.D. Cal. 2013)).

In the CAC, Plaintiffs allege the following relevant facts:

- "In the seven months prior to the Class Period, Defendant Mariotti sold 150,000 shares for $3.3 million in proceeds. During the approximately seven months of the class period, he sold 500,000 shares for $12 million in proceeds." (CAC ¶ 164.)
- "ACON and Mariotti unloaded a significant amount of their Funko shares pursuant to the [secondary stock offering in September 2019] – nearly $100 million. Defendant Perlmutter also sold personal shares during the Class Period, on October 1, 2019, netting $1,159,200." (Id. ¶ 165.)
- Pursuant to the secondary offering on September 19, 2019, Defendant Mariotti and the ACON Defendants sold a total of 4 million shares to J.P. Morgan Securities LLC at $25.42 per share, netting Defendant Mariotti $10,168,000 and the ACON Defendants $91,512,000. (Id. ¶¶ 110-111.) Following the secondary offering, "ACON's 54.5% ownership of Class A shares was reduced to 45.7% and Defendant Mariotti's 10% Class A stake was reduced to 8.6%. (Id. ¶ 112.)
- "Other than one sale of 50,000 shares by Defendant Mariotti, each of these sales took place when Funko stock was over $20 per share, approximately three times what it was at the end of the Class Period." (Id. ¶ 166.)

As to the ACON Defendants and Defendant Perlmutter, Plaintiffs fail to allege any facts to show their prior trading history. From what few allegations Plaintiffs have pled about the transactions of these Defendants, it is clear the ACON Defendants sold approximately 8.8% of their Funko stock holdings in connection with Funko's secondary stock offering, and Defendant Perlmutter's sale occurred in October 2019. Both of these sales, however, took place several months before Funko's corrective disclosures and the drop in Funko's stock price. Without more allegations to establish each of the three Zucco Partners, LLC factors, the Court is unable to determine whether these stock sales were suspicious. See Zucco Partners, LLC, 552 F.3d at 1005. The paucity of the CAC's allegations about these transactions demonstrate Plaintiffs fail to establish a strong inference of scienter on this basis.

As to Defendant Mariotti, the CAC's allegations do not demonstrate with particularity that his stock sales constituted circumstantial evidence of scienter. Defendant Mariotti's alleged sale of 400,000 shares of Funko stock was in connection with Funko's secondary stock offering, which took place several months before Funko's corrective disclosures and accompanying drop in stock price. His sale of stock at that time reduced his holdings minimally, by only 1.4%. (See CAC ¶ 112). Plaintiffs do not allege when he sold the remaining 100,000 shares during the Class Period, so the Court is unable to determine the "timing of the sales" factor with respect to the sale of those shares. Next, the CAC alleges Defendant Mariotti's prior trading history for only the seven-month period preceding the Class Period. (CAC ¶ 164.) Based on that short window of time, it appears Defendant Mariotti's trading history was somewhat consistent, given the CAC's allegations that he specifically sold 400,000 shares in connection with Funko's secondary stock offering that took place in September 2019 and which the CAC does not allege was a regular occurrence in Defendant Mariotti's history of selling his Funko stock. The CAC's allegations about Defendant Mariotti's sale of an additional 100,000 shares at some other time during the Class Period appears consistent with his typical practice, given the 150,000 shares he allegedly sold before the Class Period. Based on these allegations, the Court cannot conclude

Defendant Mariotti's stock sales were suspicious or sufficient to constitute circumstantial evidence of scienter. See Zucco Partners, LLC, 552 F.3d at 1005.

The Court notes the alleged overall amounts of money earned by some of the Defendants through these stock sales was high, totaling over $100 million, as well as Plaintiffs' contention that the sales were suspicious because the Funko share price was near its highest when these sales took place. (See Opp'n at 31.) These factors are not determinative, however, especially given the paucity of allegations in the CAC on the remaining Zucco Partners, LLC factors.

Finally, the Court agrees with the Funko Defendants "the absence of [any allegations] of sales by five of the seven Individual Defendants weighs heavily against an inference of scienter." (Funko Mot. at 23-24.) Plaintiffs fail to allege even a majority of the individual Defendants sold Funko stock during the Class Period. "One insider's well timed sales do not support a 'strong inference' required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made." Ronconi, 253 F.3d at 436 (internal footnote omitted). "[T]he absence of any allegations that the other Defendants engaged in insider sales during the Class Period" is "significant." Alaska Elec. Pension Fund v. Adecco S.A., 434 F. Supp. 2d 815, 834 (S.D. Cal. 2006), aff'd, 256 F. App'x 74 (9th Cir. 2007).

The Court has considered the CAC's scienter allegations individually and found, standing alone, each allegation is insufficient to create a strong inference of scienter. The Court has also conducted a holistic review of the allegations and taken into account any plausible opposing inferences. Even in combination, the CAC's scienter allegations do not "create a strong inference of intentional conduct or deliberate recklessness." Curry, 875 F.3d at 1226.

Accordingly, Plaintiffs have not stated a claim for violation of Section 10(b) of the Securities Exchange Act or Rule 10b-5.

**B. Claim 2: Violation of Section 20(a) of the Securities Exchange Act**

To establish a claim under Section 20(a), a plaintiff "must first prove a primary violation of underlying federal securities laws, such as Section 10(b) or Rule 10b-5, and then show that the defendant exercised actual power over the primary violator." In re NVIDIA Corp. Sec. Litig., 768 F.3d at 1052.

As discussed herein, Plaintiffs have not stated a Section 10(b) or Rule 10b-5 violation, so there is no alleged primary violation that could support a Section 20(a) claim. Accordingly, Plaintiffs do not state a Section 20(a) claim against the Funko Defendants and the ACON Defendants. See In re Cutera Sec. Litig., 610 F.3d at 1113 n.6.

**C. Claim 3: Violation of Section 20A of the Securities Exchange Act**

"Section 20A of the Exchange Act creates a private cause of action for 'contemporaneous' insider trading. To satisfy § 20A, a plaintiff must plead (i) a predicate violation of the securities laws; and (2) facts showing that the trading activity of plaintiffs and defendants occur 'contemporaneously.'" Hefler v. Wells Fargo & Co., No. 16-cv-05479-JST, 2018 WL 1070116, at *12 (N.D. Cal. Feb. 27, 2018) (quoting In re Countrywide Fin. Corp. Sec.

Litig., 588 F. Supp. 2d 1132, 1074-75 (C.D. Cal. 2008)). The Ninth Circuit has acknowledged insider trading in violation of § 10(b) and Rule 10b-5 may serve as the predicate violation for a private Section 20A claim. See Johnson v. Aljian, 490 F.3d 778, 784-85 (9th Cir. 2007).

As with Plaintiffs' Section 20(a) claim, Plaintiffs have failed to plead a predicate violation of the securities laws to support their Section 20A claim. Accordingly, Plaintiffs fail to state a Section 20A claim against the Funko Defendants and the ACON Defendants.

**D. Leave to Amend**

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities." Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and alterations omitted). The law in the Ninth Circuit is clear "Rule 15's policy of favoring amendments to pleadings should be applied with 'extreme liberality." Eldridge v. Block, 832 F.2d 1132, 1135 (9th Cir. 1987). When dismissing a claim, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." Id. at 1130 (quoting Doe v. United States, 58 F.3d 494, 497 (9th Cir. 1995) (internal quotation marks omitted)). Leave to amend will be denied only when allowing amendment would unduly prejudice the opposing party, cause undue delay, be futile, or if the moving party acted in bad faith. Leadsinger, Inc. v. BMG Music Publ'g, 512 F.3d 522, 532 (9th Cir. 2008).

Based on the record before the Court, there is no basis to deny Plaintiffs leave to amend their Section 10(b), Rule 10b-5, Section 20(a), and Section 20A claims against Defendants. Neither the Funko Defendants nor the ACON Defendants have demonstrated amendment would be futile, cause undue delay in this litigation, or cause them undue prejudice.

## VI. Conclusion

For the foregoing reasons, the Court GRANTS the Funko Defendants' and the ACON Defendants' Motions to Dismiss the Consolidated Amended Complaint. The Court also grants Plaintiffs leave to amend their Section 10(b), Rule 10b-5, Section 20(a), and Section 20A claims against Defendants to address the pleading deficiencies set forth in this Order. Plaintiffs' amended complaint shall be filed by no later than March 29, 2021, failing which the Court will dismiss this action.

**IT IS SO ORDERED.**