**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Co-Lead Counsel for*
*Lead Plaintiffs*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

GILBERTO FERREIRA, Individually and On Behalf of All Others Similarly Situated,

              Plaintiff,

   v.

FUNKO, INC., BRIAN MARIOTTI, RUSSELL NICKEL, ANDREW PERLMUTTER, JENNIFER FALL JUNG, KEN BROTMAN, GINO DELLOMO, ADAM KRIGER, ACON INVESTMENTS, L.L.C., ACON FUNKO MANAGER, L.L.C., ACON FUNKO INVESTORS, L.L.C., ACON FUNKO INVESTORS HOLDINGS 1, L.L.C., ACON FUNKO INVESTORS HOLDLINGS 2, L.L.C., ACON FUNKO INVESTORS HOLDINGS 3, L.L.C., and ACON EQUITY GENPAR, L.L.C.,

              Defendants.

Case No. 2:20-cv-02319-VAP-PJW

**LEAD PLAINTIFFS' SUR-REPLY IN SUPPORT OF THEIR OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT**

<u>Hearing</u>
Date: September 20, 2021
Time: 2:00 PM
Courtroom: 8A
Judge: Hon. Virginia A. Phillips

In accordance with the Court's June 16, 2021 Order (ECF No. 156), Lead Plaintiffs Abdul Baker, Zhibin Zhang, and Huaiyu Zheng ("Plaintiffs") submit this sur-reply in support of their opposition to the Funko Defendants' and ACON Defendants' (collectively "Defendants") motions to dismiss the Second Amended Complaint ("SAC"), addressing the Ninth Circuit's decision in *In re Alphabet, Inc. Securities Litigation.*, 2021 WL 2448223 (9th Cir. June 16, 2021) ("*Alphabet*").

## I.   *ALPHABET* CONFIRMS THAT FUNKO'S INVENTORY RISK WARNINGS WERE FALSE AND MISLEADING

The Ninth Circuit's recent decision in *Alphabet* supports this Court's prior holding that Plaintiffs have adequately alleged that Funko's inventory risk warnings were false and misleading and, therefore, not meaningful for purposes of the PSLRA's safe harbor provision. *See Ferreira v. Funko, Inc.*, 2021 WL 880400, at *18, *25 (C.D. Cal. Feb. 25, 2021).[1]

Alphabet's 2017 Form 10-K for the year-ended December 31, 2017 warned investors of potential risks associated with a cybersecurity failure: "*[i]f* our securities measures are breached" then the company's "services may be perceived as not being secure" and "we may incur significant legal and financial exposure." (emphasis added). *Alphabet*, 2021 WL 2448223, at *3. The 10-K also warned that even unfounded concerns about Alphabet's "practices with regard to the collection, use, disclosure, or security of personal information or other privacy related matters" could damage the company's "reputation and adversely affect [its] operating results." *Id.* Subsequently, on April 23, 2018, Alphabet filed its Form 10-Q for the period-ending March 31, 2018 (the "April 10-Q") and on July 24, 2018, filed its Form 10-Q for the period-ending June 30, 2018 (the "July 10-

---

[1] Further, as set forth herein and in Section II-A, *supra*, *Alphabet* also supports Plaintiffs' allegations that Defendants issued the inventory risk warnings with actual knowledge that they were false misleading. Accordingly, Defendants' risk warnings are not protected by the PSLRA's safe harbor. *See* 15 U.S.C. §78u-5(c)(1).

Q"). Both the April and July 10-Qs stated that "there have been no material changes to our risk factors since our Annual Report on Form 10-K for the year ended December 31, 2017." 2021 WL 2448223, at *4.

However, the plaintiff in *Alphabet* alleged that the risks Alphabet warned of had already materialized by the time the April and July 10-Qs were issued. Specifically, the plaintiff alleged that in March and April 2018, Google discovered a software glitch in the Google+ social network that had existed since 2015 that allowed third-party developers to collect users' personal data (referred to as the "Three-Year Bug"), and other security vulnerabilities in Google's security system. *Id.* at *4. The plaintiff further alleged that in April 2018, Google's legal and policy staff prepared a memo that detailed the Three-Year Bug and the other security vulnerabilities and warned of the consequences of disclosure (the "Privacy Bug Memo") and that the named defendants were aware of the memo. *Id.*

Despite the defendants' knowledge of the Privacy Bug Memo and Google's security lapses, neither the April 10-Q, nor the July 10-Q made any mention of the Three-Year Bug or the other security vulnerabilities identified in the Privacy Bug Memo. 2021 WL 2448223, at *10. Accordingly, the Ninth Circuit found that the plaintiff adequately alleged that the risk statements were materially misleading because they were made after the defendants detected the cybersecurity issues and the omitted information would have materially altered the total mix of information available to investors. *Id*. Citing the court's prior decisions finding risk disclosures misleading when they "speak[ ] entirely of as-yet-unrealized risks and contingencies" and do not "alert[ ] the reader that some of these risks may already have come to fruition," the court held that Alphabet's warning of risks that "could" or "may" occur, were misleading to a reasonable investor because Alphabet knew those risks had already materialized. 2021 WL 2448223, at *11 (citing *Berson v. Applied Signal Tech., Inc.,* 527 F. 3d 982, 985-

**LEAD PLAINTIFFS' SUR-REPLY Case No. 2:20-cv-02319-VAP-PJW**

87 (9th Cir. 2008), *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009), and *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1015-16 (9th Cir. 2018).

The SAC's allegations concerning Funko's misleading risk warnings are nearly identical to the allegations in *Alphabet*. The SAC alleges that Funko's Form 10-Qs for the second and third quarters of 2019, issued on August 8, 2019 and October 31, 2019 respectively, warned of *potential* risks *if* Funko accumulated excess inventory:

> *If* demand or future sales do not reach forecasted levels, we *could* have excess inventory that we *may* need to hold for a long period of time, write down, sell at prices lower than expected or discard. *If* we are not successful in managing our inventory, our business, financial condition and results of operations *could* be adversely affected.

¶¶ 127, 136 (emphasis added).[2]

However, unknown to investors, by July 2019, Funko had already accumulated approximately 8-9 million units of excess, obsolete inventory. ¶ 75. By October 2019, the amount of excess, obsolete inventory ballooned to 10-12 million units. *Id*. Like *Alphabet*, the SAC alleges that key employees created specific reports that informed Defendants of Funko's inventory issues. ¶¶ 77-83. Specifically, starting in August 2019, Defendants Jung and Perlmutter began receiving weekly Aged Inventory Reports that quantified the amount of obsolete inventory Funko had accumulated. ¶ 80. In addition, beginning in September 2019, Defendants Jung and Perlmutter reviewed Funko's inventory position weekly through an Open to Buy plan created by CW1, Funko's then-Director of Merchandise and Planning. ¶ 81. Defendant Mariotti was advised of the inventory issues via emails summarizing each Weekly Sales meeting. ¶ 111. Like the

---

[2] Instead of referring to the risk language contained in the Company's 2018 10-K and stating that there had been "no material change" as in *Alphabet*, Defendants did the functional equivalent by repeating the same hypothetical warning verbatim in each 10-Q.

Privacy Bug Memo in *Alphabet*, the Aged Inventory Reports, Open to Buy plan and emails informed Defendants of Funko's material excess inventory issues and fostered discussions at Funko's Weekly Sales Meetings of the potential consequences of the excess, obsolete inventory, including Funko's inability to store the inventory, the inability to sell the inventory, and the need to destroy and write down the inventory. ¶¶ 79-81. The excess, obsolete inventory issue was so prevalent that Funko ran out of warehouse space to store it – the Company had to acquire a warehouse in Puyallup, Washington in August 2019 for the sole purpose of storing obsolete inventory slated for destruction. ¶ 79.

Despite Defendants' knowledge of Funko's massive accumulation of excess, obsolete inventory, Defendants engaged in the same fraudulent and misleading disclosure practices found to be misleading in *Alphabet* – framing the risks as mere possibilities when the risks had already materialized. *Compare Alphabet*, 2021 WL 2448223, at *11 *with* ¶¶ 127, 136. Just as in *Alphabet*, Defendants omitted any mention of the then-existing problem – that Funko had already accumulated millions of dollars of excess, obsolete inventory that could not be sold. That is why this Court previously held that Funko's inventory risk warnings were misleading. *See Ferreira v. Funko, Inc.*, 2021 WL 880400, at *18, *25 (C.D. Cal. Feb. 25, 2021) (finding that Funko's inventory statements misleading because they set forth "various hypothetical risks associated with maintaining excess inventory without disclosing that this risk had materialized.").

Defendants attempt to avoid *Alphabet* by ignoring its clear similarities to this case and by urging that it does not apply because the Ninth Circuit did not discuss forward-looking statements or the PSLRA's safe harbor. Reply at 11-12.[3] However, this Court already held that the PSLRA's safe harbor does not save Defendants because Funko's misleading cautionary language was not meaningful

---

[3] "Reply" refers to the Funko Defendants' Reply in Support of Their Motion to Dismiss the Consolidated Second Amended Complaint (ECF No. 158).

and thus, Funko's forward-looking risk statements are actionable – a holding Defendants do not contest. *See Funko*, 2021 WL 880400, at *18, *25; *see* MTD at 12-13.

Defendants further attempt to distinguish *Alphabet* by suggesting that the court's holding is limited to instances in which "senior management carefully analyzed, in writing, the risks and benefits" of disclosure. Reply at 12. This argument also fails. The Ninth Circuit's holding was not so narrow; it did not condition its holding on the weighing of pluses and minuses of disclosures. Rather, the court relied upon its well-established precedent for the basic principle that defendants cannot simply "warn[] of the harms that could follow" from a situation when they know that situation has already occurred. *Alphabet*, 2021 WL 2448223, at *10; *11 (citing *Berson,* 527 F.3d at 985-87, *Siracusano*, 585 F.3d at 1181, and *Khoja*, 899 F.3d at 1015-16); and distinguishing *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1195-96 (9th Cir. 2021) (where the risk language disclosed that the company already experienced the warned-of challenges).

Here, while Funko was sitting on warehouses full of $12-15 million worth of excess, obsolete inventory that it knew could not be sold, Defendants merely warned of what "could" happen *if* such an accumulation occurred. ¶¶ 127; 136. These disclosures were materially misleading. Like the undisclosed cybersecurity issues in *Alphabet,* "[b]ecause [the accumulation of excess inventory] may cause a range of substantial costs and harms, reasonable investors would likely find omissions regarding [the] significant [amount of Funko's excess, obsolete inventory] material to their decision making." 2021 WL 2448223, at *11.

Accordingly, *Alphabet* is directly on point and supports the SAC's allegations that Funko's inventory risk statements were materially misleading.

## II.    *ALPHABET* CONFIRMS THAT PLAINTIFFS' ALLEGATIONS RAISE A STRONG INFERENCE OF SCIENTER

The Ninth Circuit's analysis in *Alphabet* with respect to scienter demonstrates that the Plaintiffs have plausibly alleged a strong inference of scienter on the part of Defendants with respect to their misleading inventory warnings and the Company's 2019 fiscal-year earnings projections.

### A.   The SAC Alleges a Strong Inference of Scienter as to Funko's Risk Statements

In *Alphabet*, the Ninth Circuit found allegations that Google senior executives read the Privacy Bug Memo and, therefore, "necessarily knew of the Three-Year Bug and other security vulnerabilities" before Alphabet issued the April 2018 10-Q, were sufficient to raise a strong inference of scienter. *Alphabet*, 2021 WL 2448223 at *12. The Ninth Circuit also held that even though the Plaintiff did not allege that Alphabet's CEO read the Privacy Bug Memo, there was a strong inference that he knew of the memo and the issues discussed therein based on his role in the company. *See id.* at *12-13.

Here, as in *Alphabet*, "[t]he complaint's specific allegations, taken as a whole, raise a strong inference" that Defendants knew about and "intentionally did not disclose" relevant information about Funko's excess inventory (*i.e.*, that Funko was sitting on $12-15 million worth of excess, obsolete inventory that it knew would not be sold). *Alphabet*, 2021 WL 2448223 at *12. Specifically, the SAC alleges that Funko's executives were "vitally concerned" with inventory and received weekly reports tracking it. *See* ¶¶ 73-85; *see also Alphabet*, 2021 WL 2448223 at *13. Defendants were regularly advised of the amount of obsolete inventory Funko had accumulated and were told that it would be necessary to destroy and write off millions of dollars-worth of inventory. ¶¶ 79-83. In addition, beginning in August 2019, Defendants Jung and Perlmutter began receiving weekly Aged Inventory Reports that quantified Funko's excess inventory and categorized the excess inventory by age. ¶¶ 80-81. In August 2019, during a Weekly Sales Meeting, Defendants Jung and Perlmutter were further informed of

**LEAD PLAINTIFFS' SUR-REPLY Case No. 2:20-cv-02319-VAP-PJW**

the need to lease the Puyallup warehouse to store the excess inventory. ¶ 79. Beginning in September 2019, at each Weekly Sales Meeting, Defendants Jung and Perlmutter also reviewed an Open to Buy plan, a tool created by CW1 that tracked Funko's inventory and included data regarding quantities of inventory slated to be written down because of obsolescence. ¶ 81. The SAC alleges that Defendants Jung and Perlmutter agreed that Funko's obsolete inventory could not be sold. ¶ 83. The SAC also alleges that Defendant Mariotti knew about Funko's inventory issues from weekly emails he received summarizing Funko's Weekly Sales Meetings. ¶¶ 83, 111. The accumulation of excess, obsolete inventory was such a significant issue for the Company, that it was discussed at quarterly board meetings attended by Defendants Mariotti, Nickel, Perlmutter, Brotman, Dellomo and Kriger (the last three of whom represented the ACON Defendants at the meetings). ¶ 85. Specifically, in late-June/early-July 2019, the board discussed the need to consolidate the excess inventory to clear it out of Funko's warehouses. *Id*.

Plaintiffs' allegations establishing Defendants' direct knowledge of Funko's inventory issues are even stronger than the allegations in *Alphabet* – here there is much more than one memo that allegedly informed Defendants that the risks warned of had already transpired. Further, contrary to the SAC's allegations of direct knowledge, the plaintiff in *Alphabet* relied only on general allegations that Alphabet's CEO had "access" to "weekly reports of Google's operating results" and made key operating decisions at Google to plead scienter – allegations that the Ninth Circuit found sufficient. *See Alphabet*, 2021 WL 2448223, at *12-13.

Just as the court found it was "not plausible" that Alphabet's CEO would have been kept in the dark on an issue as important at the Three-Year Bug, it is equally not plausible that Defendants Mariotti, Jung and Perlmutter – each of whom received weekly reports concerning Funko's inventory and, with respect to Defendants Jung and Perlmutter, attended regular Weekly Sales Meetings where

Funko's excess inventory was discussed – did not know that Funko had amassed between \$12-15 million worth of excess, obsolete inventory that could not be sold.[4] *See Alphabet*, 2021 WL 2448223, at \*13. In fact, as detailed *supra*, the SAC specifically alleges that executives and board members did know of these issues.

The SAC further alleges sufficient facts demonstrating that armed with knowledge of Funko's massive excess inventory problem, Funko intentionally did not disclose this material information to investors. Just as the defendants in *Alphabet* chose to conceal security vulnerabilities to avoid regulatory scrutiny and loss of consumer confidence, Defendants here chose to conceal the true state and extent of Funko's inventory issues to delay the impact the disclosure would have on the price of Funko stock. Defendants then took advantage of the high price of Funko's stock by conducting a Secondary Public Offering on September 19, 2019. ¶¶ 98, 123, 161, 165; *Alphabet*, 2021 WL 2448223 at \*13. With the investing public unaware of Funko's massive excess inventory issues, Defendant Mariotti and the ACON Defendants (who effectively controlled Funko) made their largest sales of Funko stock at its near peak price, netting over \$100 million combined. ¶ 123. Thus, despite Defendants' assertion (*see* Reply at 18), Plaintiffs have alleged that Defendants had a motive to conceal Funko's accumulation of obsolete inventory – though motive allegations are not required to establish scienter. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 325 (2007) ("While it is true that motive can be a relevant consideration, and … may weigh heavily in favor of a scienter inference, we agree … that the absence of a motive allegation is not fatal"); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S.

---

[4] Defendants claim that *Alphabet*'s scienter allegations are distinguishable because, unlike here, the plaintiff in *Alphabet* alleged that Google executives weighed the pros and cons of disclosing the omitted information. *See* Reply at 18. However, as noted above, the Ninth Circuit's holding was not dependent on whether the defendants debated the need to disclose the omitted information. *See supra* at Section I. Rather, the court's holding was focused on the defendants' knowledge of the omitted facts. *Alphabet*, 2021 WL 2448223, at \*12-13.

**LEAD PLAINTIFFS' SUR-REPLY Case No. 2:20-cv-02319-VAP-PJW**

27, 48 (2011) ("The absence of a motive allegation … is not dispositive."). Like *Alphabet*, the SAC alleges that the disclosure of Funko's excess, obsolete inventory issues would have had a negative impact on Funko – a fact that was confirmed by the 40% drop in Funko's share price when Defendants eventually disclosed that a $16.8 million inventory write-down would be necessary. *See Alphabet*, 2021 WL 2448223, at *13 (noting that Alphabet's decision to conceal the company's security issues to "buy time" enabled it to delay scrutiny for an additional six months).

The competing innocent inference that this Court would have to accept if Defendants' arguments carried the day – that Defendants were unaware that Funko had millions of dollars of obsolete inventory that could not be sold or were merely negligent in continuing to present excess inventory issues as a hypothetical to investors – is simply not plausible. *See id.* at *12-13 (finding the "competing inference that Alphabet knew of the information about breach in Alphabet's data security but was negligent in not disclosing not plausible"). When viewed holistically, the inference of scienter is stronger here than in *Alphabet* because, in addition to allegations of motive, the SAC contains detailed allegations from CWs who provided first-hand accounts of Defendants' knowledge of Funko's inventory issues, as well as allegations of suspicious Class Period stock sales. ¶¶ 74-85; 118-125, 164-166.

### B. The SAC Alleges a Strong Inference of Scienter as to Funko's FY2019 Guidance

*Alphabet* also supports Plaintiffs' scienter allegations with respect to Funko's FY2019 guidance. The SAC pleads facts, based on the first-hand account of a reliable confidential witness (CW1), that support the allegation that Defendants knew it was impossible to meet Funko's FY2019 guidance.[5] Specifically, the SAC alleges that by early-September 2019, Funko's customer

---

[5]  *See Funko*, 2021 WL 880400 at *26-27 (holding that CW1 is a reliable confidential witness).

**LEAD PLAINTIFFS' SUR-REPLY Case No. 2:20-cv-02319-VAP-PJW**

orders showed a $30-40 million shortfall in sales and everyone who attended Funko's Weekly Sales Meetings agreed that the shortfall could not be made up. ¶¶ 104-109. Defendant Jung was part of these discussions and always agreed with the analysis. ¶¶ 108-110. The SAC further alleges that CW1 personally told Defendant Jung that it was impossible to fix the shortfall. ¶ 110. Defendant Mariotti knew of the shortfall through the same weekly emails that informed him of the Company's inventory issues. ¶ 111. The SAC also alleges that Defendant Mariotti knew that customer demand was lacking because on at least six different occasions between July and October 2019, CW1 advised him that there was no demand for additional products. In each instance, Defendant Mariotti accepted CW1's analysis. ¶ 112.

In their Reply, Defendants wrongly claim that *Alphabet* is inapplicable because the SAC alleges nothing more than a "simple disagreement between management and a new, mid-level employee." Reply at 18. However, as detailed in the SAC, CW1 was not a lone voice. Rather, there was a consensus among the members of Funko's planning, finance and merchandising teams who attended the Weekly Sales Meetings that Funko's sales shortfall could not be made up. ¶¶ 109-110. Accordingly, the fraudulent inference – that Defendants knew a sales shortfall existed that could not be made up but intentionally concealed it from investors to delay the negative consequences associated with missing Funko's earnings projections for the first time since going public in late-2017 – is far more compelling than the competing inference that Defendants either did not know of the shortfall, or honestly believed that earnings guidance would be met, despite the shortfall.

## CONCLUSION

For the reasons set forth above, *Alphabet* supports Plaintiffs' allegations and demonstrates that Plaintiffs have adequately alleged falsity and scienter. Accordingly, Defendants' motions to dismiss the SAC should be denied.

DATED: July 16, 2021

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Cara David*
Jeremy A. Lieberman
(admitted *pro hac vice*)
Cara David
(admitted *pro hac vice*)
600 Third Ave., 20th Fl.
New York, NY 10016
(212) 661-1100
jalieberman@pomlaw.com
cdavid@pomlaw.com

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
Email: jpafiti@pomlaw.com

*Co-Lead Counsel for Lead Plaintiffs*

**BERNSTEIN LIEBHARD LLP**

Stanley D. Bernstein
(*pro hac vice* forthcoming)
Stephanie Beige
(admitted *pro hac vice*)
Laurence J. Hasson
(*pro hac vice* forthcoming)
Peter J. Harrington
(*pro hac vice* forthcoming)
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
Email: bernstein@bernlieb.com
beige@bernlieb.com
lhasson@bernlieb.com

LEAD PLAINTIFFS' SUR-REPLY Case No. 2:20-cv-02319-VAP-PJW

pharrington@bernlieb.com

*Co-Lead Counsel for Lead Plaintiffs*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Email: peretz@bgandg.com

*Additional Counsel for Lead Plaintiffs*

**LEAD PLAINTIFFS' SUR-REPLY Case No. 2:20-cv-02319-VAP-PJW**

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2021, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Cara David*
Cara David