United States District Court
Central District of California

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Gilberto Ferreira, et al.,

Plaintiffs,

v.

Funko Inc., et al.,

Defendants.

2:20-cv-02319-VAP (PJWx)

**Order Granting in Part and Denying in Part Motions to Dismiss the Consolidated Second Amended Complaint (Dkt. Nos. 149-152)**

Before the Court are two Motions to Dismiss the Consolidated Second Amended Complaint ("Motions"), filed on May 7, 2021. The Motions were filed by two groups of Defendants, the first group consisting of Defendants Funko Inc., Brian Mariotti, Russell Nickel, Andrew Perlmutter, Jennifer Fall Jung, Ken Brotman, Gino Dellomo, and Adam Kriger (hereinafter referred to as "Funko Defendants") and the second group consisting of Defendants ACON Investments, LLC, ACON Funko Manager, LLC, ACON Funko Investors, LLC, ACON Funko Investors Holdings 1, LLC, ACON Funko Investors Holdings 2, LLC, ACON Funko Investors Holdings 3, LLC, and ACON Equity GenPar, LLC (hereinafter referred to as "ACON Defendants").[1] Having considered the papers filed in support

[1] The Consolidated Second Amended Complaint defines the "ACON Defendants" as including Defendants Ken Brotman, Gino Dellomo, and Adam Kriger. For ease of reference and for purposes of this Order, however, the Court includes Defendants Brotman, Dellomo, and Kriger within the "Funko Defendants" because they joined the Funko Motion. The ACON Motion also defines the "ACON Defendants" in the same manner, i.e., excluding Defendants Brotman, Dellomo, and Kriger.

United States District Court
Central District of California

of, and in opposition to, the two Motions, as well as the arguments advanced by counsel at the hearing, the Court GRANTS IN PART and DENIES IN PART the Motions for the following reasons.

## I. Procedural History

On March 10, 2020, Plaintiff Gilberto Ferreira, individually and on behalf of all others similarly situated, initiated this action by filing a Complaint against Defendants Funko, Inc., Brian Mariotti, Russell Nickel, and Jennifer Fall Jung and alleging the following claims: (1) violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5; and (2) violation of Section 20(a) of the Securities Exchange Act.

On April 3, 2020, Plaintiff Mohamed Nahas, individually and on behalf of all others similarly situated, initiated a related action in Case No. 2:20-cv-03130-VAP-PJWx by filing a Complaint against Defendants Funko, Inc. Brian Mariotti, Russell Nickel, and Jennifer Fall Jung and alleging the following claims: (1) violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5; and (2) violation of Section 20(a) of the Securities Exchange Act.

On June 11, 2020, the Court granted several motions filed by Plaintiffs Abdul Baker, Zhibin Zhang, Huaiyu Zheng, Gerber Kawasaki, Inc., William Hurt, Jarett Elion, and Zheng Li to consolidate this case and the Nahas matter, and appointed Plaintiffs Abdul Baker, Zhibin Zhang, and Huaiyu Zheng as the lead Plaintiffs and Pomerantz LLP and Bernstein Liebhard LLP as co-lead counsel for the putative class.

On July 31, 2020, lead Plaintiffs Zhibin Zhang, Abdul Baker, and Huaiyu Zheng ("Plaintiffs") filed a Consolidated Amended Complaint ("CAC") against Defendants Funko Inc., Jennifer Fall Jung, Brian Mariotti, Russell Nickel, Andrew

United States District Court
Central District of California

Perlmutter, Ken Brotman, Gino Dellomo, Adam Kriger, ACON Investments LLC, ACON Funko Manager, LLC, ACON Funko Investors, LLC, ACON Funko Investors Holdings 1, LLC, ACON Funko Investors Holdings 2, LLC, ACON Funko Investors Holdings 3, LLC, and ACON Equity GenPar LLC. In the CAC, lead Plaintiffs alleged the following claims: (1) violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 against all Defendants; (2) violation of Section 20(a) of the Securities Exchange Act against Defendants Jennifer Fall Jung, Brian Mariotti, Russell Nickel, Andrew Perlmutter, and the ACON Defendants; and (3) violation of Section 20A of the Securities Exchange Act against Defendants Brian Mariotti, Andrew Perlmutter, and the ACON Defendants. The CAC was filed on behalf of persons or entities that purchased or otherwise acquired Funko securities between August 8, 2019 and March 5, 2020. (CAC ¶ 1.)

On October 2, 2020, the Funko Defendants and ACON Defendants filed two motions to dismiss the CAC. On February 25, 2021, the Court granted both motions, dismissed the CAC, and granted Plaintiffs leave to amend.

In the February 25, 2021 Order, the Court concluded Plaintiffs failed to plead sufficient allegations to state claims under Sections 10(b), 20(a), and 20A of the Securities Exchange Act. As to Plaintiffs' Section 10(b) claim, the Court found six of the eight alleged misrepresentations or omissions were not actionable and Plaintiffs failed to allege sufficient facts to give rise to a strong inference of scienter. As there was no predicate violation of the Securities Exchange Act, the Court concluded Plaintiffs' Section 20(a) and 20A claims also failed.

Plaintiffs filed a Consolidated Second Amended Complaint ("SAC") against Defendants on March 29, 2021. The SAC alleges the same claims as the CAC, except claim 1 is now alleged against only Defendants Funko, Brian Mariotti, and Jennifer Fall Jung. The SAC also includes additional factual allegations not

previously alleged in the CAC, purporting to show Defendants knew Funko held excess obsolete inventory and knew it was impossible to meet the FY2019 projections in August and October 2019.

The Funko Defendants filed their Motion to Dismiss the SAC ( "Funko Motion") on May 7, 2021. In support of the Funko Motion, the Funko Defendants filed the Declaration of Kevin M. McDonough ("McDonough Decl."), attaching Exhibits 1 through 9, and a Request for Judicial Notice ("Funko RJN").

The ACON Defendants filed their Motion to Dismiss the SAC ("ACON Motion") on May 7, 2021. The ACON Defendants also filed a joinder to the Funko RJN.

Plaintiffs filed separate Opposition briefs to each of the Motions on June 11, 2021, in addition to opposition to the Funko RJN ("Pl. Opp'n to Funko RJN"). In support of their Opposition to the ACON Motion, Plaintiffs also filed the Declaration of Stephanie M. Beige ("Beige Decl."), attaching Exhibit 1, and a Request for Judicial Notice ("Pl. RJN").

On June 16, 2021, the Court ordered the parties to file supplemental briefing on the impact of the Ninth Circuit's decision in State of R.I. v. Alphabet Inc. (In re Alphabet Sec. Litig.), 1 F.4th 687 (9th Cir. June 16, 2021) on the issues raised in the Motions.

The Funko Defendants filed their Reply to Plaintiffs' Opposition on July 2, 2021, in addition to a Reply to Plaintiff's Opposition to the Funko RJN. The ACON Defendants also filed their Reply to the Opposition on July 2, 2021. Defendants' Reply briefs included a response to the Court's June 16, 2021 Order.

On July 16, 2021, Plaintiffs filed an authorized Sur-Reply regarding both Motions, including a response to the June 16, 2021 Order.

United States District Court
Central District of California

United States District Court
Central District of California

## II. Factual Allegations

Defendant Funko, Inc. ("Funko") is a "pop culture consumer products company that creates vinyl figures, action toys, plush, accessories, apparel, and homewares relating to movies, TV shows, videogames, musicians, and sports teams." (SAC ¶¶ 2, 44.) Funko "licenses with established content providers such as Disney, HBO, LucasFilms, Marvel, Blizzard Entertainment, the National Football League, and Warner Brothers." (Id. ¶ 49.) "The majority of Funko's sales are generated from the sales of new products based on movies, television shows and video games." (Id. ¶ 50.) "90% of Funko's sales of new products occur within the first three to four months of a release and are directly correlated with the success and popularity of the releases." (Id.) Funko is unlikely to sell products a year after their release. (Id. ¶ 51.) Certain licenses did not allow Funko to sell old inventory at discounts as doing so would otherwise "damage the prestige and collectability of certain products." (Id.)

Defendant Brian Mariotti ("Mariotti") has served as the Chief Executive Officer of Funko since he and a group of investors acquired Funko in 2005. (Id. ¶¶ 25, 46.) Mariotti also served as the Chief Executive Officer of Funko Acquisition Holdings, LLC, the predecessor company to Funko, and of Funko Holdings LLC, which is a "holding company, which . . . owns 100% of Funko, LLC, the Company's operating entity." (Id. ¶ 25.)

Defendant Russell Nickel ("Nickel") served as Funko's Chief Financial Officer from October 2013 to August 13, 2019 and Defendant Jennifer Fall Jung ("Jung") has served as Funko's Chief Financial Officer since August 13, 2019. (Id. ¶¶ 26-27.) Defendant Andrew Perlmutter ("Perlmutter") has served as Funko's President since October 2017. (Id. ¶ 28.) Defendants Ken Brotman ("Brotman"),

United States District Court
Central District of California

Gino Dellomo ("Dellomo"), and Adam Kriger ("Kriger") have served on Funko's Board of Directors since April 2017. (Id. ¶¶ 36-38.)

Defendant ACON Investments, LLC acquired Funko in 2015. (Id. ¶¶ 32, 47.) Funko "went public" on November 2, 2017, and the initial public offering ("IPO") made available 10,416,666 shares of Class A common stock of Funko at a price of $12 per share. (Id. ¶ 48.) Shortly before Funko's IPO, ACON Funko Investors LLC owned 100% of Funko Class A common stock. (Id. ¶ 32.) After the IPO, ACON Funko Investors LLC and ACON Investments LLC owned over 55% of the Class A shares of Funko. (Id.)

On August 8, 2019, Funko filed a Form 10-Q for the second quarter of 2019, which relayed its financial results. (Id. ¶ 127.) In that Form 10-Q, Funko identified a potential risk about its inventory, stating as follows in pertinent part: "Our success depends, in part, on our ability to successfully manage our inventories. . . . If demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold onto for a long period of time, write down, sell at prices lower than expected or discard." (Id.) This statement was false and misleading because that risk had already materialized. (Id. ¶ 128.)

According to several former Funko employees, "by August 2019, [Funko] had amassed millions of dollars of obsolete inventory in various Funko warehouses due to [Funko's] 'haphazard' internal sales forecasting practices." (Id. ¶ 3.) As of August 2019, Funko held eight to nine million units of obsolete inventory, valued at $10-11.25 million, and by October 2019, the obsolete inventory had grown to ten to twelve million units valued at $12.5-15 million. (Id.) In October 2019, Funko leased a warehouse in Puyallup, Washington to store approximately 80% of its obsolete and excess inventory. (Id. ¶¶ 5, 79, 87, 106, 128(a), 131(e), 134(e), 137(a), 162(a).)

Funko did not have a reliable internal system to forecast accurately consumer demand for its products, resulting in Funko ordering significant excess product. (Id. ¶ 52.) This problem was well-known among Funko employees, senior management including Defendants Mariotti, Nickel, Jung, and Perlmutter, and members of Funko's Board of Directors including Defendants Brotman, Dellomo, and Kriger. (Id. ¶¶ 53, 73, 76-93, 108-117.) The excess inventory problem was discussed at weekly sales meetings attended by Defendants Jung and Perlmutter, over emails, and at meetings of the Funko Board of Directors. (Id. ¶¶ 77-83, 108-117.)

After filing a "shelf registration statement" with the United States Securities and Exchange Commission ("SEC") on April 19, 2019 (id. ¶ 119) and despite knowing it was "sitting on warehouses full of obsolete inventory and [] [Funko] would not meet its FY2019 earnings guidance" (id. ¶ 118), Funko "conducted a secondary [public] offering ["Secondary Public Offering"] on September 19, 2019 . . . , consist[ing] of personal shares sold by Defendant Mariotti and various entities affiliated with ACON Investments, LLC, including ACON Funko Investments LLC" (id. ¶ 8). "[T]aking advantage of the fact that shares of Funko had climbed 25% in the last month" (id. ¶ 120), Defendant Mariotti and the ACON Defendants profited over $100 million from selling their stock during the Secondary Public Offering (id. ¶¶ 8, 123, 204-207). As a result of the Secondary Public Offering, "ACON's 54.5% ownership of Class A shares was reduced to 45.7% and Defendant Mariotti's 10% Class A stake was reduced to 8.6%." (Id. ¶ 124.) Funko did not benefit, or receive any proceeds, from the Secondary Public Offering, yet it paid approximately $700,000 in expenses related to it. (Id. ¶ 125.)

Funko issued a press release on October 31, 2019 regarding its third quarter 2019 earnings performance. (Id. ¶ 129.) In the press release, Funko reported a 26% increase in net sales compared to the third quarter of 2018 and repeated its positive

United States District Court
Central District of California

sales outlook for FY2019. (Id.) This statement was false and misleading because Defendants knew it was impossible to meet the FY2019 sales guidance by October 31, 2019. (Id. ¶ 131.)

On October 31, 2019, Funko filed a Form 10-Q for the third quarter of 2019. (Id. ¶ 136.) The Form 10-Q contained the same risk disclosure about Funko's inventory as the Form 10-Q filed for the previous quarter. In other words, it included warnings about possible excess inventory "if demand or future sales do not reach forecasted levels," but it did not disclose the excess inventory it already held, rendering the statement false and misleading. (Id. ¶ 136-137.)

Also on October 31, 2019, Funko held an earnings call with investors, during which Defendant Mariotti confirmed Funko's FY2019 guidance, which projected 22-24% sales growth. (Id. ¶¶ 95, 126.) Defendants "represented to the market that they expected net sales of $840 million to $850 million, representing year-over-year growth of 22% to 24%, adjusted EBITDA of $140 million; and adjusted earnings per diluted share of $1.15 to $1.22, which assumes a blended corporate tax rate of 25% and a weighted average diluted share count of 53.5 million shares at the end of the year." (Id. ¶¶ 126, 130.) This statement was false and misleading because Funko's internal sales data showed "there were not enough products tied to the fourth quarter releases and customer demand for the new fourth quarter products was insufficient to generate the sales necessary to meet the guidance" and "Funko could not make up the shortfall by selling the Company's aged, excess inventory." (Id. ¶¶ 96, 100.) Defendants knew by late August or early September 2019 that it was impossible to meet the FY2019 sales guidance. (Id. ¶ 100, 104-107.)

Also during the October 31, 2019 earnings call, Defendant Jung discussed the third quarter 2019 results, reiterated Funko's earnings guidance for FY2019, and stated the fourth quarter of 2019 would be Funko's "biggest quarter ever as a

United States District Court
Central District of California

United States District Court
Central District of California

company." (Id. ¶ 133.) This statement was false and misleading when made because Defendant Jung "did not honestly believe that the FY2019 guidance was achievable because there were not enough products tied to the fourth quarter releases and customer demand for the new fourth quarter products was insufficient to generate the sales necessary to meet the guidance." (Id. ¶ 134.)

Following the investor call, Funko's share price dropped because "analysts and the market were disappointed by [Funko's] decision to maintain its 2019 full-year guidance" instead of increasing it. (Id. ¶ 98.)

Plaintiffs purchased Funko securities between August 8, 2019 and March 5, 2020 (hereinafter the "Class Period"). (Id. ¶¶ 1, 179.) Defendant Perlmutter sold 56,250 shares at $20.61 per share on October 1, 2019. (Id. ¶ 211.)

On February 5, 2020, Funko publicly announced its preliminary fourth quarter 2019 financial results, reflecting a net sales decrease of 8%, and disclosed a write-down of $16.8 million "to 'dispose of slower moving inventory to increase operational capacity.'" (Id. ¶ 138.) On February 6, 2020, Funko's share price decreased by 40% and closed at $9.29. (Id. ¶ 140.)

On March 5, 2020, Funko issued a press release, disclosing its fourth quarter 2019 earnings and FY2019 financial results which reflected a 4% decrease in net sales year-over-year. (Id. ¶¶ 148-149.) On an earnings call with investors, Mariotti admitted Funko's forecasting and inventory management practices needed to be revised but blamed the poor results for the fourth quarter of 2019 on "unexpected market conditions." (Id. ¶¶ 151, 153.) On March 6, 2020, Funko's share price closed at $6.92. (Id. ¶ 155.)

In setting forth the factual allegations in the SAC, Plaintiffs rely on the accounts of several confidential witnesses, as follows.

**A. Confidential Witness 1 ("CW1")**

CW1 was Funko's Director of Merchandise Planning from July 2019 to June 2020. (Id. ¶ 54.) CW1 was responsible for "developing Company-wide sales forecasts and for determining the quantity of product that needed to be ordered and developed to meet customer demand" and for "inventory management." (Id.) By virtue of his role, he had "first-hand knowledge of Funko's sales forecasting practices and inventory issues." (Id.) According to CW1, Funko did not have a "system of checks and balances to ensure that [it] w[as] ordering the right amount of inventory" before CW1 was hired and Funko "was always ordering excess product." (Id. ¶ 56.) Funko implemented changes to its ordering practices a few months before CW1 joined Funko and when CW1 was hired, he joined Funko's planning team, which "was created to curtail over-ordering and stem the accumulation of additional excess inventory." (Id. ¶ 57.)

CW1 stated Funko's inventory issues were well-known by employees and management alike at Funko. (Id. ¶ 76.) CW1 explained "the inventory issue was obvious and [] was so dire that in August 2019, [Funko] had 200 shipping containers of product sitting in the Port of Seattle and [in Funko's] parking lot that could not be unloaded because [Funko's] Everett, Washington warehouse was full of aged inventory." (Id.) CW1 represented Defendants Jung and Perlmutter were aware of the inventory issue since July 2019 because it was discussed during weekly sales meetings where CW1, Defendant Jung, and Defendant Perlmutter were present, along with Defendant Nickel, other Funko executives, and employees who reported directly to CW1. (Id. ¶ 77.) The purpose of the weekly sales meetings was to evaluate Funko's current sales and forecast projected sales for the upcoming three to four months. (Id. ¶ 78.) During each weekly sales meeting from at least August 2019 to February 2020, the participants discussed "risks to

United States District Court
Central District of California

[Funko's] sales plan, which included discussing Funko's accumulation of obsolete inventory." (Id. ¶¶ 78, 79.) During a weekly sales meeting in August 2019, Julie Leary, Funko's Director of Financial Planning and Analysis, who was CW1's direct supervisor and who reported directly to Funko's Chief Operating Officer (id. ¶ 55), reported to the attendees that Funko leased a new warehouse in Puyallup, Washington to store aged products that were going to be destroyed. CW1 informed the attendees that the Puyallup warehouse did not have "fulfillment capabilities," the products were not stored in any organized manner there, and products that were stored there "'were never coming back.'" (Id. ¶ 79.) CW1 believed "approximately 80% of Funko's obsolete inventory was being stored at Puyallup." (Id.) Starting in August 2019, the attendees of the weekly sales meetings discussed "how much inventory was eventually going to be written off." (Id. ¶ 80.)

Beginning in August 2019, Funko began generating a weekly report on its aged inventory, indicating the amount of aged inventory accumulated and sorted by age, i.e., over 90 days old, over 180 days old, and over one year old. (Id. ¶ 80.) These reports were emailed weekly to the attendees of the weekly sales meetings, including Defendants Jung and Perlmutter. (Id.) CW1 understood the weekly aged inventory reports assisted the finance team in determining "the amount of inventory they proposed writing off." (Id.)

Beginning in September 2019, CW1 began tracking excess inventory through an "Open to Buy" plan, a "financial tool used in the retail industry to better understand sales and inventory positions." (Id. ¶ 81.) CW1's "Open to Buy" plan tracked the "present amount of inventory, excess inventory, the estimated cost of sale of the inventory, and contained a line item called 'write-down,' indicating how much of the inventory was obsolete." (Id.) The attendees of the weekly sales meetings, including Defendants Jung and Perlmutter, "reviewed the data in the

United States District Court
Central District of California

United States District Court
Central District of California

Open to Buy plan during each meeting [starting in September 2019] and discussed the obsolete inventory and the timing of when to write off the obsolete inventory." (Id.) CW1 believed everyone who attended the weekly sales meeting, including Defendant Jung, "agreed with the fact that the excess inventory Funko had accumulated was obsolete and could not be sold." (Id. ¶ 82.)

CW1 stated Defendants Mariotti, Jung, and Perlmutter were aware that "Funko had warehouses full of obsolete inventory" through their attendance at the weekly sales meetings and also because they received emails that summarized the issues discussed at each meeting, including discussions about inventory. (Id. ¶ 83.)

When CW1 heard Defendant Mariotti reaffirm Funko's FY2019 guidance on the October 31, 2019 earnings call, CW1 knew achieving that guidance was impossible. (Id. ¶ 97.) To achieve the 22-24% FY2019 projected growth, Funko needed sales growth of at least 15% in the fourth quarter. (Id.) "CW1's review of Funko's fourth quarter customer orders and the revenue generated from those orders, showed that fourth quarter sales would decline 15%." (Id. (emphasis in original).)

According to CW1, "Funko ordered products months in advance of new releases and based those orders on anticipated customer demand. Products slated to be sold during the fourth quarter were designed and ordered for production in the spring of 2019 and the number of units ordered at that time represented all of the new products that [Funko] would have available for sale in the fourth quarter." (Id. ¶ 102.) CW1 believed Funko "could not make up the sales shortfall by selling [Funko's] aged, excess inventory and, even if there was another new release to base additional products on (and there was not), it was too late for [Funko] to produce additional new products for the fourth quarter" of 2019. (Id. ¶ 100.) Customer orders for the fourth quarter of 2019 were placed in August and September of 2019;

United States District Court
Central District of California

by September 2019, "customer orders were below what the planning team had estimated" and "the amount o[f] revenue that could be generated by the number of units in the orders[] showed [] [Funko] was $30-40 million short of the FY2019 sales guidance." (Id. ¶ 104.)

CW1 believed Funko had high sales figures for the first half of 2019 due to the popularity of products tied to successful movies, television shows, and video games. (Id. ¶ 101.) He also believed "Funko's products based on the fourth quarter tentpole releases had fewer marketable characters and Funko's internal sales forecasting showed the products would not be as popular." (Id.)

CW1 stated Defendants knew by late August or early September 2019 that it was impossible to meet the projected sales guidance it had issued for FY2019. (Id. ¶ 100, 104-107.) According to CW1's calculations, it was "'statistically impossible' to close the gap between [Funko's] internal sales data and [Funko's] public guidance." (Id. ¶ 105.) "[T]he shortfall could not be made up unless Funko offered additional new products . . . and it was too late to design and produce additional new products for the fourth quarter." (Id.) "The planning team's calculation of customer demand for the new products was lower than what was needed to meet Defendants' sales projections, and the amount of new products ordered for the fourth quarter was based on the planning team's analysis." (Id.) "[E]ven if Funko sold every available unit of its new products during the fourth quarter, [Funko] still would not have generated enough revenue to meet its stated guidance." (Id.)

CW1 believed the only way to make up the shortfall was if Funko sold at least "6 million units of obsolete inventory at full price, which was impossible, since there was little demand for Funko's aged inventory, even at a discount." (Id. ¶ 106.) Even if there was demand for Funko's obsolete inventory, Funko could not fulfill those orders because the obsolete inventory was stored in the Puyallup

United States District Court
Central District of California

facility, which did not have fulfillment capabilities. (Id.) CW1 believed Funko would experience a decline of 15% during the fourth quarter of 2019 while Funko publicly touted its projections that it would grow 15-20%. (Id. ¶ 107.)

CW1 reported the inability to meet Funko's fourth quarter 2019 sales targets during weekly sales meetings beginning in late August or early September 2019. (Id. ¶ 108.) The attendees at those meetings, including Defendant Jung, "discussed any shortfalls between the internal sales forecasts and [Funko's] sales guidance that was represented to the market." (Id.) CW1 believed beginning in September 2019, everyone who attended the weekly sales meetings "agreed a shortfall existed" and "the new products Funko was offering for the fourth quarter would not deliver the revenue [Funko] was projecting." (Id. ¶ 109.) From September 2019 until the end of the year, this matter was discussed at every weekly sales meeting. (Id.)

CW1 stated Defendant Jung "knew of the shortfall and 'always agreed with the analysis,'" despite becoming "increasing[ly] frustrated by the existence of the shortfall during each successive [w]eekly [s]ales [m]eeting that took place in September and October 2019." (Id. ¶ 110.) During a weekly sales meeting in September 2019, after the attendees discussed the shortfall, Defendant Jung said Funko was "'guiding Wall Street toward the numbers" anyway and directed the sales team to try and 'figure it out' and 'make up the difference.'" (Id.) In response, CW1 said it was "impossible to fix the shortfall because there were no additional new products scheduled for release in the fourth quarter and customers did not want the aged inventory." (Id.)

CW1 believed Defendant Mariotti was aware of the shortfall because he received emails summarizing every weekly sales meeting and he attended some of those meetings. (Id. ¶ 111.) On five or six occasions between July and October 2019, Defendant Mariotti asked the planning team to order more units of certain

products, but CW1 showed him the analysis of what Funko could sell and explained the extra product Defendant Mariotti wanted ordered would end up as excess inventory, and Defendant Mariotti withdrew his request because he "accepted CW1's explanation." (Id. ¶ 112.)

CW1 raised his concerns about the "lack of new products tied to the fourth quarter releases" with Allison Dinan, a product developer at Funko who reported directly to Defendant Mariotti, and he believed she conveyed his concerns to Defendant Mariotti. (Id. ¶ 113.) CW1 also raised his concern that "there were not enough products tied to the fourth quarter releases and customer demand for the new fourth quarter products was insufficient to generate the sales necessary to meet the guidance" with Funko's Chief Operating Officer, Joe Sansone, the Director of Financial Planning and Analysis, Julie Leary, the Senior Vice President of Sales, Johanna Gepford, and the Vice President of Sales, James Beckley "as early as August 2019." (Id. ¶ 114.)

**B. Confidential Witness 2 ("CW2")**

CW2 was the general manager of Loungefly, "a consumer products company acquired by Funko in May 2017," from May 2017 through July 2019. (Id. ¶ 59.) Loungefly sold "pop culture-focused accessories and handbags . . . that feature[d] characters owned by licensed brands." (Id.) CW2 "oversaw all the divisions of Loungefly and was responsible for, among other things, profit and loss, budgeting, and forecasting." (Id.) CW2 reported to Defendant Perlmutter and had "first-hand knowledge about Funko's sales forecasting practices and excess inventory." (Id.) According to CW2, "poor internal sales forecasting resulted in large amounts of obsolete inventory being stored by [Funko] for years." (Id. ¶ 60.) Funko's sales forecasts "did not adequately account for the risk that [Funko's] retail customers

United States District Court
Central District of California

United States District Court
Central District of California

would not purchase all of the units they indicated they would purchase" and CW2 stated this failure "was a common problem in 2018 and 2019." (Id. ¶ 61.) CW2 explained Funko "chose not to re-release or liquidate certain unsold products because it would take away from the collectability of the products, as collectors would not want to see the products they paid top dollar for on sale at a dollar store." (Id. ¶ 62.)

CW2 explained in 2018 and 2019, "Funko had accumulated so much excess inventory that it ran out of space at its warehouse and '[a]ny time they ran out of space at the warehouse, instead of doing something with the inventory, they said we'll just get another warehouse.'" (Id. ¶ 84.) In July 2019, Funko "had multiple warehouses in the Seattle area" and Funko "was still discussing how to consolidate the growing inventory." (Id.)

CW2 regularly attended Funko's quarterly Board meetings and the excess inventory was discussed frequently; Defendants Mariotti, Nickel, and Perlmutter attended these Board meetings as well. (Id. ¶ 85.) "[T]hroughout 2018, the discussions at the quarterly Board meetings centered on what to do with the excess inventory and always resulted in [Funko] getting more and more warehouses." (Id.) "At the last meeting [CW2] attended in late-June or early July 2019, the discussion changed to the need to try and consolidate the obsolete inventory: 'All I heard was we need to clear out these warehouses. . . . we need to consolidate the inventory.'" (Id.) Defendants Mariotti, Nickel, Perlmutter, Brotman, and Dellomo were present at the last Board meeting CW2 attended where that was discussed. (Id.)

CW2 believed Defendants Mariotti, Nickel, and Jung "would have been aware of the shortfall [between projected sales and the FY2019 guidance] because they each monitored sales 'constantly.'" (Id. ¶ 116.)

### C. Confidential Witness 3 ("CW3")

CW3 was an account manager at Funko from November 2017 until December 2019. (Id. ¶ 64.) CW3 worked in Arkansas and was assigned to Funko's account with Wal-Mart. (Id.) CW3 was "responsible for forecasting and planning sales of Funko items at Wal-Mart" and had "first-hand knowledge about [Funko's] sales forecasting and inventory practices." (Id.) CW3 emailed weekly sales updates for his unit to Funko executives, including Defendant Perlmutter, and his emails were also circulated to Defendants Mariotti and Nickel. (Id. ¶ 66.) According to CW3, Funko's retail customers "did not commit to buying specific quantities of product" so Funko "merely engaged in a 'guessing game' of predicting sales and ordering inventory." (Id. ¶ 67.) Funko did not have a "methodology to the process of forecasting customer demand and managing inventory." (Id.)

CW3 believed Defendants Mariotti, Nickel, Perlmutter, and Jung "received sales forecasts and were closely tracking [Funko's] sales." (Id. ¶ 117.)

### D. Confidential Witness 4 ("CW4")

CW4 worked at Funko from January 2018 to June 2020, first as a customer service manager from January to June 2018, at which time CW4 was promoted to a customer service and sales team manager. (Id. ¶ 69.) CW4 was "responsible for managing an inside sales team of five sales managers and four account coordinators who worked with direct-to-consumer customers and e-commerce." (Id.) CW4 had "first-hand knowledge of Funko's sales forecasting and inventory issues." (Id.) CW4 explained "it was common for [Funko's] retail customers . . . not to commit to a specific quantity of products but rather, pre-order a certain amount and then reduce their orders at a later date" which "resulted in excess inventory that would be stored in warehouses." (Id. ¶ 70.) According to CW4, "around October 2019,



United States District Court
Central District of California

United States District Court
Central District of California

Funko opened another warehouse in Puyallup, Washington to house excess inventory that either wasn't moving quickly or wasn't going to be released." (Id. ¶ 87.)

### E. Confidential Witness 5 ("CW5")

CW5 worked at Funko from August 2018 to September 2019 as a sales coordinator. (Id. ¶ 71.) CW5 "provided back-end sales support for Funko's Latin American territory," and "assisted with sales development and tracked monthly sales" from "Funko's South Everett warehouse." (Id. ¶ 72.) CW5 had "first-hand knowledge of Funko's sales and forecasting practices." (Id.) CW5 explained by the end of 2018, "'[i]t was a regular thing that our warehouse was overstocked'" and the excess inventory was discussed at weekly sales meetings CW5 attended. (Id. ¶¶ 88, 89.)

CW5 did not believe Funko's FY2019 guidance was realistic as applied to his region. (Id. ¶ 115.) Funko set a sales growth goal of 28% for the Latin American units for 2019, which CW5 concluded "was not based on the forecast that CW5 and his supervisor . . . reached after meeting with their customers." (Id.) CW5's manager "pushed back and told management his team could not achieve the sales goals, [but] Funko executives were persistent and insisted on the 28% growth." (Id.)

### F. Confidential Witness 6 ("CW6")

CW6 worked as a senior fulfillment supervisor at Funko from March to August 2019 from Funko's warehouse in Everett, Washington. (Id. ¶ 91.) CW6 was responsible "for ensuring that Funko's products were being shipped to customers according to customer guidelines and for ensuring that all goods received

United States District Court
Central District of California

at the warehouses were offloaded and entered into the inventory system. (Id.) CW6 had "first-hand knowledge of excess inventory stored at Funko's warehouses." (Id.) According to CW6, Funko's excess inventory problem was "obvious to everyone" and as of March 2019, "Funko was sitting on old product that should have been removed earlier and that the warehouses stored a lot of 'dead' products that were three to four years old." (Id. ¶ 92.) "[T]he excess inventory was such a large issue that Funko contracted with a vendor to periodically destroy old inventory by the trailer full" but this process did not remove all the excess inventory and "much of [it] continued to remain in storage." (Id. ¶ 93.)

## III. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows a party to bring a motion to dismiss for failure to state a claim upon which relief can be granted. Rule 12(b)(6) is read along with Rule 8(a), which requires a short, plain statement upon which a pleading shows entitlement to relief. Fed. R. Civ. P. 8(a)(2); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). A motion to dismiss can be based on the failure to allege a cognizable legal theory or the failure to allege sufficient facts under a cognizable legal theory. Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 534 (9th Cir. 1984).

When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint – as well as any reasonable inferences to be drawn from them – as true and construe them in the light most favorable to the nonmoving party. See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of the Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005).

United States District Court
Central District of California

To survive a motion to dismiss, a plaintiff must allege facts that state a claim for relief that is plausible, not merely conceivable. Twombly, 550 U.S. at 556, 570. "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). Then, for all well-pled factual allegations, the court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. "[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009) (applying Iqbal's two-step analysis).

A complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively" and "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011). "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." Id.

Although the scope of review is limited to the contents of the complaint, the Court may also consider exhibits submitted with the complaint, Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989), and "take judicial notice of matters of public record outside the pleadings," Mir v. Little Co. of Mary Hosp., 844 F.2d 646, 649 (9th Cir. 1988).

United States District Court
Central District of California

## IV. Judicial Notice

A court may properly take judicial notice of: (1) material which is included as part of the complaint or relied upon by the complaint; and (2) matters in the public record. See Marder v. Lopez, 450 F.3d 445, 448 (9th Cir. 2006). A court may take judicial notice of a public record not for the truth of the facts recited in the document, but for the existence of the matters therein that cannot reasonably be questioned. See Fed. R. Evid. 201. The court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992) (citation omitted). The Court also may take judicial notice of material incorporated by reference into the SAC. See Coto Settlement v. Eisenberg, 593 F.3d 1031, 1038 (9th Cir. 2010); Intri-Plex Tech., Inc. v. Crest Grp., Inc., 499 F.3d 1048, 1052 (9th Cir. 2007). Documents are properly incorporated into the complaint by reference "in situations where the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint, the document's authenticity is not in question and there are no disputed issues as to the document's relevance." Coto Settlement, 593 F.3d at 1038; see also United States v. Corinthian Coll., 655 F.3d 984, 999 (9th Cir. 2011).

In Khoja v. Orexigen Therapeutics, the Ninth Circuit clarified the judicial notice rule and incorporation by reference doctrine. Khoja v. Orexigen Therapeutics, 899 F.3d 988, 998-1003 (9th Cir. 2018). It explained a court may take "judicial notice of matters of public record," but "cannot take judicial notice of disputed facts contained in such public records." Khoja, 899 F.3d at 999 (citation and quotations omitted). If a court takes judicial notice of a document, it must specify what facts it judicially noticed from the document. Id. Separately, the

incorporation by reference doctrine is a judicially-created doctrine that allows a court to consider certain documents as though they were part of the complaint itself. Id. at 1002. This is to prevent plaintiffs from cherry-picking certain portions of documents that support their claims, while omitting portions that weaken their claims. Id. It is improper to consider documents "only to resolve factual disputes against the plaintiff's well-pled allegations in the complaint." Id. at 1014. "[U]nlike judicial notice, a court may assume [an incorporated document's] contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." Id. at 1003. The Khoja court warned, "the unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery. This risk is especially significant in SEC fraud matters, where there is already a heightened pleading standard, and the defendants possess materials to which the plaintiffs do not yet have access." Id. at 998.

United States District Court
Central District of California

**A. Funko RJN**

The Funko RJN asks the Court to take judicial notice of the following Exhibits attached to the McDonough Declaration: a copy of the CAC (Exhibit 2); Subtopic 300-10-35 of the Financial Accounting Board's Accounting Standards Codification (Exhibit 3); excerpts of Funko's Form 10-K for the year ended December 31, 2018 (Exhibit 4); excerpts of Funko's Form 10-Q for the second quarter of 2019 (Exhibit 5); the transcript of Funko's August 8, 2019 earnings call for the second quarter of 2019 (Exhibit 6); excerpts of Funko's 10-Q for the third quarter of 2019 (Exhibit 7); Funko's Form 8-K and press release announcing financial results for the third quarter of 2019 (Exhibit 8); and the transcript of Funko's October 31, 2019 earnings call for the third quarter of 2019 (Exhibit 9).

The Funko Defendants argue these Exhibits are subject to judicial notice. They claim: Exhibits 5, 7, 8, and 9 are incorporated by reference in the SAC; Exhibit 2 is relevant because Plaintiffs have omitted allegations previously set forth in the CAC; Exhibits 6 and 9 form the basis of Plaintiffs' claims and establish what information was disclosed to investors during relevant earnings calls; Exhibit 4, when considered with Exhibits 5, 7, and 8, which refer to Exhibit 4 and incorporate it by reference, contains the complete universe of Funko's risk disclosures; and Exhibit 3 is the proper subject of judicial notice because its accuracy cannot be questioned reasonably. (See Funko RJN.) As mentioned supra, the ACON Defendants join in the Funko RJN.

Plaintiffs oppose the Funko RJN as to Funko's Exhibits 2-7. Plaintiffs argue Exhibits 3, 4, and 6 are not incorporated by reference in the SAC because they are "not quoted, cited or discussed in the SAC, and do not form the basis for Plaintiffs' claims." (Pl. Opp'n to Funko RJN at 3.) As to Exhibits 5 and 7, Plaintiffs oppose the Funko RJN "to the extent Defendants rely on those exhibits to argue that Exhibit 4 (Funko's 2018 10-K) was incorporated by reference into the 2Q and 3Q 2019 10-Qs" and "to the extent Defendants seek to use these documents to argue that Defendants disclosed Funko's true inventory condition through its reported total inventory holdings." (Id. at 10.)

Applying Khoja here, the Court concludes some of the documents submitted by the Funko Defendants are subject to judicial notice while others are not.

First, the Court need not take judicial notice of Exhibit 2, as it was filed in this action. The Court can consider it and compare the allegations between the CAC and the SAC, without taking judicial notice of the CAC.

The Court next considers Exhibit 3. Although the SAC contains allegations about Funko's holding of excess and obsolete inventory that Funko eventually

United States District Court
Central District of California

United States District Court
Central District of California

wrote down, the SAC does not contain any allegations that Defendants violated the accounting standards set forth in Exhibit 3, nor does the SAC cite to, quote, or refer in any way to these standards. Cf. In re Daou Sys., Inc., 411 F.3d 1006, 1016 (9th Cir. 2005) ("Violations of GAAP standards can also provide evidence of scienter."). Accordingly, Exhibit 3 is not incorporated by reference in the SAC and is not subject to judicial notice. See Khoja, 899 F.3d at 998.

As to Exhibit 4, the Court points out in the February 25, 2021 Order that it denied the Funko Defendants' request to take judicial notice of this document because it was not incorporated by reference in the CAC and, as it was issued outside the Class Period, it was not relevant to the Court's analysis. Moreover, although Defendants argued the 2018 Form 10-K contained a disclosure that Funko maintained reserves for excess and obsolete inventory, the Court could not consider that disclosure in ruling on the motions to dismiss. Likewise, in considering the instant Motions, the Court concludes Exhibit 4 is not incorporated by reference in the SAC, as it was not cited to in the SAC and Plaintiffs' claims are not based on, nor do they rely on, any statements contained therein. Exhibit 4 appears only relevant to the Funko Defendants' defense, not Plaintiffs' claims. See Khoja, 899 F.3d at 1002 ("However, if the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint. Otherwise, defendants could use the doctrine to insert their own version of events into the complaint to defeat otherwise cognizable claims."). Hence, Exhibit 4 is not the proper subject of judicial notice. Id. at 1002-1003 ("Although the incorporation-by-reference doctrine is designed to prevent artful pleading by plaintiffs, the doctrine is not a tool for defendants to short-circuit the resolution of a well-pleaded claim.").

As to Exhibit 5, the SAC refers to and quotes statements made in Funko's Form 10-Q for the second quarter of 2019 as a basis for Plaintiffs' claim 1, for violation of Section 10(b) of the Securities Exchange Act. Although Plaintiffs oppose the Court considering Exhibit 5's reference to disclosures made in the 2018 Form 10-K, inter alia, there is no dispute as to Exhibit 5's authenticity and there is no dispute as to its relevance. See Coto Settlement, 593 F.3d at 1038; Corinthian Coll., 655 F.3d at 999. The Court only takes judicial notice of the discussion under "Item IA. Risk Factors" found at pages 36-55 of Exhibit 5, to the extent the SAC relies on these statements to form the basis of Plaintiffs' Section 10(b) claim.

Regarding Exhibit 6, the Court previously took judicial notice of various statements found in the transcript of Funko's August 8, 2019 earnings call, in ruling on the earlier motions to dismiss. Unlike the CAC, however, the SAC does not allege statements made during the August 8, 2019 earnings call were misleading or contained material omissions in violation of Section 10(b) of the Securities Exchange Act. Accordingly, this transcript is no longer incorporated by reference, it is no longer relevant to Plaintiffs' claims, and it does not form the basis of any of their claims. Exhibit 6 is not subject to judicial notice. See Khoja, 899 F.3d at 998.

Next, portions of Funko's 10-Q for the third quarter of 2019 found in Exhibit 7 are quoted in the SAC, the statements contained therein form the basis of Plaintiffs' Section 10(b) claim, there is no dispute as to Exhibit 7's authenticity, and there is no dispute as to its relevance. See Coto Settlement, 593 F.3d at 1038; Corinthian Coll., 655 F.3d at 999. The Court notes Plaintiffs' opposition to, inter alia, the Court considering Exhibit 7's reference to the disclosures set forth in Funko's 2018 Form 10-K. The Court only takes judicial notice of the discussion under "Item IA. Risk Factors" found at pages 37-56 of Exhibit 7 to the extent that discussion is the basis of Plaintiffs' Section 10(b) claim.

United States District Court
Central District of California

Finally, as to Exhibits 8 and 9, Plaintiffs do not oppose the Court taking judicial notice of these documents. Both documents are quoted in the SAC, there is no dispute as to their authenticity, and there is no dispute as to their relevance. Id. The Court takes judicial notice of the financial statements, cautionary notes, and FY2019 guidance set forth in Exhibit 8. The Court also takes judicial notice of Andrew Harless' statement on page 4, and Defendant Jung's statements on pages 7, 8 and 13 of Exhibit 9.

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART the Funko RJN.

**B. Plaintiffs' RJN**

Plaintiffs move the Court to take judicial notice of excerpts of Funko's September 16, 2019 Prospectus Supplement, which was filed with the SEC on September 18, 2019. (See Pl. RJN.) According to Plaintiffs, the excerpts of this document are incorporated by reference in the SAC and are the appropriate subject of judicial notice. (Id. at 1.) Plaintiffs argue they rely on the prospectus "to form the basis of their allegations" about Funko's Secondary Public Offering, including the number of shares Defendant Mariotti and the ACON Defendants sold, the price per share, their ownership interests before and after the Secondary Public Offering, and the ACON Defendants' control over the Funko Defendants. (Id. at 2.) In particular, Plaintiffs move the Court to take judicial notice of page S-62 of the prospectus.

Defendants do not oppose Plaintiff's RJN.

Funko's prospectus is referenced in the SAC, there is no dispute as to its authenticity, and there is no dispute as to its relevance. See Coto Settlement, 593 F.3d at 1038; Corinthian Coll., 655 F.3d at 999. The Court GRANTS Plaintiffs'

United States District Court
Central District of California

United States District Court
Central District of California

RJN and takes judicial notice of the chart on page S-62, which sets forth the amount and percentage of Class A and Class B common stock being sold by the ACON Defendants and Defendant Mariotti at the Secondary Public Offering in September 2019.

## V. Discussion

The Funko Defendants move to dismiss the SAC for several reasons. They argue the SAC fails to state a Section 10(b) claim because: Plaintiffs do not allege an actionable misstatement or omission; the SAC's allegations do not support a strong inference of scienter; and, in any event, no such claim can be alleged against Defendants Perlmutter, Dellomo, Kriger, and Brotman because they did not make a false or misleading statement nor did they have "ultimate authority" over the alleged false or misleading statements that were made by others. According to the Funko Defendants, because Plaintiffs fail to state a Section 10(b) claim, their Section 20(a) and 20(A) claims must fail as well.

The ACON Defendants move to dismiss the SAC on similar grounds. Namely, the ACON Defendants contend Plaintiffs fail to state a Section 20(a) claim for control person liability because they fail to plead a Section 10(b) claim against the Funko Defendants and they fail to allege the ACON Defendants exercised actual power or control over the Funko Defendants with respect to the alleged primary Section 10(b) violations. The ACON Defendants also argue Plaintiffs fail to state a Section 20(A) claim for insider trading because the SAC does not allege the ACON Defendants violated Section 10(b) and the SAC contains no allegation that the ACON Defendants possessed material, nonpublic information when selling Funko stock.

In Opposition, Plaintiffs argue the SAC states a Section 10(b) claim because it alleges sufficient materially misleading statements regarding Funko's inventory holdings and FY2019 earnings guidance. Plaintiffs also contend the allegations in the SAC raise a strong inference of scienter, as the allegations are based on accounts from reliable sources, and Defendants' stock sales support the inference. According to Plaintiffs, the Funko Defendants and ACON Defendants are control persons of Funko. Finally, Plaintiffs argue the SAC sufficiently alleges Section 20(a) and Section 20A claims.

The Court discusses each argument, in turn.

### A. Claim 1: Violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for:

> [A]ny person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). SEC Rule 10b-5 provides that "[i]t shall be unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b).

"There are six elements to a securities fraud claim under § 10(b) and Rule 10b-5: (1) a material misrepresentation or omission; (2) scienter (i.e., a wrongful state of mind); (3) a connection between the misrepresentation and the purchase or

United States District Court
Central District of California

United States District Court
Central District of California

sale of a security; (4) reliance upon the misrepresentation (often established in 'fraud-on-the-market' cases via a presumption that the price of publicly-traded securities reflects all information in the public domain); (5) economic loss; and (6) loss causation." Loos v. Immersion Corp., 762 F.3d 880, 886-87 (9th Cir. 2014). These elements are "strenuous but well established." Curry v. Yelp Inc., 875 F.3d 1219, 1224 (9th Cir. 2017).

Through the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Congress imposed heightened pleading standards on federal securities fraud actions. See 15 U.S.C. §§ 78u-4(b)(1)-(2). "At the pleading stage, a complaint stating claims under section 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009). Under Federal Rule of Civil Procedure 9(b), a plaintiff must plead fraud claims "with particularity" but may allege "[m]alice, intent, knowledge, and other conditions of a person's mind . . . generally." Rule 9(b) requires "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations," and that the allegations "be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (internal citations omitted). Similarly, the PSLRA requires "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B); Tellabs, Inc. v. Maker Issues & Rights, Ltd., 551 U.S. 308, 321 (2007). Under the PSLRA, both falsity and scienter must be pled with particularity. Zucco Partners, LLC, 552 F.3d at 990.

United States District Court
Central District of California

**1. Material Misrepresentation or Omission**

As stated supra, the Funko Defendants argue Plaintiffs fail to allege an actionable material misrepresentation or omission.

For a misstatement or omission made by a defendant to be actionable, it must concern material facts. Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988); TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. See TSC Indus., Inc., 426 U.S. at 449; Schueneman v. Arena Pharm., Inc., 840 F.3d 698, 705-06 (9th Cir. 2016). A material misrepresentation or omission is adequately alleged "when a plaintiff points to [the] defendant's statements that directly contradict what the defendant knew at that time." Khoja, 899 F.3d at 1008 (citing In re Astossa Genetics Inc. Sec. Litig., 868 F.3d 784, 794-96 (9th Cir. 2017)).

Liability can arise not only from affirmative representations but also from failures to disclose material information. SEC v. Dain Rauscher, 254 F.3d 852, 855-56 (9th Cir. 2001). "Omissions are actionable under [§ 10(b)] and Rule 10b-5 thereunder only if the party omitting the fact had a duty to disclose that fact." In re Amgen Inc. Sec. Litig., 544 F. Supp. 2d 1009, 1029-30 (C.D. Cal. 2008) (citing Chiarella v. United States, 445 U.S. 222, 230 (1980)). The antifraud provisions impose "'a duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading.'" SEC v. Fehn, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996) (quoting Hanon v. Dataproducts Corp., 976 F.2d 497, 504 (9th Cir. 1992)).

"To be actionable under securities law, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." Brody v. Transnat'l

United States District Court
Central District of California

Hosp. Corp., 280 F.3d 997, 1006 (9th Cir. 2002). Once a party chooses to speak on a subject, it must disclose facts necessary to make the statements "not misleading" in light of the circumstances under which they were made. Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 43 (2011). "[W]hen a plaintiff relies on a theory of omission, the plaintiff must allege 'facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc., 856 F.3d 605, 615-16 (9th Cir. 2017) (quoting Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 194 (2015)). It is not sufficient that an investor merely "consider[ed] the omitted information significant." Markette v. XOMA Corp., No. 15-CV-3425 (HSG), 2017 WL 4310759, at *7 (N.D. Cal. Sept. 28, 2017) (internal quotation marks omitted).

To assert a claim under the PSLRA, the plaintiff must plead with particularity, inter alia, the element of falsity. Zucco Partners, LLC, 552 F.3d at 990-91. "The PSLRA has exacting requirements for pleading 'falsity.'" Metzler Inv. GMBH v. Corinthian Coll., Inc., 540 F.3d 1049, 1070 (9th Cir. 2008). "In the Ninth Circuit, plaintiffs may establish falsity in three ways: 'if (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy.'" City of Sunrise Firefighters' Pension Fund v. Oracle Corp., No. 18-cv-04844-BLF, 2021 WL 1091891, at *14 (N.D. Cal. Mar. 22, 2021) (quoting City of Dearborn Heights Act 345 Police & Fire Ret. Sys., 856 F.3d at 616). A plaintiff must plead "specific facts indicating why" the statements at issue were false. Metzler Inv. GMBH, 540 F.3d at 1070; see also Ronconi v. Larkin, 253 F.3d 423, 434 (9th Cir. 2001) ("Plaintiffs' complaint was required to allege specific facts

United States District Court
Central District of California

that show" how statements were false); In re Arrowhead Pharm., Inc. Sec. Litig., 782 F. App'x 572, 574 (9th Cir. 2019). Moreover, to be actionable, a statement must be false at the time it was made. Ronconi, 253 F.3d at 430. "The fact that [a] prediction proves to be wrong in hindsight does not render the statement untrue when made." In re VeriFone Sec. Litig., 11 F.3d 865, 871 (9th Cir. 1993).

The PSLRA creates a safe harbor for certain "forward-looking statements." "A forward-looking statement is 'a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items.'" In re Cutera Sec. Litig., 610 F.3d 1103, 1111 (9th Cir. 2010) (quoting 15 U.S.C. § 78u-5(i)(1)(A)). The safe harbor provision applies to two types of forward-looking statements: (1) those "identified as a forward-looking statement and accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" and (2) statements that the plaintiff fails to prove were made with actual knowledge that they were false or misleading. 15 U.S.C. § 78u-5(c)(1). "This safe harbor 'is designed to protect companies and their officials' when they merely fall short of their 'optimistic projections.'" Friedman v. Tesla, Inc., 985 F.3d 1180, 1189 (9th Cir. 2021) (quoting In re Quality Sys., Inc. Sec. Litig., 865 F.3d 1130, 1142 (9th Cir. 2017)). "Forward-looking language includes statements that a company 'expects,' 'believes,' or 'is confident' that certain projections will be realized in the future." Oaktree Principal Fund V, LP v. Warburg Pincus LLC, No. CV 15-8574 PSG (MRWx), 2017 WL 3187688, at *9 (C.D. Cal. Jan. 17, 2017) (citations omitted). "[W]here defendants make mixed statements containing non-forward-looking statements as well as forward-looking statements, the non-forward-looking

United States District Court
Central District of California

statements are not protected by the safe harbor of the PSLRA." In re Quality Sys., Inc. Sec. Litig., 865 F.3d at 1142.

A statement that is not capable of objective verification is considered "puffery" and does not constitute a material misrepresentation under the PSLRA. Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 606 (9th Cir. 2014). "When valuing corporations . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers . . . [most investors] know how to devalue the optimism of corporate executives." In re Cutera Sec. Litig., 610 F.3d at 1111 (internal quotations omitted). "But even 'general statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." In re Quality Sys., Inc. Sec. Litig., 865 F.3d at 1143-44 (quoting Warshaw v. Xoma Corp., 74 F.3d 955, 959 (9th Cir. 1996)). Puffing language includes vague statements of optimism like "business couldn't be better" and "industry-leading," as well as words like "strong," "robust," "well positioned," "solid," and "improved." See In re Wet Seal, Inc. Sec. Litig., 518 F. Supp. 2d 1148, 1168 (C.D. Cal. 2007). "[A]n optimistic, subjective assessment hardly amounts to a securities violation." Apollo Grp. Inc., 774 F.3d at 606.

Here, Plaintiffs allege Defendants made five materially false and misleading statements and omissions in August and October 2019 relating to Funko's sales performance and the amount of inventory it held.[2] The Court discusses each alleged misstatement or omission in turn.

---

[2] Plaintiffs agree each of the five statements, discussed herein, were forward-looking statements for purposes of the PSLRA. They contend, however, each statement is not shielded by the PSLRA's safe harbor for forward-looking statements because they were not accompanied by

**i. Statement No. 1**

In Funko's second quarter 2019 Form 10-Q, filed with the SEC on August 8, 2019, Plaintiffs allege Defendant Funko stated, in pertinent part:

> **Our success depends, in part, on our ability to successfully manage our inventories.** We must maintain sufficient inventory levels to operate our business successfully, but we must also avoid accumulating excess inventory, which increases working capital needs and lowers gross margin. We obtain substantially all of our inventory from third-party manufacturers located outside the United States and must typically order products well in advance of the time these products will be offered for sale to our customers. As a result, it may be difficult to respond to changes in consumer preferences and market conditions, which, for pop culture products, can change rapidly. If we do not accurately anticipate the popularity of certain products, then we may not have sufficient inventory to meet demand. **Alternatively, if demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard.** If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected. We may also be negatively affected by changes in retailers' inventory policies and practices. As a result of the desire of retailers to more closely manage inventory levels, there is a growing trend to make purchases on a "just-in-time" basis. This requires us to more closely anticipate demand and could require us to carry additional inventory. Policies and practices of individual retailers may adversely affect

---

meaningful cautionary language and were made with actual knowledge of their falsity. (See SAC ¶ 178.)

United States District Court
Central District of California

us as well, including those relating to access to and time on shelf space, price demands, payment terms and favoring the products of our competitors. Our retail customers make no binding long-term commitments to us regarding purchase volumes and make all purchases by delivering purchase orders. Any retailer can therefore freely reduce its overall purchase of our products, including the number and variety of our products that it carries, and reduce the shelf space allotted for our products. **If demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard.** If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected.

(SAC ¶ 127 (emphasis in original); see also McDonough Decl. ¶ 7, Exh. 5 at 42.) Plaintiffs allege this statement was misleading because "[b]y August 8, 2019, Defendants knew that the 'risk' that [Funko] could have excess inventory as a result of customer demand not reaching forecasted levels had already materialized . . . [as] numerous former Funko employees reported that Funko's failure to accurately forecast sales and customer demand resulted in millions of dollars of obsolete inventory being stored in multiple warehouses . . . ." (SAC ¶ 128.) Plaintiffs rely on the statements of its confidential witnesses to support this allegation. (See SAC ¶¶ 73-93, 128(a)-(f).)

In the Motion, the Funko Defendants acknowledge the Court previously found this statement to have been forward-looking but not protected by the PSLRA safe harbor because it was not accompanied by sufficient cautionary language. (Funko Mot. at 12.) The Funko Defendants "do not ask the Court to reconsider that holding" but argue, instead, that "the safe harbor applies because the [SAC] does



United States District Court
Central District of California

not adequately plead that the risk disclosures were made with 'actual knowledge' of their falsity." (Id. at 13.) According to the Funko Defendants, "Plaintiffs do not allege that the Individual Defendants concluded or believed as of August 8, 2019 . . . that Funko held a material amount of obsolete inventory that needed to be written down, sold at discounted prices, or discarded," which were the risks identified in the Form 10-Q for the second quarter of 2019. (Id.) They contend Plaintiffs do not challenge the accuracy of Funko's disclosure about its inventory balance, the timing of Funko's write-down, or the accuracy of Defendant Nickel's statement during an earnings call with investors on August 8, 2019 that Funko had taken higher reserves for slower-moving inventory.[3] (Id.)

In Opposition, Plaintiffs argue Funko's inventory risk warning was misleading and not protected by the PSLRA's safe harbor for forward-looking statements. (See Opp'n at 6-11.) In particular, Plaintiffs contend the Funko Defendants improperly rely on documents outside of the four corners of the SAC to suggest Funko actually disclosed it was holding excess and obsolete inventory during the second and third quarters of 2019. Plaintiffs oppose the Court taking judicial notice of those documents and, in any event, they argue those documents do not show Funko actually disclosed that the risk warning was no longer only a potential risk. (Id. at 8-9.) Plaintiffs also point out the SAC contains "particularized facts" showing Funko's risk warning was "made with actual knowledge that [it] w[as] false and misleading," as follows: Defendants Jung and

[3] As the Court has declined to take judicial notice of the transcript of the August 8, 2019 earnings call and Plaintiffs do not base their Section 10(b) claim on any alleged misrepresentation made during that call, the Court does not address the Funko Defendants' argument about whether Defendant Nickel made an accurate disclosure about Funko's inventory holdings during that call.

United States District Court
Central District of California

Perlmutter "received weekly [a]ged [i]nventory [r]eports that quantified the amount of inventory Funko had accumulated" (SAC ¶¶ 80-81); the "[a]ged [i]nventory [r]eports, and the question of how much inventory Funko would eventually need to write off, were discussed at [w]eekly [s]ales meetings" (id.); "in August 2019, Defendants Jung and Perlmutter were told that Funko acquired the Puyallup warehouse to store products that were to be destroyed" (id. ¶ 79); beginning in September 2019, during the weekly sales meetings, "Defendants Jung and Perlmutter reviewed results from an Open to Buy tool created by CW1 that tracked Funko's obsolete inventory" (id. ¶ 81); Defendants Jung and Perlmutter "agreed that Funko had obsolete inventory that could not be sold" (id. ¶ 83); and Funko's excess inventory "problem" was discussed at Funko's Board meetings, which Defendants Mariotti, Nickel, Perlmutter, Brotman, Dellomo, and Krieger attended (id. ¶ 85). (Opp'n at 9-10.) According to Plaintiffs, the SAC sufficiently pleads facts to show "Defendants knew that Funko was storing a material amount of obsolete inventory that would require one or more of the adverse actions set forth in the risk warnings (holding for a long period, selling at a discount, writing down or discarding)." (Opp'n at 11.)

As the Court noted in the February 25, 2021 Order, the PSLRA's safe harbor protects forward-looking statements that are accompanied by meaningful cautionary statements, see 15 U.S.C. §78u-5(c)(1)(A), as well as forward-looking statements that the plaintiff fails to prove "w[ere] made with actual knowledge by that person that the statement[s] w[ere] false or misleading," see 15 U.S.C. §78u-5(c)(1)(B). See Friedman, 985 F.3d at 1190. The Court previously concluded Plaintiffs alleged sufficient facts to support its allegation that this statement was misleading and the accompanying cautionary language was not meaningful because, although the risk disclosure only discussed possible future risks and did not affirmatively state Funko

United States District Court
Central District of California

had no excess or obsolete inventory, the statement set forth various hypothetical risks associated with maintaining excess inventory without disclosing that this risk had materialized, as alleged by Plaintiffs. The Court does not revisit this conclusion.[4]

Instead, the Court considers whether the SAC alleges plausible facts to show the August 8, 2019 inventory risk warning was issued with actual knowledge of its falsity. See 15 U.S.C. § 78u-5(c)(1); In re Quality Sys., 865 F.3d at 1149; see also Abe v. AFCH, Inc., No. 2:20-CV-08193-ODW (PVCx), 2021 WL 2209309, at *5 (C.D. Cal. June 1, 2021) (concluding the complaint's allegations failed to establish the information provided by the defendants to the plaintiff was false or stated with actual knowledge that it was false or misleading); Kniss v. Booth, No. SACV 07-1215 AHS (PJWx), 2010 WL 11506770, at *7 (C.D. Cal. June 29, 2010) (dismissing securities claim for failure to allege with particularity, among other things, that "defendants had actual knowledge that their projections were false or misleading" and that the projections "were false when made").

Preliminarily, although claim 1 is alleged against Defendants Funko, Mariotti, and Jung, statement no. 1 was set forth in a Form 10-Q issued by Funko,

---

[4] In their Sur-Reply, Plaintiffs discuss the Ninth Circuit's recent decision in In re Alphabet, Inc. Sec. Litig., 1 F.4th 687 (9th Cir. 2021) and argue that case bolsters the Court's conclusion reached in the February 25, 2021 Order that Funko's inventory risk warnings were not meaningful. (See Sur-Reply at 1-5.) As the Court does not revisit its conclusion and instead considers the Funko Defendants' arguments about the SAC's purported deficiency in pleading Defendants had actual knowledge of the falsity or misleading nature of statement no. 1, the Court does not address the In re Alphabet, Inc. Sec. Litig. decision at this step of the analysis. The Court also points out that case did not concern the application of the PSLRA safe harbor for forward-looking statements, which is at issue here. In any event, the Court discusses the import of the In re Alphabet, Inc. Sec. Litig. decision in the scienter analysis, below.

United States District Court
Central District of California

United States District Court
Central District of California

which is a "business entity" and not a "natural person," so the Court must consider whether Plaintiffs sufficiently allege statement no. 1 was "made by or with the approval of an executive officer of [Funko]" and was "made or approved by such officer with actual knowledge by that officer that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B)(ii). Plaintiffs contend the SAC contains particularized allegations to show Defendants Jung, Perlmutter, Mariotti, and Nickel had actual knowledge of Funko's excess inventory issues.[5] (See Opp'n at 9-10.)

The SAC alleges Defendants Mariotti (Chief Executive Officer), Nickel (Chief Financial Officer from October 2013 to August 13, 2019), Jung (Chief Financial Officer since August 13, 2019), and Perlmutter (President) were officers of Funko and they "approved or ratified" each of the five alleged false and misleading statements. (SAC ¶¶ 25-29.) The Funko Defendants do not challenge the sufficiency of these allegations. The Court concludes they satisfy the first prong of 15 U.S.C. § 78u-5(c)(1)(B)(ii)(I) to allege sufficiently that statement no. 1[6] was made with the approval of an "executive officer" of Funko.

---

[5] Plaintiffs also argue Defendants Brotman, Dellomo, and Krieger had actual knowledge of Funko's excess inventory issues by virtue of their attendance at Board meetings where the issue was discussed. (See Opp'n at 10; SAC ¶ 85.) The SAC, however, does not allege that Defendants Brotman, Dellomo, or Krieger approved statement no. 1. (Compare SAC ¶ 29(g); with SAC ¶¶ 36-38.) The Court, thus, limits its review to whether Plaintiffs have alleged sufficient facts to show Defendants Jung, Perlmutter, Mariotti, and Nickel had actual knowledge that the Form 10-Q inventory risk disclosures were false or misleading.

[6] The Court reaches the same conclusion as to statement nos. 2 and 3, which were also alleged to have been made by Funko in public filings with the SEC. The Court notes statement nos. 4-5 are alleged to have been made by Defendant Jung directly.

United States District Court
Central District of California

The Court next considers whether the SAC alleges sufficient particularized facts to show Defendants Mariotti, Nickel, Jung, or Perlmutter approved of statement no. 1 "with actual knowledge by that officer that [it] was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B)(ii)(II).

Although the Funko Defendants did not raise this argument, the Court points out the SAC alleges Defendant Jung became the Chief Financial Officer of Funko on August 13, 2019, as stated supra. (See SAC ¶ 27.) Statement no. 1 was alleged to have been made on August 8, 2019. (See id. ¶ 127.) The SAC does not contain any allegations that Defendant Jung was an "executive officer," as contemplated by 15 U.S.C. § 78u-5(c)(1)(B)(ii), of Funko before August 13, 2019. Hence, Defendant Jung's purported knowledge of the falsity or misleading nature of statement no. 1 when it was issued before she became Funko's Chief Financial Officer is immaterial to the Court's analysis below. The Court turns to allegations regarding the knowledge of Defendants Perlmutter, Mariotti, and Nickel, i.e., the remaining Funko "executive officers."

The SAC alleges Defendant Perlmutter had actual knowledge that statement no. 1 was false or misleading because:

- He attended Funko Board meetings where Funko's excess inventory issues were discussed in 2018 through late June or early July 2019 (SAC ¶ 85);
- Beginning in July 2019 through February 2020, he attended weekly sales meetings where Funko's excess inventory issues were discussed (id. ¶¶ 77, 79, 83, 128(a));
- Starting in July 2019, he received emails summarizing the discussions from the weekly sales meetings, including the excess inventory issues (id. ¶ 83);

- Starting in August 2019, he received weekly aged inventory reports, which quantified the volume of Funko's obsolete inventory, and those reports were discussed at the weekly sales meetings he attended (id. ¶¶ 80, 128(a));
- In "late summer" or "August 2019," he knew Funko had 200 shipping containers of product stored at the Port of Seattle and in Funko's parking lot that could not be unloaded because its warehouses were full of old inventory (id. ¶¶ 76, 128(a), 162); and
- During a weekly sales meeting in August 2019, the meeting attendees, including Defendant Perlmutter, were told that Funko had leased a warehouse in Puyallup, Washington to store aged products that were slated to be destroyed (id. ¶ 79).

These allegations suggest Defendant Perlmutter at least should have been aware that Funko was holding excess inventory before the company issued statement no. 1 on August 8, 2019. The allegations do not show, however, that Defendant Perlmutter had actual knowledge that by August 8, 2019, Funko was holding excess product for a long period of time, it was writing down the excess product, it was selling the excess product at a reduced price, or discarding the excess product because customer demand and sales had not reached Funko's forecasted levels, which were the risks of which Funko warned in statement no. 1. In other words, these allegations do not demonstrate Defendant Perlmutter knew the risks warned of in statement no. 1 had already materialized, rendering statement no. 1 false or misleading when it was issued. The bulk of the allegations about Defendant Perlmutter's purported knowledge were based on matters discussed at weekly sales meetings and over email "beginning" or "starting" "in August 2019." As alleged in the SAC, it was not until August 2019 that Defendant Perlmutter and

United States District Court
Central District of California

United States District Court
Central District of California

the other attendees of the weekly sales meeting had the benefit of the aged inventory report, which classified Funko's inventory holdings in different ways, including showing what portion was obsolete and its monetary value. The SAC does not allege when in August 2019 the first aged inventory report was provided to the attendees of the weekly sales meeting and whether it was before the Form 10-Q was filed on August 8, 2019. Even assuming the aged inventory report was distributed the first week of August 2019, Defendant Perlmutter would have first learned of the extent of Funko's excess inventory issue through the aged inventory report at most one or two days (see SAC ¶ 77 (alleging weekly sales meetings took place on Tuesdays or Wednesdays)) before Funko filed the Form 10-Q containing statement no. 1 with the SEC on August 8, 2019. Without a date certain when the first aged inventory report was distributed at the weekly sales meeting in August 2019 and based on these allegations alone, the Court does not find the SAC states particularized and plausible allegations that Defendant Perlmutter knew that statement no. 1 was false or misleading when it was issued. Moreover, the SAC does not set forth the contents of the first aged inventory report, nor the substance of the discussion about it at the weekly sales meeting in August 2019.

Moreover, the SAC's allegations about the excess inventory discussions during weekly sales meetings beginning in July 2019 fail to demonstrate plausibly that Defendant Perlmutter would have known statement no. 1 was false or misleading. The SAC does not describe in any detail the context of the inventory discussions, i.e., whether the excess inventory discussed was of new products Funko anticipated selling in the future but had to store in the interim, if it consisted of products Funko did not anticipate being able to sell and instead would have to destroy, or the like. The Court also notes the allegations in the SAC employ varying descriptions of the inventory, including describing it at times as "excess" and other

United States District Court
Central District of California

times as "obsolete." (See SAC ¶¶ 3, 5, 79, 87, 106, 128(a), 131(e), 134(e), 137(a), 162(a).) The lack of consistency in the description of the inventory suggests the SAC was describing different holdings of inventory, i.e., some that was obsolete and ultimately slated for destruction and some that was not. Yet, the allegations in the SAC at least with respect to the discussions at the weekly sales meetings beginning in July 2019 do not specify what type or types of inventory holdings were being discussed and what in particular was discussed.

Furthermore, the SAC's allegations regarding the discussions of the excess inventory at quarterly Funko Board meetings in 2018 do not state with particularity what was discussed throughout 2018 except that the conversation was about "what to do with the excess inventory." (SAC ¶ 85.) Likewise, the SAC's allegations about the "need to clear out the[] warehouses" and "consolidate the inventory" discussed at the Funko Board meeting in late June or early July 2019 (id.), do not show Defendant Perlmutter knew statement no. 1 was false or misleading. The SAC does not contain allegations that, for example, the excess inventory discussed in 2018 was the same inventory discussed in June or July 2019, which could raise an inference that the inventory was being held for a long period of time. These allegations also suffer from the failure to distinguish between excess and obsolete inventory, referenced above. In any event, there is no way for the Court to infer reasonably what length of time Funko was holding excess inventory during this time period in order to determine whether Funko was holding it for "a long period of time" as warned of in statement no. 1, such that this risk had already materialized and Defendant Perlmutter knew it. The SAC's failure to identify with particularity the subjects discussed at the relevant Funko Board meetings is detrimental to Plaintiffs' allegations on this point. Drawing all reasonable inferences and construing the allegations in the light most favorable to Plaintiffs, the SAC does not

state sufficiently or plausibly allegations that Defendant Perlmutter knew by August 8, 2019 that Funko's statement no. 1 was false or misleading.

The SAC's allegations about Defendants Mariotti and Nickel fare no better. The SAC alleges Defendant Mariotti knew statement no. 1 was false or misleading because, starting in July 2019, he received emails summarizing weekly sales meetings where the excess inventory issue was discussed and he attended Funko Board meetings where it was discussed beginning in 2018. (See SAC ¶¶ 83, 85.) The SAC alleges Defendant Nickel was aware of it because he attended weekly sales meetings where it was discussed beginning in July 2019 and he also attended the same Funko Board meetings with Defendants Mariotti and Perlmutter, where it was discussed since 2018. (Id. ¶¶ 77, 85.) The Court has already found these allegations insufficient to demonstrate Defendant Perlmutter knew statement no. 1 was false or misleading when it was issued. Accordingly, for the same reasons identified supra with respect to Defendant Perlmutter, these allegations are insufficient to show either Defendant Mariotti or Defendant Nickel knew statement no. 1 was false or misleading when it was issued on August 8, 2019. At most the allegations suggest Defendants Mariotti and Nickel were aware that Funko maintained excess inventory, but they do not support a plausible inference that Defendants Mariotti and Nickel knew Funko maintained excess or obsolete inventory for a long period of time, Funko was writing down the inventory, or destroying it, as warned of in statement no. 1, to demonstrate they knew statement no. 1 was false or misleading as of August 8, 2019.

To the extent the SAC groups all of the Defendants together to allege they were aware of the excess inventory because there were shipping containers of inventory stored at Port of Seattle and the Funko parking lot in "late summer 2019" (SAC ¶ 128(a)) or in "August 2019" (id. ¶ 76), these allegations are not sufficiently

United States District Court
Central District of California

particular. For example, the allegations do not specify that Defendants Perlmutter, Mariotti, or Nickel were aware of the existence of these containers or that each was aware of their contents, how they obtained this understanding, or even how long these containers were stored in these locations. These allegations do not demonstrate Defendants Perlmutter, Mariotti, or Nickel had actual knowledge statement no. 1 was untrue or misleading when it was issued on August 8, 2019.

The SAC also alleges the excess inventory issue started to be discussed at weekly sales meetings toward the end of 2018 and was a "persistent problem after that." (SAC ¶ 89.) The SAC, however, does not allege any Defendant attended any of those meetings or were aware of what was discussed during those meetings. Instead, the SAC alleges only that these meetings were led by James Beckley, the vice president of sales, and Johanna Gepford, the senior vice president of sales. (Id. ¶¶ 60, 65, 89.) Hence, these allegations do not show Defendants Perlmutter, Mariotti, or Nickel had actual knowledge that statement no. 1 was false or misleading when it was issued.

Accordingly, Plaintiffs have failed to allege plausible particularized facts to show the PSLRA's safe harbor does not shield statement no. 1. In other words, the Court concludes statement no. 1 is a forward-looking statement that was not made with actual knowledge that it was false or misleading. See 15 U.S.C. §78u-5(c)(1)(B); see also Friedman, 985 F.3d at 1190. Statement no. 1 is not actionable.

**ii. Statement No. 2**

Plaintiffs allege when Funko repeated statement no. 1 in its third quarter 2019 Form 10-Q filed with the SEC on October 31, 2019 (hereinafter "statement no. 2"), it was false and misleading. (SAC ¶¶ 136-137; see also McDonough Decl. ¶ 9, Exh. 7 at 43.) Statement no. 2 is identical to statement no. 1, so the Court does



United States District Court
Central District of California

not repeat it here. Plaintiffs allege statement no. 2 was misleading because "[b]y October 31, 2019, Defendants knew that the 'risk' that [Funko] could have excess inventory as a result of customer demand not reaching forecasted levels had already materialized." (SAC ¶ 137.) As with statement no. 1, Plaintiffs rely on the statements of confidential witnesses to support this allegation. (Id. ¶ 137(a)-(f).)

The parties set forth the same arguments in the Motion and the Opposition as discussed with respect to statement no. 1. Acknowledging the Court's February 25, 2021 Order in which the Court found this statement was actionable under the PSLRA because it did not contain sufficient cautionary language, the Funko Defendants now contend statement no. 2 is protected by the PSLRA safe harbor for forward-looking statements because Plaintiffs have failed to allege particularized plausible facts to show statement no. 2 was issued with knowledge of its falsity. Plaintiffs, in Opposition, contend the same allegations referenced supra with respect to statement no. 1 demonstrate this statement is not protected by the PSLRA's safe harbor because it was issued with actual knowledge that it was false or misleading.

The Court reaches a different conclusion about statement no. 2. The critical distinctions between the two statements are timing and the allegations about

United States District Court
Central District of California

United States District Court
Central District of California

information Defendants Jung, Perlmutter, and Mariotti[7] knew by October 31, 2019.[8]

The SAC alleges every weekly sales meeting from August 2019 through the issuance of statement no. 2 on October 31, 2019 (and beyond), discussed Funko's excess inventory issue. (SAC ¶ 79.) More specifically, addressing the concern raised supra about the seemingly imprecise references to "excess" or "obsolete" inventory throughout the SAC, the SAC alleges, beginning in August 2019, each weekly sales meeting was accompanied by the aged inventory report, which set forth exactly what inventory Funko held, including how much was obsolete and slated for destruction, as well as its monetary value. (Id. ¶ 80.) Then, starting in September 2019, each weekly sales meeting was informed by the Open to Buy plan as well as the aged inventory report; the Open to Buy plan "showed the present amount of inventory, excess inventory, the estimated cost of sale of the inventory,

---

[7] Again, Plaintiffs argue the SAC contains sufficient allegations to show Defendants Jung, Perlmutter, Mariotti, Nickel, Brotman, Dellomo, and Krieger had actual knowledge of Funko's excess inventory issues. (See Opp'n at 9-10.) The SAC, however, does not contain any allegations that Defendants Brotman, Dellomo, and Krieger approved statement no. 2 so the Court will not consider their alleged knowledge of the falsity of statement no. 2 in this analysis. (Compare SAC ¶ 29(g); with SAC ¶¶ 36-38.) Moreover, because the SAC alleges Defendant Nickel served as Funko's Chief Financial Officer from October 2013 until August 13, 2019 (id. ¶ 26), Defendant Nickel was not an "executive officer" of Funko on October 31, 2019 and his alleged knowledge of the falsity or misleading nature of statement no. 2 is immaterial to the Court's analysis here. The Court will consider only the alleged actual knowledge of the "executive officers" of Funko at the time statement no. 2 was issued, i.e., Defendants Jung, Perlmutter, and Mariotti, and who the SAC alleges approved or ratified statement no. 2. (Id. ¶ 29(g).)

[8] Statement no. 2 was issued by Funko so the Court must consider whether its "executive officers" Defendants Jung, Perlmutter, or Mariotti approved statement no. 2 with actual knowledge that it was false or misleading. See 15 U.S.C. § 78u-5(c)(1)(B)(ii)(II).

United States District Court
Central District of California

and contained a line item called 'write-down,' indicating how much of the inventory was obsolete." (Id. ¶ 81.)

Assuming arguendo the aged inventory report was issued beginning the first week of August 2019, it would have been issued and discussed thirteen times between the first week of August and the issuance of the Form 10-Q on October 31, 2019, as there were thirteen weeks in that period. Likewise, assuming arguendo the Open to Buy plan was produced beginning the first week of September, it would have been discussed at nine meetings before Funko issued the Form 10-Q containing statement no. 2 on October 31, 2019, as there were nine weeks in that period. During these thirteen-week and nine-week periods, the SAC alleges Defendants Jung and Perlmutter participated in every weekly sales meeting, received and discussed the weekly aged inventory reports and weekly Open to Buy plan at these meetings, and received emails summarizing each meeting. The SAC also alleges Defendant Mariotti received the emails summarizing each weekly sales meeting during this period, meaning he would have received this information thirteen and nine times, respectively.

The SAC also alleges the attendees of an August 2019 weekly sales meeting, including Defendants Jung and Perlmutter, were told that Funko leased the Puyallup warehouse to store "aged products that were going to be destroyed" and "the plan was to bring in a machine similar to a woodchipper to destroy the obsolete inventory stored at Puyallup." (SAC ¶ 79.) This allegation shows at least Defendants Jung and Perlmutter were aware Funko was planning to destroy a large volume of obsolete inventory, which shows one of the risks warned of in statement no. 2, i.e., that excess product may need to be destroyed, had materialized.

Taken together, the Open to Buy plan data, the aged inventory reports, and the discussions about each at the weekly sales meetings for months before statement

no. 2 was issued on October 31, 2019, demonstrate sufficient particularized facts to allege Defendants Jung, Perlmutter, and Mariotti, who were each "executive officers" of Funko during this time, as discussed supra, reasonably knew about Funko's excess and obsolete inventory issues such that they knew statement no. 2 was false or misleading when it was issued on October 31, 2019. Their alleged knowledge of the Puyallup warehouse and Funko's intentions to destroy a large volume of obsolete inventory at some point in August 2019 bolster this conclusion.

The cases the Funko Defendants rely upon are of no assistance to them here as each is distinguishable.[9] (See Funko Mot. at 14.) For example, In re Leapfrog Enter., Inc. Sec. Litig., 200 F. Supp. 3d 987 (N.D. Cal. 2016) is distinguishable factually. That case involved similar allegations as are present here, namely that the defendants failed to disclose an excess of inventory and made misleading public statements about carryover inventory. In re Leapfrog Enter., Inc. Sec. Litig., 200 F. Supp. 3d at 1002. There, the court considered the alleged misleading statements and concluded many were accompanied by meaningful disclosures that

---

[9] The Funko Defendants' reliance on Morgan v. AXT, Inc., No. C 04-4362 MJJ, C 05-5106 MJJ, 2005 WL 2347125 (N.D. Cal. Sept. 23, 2005) is misplaced. In that case, the plaintiff alleged the defendant engaged in accounting fraud but failed to allege "that particular accounting decisions were improper or facts that support a strong inference that [d]efendants were aware of facts that rendered their accounting decisions fraudulent." Morgan, 2005 WL 2347125 at *14. This case is distinguishable because here Plaintiffs do not allege accounting fraud, nor do they allege Funko should have written down its excess inventory before it chose to do so after the fourth quarter of 2019. Hence, the Morgan case is inapposite. The Funko Defendants' citation to In re Rackable Sys., Inc. Sec. Litig., No. C 09-0222 CW, 2010 WL 199703 (N.D. Cal. Jan. 13, 2010) fails for the same reason, as that case concerned a claim that the defendants failed "to account properly for excess and obsolete inventory" and "should have written off this inventory at a loss" but did not. In re Rackable Sys., Inc. Sec. Litig., 2010 WL 199703 at *6. No such claims are alleged in this case.

United States District Court
Central District of California

United States District Court
Central District of California

"substantially mitigate[d] the[ir] potentially misleading nature" and, in any event, the plaintiffs had failed to allege sufficient facts to show the defendants "did not believe their assessment of the inventory problem at the time the statements were made." Id. at 1003-04. The court pointed out the plaintiffs had not alleged "specific figures given about the current level of inventory at the time of each particular statement that would demonstrate falsity (and hence knowledge thereof) at the time," nor had the plaintiffs alleged that there were "any reports that would have alerted [d]efendants in advance that inventory problems were going to exceed what they had disclosed." Id. In addition, the plaintiffs had not alleged "there was something said during demand planning, consensus, and weekly E-Commerce team meetings which would have demonstrated the challenged statements were false and knowingly so." Id. at 1005.

In contrast, the SAC here alleges specific facts regarding each of the deficiencies identified by the court in In re Leapfrog Enter. Inc. Sec. Litig. For example, the SAC alleges specific facts as to: the amount and value of Funko's excess and obsolete inventory at the time statement no. 2 was issued; the receipt by Defendants Jung, Perlmutter, and Mariotti of written reports (i.e., the aged inventory report and the Open to Buy plan) documenting the issue on a weekly basis over the course of several months leading up to the issuance of statement no. 2; and the lengthy discussions about the reports during several weekly sales meetings Defendant Jung and Perlmutter attended and in which they participated, and of which Defendant Mariotti was aware as he received emails summarizing each meeting. Unlike in In re Leapfrog Enter. Inc. Sec. Litig., the SAC's allegations here are detailed, particularized, and sufficient to state a claim that statement no. 2, although forward-looking, was made with actual knowledge of its falsity.

United States District Court
Central District of California

Accordingly, statement no. 2 is not protected by the PSLRA's safe harbor for forward-looking statements and it is actionable.

**iii. Statement No. 3**

In its third quarter 2019 Form 8-K, Plaintiffs allege Defendant Funko stated as follows:

> The Company is reiterating its outlook for the full year 2019. The Company expects net sales to be in a range of $840 million to $850 million. Adjusted EBITDA is expected to be in a range of $140 million to $145 million. Adjusted Earnings per Diluted Share is expected to be in a range of $1.15 per share to $1.22 per share and is based on estimated adjusted average diluted shares outstanding of 53.5 million for the full year 2019.

(SAC ¶ 129; McDonough Decl. ¶ 10, Exh. 8 at 6.) Plaintiffs allege this statement was false and misleading because at the time it was made, Defendants Jung, Perlmutter, Mariotti, and Nickel "knew that it was impossible for Funko to meet the FY2019 guidance because there were not enough products tied to the fourth quarter releases and customer demand for the fourth quarter products was insufficient to generate the sales necessary to meet the guidance." (SAC ¶ 131.) Plaintiffs rely on the statements of CW1 and CW5 to support this allegation. (Id. ¶¶ 100-114, 131(a)-(k), 132.)

In the Motion, the Funko Defendants argue statement no. 3 is forward-looking and protected by the PSLRA. (See Funko Mot. at 8-11.) They point out the Court already found this statement to be protected by the PSLRA because it was forward-looking and accompanied by sufficient cautionary language, namely, the Form 8-K's reference to extensive risk factor disclosures. They argue Plaintiffs' inclusion of additional allegations and suggestion that Defendants knew it was

United States District Court
Central District of California

impossible to meet the FY2019 guidance on October 31, 2019 are insufficient to show the cautionary language accompanying statement no. 3 was not meaningful. (Id. at 8-9.) The Funko Defendants also argue Plaintiffs have failed to plead with particularity that statement no. 3 was made with actual knowledge that it was false or misleading. (Id. at 9-11.)

In Opposition, Plaintiffs argue statement no. 3 was made with actual knowledge that it was false or misleading and not accompanied by meaningful cautionary language because Defendants knew it was impossible to meet the FY2019 sales guidance by October 31, 2019. (See Opp'n at 17-19.)

In the February 25, 2021 Order, the Court found this statement to be protected by the PSLRA's safe harbor for forward-looking statements because it was accompanied by meaningful cautionary language. The Court pointed out Funko's third quarter 2019 Form 8-K contained the following cautionary language:

> This press release contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. All statements contained in this press release that do not relate to matters of historical fact should be considered forward-looking statements, including statements regarding our anticipated financial results, the underlying trends in our business, growing demand for our products, our potential for growth, plans for investments in our business and future opportunities . . . . These forward-looking statements are based on management's current expectations. These statements are neither promises nor guarantees, but involve known and unknown risks, uncertainties and other important factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements, including, but not limited to, the following: our

United States District Court
Central District of California

> ability to maintain and realize the full value of our license agreements; the ongoing level of popularity of our products with consumers; changes in the retail industry and markets for our consumer products; our ability to maintain our relationships with retail customers and distributors; our ability to compete effectively; fluctuations in our gross margin; our dependence on content development and creation by third parties; our ability to develop and introduce products in a timely and cost-effective manner; . . . the possibility or existence of global and regional economic downturns . . . . These and other important factors discussed under the caption 'Risk Factors' in our quarterly report on Form 10-Q for the quarter ended September 30, 2019 and our other filings with the Securities and Exchange Commission could cause actual results to differ materially from those indicated by the forward-looking statements made in this press release. Any such forward-looking statements represent management's estimates as of the date of this press release. While we may elect to update such forward-looking statements at some point in the future, we disclaim any obligation to do so, even if subsequent events cause our views to change. These forward-looking statements should not be relied upon as representing our views as of any date subsequent to the date of this press release.

(McDonough Decl. ¶ 10, Exh. 8 at 7.) The Court also pointed out the Form 8-K referenced the third quarter 2019 Form 10-Q disclosures, which provided dozens of detailed disclosures. (See McDonough Decl. ¶ 9, Exh. 7 at 41-56.) Based on the cautionary language in both Funko's third quarter 2019 Forms 8-K and 10-Q, the Court concluded Plaintiffs' allegations failed to show the cautionary language was not meaningful. See Oaktree Principal Fund V, LP, 2017 WL 3187688 at *10; City of Royal Oak Ret. Sys. v. Juniper Networks, Inc., 880 F. Supp. 2d 1045, 1062 (N.D.

United States District Court
Central District of California

Cal. 2012); In re Musicmaker.com Sec. Litig., No. CV00-2018 CAS (MANx), 2001 WL 34062431, at *23 (C.D. Cal. June 4, 2001).

In the February 25, 2021 Order, the Court also pointed out the Friedman opinion addressed an aspect of the cautionary language analysis that applied in this case. In Friedman, the plaintiffs did not challenge the sufficiency of Tesla's cautionary statements before the district court or on appeal, but the plaintiffs did challenge the district court's assumption that if plaintiffs "had adequately pleaded that the relevant Tesla officer knew that 'it was impossible' to meet the company's forward-looking projections, and 'not merely highly unlikely,' then any accompanying 'cautionary' language that failed to reveal this impossibility would not be 'meaningful.'" See Friedman, 985 F.3d at 1193 (emphasis in original).

Without deciding whether the district court's assumption was correct, the Ninth Circuit agreed the plaintiffs failed to plead a known impossibility during the time period over which the alleged misstatements and omissions were made. Id. at 1193-94. The plaintiffs alleged that two employees told Tesla's co-founder Musk in 2016 that the goal of producing 5,000 cars by the end of 2017 was impossible, yet the court found the allegation insufficient for two reasons: (1) the plaintiffs "failed to plead any facts showing that Musk ever accepted those employees' views that the goal was impossible;" and (2) the plaintiffs "failed to plead facts showing that [d]efendants adopted the conservative timeline for production on which these employees' pessimism was based." Id. at 1194. The court also found insufficient the plaintiffs' allegation that suppliers had informed Tesla that its production timelines were impossible because those allegations did "not establish that [d]efendants . . . shared that gloomy view." Id. (emphasis in original). Hence, the court found "[b]ecause [p]laintiffs [] failed to plead that [d]efendants knew their year's end goal was impossible to achieve, there is no basis for concluding that any

United States District Court
Central District of California

of their cautionary statements were supposedly deficient on that ground." Id. (emphasis in original).

The Court previously found Friedman distinguishable because Plaintiffs challenged the sufficiency of Funko's cautionary language on several grounds, but nonetheless followed Friedman's reasoning because Plaintiffs had failed to allege particularized facts to show Defendants knew their FY2019 guidance was impossible to meet. The Court concluded that, as in Friedman, Plaintiffs' allegations failed to show Defendants shared CW1's "pessimism" or "gloomy view" that it was impossible to meet the FY2019 guidance by October 31, 2019. See Friedman, 985 F.3d at 1194. As such, Plaintiffs failed to allege Defendants knew Funko's FY2019 guidance was impossible to achieve and, as a result, there was no basis to conclude Funko's cautionary statements were deficient on this basis.

In response to the Court's discussion in the February 25, 201 Order, Plaintiffs now plead in the SAC additional facts and allege Defendants Jung, Perlmutter, and Mariotti[10] knew it was impossible to achieve the FY2019 guidance on October 31, 2019 when Funko issued statement no. 3, as follows:

- By September 2019, Funko had received customer orders for the fourth quarter and those orders were "below what the planning team had estimated"

---

[10] As with statement no. 2, the Court only considers the alleged actual knowledge of Defendants Jung, Perlmutter, and Mariotti because they were "executive officers" of Funko on October 31, 2019 when statement no. 3 was made and they are alleged to have approved or ratified the statement. (See SAC ¶ 29(g).) Again, Defendants Brotman, Dellomo, and Kriger are not alleged to have approved or ratified statement no. 3, so their alleged knowledge of the falsity or misleading nature of statement no. 3 is immaterial to this analysis. Likewise, as Defendant Nickel was not an "executive officer" of Funko on October 31, 2019 his alleged knowledge is also immaterial.

to the tune of "$30-40 million short of the FY2019 sales guidance" (SAC ¶ 104);

- According to CW1, it was "statistically impossible" to close the gap between the FY2019 guidance and Funko's internal sales data because "even if Funko sold every available unit of its new products during the fourth quarter, [Funko] would still not have generated enough revenue to meet its stated sales guidance," "it was too late to design and produce additional new products for the fourth quarter," and Funko would have had to sell "6 million units of obsolete inventory at full price, which was impossible since there was little demand for Funko's aged inventory, even at a discount" (id. ¶¶ 105, 106);
- For the fourth quarter of 2019, internally Funko was projecting a 15% decline in sales (id. ¶ 107);
- Beginning in late August or early September 2019, CW1 and his team "reported on customer demand for products on its impact on [Funko's] ability to meet the fourth quarter sales targets" during each weekly sales meeting (id. ¶ 108);
- During these weekly sales meetings, the attendees, including Defendant Jung, "discussed any shortfalls between the internal sales forecasts and [Funko's] sales guidance that was represented to the market" and discussed "how there were not enough products tied to the fourth quarter releases and customer demand for the new fourth quarter products was insufficient to generate the sales necessary to meet the guidance" (id. ¶¶ 108, 109);
- Beginning in early September 2019, the attendees of the weekly sales meetings "agreed that a shortfall existed" (id. ¶ 109);

United States District Court
Central District of California

- Defendant Jung "knew of the shortfall" and, according to CW1 "always agreed with the analysis" (id. ¶ 110);
- During a weekly sales meeting in September 2019, "after discussing the shortfall, Defendant Jung told CW1 that Funko was 'guiding Wall Street towards the numbers' anyway and directed the sales team to try and 'figure it out' and 'make up the difference,'" to which CW1 responded that it was "impossible to fix the shortfall because there were no additional new products scheduled for release in the fourth quarter and customers did not want the aged inventory" (id.);
- Defendant Jung "became increasingly frustrated by the existence of the shortfall during each successive [w]eekly [s]ales [m]eeting that took place in September and October 2019" but "she accepted the groups' analysis of the fact that the shortfall existed" (id.);
- Defendant Mariotti knew about the sales shortfall because he received weekly emails summarizing each weekly sales meeting (id. ¶ 111);
- Defendant Perlmutter knew about the sales shortfall because he attended the weekly sales meetings when it was discussed (id.); and
- CW2 and CW3 believed Defendants Jung, Mariotti, and Nickel were aware of the sales shortfall because they closely monitored Funko's sales (id. ¶¶ 116, 117)

(See also id. ¶ 163.)

The Court acknowledges that the PSLRA's safe harbor for forward-looking statements applies in two distinct instances, i.e., when those statements are accompanied by meaningful cautionary language or when they are made with actual knowledge of their falsity or misleading nature. See 15 U.S.C. § 78u-5(c)(1)(A)-(B). The Court also recognizes the analysis discussed above in Friedman somewhat



United States District Court
Central District of California

blurs this distinction and the Ninth Circuit did not necessarily endorse the district court's view that cautionary language accompanying a forward-looking statement could be considered unmeaningful because the defendant knew it was impossible to achieve the goal touted publicly. In any event, because the foregoing discussion in Friedman is persuasive given the factual similarities between that case and this one, the Court now considers whether the additional allegations in the SAC demonstrate sufficiently and plausibly that Defendants Jung, Perlmutter, and Mariotti knew it was impossible to meet the FY2019 sales guidance when Funko issued statement no. 3 on October 31, 2019, which could show the cautionary language set forth above was not meaningful.

Certainly the SAC's allegations show CW1 believed it was impossible to meet the FY2019 guidance by late August or early September 2019. The SAC does not allege, however, that Defendants Jung, Perlmutter, and Mariotti knew it was impossible to meet the guidance. The SAC sets forth detailed allegations about the discussions at the weekly sales meetings Defendants Jung and Perlmutter attended between August and October 2019 where the projected shortfall was discussed and alleges all attendees agreed there was a projected shortfall.

What the SAC lacks, however, is any allegations to show each of these Defendants understood there was no possible way to meet the FY2019 guidance when statement no. 3 was issued on October 31, 2019. The SAC alleges Funko's internal sales projections showed it was highly unlikely that Funko could meet its FY2019 sales guidance based on the customer orders for new products placed for the fourth quarter. The SAC also alleges, however, the sales of new products accounted for "the majority" of Funko's sales but not the entirety of its total sales. (Compare SAC ¶ 50; with CAC ¶¶ 49 ("Funko's sales consist of a mixture of sales from products that are based on contemporaneous pop culture releases . . . as well as

United States District Court
Central District of California

from products that are based on older releases that are so popular that they transcend fad status . . . known as "evergreen content."), 50 ("Since 2018, Funko's evergreen content has typically accounted for approximately 45% of the Company's sales.").) Moreover, CW1's calculation that the fourth quarter of 2019 would result in a 15% sales decline did not bear out; instead, the actual decline was about half of what CW1 projected. (Compare SAC ¶ 138 (Funko reported a net sales decrease of 8% for the fourth quarter of 2019 on February 5, 2020); with SAC ¶ 107 (CW1 projected a 15% sales decline for the fourth quarter of 2019).) Although Funko did not meet the FY2019 guidance, these allegations suggests a significant volume of sales were made up in the fourth quarter, despite Funko's internal sales projections and CW1's belief it was impossible to make up the deficit with sales of new products.

Furthermore, despite the internal sales projections for new products for the fourth quarter of 2019, Defendant Jung apparently did not believe it was impossible to meet the guidance because she told CW1 and the sales team to "figure it out" and find a way to make up the shortfall and meet the projections.

The SAC contains no allegations specific to Defendants Perlmutter and Mariotti to show they agreed with CW1 that it was impossible to achieve the FY2019 sales guidance. The SAC does not allege Defendant Mariotti attended the weekly sales meetings before October 31, 2019 or that he even agreed with the internal sales projections presented at or discussed during those meetings or summarized in emails sent thereafter. To the extent the Ninth Circuit in Friedman suggested a plaintiff can plead around the PSLRA safe harbor for forward-looking statements accompanied by cautionary language by alleging a defendant knew it was impossible to reach a goal when that goal was stated publicly, Plaintiffs here have not met that pleading burden.

United States District Court
Central District of California

United States District Court
Central District of California

Hence, the Court concludes the SAC does not allege sufficiently particularized and plausible facts to show the cautionary language that accompanied statement no. 3 was not meaningful. Like those alleged in the CAC, the SAC's allegations are similar to those the Ninth Circuit found insufficient in Friedman because they fail to show Defendants Jung, Perlmutter, and Mariotti shared CW1's "pessimism" or "gloomy view" that it was impossible to meet the FY2019 guidance by October 31, 2019. See Friedman, 985 F.3d at 1194.

Plaintiffs' new allegations demonstrate Defendants Jung, Perlmutter, and Mariotti, each an "executive officer" of Funko, knew it was highly likely Funko would not meet the FY2019 sales guidance, which could suggest they understood statement no. 3 was misleading when it was issued on October 31, 2019. That is a separate prong of the PSLRA safe-harbor, however. As the Ninth Circuit has made clear:

> '[A] defendant will not be liable for a false or misleading statement if it is forward-looking and either is accompanied by cautionary language or is made without actual knowledge that it is false or misleading.' Consequently, where a defendant has made a sufficient showing that a challenged forward-looking statement was accompanied by meaningful cautionary statements . . ., a plaintiff cannot defeat that invocation of § 21E's safe harbor merely by alleging, for example, that the company knew the announced forward-looking objective was unlikely to be achieved. Rather, the plaintiff must plead additional facts that would vitiate an element of that version of the safe harbor – such as, for example, facts indicating that the 'cautionary statements' cited by the defendant were not 'meaningful.'

Friedman, 985 F.3d at 1190; see also In re Arrowhead Pharm., Inc. Sec. Litig., No. CV 16-08505 PSG (PJWx), 2017 WL 5635422, at *4 (C.D. Cal. Sept. 20, 2017)

United States District Court
Central District of California

(concluding forward-looking statements accompanied by meaningful cautionary statements "cannot be a basis for liability – even if they are untrue or deceptive when made."). As Plaintiffs have failed to allege sufficient facts to show the cautionary statements accompanying statement no. 3 were not meaningful, the Court concludes statement no. 3 is shielded by the PSLRA's safe harbor for forward-looking statements and is not actionable.

**iv. Statement No. 4**

During an earnings call with investors on October 31, 2019, Plaintiffs allege Defendant Jung stated as follows:

> [W]e are maintaining our guidance ranges we laid out on the second quarter conference call, which are: net sales of $840 million to $850 million, representing year-over-year growth of 22% to 24%; adjusted EBITDA of $140 million to $145 million; and adjusted earnings per diluted share of $1.15 to $1.22, which assumes a blended corporate tax rate of 25% and a weighted average diluted share count of 53.5 million shares at the end of the year.

(SAC ¶ 130; see also McDonough Decl. ¶ 11, Exh. 9 at 8.) Plaintiffs allege this statement was false and misleading because, by late August 2019, Defendant Jung "knew that it was impossible for Funko to meet the FY2019 guidance because there were not enough products tied to the fourth quarter releases and customer demand for the fourth quarter products was insufficient to generate the sales necessary to meet the guidance." (SAC ¶ 131.) Plaintiffs rely on the statements of CW1 and CW5 to support this allegation. (Id. ¶¶ 100-114, 131(a)-(k), 132.)

In the Motion, the Funko Defendants argue statement no. 3 is forward-looking and protected by the PSLRA. (See Funko Mot. at 8-11.) They point out the

Court already found this statement to be protected by the PSLRA because it was forward-looking and accompanied by sufficient cautionary language, namely the Form 8-K's reference to extensive risk factor disclosures. They argue Plaintiffs' inclusion of additional allegations and suggestion that Defendants knew it was impossible to meet the FY2019 guidance on October 31, 2019 are insufficient to show the cautionary language accompanying statement no. 3 was not meaningful. (Id. at 8-9.) The Funko Defendants also argue Plaintiffs have failed to plead with particularity that statement no. 3 was made with actual knowledge that it was false or misleading. (Id. at 9-11.)

In Opposition, Plaintiffs argue statement no. 3 was made with actual knowledge that it was false or misleading and it was not accompanied by meaningful cautionary language because Defendant Jung knew it was impossible to meet the FY2019 sales guidance by October 31, 2019. (See Opp'n at 17-19.)

In the February 25, 2021 Order, the Court found this statement to be protected by the PSLRA's safe harbor for forward-looking statements because it was accompanied by meaningful cautionary language. As the Court pointed out previously, at the outset of the October 31, 2019 earnings call, Andrew Harless, Funko's Manager of Investor Relations, stated the following:

> Management's remarks on this call may contain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These may include statements regarding our business goals, plans, abilities and opportunities; industry and consumer trends; growth, momentum and investment initiatives; collaboration and license relationships; consumer engagement and brand awareness; acquisitions and related expenses; potential tariffs; and anticipated financial performance. Actual results may differ materially from those discussed in the Risk Factors section of our

United States District Court
Central District of California

> Form 10-Q for the quarter ended September 30, 2019, and our other filings with the SEC. Any forward-looking statements made on this call represent our views only as of today, and we undertake no obligation to update them.

(McDonough Decl. ¶ 11, Exh. 9 at 4.) Harless's statement incorporated by reference the risk disclosures from Funko's third quarter 2019 Form 10-Q. The Court concluded Harless's statement, which incorporated the detailed risk disclosures from Funko's third quarter 2019 Form 10-Q, were specific, robust, and meaningful.

With respect to Plaintiffs' additional allegations in the SAC, for the same reasons the Court found the cautionary statements regarding statement no. 3 to be meaningful, the Court also finds the cautionary statements regarding statement no. 4 to be meaningful as well. See Oaktree Principal Fund V, LP, 2017 WL 3187688 at *10; City of Royal Oak Ret. Sys., 880 F. Supp. 2d at 1062; In re Musicmaker.com Sec. Litig., 2001 WL 34062431 at *23. "Because [Funko] began . . . its [October 31, 2019 earnings call] with a statement of caution about future predictions, a reasonable investor would have given little credence to [] predictive statements during the call." Oaktree Principal Fund V, LP, 2017 WL 3187688 at *11. Although the SAC alleges several additional facts attempting to show Defendant Jung knew it was impossible to meet the FY2019 guidance when she made statement no. 4, for the reasons discussed supra, the Court concludes the allegations are not plausible given Defendant Jung's apparent belief that the FY2019 guidance could be met despite the projected shortfall in sales of new products for the fourth quarter of 2019. (See SAC ¶ 110.)

As mentioned supra, the additional allegations in the SAC suggest Defendant Jung knew by October 31, 2019 that it was highly unlikely Funko could meet the FY2019 sales guidance and she knew her statements during the earnings call were

United States District Court
Central District of California

misleading. That is a separate prong of the PSLRA's safe harbor for forward-looking statements, however. As the Court concludes statement no. 4 is shielded by the PSLRA safe harbor because it was accompanied by meaningful cautionary language, whether Defendant Jung made statement no. 4 with actual knowledge that it was false or misleading is of no consequence.[11] See Friedman, 985 F.3d at 1190.

### v. Statement No. 5

During the same October 31, 2019 earnings call, Plaintiffs allege Defendant Jung stated:

> I'll start with the guidance question. So coming out of Q2, the company re-guided to $840 million to $850 million on an annualized basis. And as you know, we do give annual guidance. We feel really good that to date, we've grown 28%, and for Q3, we're at 26%. But the range within that guidance is a little over 1%, so it's already a pretty tight spread there. As we look forward, though, as well, Q4, we are coming up against a very high Q4 last year, it was approaching 38% in a growth rate. **And even with our current guidance, Q4 will be our biggest quarter ever as a company.**
>
> So we're feeling really good about where we are right now. And overall, you have to remember that a lot of the Frozen and Star Wars shipments did come into 3Q, and we did have that $3 million in FOB that also came into Q3. So although we're very positive on Q4, I think if you look at the 2-year stack, it's a very healthy build.

---

[11] To the extent the Funko Defendants contend statement no. 4 is not actionable because it was an opinion, the Court does not reach this argument. (See Funko Mot. at 11-12.)

United States District Court
Central District of California

(SAC ¶ 133 (emphasis in original); see also McDonough Decl. ¶ 11, Exh. 9 at 13.) As with statement nos. 3 and 4, Plaintiffs allege this statement was false and misleading because "[a]t the time these statements were made, Defendant Jung did not honestly believe that the FY2019 guidance was achievable because there were not enough products tied to the fourth quarter releases and customer demand for the new fourth quarter products was insufficient to generate the sales necessary to meet the guidance." (SAC ¶ 134.) Plaintiffs rely on the statements of CW1 and CW5 to support this allegation. (Id. ¶¶ 110-114, 134(a)-(k), 135.)

The parties make the same arguments about statement no. 5 as they do with respect to statement no. 4, so the Court does not repeat them here. Furthermore, the same disclosures and cautionary language discussed with respect to statement no. 4 also accompanied statement no. 5, as Defendant Jung made both statements during the same October 31, 2019 earnings call. The Court does not repeat its discussion or conclusion that the cautionary language was meaningful. For the same reasons the Court found the PSLRA safe harbor shields statement no. 4, the Court also concludes it shields statement no. 5. Accordingly, statement no. 5 is not actionable.[12]

**2. Scienter**

As the Court has concluded Plaintiffs have alleged one actionable statement (statement no. 2), the Court next determines whether the SAC contains sufficient particularized allegations to demonstrate scienter.

[12] As with statement no. 4, to the extent the Funko Defendants argue statement no. 5 is not actionable because it is an opinion or corporate puffery, the Court need not and does not reach this argument. (See Funko Mot. at 11-12.)



United States District Court Central District of California

United States District Court
Central District of California

In the February 25, 2021 Order the Court considered whether Plaintiffs sufficiently alleged scienter based on the statements of confidential witnesses and allegedly suspicious stock sales and concluded they did not. The Court found Plaintiffs did not allege sufficient facts to show CW2, CW3, CW4, CW5, and CW6 had personal knowledge to support an inference of scienter. In particular, CW2 and CW6 were not employed during the Class Period and did not have personal knowledge of Funko's inventory holdings during the Class Period. CW3 and CW5 were not alleged to have an understanding of or familiarity with Funko's global operations or a complete understanding of Funko's inventory holdings in relation to its business operations. CW3, CW4, and CW5 were not alleged to have had direct contact with Defendants and could not opine competently and with personal knowledge as to what any Defendants knew about Funko's inventory levels during the Class Period. Although the Court concluded CW1 was competent and had personal knowledge, Plaintiffs' allegations based on CW1's statement did not support a strong inference of scienter. Finally, as to the allegedly suspicious stock sales, the Court concluded Plaintiffs had failed to alleged sufficient facts to support a strong inference of scienter on this basis as well.

"Scienter is 'a mental state embracing intent to deceive, manipulate, or defraud.'" Police Re. Sys. of St. Louis v. Intuitive Surgical, Inc., 759 F.3d 1051, 1061 (9th Cir. 2014) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12 (1976)). To plead scienter, the plaintiff must "allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." In re Daou Systems, 411 F.3d at 1014-15. "A securities fraud complaint will survive 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Curry, 875 F.3d at 1226 (quoting Tellabs, 551 U.S. at 324). "The

inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences' . . . [y]et the inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling." Tellabs, 551 U.S. at 324; see also In re Iso Ray, Inc. Sec. Litig., 189 F. Supp. 3d 1057, 1075 (E.D. Wash. 2016) ("A plaintiff must show that a defendant engaged in knowing or intentional conduct.") (citing South Ferry LP, No. 2. v. Killinger, 542 F.3d 776, 784 (9th Cir. 2008)).

To allege that a defendant acted with scienter in omitting information, a plaintiff must plead "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Zucco Partners, LLC, 552 F.3d at 991. This requires the pleading of particularized facts that give rise to a strong inference that the defendant intended to mislead the plaintiff through its omission or knew that the plaintiff would be misled by the omission. See Amgen, 544 F. Supp. 2d at 1028-29 (denying motion to dismiss § 10(b) claim where the plaintiff had alleged facts giving rise to the inference that defendants had "actual knowledge" that its statements would mislead the public).

A court reviewing a complaint's scienter allegations conducts a two-part inquiry: first, it "determine[s] whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter," and second, if no individual allegation is sufficient, it "conduct[s] a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." Curry, 875 F.3d at 1226 (quoting New Mexico State Inv. Council v. Ernst & Young LLP, 641 F.3d 1089, 1095 (9th

United States District Court
Central District of California

Cir. 2011)). The Court must also "'take into account [any] plausible opposing inferences.'" Zucco Partners, LLC, 552 F.3d at 990 (quoting Tellabs, 551 U.S. at 323).

Of some assistance here, the Ninth Circuit recently addressed the sufficiency of scienter allegations in In re Alphabet, Inc., Sec. Litig., 1 F.4th 687 (9th Cir. 2021). In that case, the plaintiffs alleged Alphabet, Inc., the parent company of Google, and several of its officers engaged in securities fraud by failing to disclose a security vulnerability in one of its products. According to the plaintiffs, the defendants were aware of the issue by April 2018 and had analyzed, prepared and distributed to senior executives a legal and policy memorandum regarding the import of publicly disclosing the security vulnerability. Despite this knowledge, the defendants touted its security and data privacy measures publicly and did not disclose the vulnerability for several months, until October 2018 after the issue was identified in a Wall Street Journal article. Id. at 694-97. In the intervening period, Alphabet, Inc. filed two quarterly reports with the SEC that contained no disclosure about the security vulnerability and affirmatively stated there had been no material changes in the risk factors it had disclosed in its Form 10-K for the year 2017, before Alphabet, Inc. had detected the security vulnerability. Id. at 696. The district court granted Alphabet, Inc.'s motion to dismiss the complaint and concluded the complaint failed to allege a material misrepresentation or omission and failed to allege scienter sufficiently. Id. at 698. On appeal, the Ninth Circuit reversed the district court's ruling in part and concluded the plaintiffs had alleged sufficient plausible facts to show the defendants' statements in the two quarterly reports were misleading and material. Id. at 702-05.

The Ninth Circuit then considered whether the plaintiffs sufficiently alleged scienter, i.e., "whether the complaint adequately alleged that the maker [of the

United States District Court
Central District of California

United States District Court
Central District of California

statements in the Form 10-Qs] omitted material information knowingly, intentionally, or with deliberate recklessness." Id. at 705. As Alphabet, Inc. is a corporate entity, the court evaluated whether the allegations in the complaint raised a strong inference that any of Alphabet, Inc.'s senior executives knew of the material information at issue at the time the misleading public statements were made. Id. The court concluded it did. Id. at 705-07.

The complaint alleged several senior executives read the memorandum about whether to disclose the security vulnerability before Alphabet, Inc. issued its April 2018 Form 10-Q and the complaint alleged with particularity the memorandum "informed senior executive leadership at Google of the scope of the problem, warned of the consequences of disclosure, and presented Google leadership with a clear decision on whether to disclose those problems." Id. at 706. The complaint sufficiently alleged several senior executives read the memorandum and discussed it amongst themselves. Id. at 706-07. In any event, the court noted that in a scienter analysis, even in the absence of an allegation that an executive read an important report, courts can consider the "senior executive's role in the company to determine whether there is a cogent and compelling inference that the senior executive knew of the information at issue" and "whether, given the importance of the information, 'it would be 'absurd' to suggest that management was without knowledge of the matter.'" Id. at 706 (quoting South Ferry LP, # 2 v. Killinger, 542 F.3d 776, 786 (9th Cir. 2008) and Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 988 (9th Cir. 2008)). Given the specific allegations in the complaint, the court concluded there was a strong inference that a senior executive at Alphabet, Inc. knew of the security vulnerabilities and the consequences of disclosure when Alphabet, Inc. made its statements in the Form 10-Qs in April and July 2018. Id. at 706. The court went on to conclude there was "an equally strong inferences that, armed with the knowledge

[of the senior executive and imputed to Alphabet, Inc.], Alphabet intentionally did not disclose the cybersecurity information to the public in order to avoid or delay the impacts disclosure could have on regulatory scrutiny, public criticism, and loss of consumer confidence." Id. at 706-07.

Applying In re Alphabet, Inc., Sec. Litig. here, because statement no. 2 was issued by Funko, the Court must consider whether the SAC sufficiently pleads facts to raise a strong inference of scienter, i.e., that Funko's senior officers knew of the excess and obsolete inventory issues when Funko issued statement no. 2 on October 31, 2019.

**i. Statements of Confidential Witnesses**

The Funko Defendants argue the SAC's allegations based on statements from confidential witnesses do not support a strong inference of scienter. (Funko Mot. at 14-19.) In Opposition, Plaintiffs argue the detailed accounts alleged by the confidential witnesses are reliable and sufficient to support an inference of scienter. (Opp'n to Funko Mot. at 18-25.)

A complaint relying upon the statements of confidential witnesses to prove scienter must satisfy two requirements: (1) "'the confidential witnesses . . . must be described with sufficient particularity to establish their reliability and personal knowledge'"; and (2) "'those statements which are reported . . . must themselves be indicative of scienter.'" Cutler v. Kirchner, 696 F. App'x 809, 815 (9th Cir. 2017) (quoting Zucco Partners, LLC, 552 F.3d at 995).

As stated supra, Plaintiffs rely on the statements of six confidential witnesses to plead scienter. (See SAC ¶¶ 54-72, 74-93, 99-117, 128, 131, 134, 135, 137.) As did the CAC, the SAC describes each of the confidential witnesses with specificity by numbering each witness and describing their job titles and responsibilities. See

United States District Court
Central District of California

Zucco Partners, LLC, 552 F.3d at 996; In re Daou Sys., Inc., 411 F.3d at 1016; In re Quality Sys., Inc. Sec. Litig., 865 F.3d at 1145.

According to the SAC, CW1 was Funko's Director of Merchandise Planning from July 2019 to June 2020. (SAC ¶ 54.) CW1 was responsible for "developing Company-wide sales forecasts and for determining the quantity of product that needed to be ordered and developed to meet customer demand" and for "inventory management." (Id.) CW2 was the general manager of Loungefly, a company Funko acquired in May 2017, and CW2 worked at Loungefly from May 2017 through July 2019. (Id. ¶ 59.) CW2 "oversaw all the divisions of Loungefly and was responsible for, among other things, profit and loss, budgeting, and forecasting." (Id.) CW3 was an account manager at Funko from November 2017 until December 2019. (Id. ¶ 64.) CW3 worked in Arkansas and was assigned to Funko's account with Wal-Mart. (Id.) CW3 was "responsible for forecasting and planning sales of Funko items at Wal-Mart." (Id.) CW4 worked at Funko from January 2018 to June 2020, as a customer service manager from January to June 2018, and then as a customer service and sales team manager. (Id. ¶ 69.) As a manager, CW4 was "responsible for managing an inside sales team of five sales managers and four account coordinators who worked with direct-to-consumer customers and e-commerce." (Id.) CW5 worked at Funko from August 2018 to September 2019 as a sales coordinator. (Id. ¶ 71.) CW5 "provided back-end sales support for Funko's Latin American territory" and he "assisted with sales development and tracked monthly sales" from "Funko's South Everett warehouse." (Id. ¶ 72.) CW6 worked as a senior fulfillment supervisor at Funko from March to August 2019 from Funko's warehouse in Everett, Washington. (Id. ¶ 91.) CW6 was responsible "for ensuring that Funko's products were being shipped to

United States District Court
Central District of California

United States District Court
Central District of California

customers according to customer guidelines and for ensuring that all goods received at the warehouses were offloaded and entered into the inventory system." (Id.)

The SAC newly alleges CW2, CW3, CW4, CW5 had first-hand knowledge about Funko's sales forecasting and inventory practices. (Id. ¶¶ 59, 64, 69, 72.) It also newly alleges CW6 had "first-hand knowledge of excess inventory stored in Funko's warehouses." (Id. ¶ 91.)

As it did in the February 25, 2021 Order, the Court concludes the SAC fails to allege sufficiently CW2, CW3, CW4, CW5, and CW6 had personal knowledge that would support a strong inference of scienter.

As the Court stated in the February 25, 2021 Order, neither CW2 nor CW6 were employed by Funko during the Class Period nor did they have personal knowledge of the levels of Funko's inventory as of October 31, 2019 when statement no. 2 was issued in Funko's Form 10-Q. See Zucco Partners, LLC, 552 F.3d at 996 (questioning the credibility of two confidential witnesses who were not employed by the defendant company during the time period in question); In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1062 (9th Cir. 2014) (statements by confidential witnesses about the defendant company's history of delaying known problems did not contribute to an inference of scienter in part because the witnesses were not employed by the defendant company during the relevant time period); cf. Webb v. Solarcity Corp., 884 F.3d 844, 851 n.1 (9th Cir. 2018) (affirming district court's discounting of statements of confidential witnesses employed outside the class period and concluding the district court was correct to consider them in any event as part of the holistic scienter analysis). The Court considers their statements only to the extent they can shed light on what senior Funko executives allegedly knew when statement no. 2 was issued on October 31, 2019. See Webb, 884 F.3d at 851 n.1. Moreover, CW2's allegation that Funko's inventory issues were discussed

at quarterly Board meetings he attended along with Defendants Mariotti, Nickel, and Perlmutter do not state with particularity sufficient facts to raise a strong inference of scienter on behalf of any senior Funko executive, as discussed supra.[13]

On the other hand, CW3, CW4, and CW5 were employed by Funko during the Class Period. Their responsibilities, however, were narrow and the SAC fails to allege plausibly how through their positions they understood or were familiar with Funko's global operations and had a complete understanding of Funko's inventory holdings in relation to its business operations. Like the CAC, the SAC fails to allege CW3, CW4, or CW5 had direct contact with any Defendant and there are no allegations to suggest they plausibly could opine about Defendants' knowledge about Funko's inventory levels when statement no. 2 was issued on October 31, 2019. See Waterford Twp. Police v. Mattel, Inc., 321 F. Supp. 3d 1133, 1154 (C.D. Cal. 2018), aff'd, 794 F. App'x. 669 (9th Cir. 2020) ("Plaintiff's allegations do not support an inference that FE2 had access to global retail inventory levels that would give FE2 knowledge that Mattel had unusually high levels of retail inventory during the Class Period. Also, since Plaintiff does not allege that FE2 had any meaningful contact with Defendants, the allegations related to FE2 do not support an inference that Defendants had any knowledge of the same inventory reports to which FE2 had access."). Due to these pleading failures, the Court finds the statements offered by CW3, CW4, and CW5 remain insufficient to support a strong inference of scienter. See Zucco Partners, LLC, 552 F.3d at 998 ("These generalized claims about corporate knowledge are not sufficient to create a strong inference of scienter, since

[13] Again, the Court notes the SAC's allegations as to Defendant Nickel's knowledge are immaterial to this analysis as he was not a Funko executive after August 13, 2019.

United States District Court
Central District of California

United States District Court
Central District of California

they fail to establish that the witness reporting them has reliable personal knowledge of the defendants' mental state.").

Next, the Court considers whether CW1's allegations support a strong inference of scienter. As described above, the SAC alleges CW1 was present at numerous sales meetings with Defendants Jung and Perlmutter where Funko's excess and obsolete inventory was discussed beginning in July 2019, including discussions about the aged inventory reports and the Open to Buy plan data that were presented at every weekly sales meeting beginning in August 2019 and September 2019, respectively; the SAC also alleges summaries of these sales meetings were sent to Defendant Mariotti, as well as the meeting attendees, by email. (See SAC ¶¶ 74-83.) These allegations demonstrate Plaintiffs have met the first Zucco Partners, LLC prong, i.e., a showing of CW1's reliability and personal knowledge.

The Court next considers whether CW1's statements themselves indicate scienter, and now concludes they do. Following In re Alphabet, Inc. Sec. Litig., the Court finds CW1's statements constitute specific particularized allegations supporting a strong inference of scienter on behalf of Defendants Jung, Perlmutter, and Mariotti as of October 31, 2019 when statement no. 2 was issued in Funko's Form 10-Q. Defendants Jung, Perlmutter, and Mariotti were executive officers of Funko and their knowledge is imputed to Funko.

As discussed with respect to statement no. 2, supra, CW1's statements strongly suggest that well before October 31, 2019, Defendants Jung, Perlmutter, and Mariotti knew Funko was storing a large volume of excess and obsolete inventory valued at several million dollars, much of it slated for containment at the newly-leased Puyallup warehouse and ultimately for destruction; they knew specific details about the problem, including the amount of excess and obsolete inventory,

its value, and what volume was slated to be written down; they were aware of the issue for approximately thirteen weeks; and Defendants Jung and Perlmutter discussed it at approximately thirteen meetings, they and Mariotti received the information by email weekly for approximately thirteen weeks, yet they failed to disclose the issue publicly or modify Funko's Form 10-Q issued on October 31, 2019 to ensure it was not misleading. These allegations are similar to those the Ninth Circuit found demonstrated a strong inference of scienter in In re Alphabet, Inc. Sec. Litig. Applying the reasoning of that decision here, the Court concludes Defendants Jung, Perlmutter, and Mariotti's receipt of the aged inventory reports, the Open to Buy plan data, and emails summarizing the discussion at every weekly sales meeting from at least August through October 2019 demonstrate sufficiently there is at least "a cogent and compelling inference that [they as] senior executives knew of the information at issue." In re Alphabet, Inc., Sec. Litig., 1 F.4th at 706. Moreover, "given the importance of the information, it would have been absurd to suggest [they were] without knowledge of the matter." Id. (internal quotation marks and citations omitted).

Taken together, these allegations support a strong inference that Defendants Jung, Perlmutter, and Mariotti knew about the excess and obsolete inventory problem and concealed it when Funko issued the Form 10-Q containing statement no. 2 on October 31, 2019. The Court has considered competing inferences and does not find any plausible or more likely than this inference. Accordingly, CW's allegations support a strong inference of scienter and the Court concludes Defendants Jung, Perlmutter, and Mariotti "had the requisite knowledge, which can be imputed to [Funko]." In re Alphabet, Inc., Sec. Litig., 1 F.4th at 706; see also In re ChinaCast Educ. Corp. Sec. Litig., 809 F.3d 471, 475 (9th Cir. 2015).

United States District Court
Central District of California

**ii. Stock Sales During Class Period**

The Funko Defendants contend the SAC's allegations about the stock sales by Defendants Perlmutter and Mariotti during the Class Period do not support a strong inference of scienter. (Funko Mot. at 19-21.) In Opposition, Plaintiffs argue Defendants' stock sales clearly demonstrate scienter because they sold nearly $105 million in stock during the Class Period and the sales were "suspicious in timing and amount." (Opp'n to ACON Mot. at 5- 9.) The Court notes that in its February 25, 2021 Order, it concluded Plaintiffs had failed to allege Defendants' stock sales during the Class Period were suspicious and they failed to support a strong inference of scienter.

"Although 'unusual' or 'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter, insider trading is suspicious only when it is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" Zucco Partners, LLC, 552 F.3d at 1005 (quoting Silicon Graphics, 183 F.3d at 986). Courts must consider three factors to determine if stock sales constitute circumstantial evidence of scienter: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." Id. As to the second factor, "courts have held the timing of stock sales may weigh in favor of scienter where 'calculated to maximize the personal benefit,' or where occurring 'just before . . . a steep drop in stock price.'" Xiaojiao Lu v. Align Tech., Inc., 417 F. Supp. 3d 1266, 1281 (N.D. Cal. 2019) (quoting No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp., 320 F.3d 920, 938 (9th Cir. 2003) and In re OmniVision Techs., Inc. Sec. Litig., 937 F. Supp. 2d 1090, 1110 (N.D. Cal. 2013)).

In the SAC, Plaintiffs allege the following relevant facts:

- Funko filed a shelf registration statement with the SEC in April 2019 and Defendant Jung accelerated the effective date of the registration statement to September 2019 in order for Funko to conduct the Secondary Public Offering on September 19, 2019 (SAC ¶¶ 119-120);
- On September 16, 2019, Funko "entered into an underwriting agreement pursuant to which Mariotti and the ACON Defendants would sell an aggregate of 4,00,000 shares to J.P. Morgan Securities LLC at a price of $25.42 per share" which was "very close to the peak 2019 Funko stock price" (id. ¶ 122);
- In the seven-month period preceding the Class Period, Defendant Mariotti sold 150,000 shares of Funko stock for $3.3 million in proceeds (id. ¶ 164);
- During the Class Period, Defendant Mariotti sold 500,000 shares of Funko stock for $12 million in proceeds (id.);
- During the Secondary Public Offering on September 19, 2019, Defendant Mariotti netted $10,168,000 from his sale of Funko stock and the ACON Defendants netted $91,512,000 (id. ¶ 123);
- The ACON Defendants' sale of stock during the Secondary Public Offering was their first sale of Funko stock (id.);
- Defendant Mariotti's sale of stock during the Secondary Public Offering was his "largest sale of Funko stock and his first public sale not associated with a trading plan" (id.);
- Following the Secondary Public Offering, "ACON's 54.5% ownership of Class A shares was reduced to 45.7% and Defendant Mariotti's 10% Class A stake was reduced to 8.6% (id. ¶ 124);
- Defendant Perlmutter sold 56,250 shares of Funko stock at $20.61 per share on October 1, 2019 (id. ¶ 211); and

United States District Court
Central District of California

- "Other than one sale of 50,000 shares by Defendant Mariotti, each of these sales took place when Funko stock was over $20 per share, approximately three times what it was at the end of the Class Period" (id. ¶ 166.).

As to Defendant Perlmutter, Plaintiffs fail to allege any facts to show his prior trading history or the percentage of shares he sold on October 1, 2019. Without more, the SAC does not allege sufficient facts to show Defendant Perlmutter's stock sale on October 1, 2019 was suspicious. See Zucco Partners, LLC, 552 F.3d at 1005.

As to the ACON Defendants, the SAC alleges they sold approximately 8.8% of their Funko stock holdings in connection with Funko's Secondary Public Offering, their first sale of Funko stock. This sale took place several months before Funko's corrective disclosures and the drop in Funko's stock price and occurred allegedly while Funko's stock price was near its peak value in 2019. These allegations alone, however, do not demonstrate sufficient facts to show this one stock sale was suspicious enough to establish a strong inference of scienter. Id.

As to Defendant Mariotti, the SAC's allegations do not demonstrate with particularity that his stock sales constituted circumstantial evidence of scienter. Defendant Mariotti's alleged sale of 400,000 shares of Funko stock was in connection with Funko's Secondary Public Offering, which took place several months before Funko's corrective disclosures and accompanying drop in stock price. Despite Plaintiffs' argument to the contrary, Defendant Mariotti's sale of stock at that time reduced his holdings minimally, by only 1.4%. Further, the allegations about his prior trading history show only the seven-month period preceding the Class Period and his trading history appears somewhat consistent, as discussed in the Court's February 25, 2021 Order. The SAC does not contain sufficiently specific allegations to show Defendant Mariotti's stock sales were

United States District Court
Central District of California

United States District Court
Central District of California

suspicious or sufficient to constitute circumstantial evidence of scienter. See Zucco Partners, LLC, 552 F.3d at 1005.

The Court notes the alleged overall amounts of money earned by some of the Defendants through these stock sales was high, totaling over $100 million, as well as Plaintiffs' contention that the sales were suspicious because the Funko share price was near its highest when these sales took place. These allegations are not sufficient, however, especially given the paucity of allegations in the SAC on the remaining Zucco Partners, LLC factors.

Finally, as the Court noted in the February 25, 2021 Order, the SAC fails to allege that even a majority of the individual Defendants sold Funko stock during the Class Period. "One insider's well timed sales do not support a 'strong inference' required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made." Ronconi, 253 F.3d at 436 (internal footnote omitted). "[T]he absence of any allegations that the other Defendants engaged in insider sales during the Class Period" is "significant." Alaska Elec. Pension Fund v. Adecco S.A., 434 F. Supp. 2d 815, 834 (S.D. Cal. 2006), aff'd, 256 F. App'x 74 (9th Cir. 2007).

Despite the Court's conclusion that the SAC's allegations about Defendants' stock sales are insufficient to support a strong inference of scienter, its decision that CW1's allegations do support such an inference compels a finding that Plaintiffs have stated a claim for violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 as to statement no. 2.

**B. Claim 2: Violation of Section 20(a) of the Securities Exchange Act**

United States District Court
Central District of California

In the Funko Motion, the Funko Defendants argue Plaintiffs cannot state a claim for violation of Section 20(a) because Plaintiffs fail to state a predicate violation of Section 10(b) and Rule 10b-5. (Funko Mot. at 21.) In the ACON Motion, the ACON Defendants argue Plaintiffs have not pled a primary Section 10(b) violation and Plaintiffs "do not adequately allege that the ACON Defendants exercised actual power or control over Funko with respect to the alleged primary violations of purportedly misleading risk disclosures concerning inventory in Funko's August 8, 2019 and October 31, 2019 quarterly reports." (ACON Mot. at 2-5.)

Section 20(a) of the Exchange Act states, in pertinent part:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). To establish a claim under Section 20(a), a plaintiff "must first prove a primary violation of underlying federal securities laws, such as Section 10(b) or Rule 10b-5, and then show that the defendant exercised actual power over the primary violator." In re NVIDIA Corp. Sec. Litig., 768 F.3d at 1052.

As stated supra, the Court has concluded Plaintiffs have stated a Section 10(b) and Rule 10b-5 violation, as alleged in the SAC against Defendants Funko, Mariotti, and Jung regarding statement no. 2. The SAC alleges claim 2 against "the Individual Defendants," defined in the SAC as Defendants Mariotti, Nickel, Jung, and Perlmutter (SAC ¶ 29), and the ACON Defendants. In order to allege sufficient facts to state a plausible claim against them, the SAC must show Defendants

United States District Court
Central District of California

Mariotti, Nickel, Jung, Perlmutter, and the ACON Defendants exercised "actual power over the primary violator." In re NVIDIA Corp. Sec. Litig., 768 F.3d at 1052 (citing Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000)).

Preliminarily, as noted supra, Defendant Nickel was alleged to have left his position at Funko as of August 13, 2019, which was months before statement no. 2 was issued by Funko on October 31, 2019. The SAC contains no allegations to suggest plausibly Defendant Nickel exercised actual power over Defendants Funko, Mariotti, or Jung, who were alleged to have violated Section 10(b) and Rule 10b-5, when Funko made statement no. 2. Accordingly, Plaintiffs cannot state a Section 20(a) claim against Defendant Nickel.

As to the remaining Funko Defendants (Defendants Mariotti, Jung, Perlmutter, Brotman, Dellomo, and Kriger) and the ACON Defendants, the Court has found Plaintiffs have alleged a predicate Section 10(a) violation. Hence, it rejects their argument that Plaintiffs cannot state a Section 20(a) claim against them on this basis. The Funko Defendants raise no other arguments to suggest the SAC's claim 2 allegations are insufficient. Accordingly, the Court DENIES the Funko Motion as to claim 2.

The Court now considers whether the SAC sufficiently and plausibly states a claim that the ACON Defendants each acted in control of Funko when Funko issued statement no. 2 in its 10-Q filing with the SEC on October 31, 2019. The SAC alleges the ACON Defendants "acted as controlling persons of Funko within the meaning of Section 20(a) of the Exchange Act" by virtue of their "stock ownership[,] [] Board control[,] [and] significant access to [] information." (SAC ¶¶ 197, 198.) According to Plaintiffs, "[s]hortly before the IPO, ACON Funko Investors, LLC . . . owned 100% of Funko Class A common stock" and after the IPO, [Defendants ACON Funko Investors, LLC and ACON Investments LLC] had

over 55% of the Class A shares of Funko."[14] (Id. ¶ 32.) As a result, the ACON Defendants "had significant control over Funko, as its controlling shareholder with an ability to appoint three of [Funko's] seven (which became eight members in September 2019) members of the Board. In fact, Funko adopted a dual class voting structure that allowed the ACON Defendants, and investor Fundamental Capital, to maintain voting control even with diminished economic interest in [Funko]." (Id.) The SAC also contains allegations about how each of the ACON Defendants relate and exert control over each other. (Id. ¶¶ 32, 34-35.)

For example, Plaintiffs allege Defendant ACON Investments, LLC controls the other ACON Defendants, including ACON Equity GenPar, LLC, "which is the sole manager of, and exercises voting and investment power over, the Funko Class A common stock held by ACON Investors Holdings 2, LLC, and ACON Investors Holdings." (Id. ¶¶ 32, 35.) The SAC also avers Defendants Brotman, Dellomo, and Kriger were Funko Board members since April 2017 because they were designated for those positions by Defendant ACON Investments LLC and also served as executives for Defendant ACON Investments LLC, e.g., Brotman was the founder and managing partner, Dellomo was the director, and Kriger was an executive partner. (Id. ¶¶ 36-38.)

[14] At the hearing, counsel for the ACON Defendants correctly pointed out that Plaintiffs later allege in ¶ 124 of the SAC that the ACON Defendants held closer to 45.7% of Funko stock after the Secondary Public Offering in September 2019 and, according to page S-62 of the prospectus statement of which the Court has taken judicial notice, the ACON Defendants held a "combined voting power" after the Secondary Public Offering of 40.3%. (See Pl. RJN, Exh. 1.) As counsel for Plaintiffs responded, however, the ACON Defendants held the largest percentage of Funko shares of any investor.

United States District Court
Central District of California

United States District Court
Central District of California

The "traditional indicia of control" are "having a prior lending relationship, owning stock in the target company, or having a seat on the board." No. 84 Emp'r-Teamster Joint Council Pension T. Fund, 320 F.3d at 945. Control also is pled sufficiently where the complaint alleges a defendant's "high level position[ ] and the fact that the false statements alleged could be found in company press releases or financial statements." In re CytRx Corp. Sec. Litig, No. CV 14-1956-GHK (PJWx), 2015 WL 5031232, at *17 (C.D. Cal. July 13, 2015). "In general, the determination of who is a controlling person . . . is an intensely factual question." See Arthur Children's Tr. v. Keim, 994 F.2d 1390, 1396 (9th Cir. 1993).

The Court concludes the SAC sufficiently states claim 2 against the ACON Defendants. The SAC alleges the ACON Defendants not only owned a significant portion of stock in Funko (45.7%) when statement no. 2 was made but also were Funko's controlling shareholders who placed Defendants Brotman, Dellomo, and Kriger on the Funko Board, each of whom was a member of the Funko Board when statement no. 2 was made. Plaintiffs' allegations sufficiently show the ACON Defendants were control persons of Funko when it issued the October 31, 2019 Form 10-Q, containing statement no. 2. See No. 84 Emp'r-Teamster Joint Council Pension T. Fund, 320 F.3d at 945; see also In re CytRx Corp. Sec. Litig., 2015 WL 5031232 at *17. In other words, although the ACON Defendants were not majority shareholders, in the sense that they owned less than 50% of Funko stock at the time statement no. 2 was made, that fact is not fatal to Plaintiffs' ability to state a Section 20(a) claim against the ACON Defendants. As stated supra, determining whether a party has actual power or control over another who is directly responsible for a securities fraud violation is an "intensely factual question." In re Alphabet Sec. Litig., 1 F.4th at 702 (internal quotation marks and citation omitted). Based on the

facts alleged, Plaintiffs have at least alleged a Section 20(a) claim. Accordingly, the ACON Motion is DENIED as to claim 2.

**C. Claim 3: Violation of Section 20A of the Securities Exchange Act**

The Funko Defendants argue Plaintiffs' Section 20A claim fails because Plaintiffs have not pled a predicate securities violation. (Funko Mot. at 21.) The ACON Defendants contend Plaintiffs cannot state a Section 20A claim because they have failed to state a predicate securities violation against them and Plaintiffs failed to allege the ACON Defendants "possessed material, nonpublic information when selling Funk stock, as required for a Section 20A claim." (ACON Mot. at 5-6.)

In the February 25, 2021 Order, the Court found Plaintiffs did not state a Section 20A claim because they had failed to state a predicate securities violation.

In pertinent part, Section 20A of the Exchange Act states:

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . or sold . . . securities of the same class.

15 U.S.C. § 78t-1(a). "Section 20A of the Exchange Act creates a private cause of action for 'contemporaneous' insider trading. To satisfy § 20A, a plaintiff must plead (i) a predicate violation of the securities laws; and (2) facts showing that the trading activity of plaintiffs and defendants occur 'contemporaneously.'" Hefler v. Wells Fargo & Co., No. 16-cv-05479-JST, 2018 WL 1070116, at *12 (N.D. Cal. Feb. 27, 2018) (quoting In re Countrywide Fin. Corp. Sec. Litig., 588 F. Supp. 2d 1132, 1074-75 (C.D. Cal. 2008)). The Ninth Circuit has acknowledged insider trading in violation of § 10(b) and Rule 10b-5 may serve as the predicate violation

United States District Court
Central District of California

for a private Section 20A claim. See Johnson v. Aljian, 490 F.3d 778, 784-85 (9th Cir. 2007).

In the SAC, Plaintiffs allege Defendants Mariotti, Perlmutter, and the ACON Defendants engaged in insider trading, which damaged Plaintiffs. (SAC ¶ 200.) Within claim 3, the SAC states each of these Defendants "committed an underlying violation by violating Section 10(b) and Rule 10b-5." (Id. ¶ 201). Defendant Mariotti and the ACON Defendants allegedly sold their Funko shares contemporaneously with Plaintiffs Zheng's and Baker's purchases (id. ¶¶ 204, 208, 210) and Defendant Perlmutter allegedly sold Funko stock contemporaneously with Plaintiff Zheng's purchase (id. ¶ 211).

As discussed herein, Plaintiffs have stated a predicate securities violation, although not for insider trading. Despite the allegation set forth in ¶ 201, however, Plaintiffs only bring a Section 10(b) claim against Defendants Funko, Mariotti, and Jung (see SAC ¶¶ 185-195). In other words, Plaintiffs have not stated a claim that the ACON Defendants or Defendant Perlmutter committed a predicate securities violation. Without a predicate violation by these particular Defendants, Plaintiffs' Section 20A claim against them fails. See In re VeriFone Holdings, Inc. Sec. Litig., 704 F.3d 694, 711 (9th Cir. 2012) ("To prevail on its claim for violations of § 20A, National Elevator must first sufficiently allege a violation of § 10(b) or Rule 10b-5."); Hefler, 2018 WL 1070116 at *12 (dismissing Section 20A claim as to certain defendants against whom the plaintiff failed to allege an underlying securities violation).

As to Defendant Mariotti, the Court has concluded Plaintiffs have stated a primary Section 10(b) claim against him with respect to statement no. 2. The Funko Motion does not address the sufficiency of the allegations in claim 3 as to

United States District Court
Central District of California

Defendant Mariotti, except to argue there was no primary violation.[15] For the foregoing reasons, the Court DISMISSES claim 3 as to Defendant Perlmutter and the ACON Defendants, but it stands against Defendant Mariotti.

**D. Leave to Amend**

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities." Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and alterations omitted). The law in the Ninth Circuit is clear "Rule 15's policy of favoring amendments to pleadings should be applied with 'extreme liberality." Eldridge v. Block, 832 F.2d 1132, 1135 (9th Cir. 1987). When dismissing a claim, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." Id. at 1130 (quoting Doe v. United States, 58 F.3d 494, 497 (9th Cir. 1995) (internal quotation marks omitted)). Leave to amend will be denied only when allowing amendment would unduly prejudice the opposing party, cause undue delay, be futile, or if the moving party

[15] At the hearing, counsel for the Funko Defendants argued Mariotti should be dismissed from claim 3 because his alleged stock trades in connection with Funko's Secondary Public Offering occurred over a month before statement no. 2 was issued. To state a Section 20A claim, however, Plaintiffs need not allege that Mariotti's stock sales were contemporaneous with the issuance of the alleged false or misleading statement, but rather were contemporaneous with Plaintiffs' purchases of Funko stock. See Hefler, 2018 WL 1070116 at *12 (setting forth the elements for a Section 20A claim); see also 15 U.S.C. § 78t-1(a).

United States District Court
Central District of California

United States District Court
Central District of California

acted in bad faith. Leadsinger, Inc. v. BMG Music Publ'g, 512 F.3d 522, 532 (9th Cir. 2008).

The Court previously granted Defendants' motion to dismiss the CAC and granted Plaintiffs leave to amend their claims to address the deficiencies identified in the February 25, 2021 Order. The SAC is Plaintiffs' second attempt to state their claims. Most of the arguments raised in the Funko and ACON Motions were raised in their motions to dismiss the CAC. This case has been pending for well over a year and a half, and over a year since the Court consolidated these related cases. Plaintiffs have already been granted leave to amend once, yet have failed to state with particularity many of the factual bases for their claims. The Court has broad discretion to deny leave to amend under these circumstances. See Zucco Partners, LLC, 552 F.3d at 1007. The Court exercises that discretion and DENIES Plaintiffs further leave to amend.

## VI. Conclusion

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART the Funko Defendants' and the ACON Defendants' Motions to Dismiss the Second Consolidated Amended Complaint, as follows:

- Plaintiffs' Section 10(b) and Rule 10b-5 claim is actionable only as to statement no. 2, discussing Funko's inventory risk warnings, which was contained in Funko's Form 10-Q filed with the SEC on October 31, 2019. The Section 10(b) and Rule 10b-5 claim premised on statement nos. 1, 3, 4, and 5 is not actionable. Those unactionable portions of claim 1 are DISMISSED.
- The Court DISMISSES Plaintiffs' Section 20(a) claim against Defendant Nickel. As this was the only claim alleged against Defendant Nickel, the

Court DISMISSES Defendant Nickel as a party. The Section 20(a) claim remains against Defendants Mariotti, Jung, Funko, and the ACON Defendants.

- The Court DISMISSES Plaintiffs' Section 20A claim against the ACON Defendants and Defendant Perlmutter. The Section 20A claim remains only against Defendant Mariotti.
- The Court DENIES Plaintiffs leave to amend.

Defendants shall file an Answer to the actionable claims alleged in the SAC by no later than November 8, 2021.

**IT IS SO ORDERED.**

Dated: October 22, 2021

Virginia A. Phillips
United States District Judge