1           **UNITED STATES DISTRICT COURT**

2       **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3        **HONORABLE VIRGINIA A. PHILLIPS, U.S. DISTRICT JUDGE**

4

5   **GILBERTO FERREIRA,**                        )
                                                  )
6                       **Plaintiff,**            )
                                                  )
7        **vs.**                                  )           **Case No.**
                                                  )   **CV 20-2319 VAP (PJWx)**
8   **FUNKO, INC., et al.,**                      )
                                                  )
9                       **Defendants.**           )
    _____     )

10

11            **REPORTER'S TRANSCRIPT OF PROCEEDINGS**
           **MOTION TO DISMISS SECOND AMENDED COMPLAINT**
12                **MONDAY, OCTOBER 18, 2021**
                        **2:16 P.M.**
13               **LOS ANGELES, CALIFORNIA**

14

15

16

17

18

19

20

21

22   _____

23      **MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR**
              FEDERAL OFFICIAL COURT REPORTER
24            350 WEST 1ST STREET, ROOM 4455
              LOS ANGELES, CALIFORNIA  90012
25                   (213) 894-2305

1              **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFFS AND MOVANTS:**

4        POMERANTZ, LLP
         BY:   CARA DAVID
5              Attorney at Law
         600 Third Avenue, 20th Floor
6        New York, New York  10016
         (212) 661-1100
7
         BERNSTEIN LIEBHARD, LLP
8        BY:  STEPHANIE M. BEIGE
              Attorney at Law
9        10 East 40th Street
         New York, New York  10016
10       (212) 779-1414

11

12  **FOR THE DEFENDANTS FUNKO, INC., BRIAN MARIOTTI,**
    **JENNIFER FALL JUNG, ANDREW PERLMUTTER, KEN BROTMAN,**
13  **GINO DELLOMO, and ADAM KRIGER:**

14       LATHAM & WATKINS, LLP
         BY:  KEVIN M. MCDONOUGH
15       BY:  THOMAS J. GIBLIN
              Attorneys at Law
16       1271 Avenue of the Americas
         New York, New York  10020
17       (212) 906-1200

18       LATHAM & WATKINS, LLP
         BY:  MERYN C.N. GRANT
19            Attorney at Law
         355 South Grand Avenue, Suite 100
20       Los Angeles, California  90071
         (213) 485-1234

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1    **APPEARANCES OF COUNSEL, CONTINUED:**

2

3    **FOR THE DEFENDANTS ACON INVESTMENTS, LLC; ACON FUNKO MANAGER,
     LLC; ACON FUNKO INVESTORS, LLC; ACON FUNKO INVESTORS**
4    **HOLDINGS 1, LLC; ACON FUNKO INVESTORS HOLDINGS 2, LLC; ACON
     INVESTORS HOLDINGS 3, LLC; and ACON EQUITY GENPAR, LLC:**

5
        AEGIS LAW GROUP, LLP
6       BY:  MICHAEL K. ROSS
             Attorney at Law
7       801 Pennsylvania Avenue NW, Suite 740
        Washington, DC  20004
8       (202) 737-3373

9       ESKOVITZ LAW
        BY:  SEAN ESKOVITZ
10           Attorney at Law
        1217 Wilshire Boulevard, Suite 3683
11      Santa Monica, California  90403
        (323) 821-5836

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1              MONDAY, OCTOBER 18, 2021; 2:16 P.M.

2                  LOS ANGELES, CALIFORNIA

3                          -oOo-

4              THE COURTROOM DEPUTY:  Calling Item No. 7,

5    LA CV 20-02319-VAP, Gilberto Ferreira, et al., versus Funko,

6    Inc., et al.

7              Counsel, please state your appearance.

8              MS. BEIGE:  Stephanie Beige from Bernstein Liebhard

9    for the plaintiffs.

10             MS. DAVID:  Cara David from Pomerantz for the

11   plaintiffs.

12             THE COURT:  Thank you.

13             MS. GRANT:  Meryn Grant from Latham & Watkins on

14   behalf of Funko and the individual defendants.

15             THE COURT:  Thank you.

16             MR. MCDONOUGH:  Good afternoon, Your Honor.

17   Kevin McDonough from Latham & Watkins on behalf of Funko and

18   the individual defendants.

19             THE COURT:  Thank you.

20             MR. GIBLIN:  Good afternoon, Your Honor.

21   Thomas Giblin from Latham & Watkins also on behalf of Funko and

22   the individual defendants.

23             MR. ROSS:  Good afternoon, Your Honor.  Michael Ross

24   on behalf of the ACON defendants.

25             MR. ESKOVITZ:  Good afternoon, Your Honor.

 1   Sean Eskovitz on behalf of the ACON defendants.

 2            THE COURT:  All right.  Thank you.

 3            All right.  We sent the parties' counsel copies of

 4   the tentative this morning so that you would have a little time

 5   at least to read it.  It's quite lengthy and detailed.  And so

 6   have both sides -- both sides received it and had a chance to

 7   review it?

 8            MS. BEIGE:  Yes, Your Honor.

 9            MS. DAVID:  Yes, Your Honor.

10            MR. MCDONOUGH:  Yes, Your Honor.

11            THE COURT:  All right.  Well, it's a split decision.

12   But I'm going to let the plaintiffs argue first because I think

13   you're more affected by the tentative.

14            MS. BEIGE:  Thank you, Your Honor.

15            Plaintiffs actually rest on the tentative, very

16   thorough tentative, and we have no further argument.

17            THE COURT:  All right.  The defense.

18            MR. MCDONOUGH:  Yes, Your Honor.  Kevin McDonough

19   from Latham.  I would like to address the Court first on behalf

20   of Funko and the individual defendants.  May I use the --

21            THE COURT:  At the lectern, please.

22            MR. MCDONOUGH:  Your Honor, again, Kevin McDonough

23   from Latham on behalf of the Funko defendants.

24            We did receive a copy of the Court's tentative

25   ruling, which is, as you know, quite thorough.  We appreciate

1    all the work that went into it.  And there were just a few

2    items that we wanted to address.

3            And the primary one is the aspect of the Court's

4    ruling that addresses scienter in the context of the

5    October 31st, 2019, inventory risk disclosures.

6            And the critical point that we wanted to discuss,

7    Your Honor, this afternoon is the fact that the plaintiffs'

8    theory regarding that disclosure is one of omission.  And the

9    scienter standard, as Your Honor noted in the tentative, for

10   theories of omission is particularly stringent.

11           THE COURT:  It's a highly unreasonable omission that

12   has to be pled.

13           MR. MCDONOUGH:  Yes.  Correct, Your Honor.  And the

14   language jumped out off the page to us in terms of the

15   requirement that the plaintiffs state particular facts

16   suggesting that the defendants either intended -- actually

17   intended to mislead investors or knew that investors would be

18   misled.

19           And when we went back and looked at the allegations

20   in light of that standard, our view is that the plaintiffs fall

21   short.

22           And we do take the Court's point that the Second

23   Amended Complaint does add allegations regarding reports about

24   inventory at the company and discussions at weekly meetings

25   about inventory at the company.  Those allegations struck us as

1   bolstering the theory on falsity but not quite getting to the

2   level of intent to mislead investors, which is required for the

3   scienter element, and that's what we'd like to focus on.

4           THE COURT:  All right.

5           MR. MCDONOUGH:  And, of course, the *Alphabet*

6   decision looms very large in all of this.  And we had the

7   opportunity to address that decision with Your Honor in our

8   briefing.  We appreciate that.

9           There are a couple of salient points from *Alphabet*

10  that we really think are different in fundamental ways from our

11  case.  As Your Honor knows, the allegations there were that the

12  Google senior management became aware of a three-year-long --

13          THE COURT:  The security risk.

14          MR. MCDONOUGH:  -- cybersecurity breach and actually

15  considered the issue should we disclose it or should we not

16  disclose it in the context of the environment we were all

17  living in, which was tremendous scrutiny for the big tech

18  industry, congressional hearings and the like following some of

19  the conduct that occurred in the 2016 election.

20          And management at the highest levels actually

21  analyzed the issue, that this is what was alleged, and decided

22  that a strategy of concealment was preferable to disclosure

23  because management was aware that if they disclosed the breach,

24  the CEO of Google and the parent company would be dragged

25  before Congress, which no one likes, and the company would face

1    additional regulatory scrutiny, reputational damage and the

2    like.

3         So it wasn't just that management had knowledge of

4    something and didn't disclose it.  They actively developed a

5    plan to conceal the information.

6         And, in fact, the information didn't come to light

7    and would not have come to light presumably but for a bombshell

8    report in the *Wall Street Journal* from an investigative

9    journalist who was able to get company records and then write

10   about the story.

11        And everything that *Alphabet* then worried about

12   happened.  There was congressional testimony, additional

13   regulatory scrutiny.

14        So there, we had motive to conceal, an actual

15   decision to conceal based on the consequences of disclosure.

16   And then the situation where the company never self-reported

17   it, it was a -- a corrective disclosure that came from the

18   independent media.

19        Here, we have --

20        THE COURT:  Of course, you're not suggesting that

21   motive has to be shown.  It's just -- I think a fair reading of

22   *Alphabet* is that it bolstered --

23        MR. MCDONOUGH:  Yes, Your Honor.  And we agree with

24   that.  We agree that motive is not required, but it's part of

25   the overall factor of the analysis.

1        THE COURT:  The holistic approach.

2        MR. MCDONOUGH:  Exactly.  Yes.  Yes.

3        Here -- and I'll stick with motive for a moment,

4  Your Honor.  Here, we have really no cognizable or even stated

5  motive for the October 31st statement because all of the stock

6  sales at issue in the Complaint occurred weeks before then.  We

7  have no strategy or decision to conceal.  There's nothing like

8  that alleged in the Complaint.

9        And, in fact, the reason that the world knows about

10  Funko's inventory problems is because Funko disclosed them

11  three months after the October 31st disclosures in

12  self-reporting of bad news.  And the company didn't only

13  disclose it, it actually accelerated the normal financial

14  reporting timeline under FCC rules and disclosed this

15  information earlier than it was required.

16        So we submit when you stack up what we see is the

17  key factors in *Alphabet* and the key factors here, they don't

18  match up to the extent that we see allegations of actual intent

19  to mislead or knowledge that the risk disclosure would be

20  misleading.

21        Just a few other points, Your Honor.  You know, it's

22  an interesting theory that the plaintiffs have developed

23  because the risk disclosure, of course, is not the only thing

24  the company reports about inventory.  And there's never been an

25  allegation that Funko should have written down its inventory

1    sooner than it did.  And there's never been any allegation that

2    Funko misstated or artificially inflated its inventory values.

3          And that, we submit, also goes to the notion of

4    intent to deceive or defraud because one would expect, if you

5    were lying about your inventory, you'd be lying about it either

6    in a variety of ways or ways that would matter most to

7    investors such as the value of the inventory that you're

8    actually holding.

9          And there are a couple of other points there,

10   Your Honor, that I have to apologize we did not develop in our

11   briefing.  But there's a lot of emphasis in the Complaint on

12   excess inventory.  And that could mean different things to

13   different people, just the way obsolete inventory is

14   subjective.  But the risks that the company talked about with

15   excess inventory is that it has a negative effect on the

16   company's working capital and gross margin.

17          THE COURT:  Because -- all right.  I understand.

18          MR. MCDONOUGH:  Because you're -- right.  And so --

19   there's no allegations, though, that the company misreported

20   its gross margin or its working capital.  So all of the key

21   indicators surrounding inventory are not alleged to be false.

22          And so we think that also goes to whether there's

23   actual intent here, when you compare that to a risk disclosure

24   that is a routine disclosure that companies make in the

25   consumer products industry.  And the fact that this presumably

1    could have been fixed with a relatively small wording change,

2    which to us begins to look more like negligence, even if it's

3    inexcusable negligence or mere recklessness.  And the

4    Ninth Circuit has been clear multiple times that even

5    inexcusable negligence or mere recklessness is not enough to

6    get over the hurdle of scienter, especially on an omission

7    theory.

8            And I'd be happy, Your Honor, to go through some of

9    the specific allegations, but I know the Court is -- is closely

10   familiar with them.  And again, we do acknowledge there are

11   allegations of meetings, of discussions about inventory, how

12   much --

13           THE COURT:  E-mails about the reports.

14           MR. MCDONOUGH:  Reporting, yes, purporting to

15   summarize the meetings and how much inventory is excess versus

16   obsolete.  But those are all subjective determinations.

17           And there's no allegation that the members of senior

18   management ever agreed or concluded that there was a material

19   amount of excess inventory or obsolete inventory, which is

20   another factor we believe comes into the overall mix of whether

21   we've got intent to mislead here.

22           THE COURT:  Well -- and we pointed this out in the

23   tentative, that there's some confusion in the -- in the

24   allegations in the Complaint, in the documents that the Court

25   has taken judicial notice of, and perhaps even in what the

```
 1    parties submitted in their motion in opposition about the

 2    distinction between excess and obsolete.

 3             Do you want to expound -- do you want to follow up

 4    on your last point?

 5             MR. MCDONOUGH:  I would like to, yes, Your Honor,

 6    because I do think it goes to -- and reflecting back on

 7    Alphabet, it's not subjective whether you had a three-year

 8    cybersecurity breach -- and the company concluded at the

 9    highest levels they had that breach.  That's an event that

10    happened that can't be denied.

11             THE COURT:  Well, it can't be denied.  And I don't

12    think your client is denying in this case that at least a

13    warehouse in -- how do you pronounce it?  Puyallup?

14             MR. MCDONOUGH:  Puyallup.

15             THE COURT:  Puyallup, okay, Washington to store

16    excess and perhaps obsolete inventory.

17             MR. MCDONOUGH:  Well, we don't concede any of the

18    allegations in the Complaint, but I take your point,

19    Your Honor.

20             And what we submit as to excess versus obsolete is,

21    you know, excess inventory is only a problem if you can't sell

22    it, with the caveat that it can affect your working capital and

23    your gross margin.  And nobody alleges there was anything wrong

24    with the reporting of gross margin or working capital here.

25             Once you get to obsolete, then the -- the assumption
```

1    is or the conclusion is that the inventory no longer has a

2    useful purpose above the cost that it required to create it.

3    And so if inventory has to be destroyed, of course it's

4    obsolete.  If there's a conclusion it can't be sold at least to

5    the level of its cost, the inventory is probably obsolete.

6              And that judgment occurs on a spectrum of:  How long

7    has certain inventory been held?  Is there a market for it?  Is

8    there some future event that will create a market for it, like

9    a new movie, a new sports season that's coming?

10             And it's certainly clear that Confidential Witness

11   No. 1 believed there was a glut of either excess or obsolete

12   inventory.  But what's not clear to our eye is whether

13   management, senior management actually concluded that there was

14   a material amount of excess or obsolete inventory before

15   October 31st.

16             And, to us, that's reinforced by the fact that the

17   plaintiffs don't challenge the timing of the inventory right

18   down at the end of 2019 because if, indeed, management

19   concluded that it had material obsolete inventory before the

20   end of the year, it needed to be written down, then, before the

21   end of the year.  And that's not alleged anywhere in the

22   Complaint.  It's actually conceded to the opposite.

23             And just to -- I'll wrap up, Your Honor, and if I

24   may address the Court in rebuttal, I would appreciate that.

25   But it's -- the way that the allegations come together, in our

1    view, is there's certainly, as we said, discussions, internal

2    discussions, internal reports about inventory.

3            But we would submit under the case law and the

4    standard that Your Honor articulated in the tentative, whether

5    those events occurred is not really the operative question.

6    It's whether management actually intended to mislead anyone

7    with this risk disclosure in the context of other disclosures

8    regarding inventory that are not challenged.  And we just don't

9    see that here.

10           And motive, I think, is a critical part of this

11   because the plaintiffs have made much about the stock sales by

12   two of the individual defendants, and none of those occurred at

13   any point after October 31st, which begs the question what is

14   the purpose of this securities fraud, particularly when the

15   company then self-reported the write-down a couple of months

16   later.

17           THE COURT:  All right.

18           MR. MCDONOUGH:  Thank you, Your Honor.

19           THE COURT:  You know, I have to -- I'll just make an

20   aside because it really doesn't relate to any of the issues

21   that you've argued or any of the issues that were dispositive.

22           But one thing that I couldn't help noting is in all

23   the discussion about the excess or -- more particularly, the

24   obsolete inventory and the -- you know, the discussion about

25   the cost of leasing an entire warehouse and so forth, the

1   options that are given as to what would happen to obsolete

2   inventory, nowhere was there any discussion about, say,

3   donating it to homeless shelters where children are housed or

4   children in foster care or group care.

5        And it just struck me that -- I wasn't a tax

6   attorney in practice, I'm certainly not an expert now -- but

7   that there would have been perhaps some benefit to the company

8   for doing that.  But more importantly, that merchandise is

9   going to be destroyed for no real good reason other than

10  it's -- you know, the movie came out three years ago.

11       MR. MCDONOUGH:  Yes, Your Honor.  No, it's a very

12  interesting point.  And as it turns out, there was some

13  discussion, I believe, with analysts about whether the company

14  could donate some of the inventory that was -- where it was

15  concluded it could no longer be sold.  And that may have

16  happened with some percentage.

17       I'm not sure the reasons why it couldn't happen with

18  all of it or what sort of concerns that were around that, but

19  it's a point that I think is a very good one and I think that

20  the company would appreciate as well and take into account.

21       THE COURT:  Thank you.

22       All right.  Which of you wishes to --

23       MS. BEIGE:  Stephanie Beige, Your Honor.

24       THE COURT:  Go ahead.

25       MS. BEIGE:  Thank you, Your Honor.

1          Your Honor, as you -- as you mentioned, motive is

2    not needed.  And the Ninth Circuit has never required motive as

3    long as you have detailed allegations supporting your claims,

4    which we do and Your Honor details very thoroughly in the

5    tentative.

6          To the extent that the question of whether there was

7    a material amount of obsolete inventory and there was any

8    knowledge on behalf of the defendants that it was material,

9    Your Honor also touched on this, you don't lease an entire

10   warehouse to house obsolete inventory without knowing it's

11   obsolete.

12         And CW-1, who is our confidential witness, alleged

13   that there was 10 to $12 million worth of obsolete inventory in

14   July.  So it clearly was material.  And --

15         THE COURT:  All right.  10 to -- 10 to $12 million.

16   But the -- I would have called them projections, but it's

17   called the net sales guidance for the entire year was 840 to

18   $850 million.

19         So percentage-wise, how do you think that factors

20   in?

21         MS. BEIGE:  Well, I still think it's a material

22   amount, considering it grew to 12 to 15 just by October and

23   then the write-down was for almost 17 million and there was a

24   40 percent drop in stock price that day.  So the market

25   certainly found it to be material.

1              THE COURT:  All right.

2              MS. BEIGE:  So -- and with respect to the failure

3   or -- to allege that there was a write-down that should have

4   been taken earlier, that was not our claim.  That doesn't mean

5   we concede that the write-down shouldn't have been.  It's just

6   not a claim we brought.

7              Defendants themselves in their brief acknowledge

8   or -- and state that an accounting claim challenging when a

9   write-down is taken is subject to numerous subjective

10  judgments.  And there's actually even, you know, battles within

11  companies when to actually take the write-down.  But that

12  doesn't mean or show that the defendants didn't know earlier

13  that all of this obsolete inventory was going to be written

14  down, which is what we allege.

15             Thank you, Your Honor.

16             THE COURT:  Thank you.  And for the ACON defendants?

17  Mr. Ross?

18             MR. ROSS:  Thank you, Your Honor.  Michael Ross on

19  behalf of the ACON defendants.

20             We, too, want to thank the Court for the very

21  thorough tentative.  Now that the case really is focused on

22  Statement No. 2, it gives us an opportunity to focus on the

23  control person liability issue with respect to Statement 2.

24             And I think there are a couple of critical facts

25  that -- because we didn't have the benefit, obviously, of the

1    tentative ruling -- we didn't highlight in the briefing.  And

2    that is obviously Statement 2 was part of the third quarter

3    10-Q.  That was dated October 31, 2019.  It is undisputed that

4    as of that date, the ACON defendants owned collectively less

5    than 50 percent of the voting shares of ACON.

6            Now, the tentative quotes paragraph 32 of the Second

7    Amended Complaint, the allegation there that ACON owned

8    55 percent of the Class A shares.  But at paragraph 124, the

9    plaintiffs specifically acknowledge -- and I quote --

10            THE COURT:  I'm sorry.  Paragraph 124?

11            MR. ROSS:  124 of the Second Amended Complaint,

12    Your Honor.  I quote, "As a result of the secondary offering,

13    ACON's 54.5 percent ownership of Class A shares was reduced to

14    45.7."

15            And also, indeed, in the prospectus that the

16    plaintiffs asked Your Honor to take judicial notice of,

17    Docket No. 154 -- and Your Honor did on page 26 of the

18    tentative -- that document, too, confirms on page 3 -- and I

19    have a copy of it, I'm happy to hand it up to Your Honor --

20    confirms that the collective voting shares owned by ACON to the

21    defendants as of late October, basically post sales in

22    September, was approximately 40 percent.

23            We're not dealing with the other statements, what

24    the ownership was prior to September 19th, the secondary

25    offering.  We can focus for control liability purposes on the

1   critical date of October 31, 2019.

2           The same is true with respect to board of directors.

3   It's undisputed that in September the board went from seven

4   members to eight members.  It's also undisputed that ACON had

5   the right to appoint three directors.  So three out of eight

6   directors does not subject ACON to control liability.

7           We cited a number of cases in our brief to that

8   effect, many of them dealing with 47 percent ownerships.  I'm

9   happy to give you those citations.  They are in our briefing.

10          THE COURT:  No, they're in the briefing.

11          MR. ROSS:  And so we think those are directly on

12  point, especially now that Statement 2 was at a period of time

13  where the -- where it's undisputed that the ownership voting,

14  collectively, power of ACON was below 50 percent.

15          And then with respect to everything else, we're --

16  we'll submit on the tentative.

17          THE COURT:  Thank you.

18          MR. ROSS:  Thank you.

19          THE COURT:  All right.  Do you wish to respond to

20  that, Ms. -- it's Ms. David?

21          MS. DAVID:  Thank you, Your Honor.

22          Um, just a few points about this.  While they owned

23  less than 50 percent at the time these statements were made,

24  they were by far the majority shareholder.  They were by far

25  the most significant shareholder, the ACON defendants were.

1    And there was the statements that they had significant

2    influence over the company even after that sale.

3            Mr. Ross, I believe, made reference to cases they

4    cite about minority shareholders.  And you'll note they cite

5    two out-of-circuit cases, and neither of them have anywhere

6    near the allegations we do.

7            So in the *Basher* -- *Brasher* case, there is

8    47.7 percent ownership, but there's nothing about being the

9    chairman of the board, having significant influence, previously

10    owning 100 percent of the company.

11            *Kuhns v. Ledger* specifically distinguishes that case

12    where it's just minority shareholder ownership.  In that case,

13    specifically they say --

14            THE COURT:  Well, can I ask before you go on.  You

15    mentioned, as one of the facts present in this case, not

16    present in *Brasher*, the fact that there had previously been

17    100 percent ownership.

18            MS. DAVID:  Yes.

19            THE COURT:  What are you arguing that the

20    significance of that is?

21            MS. DAVID:  The significance to us -- and it's also

22    in the *Thomas v. MagnaChip* case is these were -- this was a --

23    the ACON defendants always had significant power over Funko.

24    Before the IPO, they were 100 percent owners, they were

25    partners.  Then when the IPO happened, their shares reduced,

1   but they always had the power to elect board members.  They

2   always had the chairmanship.  That's always theirs.

3              THE COURT:  All right.

4              MS. DAVID:  And so just to -- so in *Kuhns v. Ledger*,

5   it specifically distinguishes cases where they had a director

6   and they had access to confidential information.  And that's

7   exactly what we allege here.

8              We allege enough to get through the pleading

9   standard, despite the 45.7 percent.  Because here, what we're

10  saying is these -- that the ACON defendants knew, you know, had

11  information, kept abreast of information, and they had

12  significant influence, according to Funko's own statements.

13             Also, you'll note that Brotman, Dellomo, and Kriger,

14  the individual defendants, were the appointees of ACON.  And no

15  one disputes that they were control persons.  So that, to us,

16  is also a large factor in the fact that the ACON defendants are

17  control persons.

18             THE COURT:  All right.  Thank you.

19             Do you wish to respond?

20             MR. ROSS:  Yes.  Very briefly, Your Honor.  Thank

21  you.

22             The issue under the case law and the statutory

23  requirements is control, not influence.  So really that's the

24  touchstone for liability on behalf of my clients.

25             I also want to address very briefly, on page 82 of

1    the tentative, there's a citation to a Ninth Circuit 2003 case,

2    *No. 84 Employer-Teamsters Joint Council.*  I do want to point

3    out for the Court that the case -- that the facts there are

4    strikingly different than the facts in the instant case.

5            There, there were two major shareholders who were

6    alleged to be collaborating.  And collectively, they owned

7    57.3 percent.  And again, that's quite different here when it's

8    undisputed that, as of October 31st, my clients owned less than

9    50 percent.

10           Also, in that case, the two alleged control

11   shareholders had the authority and the ability and, in fact,

12   did appoint a majority of the board.  That's obviously not the

13   case here where my clients only had the power to appoint three

14   of eight board members.

15           THE COURT:  All right.  Thank you.

16           MR. ROSS:  Thank you.

17           MR. MCDONOUGH:  Your Honor, may I be heard briefly?

18           THE COURT:  Yes.

19           MR. MCDONOUGH:  Just a few points, Your Honor.

20   Ms. Beige focused again on obsolete inventory.  And I do think

21   that continues to be a key issue here because of the subjective

22   nature of it.

23           And when -- when one is looking at a fact pattern to

24   determine whether it states a theory of intent to defraud, the

25   subjectivity of the decision or the subjectivity of the subject

1    matter matters a great deal.  It is in the eye of the beholder,

2    to a large extent.

3              THE COURT:  Are you saying -- are you saying that

4    it's a subjective decision whether inventory is excess or

5    obsolete?

6              MR. MCDONOUGH:  That's correct.

7              THE COURT:  All right.

8              MR. MCDONOUGH:  That's correct, Your Honor.

9              You know, I have a CD player that I use at my house.

10   My kids think it's obsolete.  I use it all the time.  I think

11   it's great.  There are different perspectives depending upon

12   the viewpoint of the person analyzing the item.

13             And here, it's true, Confidential Witness 1

14   apparently believed that there was 11 to $12 million of

15   obsolete inventory at some point.  The critical defect we see,

16   though, in that allegation is there is no assertion that

17   management actually agreed with him.

18             So while they were aware of how much inventory they

19   were carrying, some of it may have been classified as excess,

20   some of it may have been classified as obsolete, there's no

21   allegation that management actually agreed that --

22             THE COURT:  Well, I think that we point that out in

23   the tentative.  Maybe it's not on that issue, but we point out

24   that there is a lack of allegations showing that what CW-1

25   opined or believed was shared --

1          MR. MCDONOUGH:  Yes.

2          THE COURT:  -- by management.

3          MR. MCDONOUGH:  Certainly.  Certainly.  And that's

4   the point.

5          So, Your Honor, again, we could come back to the

6   distinction between the facts alleged here in *Alphabet* and the

7   particular standard that applies to omission theories in terms

8   of scienter.

9          And then just one last different point we wanted to

10  mention, Your Honor, is even if the final ruling reflected the

11  tentative exactly, we think that the Section 20(A) claim

12  against Mr. Mariotti likely should come out as well because the

13  predicate violation of Section 10(b) that is identified in the

14  tentative post-dates all of his --

15         THE COURT:  That's correct.

16         MR. MCDONOUGH:  -- alleged stock sales in the

17  Complaint.

18         THE COURT:  All right.  Thank you.

19         MR. MCDONOUGH:  Thank you very much, Your Honor.

20         THE COURT:  And is -- is Mr. Mariotti's name, is it

21  one r and two t's?  Or two r's and one t?

22         MR. MCDONOUGH:  I get this wrong all the time,

23  Your Honor, but I think it's one r and two t's.

24         THE COURT:  Oh, thank you.  Thank you.

25         MR. MCDONOUGH:  Yes.

1          THE COURT:  All right.  Thank you.  I'm going to

2     take the matter under submission.

3          And please, if you brought copies of the tentative,

4     destroy them.  I mean, you have the e-mail of them, but please

5     destroy them.

6          MR. MCDONOUGH:  We will.  Thank you very much.

7          THE COURT:  Thank you very much.

8          (Proceedings concluded at 2:45 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1                    **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5

6                I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10   IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17                      DATED THIS 27TH DAY OF OCTOBER, 2021.

18

19

20                      /S/ MYRA L. PONCE
                        _____
21                      MYRA L. PONCE, CSR NO. 11544, CRR, RDR
                        FEDERAL OFFICIAL COURT REPORTER
22

23

24

25

**UNITED STATES DISTRICT COURT**