1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

United States District Court
Central District of California

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

Gilberto Ferreira,

          Plaintiff(s),

          v.

Funko, Inc., et al.,

          Defendant(s).

Case No. 2:20-cv-02319-VAP-MAAx

**Order GRANTING Motion for Settlement Approval and GRANTING Motion for Attorneys' Fees (Dkt. 196, 197)**

      Lead Plaintiffs Abdul Baker ("Baker"), Zhibin Zhang ("Zhang"), and Huaiyu Zheng ("Zheng") (collectively, "Lead Plaintiffs") filed an unopposed Motion for Final Approval of Settlement, Certification of Settlement Class, and Entry of Judgment ("Motion for Final Approval") (ECF No. 196) and an unopposed Motion for Attorneys' Fees, Expenses, and Reimbursement to Lead Plaintiffs ("Motion for Attorneys' Fees").  (ECF No. 197.)

      After considering all the papers filed in support of the Motions, and the arguments advanced at the hearing, the Court **GRANTS** the Motion for Final Approval of the Settlement and the Motion for Attorneys' Fees, Litigation Costs, and Service Award.

# I.   BACKGROUND

Plaintiff Gilberto Ferreira filed a Class Action Complaint against Defendants on March 10, 2020.  (ECF No. 1.)  Plaintiffs Mohamed Nahas ("Nahas") and Blahovest Y. Dachev ("Dachev") filed similar actions against Defendants.  *See Nahas v. Funko, Inc.*, No. 2-20-cv-03130 (C.D. Cal.) (the "*Nahas* Action"); *Dachev v. Funko, Inc.*, No. 2-20-cv-00544 (W.D. Wash.) (the "*Dachev* Action").  On June 11, 2020, the Court consolidated the *Ferreira* Action and the *Nahas* Action ("Action").  (ECF No. 58.)  Plaintiff Dachev voluntarily dismissed the *Dachev* Action on June 24, 2020. (Settlement Motion at 2 n.4.)  The Court appointed Abdul Baker, Zhibin Zhang, and Huaiyu Zheng as Lead Plaintiffs in this action.  (ECF No. 58.)

Plaintiffs filed a First Consolidated Amended Complaint on July 31, 2020, (ECF No. 74), and a Second Consolidated Amended Complaint ("SAC") on March 29, 2021.  (ECF No. 142.)  The SAC alleges that between August 8, 2019, and March 5, 2020 (the "Class Period"), Defendants issued false and misleading statements and omitted material adverse information about Funko Inc.'s ("Funko") excess inventory and projected earnings for the 2019 fiscal year.  (SAC ¶¶ 3, 7, 170.)  According to Plaintiffs, Defendants knew Funko would not achieve its projections, but they publicly made misleading statements and omissions to the contrary.  (*Id.* ¶ 7.)  Additionally, Plaintiffs allege that Defendants misrepresented the state of Funko's excess inventory to investors.  (*Id.* ¶ 6.)  Defendants' misleading statements and omissions artificially inflated Funko's stock price during the Class Period, and Defendants sold shares of Funko stock for personal benefit.  (*Id.* ¶¶ 8, 171.)  When Funko's 2019 earnings and the state of its excess inventory

United States District Court
Central District of California

1   were publicly disclosed on February 5, 2020, Funko's stock price fell by 40

2   percent.  (*Id.* ¶¶ 9-10.)  According to Plaintiffs, the drop in Funko's stock

3   price caused Funko investors, including Plaintiffs and Class members, to

4   lose hundreds of millions of dollars.  (*Id.* ¶ 16.)  Plaintiffs allege these

5   actions violated Sections 10(b), 20(a), and 20A of the Securities Exchange

6   Act of 1934, and Rule 10b-5 promulgated thereunder.  (*Id.* ¶¶ 185-213.)

7

8        Defendants[1] filed motions to dismiss the SAC on May 7, 2021.  (ECF

9   No. 149, 151.)  On October 22, 2021, the Court dismissed with prejudice

10  Lead Plaintiffs' Section 10(b) claims based on statements related to Funko's

11  projected net sales guidance as protected by the safe harbor provision of

12  the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  (ECF

13  No. 165.)  The Court denied the motion to dismiss with respect to Funko's

14  inventory risk disclosures issued on October 31, 2019 but granted the

15  motion with respect to the same warnings issued on August 8, 2019 for

16  failure to plead scienter.  (*Id.* at 87.)  The Court denied Defendant Brian

17  Mariotti's ("Mariotti") motion to dismiss Plaintiffs' Section 20A claim based on

18  his sales of Funko shares in Funko's Secondary Offering but dismissed

19  Lead Plaintiffs' 20A claims against Defendant Perlmutter and the ACON

20  Defendants for lack of a predicate violation.  (*Id.* at 88.)  The Court also

21  denied Defendants' motions to dismiss Lead Plaintiffs' Section 20(a) control

22  ──────────────

23  [1] Motions to dismiss (ECF No. 149, 151) were filed by two separate groups of De-
    fendants.  One was filed by Defendants Funko Inc., Brian Mariotti, Russell Nickel,
    Andrew Perlmutter, Jennifer Fall Jung, Ken Brotman, Gino Dellomo, and Adam
24  Kriger (collectively, "Funko Defendants").  (ECF No. 149.)  The other motion was
    filed by Defendants ACON Investments, LLC, ACON Funko Manager, LLC, ACON
25  Funko Investors, LLC, ACON Funko Investors Holdings 1, LLC, ACON Funko In-
    vestors Holdings 2, LLC, ACON Funko Investors Holdings 3, LLC, and ACON Eq-
26  uity GenPar, LLC (collectively, "ACON Defendants").  (ECF No. 151.)

person claims against Defendants Mariotti, Jung, Brotman, Dellomo, Kriger, and the ACON Defendants.  (*Id*.)  Thus, Lead Plaintiffs' remaining 10(b) and 20(a) claims are based entirely on one statement: Funko's October 31, 2019 inventory risk disclosure and their 20A claim remains only as to Defendant Mariotti.  (*Id*.)

The parties engaged in preliminary discovery and participated in one full-day mediation session before Michelle Yoshida of Phillips ADR, on April 27, 2022, where the parties reached a settlement in principle.  (ECF No. 196 at 9.)  A Memorandum of Understanding was executed on April 29, 2022, and the parties subsequently negotiated the terms of the Settlement Agreement as set forth in the Stipulation and Agreement of Settlement ("Settlement Agreement").  ("SA," ECF No. 186-1.)

On July 19, 2022, the Court granted Preliminary Approval of the Class Action Settlement ("Preliminary Approval Order").  (ECF No. 193.)  Plaintiff now moves for Final Approval of Settlement (ECF No. 196) and for Approval of Attorneys' Fees, Expenses, and Reimbursements to Lead Plaintiffs (ECF No. 197).

**A.     Settlement Class**

The Settlement Class, as defined in the Settlement Agreement, consists of:

[A]ll persons and entities who or which purchased or otherwise acquired shares of Funko publicly traded common stock during the

period from August 8, 2019 through March 5, 2020, inclusive, and
who were damaged thereby.  The Settlement Class includes all
persons or entities who purchased Funko common stock
contemporaneously with sales of Funko common stock made by
Defendant Mariotti during the Class Period.

(SA ¶ 1(rr).)  The class consists of investors who purchased Funko common
stock during the Class Period.  (*Id.*)

**B.      Settlement Terms**

The Settlement Agreement establishes a $7,000,000 gross settlement
fund.  (SA ¶ 1(qq).)  Strategic Claims Services ("Claims Administrator") will
serve as the Claims Administrator.  (*Id.* ¶ 1(g).)  Class members are to
submit the Claim Form through the Settlement website or by hardcopy.  (*Id.*
¶ 27(a).)  The Claims Administrator will determine each claimant's eligibility
and calculate their respective claim.  (*Id.* ¶ 23.)  Claimants will be notified of
any ineligibility and will have an opportunity to remedy deficiencies.  (*Id.* ¶
27(d).)  The Claims Administrator will distribute payments to Authorized
Claimants after the Settlement Agreement reaches its Effective Date and all
applicable deadlines have passed.  (*Id.* ¶¶ 29, 34.)

The Effective Date is the date when all of the following conditions
occur: the Court approves the Settlement Agreement; the Court approves
the Preliminary Approval Order; the Settlement Amount is deposited into the
Escrow Account; neither party terminates the Settlement Agreement; and
when the Court enters final Judgment.  (*Id.* ¶ 34.)

United States District Court
Central District of California

If a balance remains in the Net Settlement Fund after at least six months from the date of the initial distribution, and after payment of notice and administration expenses, taxes, and attorneys' fees and expenses, any remaining funds will be re-distributed to Authorized Claimants who have cashed their checks and who would receive at least $10.00 from such re-distribution.  (*Id.* ¶ 32; ECF No. 196 at 16.)  If a balance remains in the Net Settlement Fund six months after the re-distribution, the remaining funds will be contributed to the Investor Protection Trust.  (ECF No. 196 at 16.)

Finally, Plaintiffs and Settlement Class Members release any future related claims against Defendants.  (SA ¶ 5.)

**C.    Notice Procedures**

On July 19, 2022, the Court authorized notice of the Settlement to the Settlement Class (the "Notice Date").  (ECF No. 193.)  Since then, Lead Plaintiffs and the Claims Administrator have provided Notice to the Settlement Class pursuant to the Preliminary Order.  (ECF No. 196 at 2.) The Claims Administrator has provided notice to the potential Settlement Class Members by: mailing or emailing the Postcard Notice; publishing the Summary Notice; establishing the Settlement Website; and posting the Internet Notice and Claim Form on the Settlement Website.  (ECF No. 193 at 5-6.)

The Claims Administrator sent the Depository Trust Company the Internet Notice of Pendency and Proposed Settlement of Class Action

United States District Court
Central District of California

("Notice") and Proof of Claim and Release Form ("Claim Form") (collectively, the "Notice and Claim") for the Depository Trust Company to publish on its Legal Notice System on August 3, 2022.  (Bravata Decl. ECF No. 198, Ex. 4, ¶ 3.)  The Legal Notice System allows the Depository Trust Company participants the ability to search and download legal notices as well as receive e-mail alerts based on specific notices once a legal notice is posted. (*Id*.)  On August 3, 2022, Strategic Claims Services completed by mail or email the Postcard Notice to all potential Settlement Class Members.  (*Id*. ¶¶ 4-6.)  In total, 30,176 potential Settlement Class Members were notified either by mailed Postcard Notice or emailed a direct link to the Postcard Notice.  (*Id*. ¶ 8.)

The Claims Administrator had the Summary Notice of Pendency of Class Action, Proposed Settlement, Motion for Attorneys' Fees and Expenses, and Settlement Fairness Hearing ("Summary Notice") transmitted once over the *PR Newswire* on August 2, 2022.  (*Id*. ¶ 9.)  The Claims Administrator also had the Summary Notice published in *Investor's Business Daily* on August 8, 2022.  (*Id*.)

On August 2, 2022, the Claims Administrator established a webpage for the Settlement on its website at www.strategicclaims.net/Funko/. The webpage is accessible 24 hours a day and seven days a week.  (*Id*. ¶ 11.) The webpage contains the updates and deadlines for the case; the online claim filing link; and pertinent documents including the Notice and Claim, the Postcard Notice, the Preliminary Approval Orders, and the Stipulation with exhibits.  (*Id*.)  The Claims Administrator also maintains a toll-free telephone

United States District Court
Central District of California

1  number for Settlement Class Members to call and obtain information about

2  the Settlement and request a Notice and Claim.  (*Id*. ¶ 10.)

3

4      The Postcard Notice, Summary Notice, Notice, and the Settlement

5  Webpage informs potential Settlement Class Members that written requests

6  for exclusion are to be mailed to Strategic Claims Services no later than

7  October 17, 2022.  (*Id.* ¶ 12.)  The Claims Administrator has been

8  monitoring all mail delivered for this case.  (*Id*.)  The Settlement Class

9  Members are also informed that anyone seeking to object to the Settlement

10  or any of its terms, the proposed Plan of Allocation, or the Fee and Expense

11  application, are required to submit their objection in writing to Lead Counsel

12  and Defendants' Counsel, and filed with the Clerk of the Court, no later than

13  October 17, 2022.  (*Id.* ¶ 13.)

14

15                    **II.    LEGAL STANDARD**

16      Federal Rule of Civil Procedure 23(e) provides that "[t]he claims,

17  issues, or defenses of a certified class may be settled, voluntarily dismissed,

18  or compromised only with the court's approval."  "[S]trong judicial policy . . .

19  favors settlements, particularly where complex class action litigation is

20  concerned." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir.

21  1992).  "The purpose of Rule 23(e) is to protect the unnamed members of

22  the class from unjust or unfair settlements affecting their rights."  *In re*

23  *Syncor ERISA Litig*., 516 F.3d 1095, 1100 (9th Cir. 2008).  The Court's

24  review of the settlement is meant to be "extremely limited" and should

25  consider the settlement as a whole.  *Hanlon v. Chrysler Corp*., 150 F.3d

26  1011, 1026 (9th Cir. 1998).

A court must engage in a two-step process to approve a proposed class action settlement.  First, the court must determine whether the proposed settlement deserves preliminary approval.  *Nat'l Rural Telecomms. Coop. v. DirecTV, Inc*., 221 F.R.D. 523, 525 (C.D. Cal. 2004).  Second, after notice is given to class members, the Court must determine whether final approval is warranted.  (*Id*.)  A court should approve a settlement pursuant to Rule 23(e) only if the settlement "is fundamentally fair, adequate and reasonable."  *Torrisi v. Tucson Elec. Power Co*., 8 F.3d 1370, 1375 (9th Cir. 1993); *accord In re Mego Fin. Corp. Sec. Litig*., 213 F.3d 454, 458 (9th Cir. 2000) (*citing Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1026 (9th Cir. 1998)).

In the Ninth Circuit, courts must balance the following factors to determine whether a class action settlement is fair, adequate, and reasonable: (1) the strength of the plaintiffs' case, (2) the risk, expense, complexity, and likely duration of further litigation, (3) the risk of maintaining class action status throughout the trial, (4) the amount offered in settlement, (5) the extent of discovery completed and the stage of the proceedings, (6) the experience and views of counsel, (7) the presence of a governmental participant, and (8) the reaction of the class members to the proposed settlement.  *Torrisi*, 8 F.3d at 1375; *accord Hanlon*, 150 F.3d at 1026.  "In addition, the settlement may not be the product of collusion among the negotiating parties."  *In re Mego Fin. Corp. Sec. Litig*., 213 F.3d at 458.

United States District Court
Central District of California

"[S]trong judicial policy . . . favors settlements, particularly where complex class action litigation is concerned." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).  When "the parties negotiate a settlement agreement before the class has been certified, settlement approval 'requires a higher standard of fairness' and 'a more probing inquiry than may normally be required under Rule 23(e).'" *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048 (9th Cir. 2019) (quoting *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012).  The Court neither presumes the Settlement Agreement is fair nor that it is the product of non-collusive, arms-length negotiations in evaluating the applicable factors.  In addition, "[t]he involvement of experienced class action counsel and the fact that the settlement agreement was reached in arm's length negotiations, after relevant discovery had taken place create a presumption that the agreement is fair." *Linney v. Cellular Alaska P'ship*, No. C-96-3008-DLJ, 1997 WL 450064, at *5 (N.D. Cal. July 18, 1997), aff'd, 151 F.3d 1234 (9th Cir. 1998).

### III.   DISCUSSION

**A.   Plaintiff's Motion for Final Approval of the Settlement**

**1.      Product of Serious, Informed, Non-Collusive Negotiations**

To approve the Settlement at this stage, the Court must first find that it is "not the product of fraud or overreaching by, or collusion between, the negotiating parties." *Hanlon*, 150 F.3d at 1027.

The Court has carefully scrutinized the Settlement Agreement and finds no signs of overt or subtle collusion.  By the time the Settlement Agreement was signed, the parties had litigated this action for over two and

United States District Court
Central District of California

half years.  (ECF No. 196 at 2, 5.)  Lead Plaintiffs and Lead Counsel have pursued this litigation by: completing an extensive pre-suit and ongoing investigation of the claims at issue, including interviews of several former Funko employees; preparing and filing the FAC; opposing Defendants' motions to dismiss the FAC; preparing and drafting the SAC, which revived the case after it had been dismissed in its entirety; serving and responding to discovery requests; engaging and consulting with experts concerning damages and loss causation; analyzing Funko's mediation statement and exhibits; analyzing documents produced by Funko to confirm the fairness and reasonableness of the Settlement; and participating in a mediation with an experienced mediator.  (*Id*. at 8-9).  Thus, as the Court previously stated in its Preliminary Approval Order, "sufficient discovery has been taken or investigation completed to enable counsel and the court to act intelligently." *Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013) (internal quotation marks omitted).  Accordingly, this indicates a lack of collusion between the parties.  *See In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 320 (N.D. Cal. 2018) ("Extensive discovery is . . . indicative of a lack of collusion, as the parties have litigated the case in an adversarial manner"); *see also Hanlon*, 150 F.3d at 1026 ("the extent of discovery completed and the stage of the proceedings" is relevant to fairness of settlement).

As previously found by this Court, the parties engaged in arm's length, serious, informed, and non-collusive negotiations between experienced and knowledgeable counsel.  (ECF No. 193 at 14-15.)  The parties' use of an experienced mediator is an "important factor" supporting a

11

finding that a proposed settlement is the "product of arms-length negotiations."  *See In re Banc of California Sec. Litig*., 2019 WL 6605884, at *2 (C.D. Cal. Dec. 4, 2019); *see also Todd v. STAAR Surgical Co*., 2017 WL 4877417, at *2 (C.D. Cal. Oct. 24, 2017) (approving settlement that was "the outcome of an arms-length negotiation conducted with the help of experienced mediator Michelle Yoshida of Phillips ADR").  The parties reached a settlement in principle after a full-day mediation session conducted by Michelle Yoshida, of Phillips ADR on April 27, 2022.  (ECF No. 196 at 9.)  The Mediator presented a mediator's recommendation of $7 million, and thereafter the parties accepted.  (*Id*. at 10.)  The Settlement Agreement is therefore presumptively the product of a non-collusive, arms-length negotiation, *see Roe v. SFBSC Management, LLC*, No. 14-cv-03616-LB, 2017 WL 4073809, at *9 (N.D. Cal. Sept. 14, 2017) (holding a settlement that is the product of an arms-length negotiation "conducted by capable and experienced counsel" is presumed to be fair and reasonable); *Satchell v. Fed. ExpressCorp.,* No. 03-cv-2878-SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.").

The Court further finds that none of the potential "subtle signs of collusion" identified by the Ninth Circuit are present in the Settlement Agreement.  *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011).  These potential signs include: (1) "when counsel receive[s] a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded"; (2) "when the parties negotiate a 'clear sailing' arrangement providing for the

payment of attorneys' fees separate and apart from class funds"; and (3)
"when the parties arrange for fees not awarded to revert to defendants
rather than be added to the class fund."  *Id.* (internal quotation marks and
citations omitted).

Under the Settlement Agreement, the Court will consider and
determine any applications for attorneys' fees or litigation expenses.  (SA ¶
25.)  The Settlement Agreement does not contain the type of "clear sailing
arrangement" that is cause for concern.  Only "a clear sailing arrangement
providing for the payment of attorneys' fees separate and apart from class
funds" is potentially indicative of collusion.  *In re Bluetooth*, 654 F.3d at 947.
As set forth below, the Court is approving plaintiffs' attorneys' fees equal to
25% of the Settlement Amount, which is consistent with the Ninth Circuit
"benchmark" and not disproportionate to the class recovery.  *See Hanlon*,
150 F.3d at 1029.  None of the factors that raise concerns of collusion are
present here.  The Court therefore finds that parties engaged in arm's
length, serious, informed, and non-collusive negotiations.  This factor
weighs in favor of approval.

### 2.      Strength of Plaintiff's Case and Future Risk

Plaintiffs' claims allege Violation of Section 10(b) of the Exchange Act
and Rule 10b-5, Violation of Section 20(a) of the Exchange Act, and
Violation of Section 20A of the Exchange Act.  (SAC ¶ 185-213.)  Lead
Counsel point to the risks and the uncertainties regarding class certification
if the settlement is not approved.  (ECF No. 196 at 14.)  As set forth in the
Settlement Agreement and Lead Plaintiff's Motion, Defendants deny and will

United States District Court
Central District of California

continue to deny the claims alleged against them.  (*Id.*; SA ¶ FF.)  Lead Counsel further demonstrate the considerable risks of litigation in this case by describing the parties' potential arguments concerning the amount of loss causation and damages (ECF No. 196 at 11), and Defendants' arguments with respect to falsity and scienter.  (*Id*. at 14.)  Although Plaintiff's claims survived a motion to dismiss, Lead Counsel assert that the outcome is still far from certain and that the case would likely require extensive continued litigation if a settlement were not approved.  (*Id*. at 13.)  The Court agrees.

As it stands, the Settlement Agreement provides distributions to Class Members on a pro rata basis from the Settlement Fund.  (ECF No. 196 at 19.)  Given the relative strength of Plaintiffs' claims, and the risks and costs associated with future complex litigation, the Settlement Agreement's terms appear to be reasonable.  Accordingly, the avoidance of costs and future litigation risks in this case weigh in favor of settlement approval.

### 3.    Amount Offered in the Settlement

The Settlement Agreement establishes a Settlement Fund of $7 million.  (SA ¶ 1(qq).)  Lead Counsel represent that this amount recovers approximately 8.7 percent of the approximately $80 million in maximum estimated aggregated damages.  (ECF No. 196 at 10.)  Courts in this circuit have approved settlements that recovered similar percentages.  *See, e.g., In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (finding settlement yielding 6 percent of potential damages was "higher than the median percentage of investor losses recovered in recent shareholder class action settlements"); *In re Snap Sec. Litig.*, No. 17-03679, 2021 WL

667590, at *1 (C.D. Cal. Feb. 18, 2021) (approving settlement representing "approximately 7.8% of the class's maximum potential aggregate damages, which is similar to the percent recovered in other court-approved securities settlements"); *In re Biolase, Inc. Sec. Litig.*, No. 13-1300, 2015 WL 12720318, at *4 (C.D. Cal. Oct. 13, 2015) (approving securities class action settlement representing "8% of the maximum recoverable damages"). Lead Counsel assert that this factor weighs in favor of approval here because the arguments concerning damages raised at trial could potentially reduce the total amount of Plaintiffs' recovery.  (*Id*. at 11-12.)  In light of the future litigation risks in this action and the comparable settlements in this Circuit, the Court finds the amount for the Settlement Fund to be favorable.

"[A] district court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement" because the amount offered is offset by fees.  *Staton v. Boeing Co*., 327 F.3d 938, 963 (9th Cir. 2003).  As discussed in more detail below, the Court finds the fees appropriate and therefore determines that the amount offered in settlement weighs in favor of approval.

### a. *Cy Pres* Recipient

"Federal courts have broad discretionary powers in shaping equitable decrees for distributing unclaimed class action funds."  *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990) (citing *Van Gemert v. Boeing Co*., 739 F.2d 730, 737 (2d Cir.1984)).  *Cy pres* distribution is "to put the unclaimed fund to the next best compensation use, *e.g*., for the aggregate, indirect, prospective benefit of the class."  *Masters v.*

*Wilhemina Model Agency, Inc.*, 472 F.3d 423, 436 (2d Cir. 2007) (citations omitted).  Under the *cy pres* doctrine, the donors' or parties' intent must be followed "as nearly as possible."  *In re Wells Fargo Secs. Litig.*, 991 F. Supp. 1193, 1195 (N.D. Cal. Jan. 20, 1998) (citations omitted).  "While the law generally favors distributing unclaimed funds for a purpose as near as possible to the legitimate objectives underlying the lawsuit, a direct nexus between the injured plaintiffs and the *cy pres* recipients is neither always feasible nor required."  *Hopson v. Hanesbrands, Inc.*, No. 08-0844, 2009 WL 928133, at *9 (N.D. Cal. Apr. 3, 2009)

In the Preliminary Approval Order, the Court declined to approve the Legal Aid Foundation of Los Angeles as the *cy pres* recipient.  (ECF No. 193 at 25-26.)  The parties now designate the Investor Protection Trust as the *cy pres* recipient.  (ECF No. 196 at 16.)  Thus, the Settlement Agreement provides that "any balance that still remains in the Net Settlement Fund after re-distribution(s) and after payment of outstanding Notice and Administration Expenses, Taxes, and attorneys' fees and expenses, if any, shall be contributed to the Investor Protection Trust." (*Id.*)

Investor Protection Trust is a nonprofit organization devoted to independent and unbiased investor education, research, and support of investor protection efforts.  (*Id.* at 17.)  Here, the claims arise from alleged violations of Section 10(b) of the Exchange Act and Rule 10b-5, Section 20(a) of the Exchange Act, and Section 20A of the Exchange Act.  (SAC ¶ 185-213.)  The *cy pres* distribution to the Investor Protection Trust is appropriate because its objectives to educate and support investor

protection efforts are consistent with the objective underlying this action involving alleged securities fraud and benefit the interests of the silent class. *See Six (6) Mexican Workers*, 904 F.2d at 1307-08 (holding that *cy pres* distributions "should be guided by the objectives of the underlying statute and the interests of the silent class members" and cannot benefit a group "too remote from the plaintiff class").  The Investor Protection Trust also operates at both the state and national level to provide independent and objective investor education to enable the public to make informed investment decisions.  (*Id.*)  This further resolves the Court's previous concern that the *cy pres* distribution to the Legal Aid Foundation in Los Angeles would fail to address the national character of this action.  *See Nachshin v. AOL, LLC*, 663 F.3d 1034, 1040 (9th Cir. 2011) (reversing a *cy pres* distribution award because it did not account for the comprehensive geographic distribution of the plaintiff class); *See In re Airline Ticket Comm'n Antitrust Litig.,* 307 F.3d 679, 683 (reversing a district court's *cy pres* distribution because it "failed to consider the full geographic scope of the case").  Accordingly, the Court finds that the *cy pres* distribution to Investor Protection Trust is appropriate for this Settlement.

### 4.    Extent of Discovery Completed and Stage of the Proceedings

This factor requires the Court to evaluate whether "the parties have sufficient information to make an informed decision about settlement." *Linney v. Cellullar Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998).

United States District Court
Central District of California

As the Court previously noted, the parties have litigated diligently since the commencement of this action.  (ECF No. 196 at 2-5.)  Counsel for Plaintiffs have prepared and drafted the Complaint, the FAC, and the SAC.  (ECF No. 1, 74, 142.)  The parties have briefed two rounds of motions to dismiss, conducted formal discovery, produced and reviewed documents, and engaged in a full-day mediation.  (ECF No. 196 at 2-5.)  Accordingly, the Court finds this factor weighs in favor of approval.  *See Linney*, 151 F.3d at 1239.

### 5.      Experience and Views of Counsel

Lead Counsel have ample experience litigating class actions similar to this case and have demonstrated the ability to prosecute vigorously on behalf of the class members.  (*See* Beige Decl., ECF No. 198, ¶¶ 68-75, Ex. 6, Bernstein Decl., Exh 7, Pomerantz Decl.)  Accordingly, the Court finds this factor weighs in favor of approval.

### 6.      Presence of a Governmental Participant

As there is no governmental participant in this action, this factor is irrelevant for the purposes of final approval.

### 7.      The Reaction of the Class Members to the Proposed Settlement

"[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms . . . are favorable to the class members."  *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 529.

Following preliminary approval of the settlement by the Court, the Claims Administrator distributed the approved class notice to the Class Members.  (Bravata Decl., ECF No. 198, Ex. 4.)  In response, the Claims Administrator has received 5,848 claims, no objections to the Settlement, and only one request for exclusion.  (Suppl. Bravata Decl., ECF No. 199-4, ¶¶ 7-9.)  Accordingly, this factor weighs in favor of approval.

### 8.    Balancing the Factors

As all of the relevant factors favor approval, the Court finds that the proposed Settlement Agreement is fair, reasonable, and adequate and **GRANTS** final approval of the Settlement Agreement.

### B.   Motion for Attorneys' Fees, Expenses, and Reimbursement to Lead Plaintiffs

Lead Counsel seeks 25% of the Settlement Fund for attorneys' fees, $141,142.47 for reimbursement of litigation expenses, and $14,100 for Lead Plaintiff Zhibin Zhang and $18,000 each for Lead Plaintiffs Huaiyu Zheng and Abdul Baker in connection with their representation of the Settlement Class.  (ECF No. 196 at 17; ECF No. 197 at 1.)  Lead Counsel additionally seeks reimbursement of $53,610.21 to the Claims Administrator for the costs incurred to administer the notices.  (ECF No. 199 at 6.)

When evaluating attorneys' fees, "the district court has discretion in common fund cases to choose either the percentage-of-the-fund or the lodestar method."  *Vizcaino v. Microsoft Corp*., 290 F.3d 1043, 1047 (9th Cir.

19

2002) (citing *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1295–96 (9th Cir.1994)).  When using the percentage-of-the-fund method, "courts typically set a benchmark of 25% of the fund as a reasonable fee award and justify any increase or decrease from this amount based on circumstances in the record." *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 455 (E.D. Cal. May 14, 2013); *see Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989).  The percentage may be adjusted upward or downward based on: (1) the results achieved; (2) the risks of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee; (5) the burdens carried by the class counsel; and (6) the awards made in similar cases.  *Monterrubio*, 291 F.R.D. at 455 (citing *Vizcaino*, 290 F.3d at 1048–50).

Lead Counsel seeks 25% of the Settlement Fund for attorneys' fees. (ECF No. 196 at 17; ECF No. 197 at 1.)  This amount is consistent with the Ninth Circuit's 25% "benchmark award for attorney[s'] fees" and with fee awards approved in cases within the Ninth Circuit.  *Hanlon*, 150 F.3d at 1029.  Further, none of the *Vizcaino* factors justify a downward departure from this benchmark.

### 1.   Results Achieved

Lead Counsel achieved a favorable result of $7 million for Settlement Class Members in light of the risks of litigation.  (ECF No. 197 at 7-9.)  The Settlement recovers approximately 8.7% of the approximately $80 million in maximum aggregate damages.  (*Id.*)  This percentage is higher than the median settlement amount of approximately 5% in recent comparable

United States District Court
Central District of California

securities class action cases in the same procedural posture.  (*Id*.; Beige Decl., Ex. 5.)  As addressed above, this factor weighs in favor of approval, as proving loss causation and damages would have been subject to challenges if this case had proceeded to trial.  (ECF No. 197 at 4-6.)

## 2.   Risks of Litigation

The requested fee is reasonable in light of the risks faced litigating this case to date and the risks and uncertainty of continued litigation.  This action involves complex factual and legal issues and, in the absence of settlement, would involve lengthy challenges where the resolution would be uncertain.  (*Id*. at 7-9.)  The risk and uncertainties of litigation are demonstrated by the fact that the FAC was dismissed in its entirety.  (ECF No. 141.)  This is further demonstrated by the fact that the claims in the SAC were partially dismissed and narrowed.  (ECF No. 165.)

This action faced serious risks and uncertainties if it had proceeded to trial.  As the case survived a motion to dismiss, the next step in this litigation was for Lead Plaintiffs to move for class certification.  (ECF No. 174.)  The class certification stage in securities litigation is challenging and often involves an excessive amount of additional litigation and substantial resources.  If this case were to proceed to summary judgment or trial, Defendants would have contested the existence of the requisite falsity and scienter which would have also raised the risks and uncertainties of this case.  (*Id*.)  The parties would have further litigated the amount of loss causation and damages.  (ECF No. 197 at 7.)  Lead Counsel continue to assert Plaintiffs' claims have merit, but nevertheless recognize that

United States District Court
Central District of California

1  Defendants have several non-frivolous defenses.  (*Id*. at 9.)  Here, Lead

2  Counsel have litigated diligently since the commencement of this action and

3  achieved a favorable settlement avoiding a risky and uncertain result.

4  Accordingly, this factor supports the approval of Lead Counsel's requested

5  attorneys' fees.

6

7  ### 3.  Skill Required and the Quality of Work

8  Lead Counsel are skilled litigators who have extensive experience in

9  securities class action litigation.  (Bernstein Decl., Ex. A, ECF No. 198-6;

10  Pomerantz Decl., Ex. A, ECF No. 198-7.)  Courts have recognized that the

11  "prosecution and management of a complex national class action requires

12  unique legal skills and abilities." *In re Heritage Bond Litig*., 2005 WL

13  1594389, at *12 (C.D. Cal. June 10, 2005).  "This is particularly true in

14  securities cases because the Private Securities Litigation Reform Act makes

15  it much more difficult for securities plaintiffs to get past a motion to dismiss."

16  *Destefano v. Zynga, Inc*., 2016 WL 537946, at *17 (N.D. Cal. Feb. 11, 2016)

17  (quoting *Omnivision*, 559 F. Supp. 2d at 1047).  Lead Counsel's work in this

18  complex securities case included, *inter alia*, discovery revealing the

19  strengths and weaknesses of this action; drafting the initial Complaint, the

20  FAC and the SAC; preparing the oppositions to two rounds of motions to

21  dismiss; and a mediation resulting in a favorable settlement for the Plaintiff

22  Class.  The positive reaction by Settlement Class members demonstrated

23  by the 5,848 claims, the lack of objections to the Settlement, and the sole

24  request for exclusion also support Class Counsel's fee request.  (Suppl.

25  Bravata Decl., ECF No. 199-4, ¶ 7-8.)  Given the quality of the work

26

performed by Lead Counsel, this factor weighs in favor of approving the attorneys' fees.

### 4.   Contingent Nature of the Fee

"It is an established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases." *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d at 1299.  Thus, whether Plaintiff's Counsel have taken the case on a contingency fee basis must be considered when deciding to vary from the 25% benchmark.  *Monterrubio*, 291 F.R.D. at 457.  Here, Lead Counsel undertook the Action on a contingent basis and have received no compensation during the years the Action was litigated.  (ECF No. 197 at 12.)  Any fee and expense award has been contingent on the result achieved.  (*Id*.)  Thus, this factor weighs in favor of approving the requested attorneys' fees award.

### 5.   Burdens Carried by Lead Counsel

The Court recognizes that Lead Counsel bore a non-trivial burden in litigating this case, and a fee award of 25% is well within the range of awards made in similar cases.  *See Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (noting that 20-30 percent is the usual common fund award).  Counsel undertook this litigation on a wholly contingent-fee basis, investing substantial time and money to prosecute a risky action with no guarantee of compensation for the investment of time and money the case would require.  (Beige Decl. ¶¶ 51-61.)  Since the Court's appointment of Lead Counsel on June 11, 2020 (ECF

No. 58), they have not been compensated for any time or expenses.  (*Id.* ¶¶ 66-74.)  Further, Lead Counsel would not have received any compensation had the parties not reached a settlement.  Lead Counsel bore the expenses throughout the case and have risked non-payment of $2,546,814.39 in time worked and over $136,142.47 in expenses.  (ECF No. 197 at 1,14; Berstein Decl., ECF No. 198-6, ¶¶ 6-7; Pomerantz Decl., ECF No. 198-7, ¶¶ 6-7.)

### 6.   Awards Made in Similar Cases

Lead Counsel's requested fee of attorneys' fees of 25% of the Settlement Fund is in line with the Ninth Circuit's "benchmark award for attorney[s'] fees."  *See Hanlon*, 150 F.3d at 1029.  Accordingly, this factor supports the requested 25% attorneys' fees.

### 7.   Lodestar Cross-check

Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award sought.  Although an analysis of counsel's lodestar is not required for an award of attorneys' fees in the Ninth Circuit, "[c]alculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award." *See Vizcaino*, 290 F.3d at 1048-51; *see also In re Coordinated Pretrial Proceedings In Petroleum Prods. Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir. 1997) (comparing the lodestar fee to the percentage fee is an appropriate measure of a percentage fee's reasonableness).

United States District Court
Central District of California

United States District Court
Central District of California

Lead Counsel claim they collectively spent approximately 3,211 hours of work at their respective hourly rates in litigating this action with a combined lodestar amount of $2,546,814.39.  (ECF No. 197 at 15.)  Co-Lead Counsel Bernstein Liebhard LLP ("Bernstein") claims it spent a total of 2,442.90 hours for a total fee of $1,982,727.89.  (Berstein LLP Decl., ECF No. 198-6, ¶ 6.)  Co-Lead Counsel Pomerantz LLP ("Pomerantz") claims it spent a total of 768.10 hours for a total fee of $564,086.50.  (Pomerantz Decl., ECF No. 198-7, ¶ 6.)  Neither Class Counsel's lodestar amount includes hours billed after September 30, 2022, and the time spent preparing the motions for approval of attorneys' fees and expenses request. (Bernstein Decl., ECF No. 198-6, ¶ 4-6; Pomerantz Decl., ECF No. 198-7, ¶¶ 4-6.)  The Court has reviewed Lead Counsel's declarations and finds the hourly rates to be reasonable.  (*Id*. ¶ 6; *Id*. ¶ 6.)  Based on Lead Counsel's lodestar, the requested fee award represents a negative lodestar multiplier of 0.69 (ECF No. 197 at 15), and is within the range of attorney fee awards routinely granted by courts in this Circuit.

Accordingly, the Court **GRANTS** the application for attorneys' fees equal to 25% of the Settlement Fund ($1,750,000).

### C.   Litigation Costs and Expenses

Lead Counsel seek reimbursement of $141,142.47 in litigation expenses.  (ECF No. 197 at 1.)  "[T]he costs and expenses incurred by counsel are subject to a test of relevance and reasonableness in amount." *In re Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1366 (N.D. Cal. 1996).  A court must "balance the need to reimburse counsel for all

reasonable expenses and costs necessary" to the litigation while "protecting the interests of the class." *Id*.

In support of the Motion for Attorneys' Fees and Expenses, both Pomerantz (Pomerantz Decl., ECF No. 198-7) and Bernstein (Bernstein Decl., ECF No. 198-6) submitted declarations including an itemized list of the litigation expenses.  (Pomerantz Decl, ECF No. 198-7, ¶ 7; Bernstein Decl., ECF No. 198-6, ¶ 7.)  Lead Counsel request for reimbursement of the following categories:  experts, consultants and mediation; filing fees; work-related transportation, hotels and meals; online legal and factual research; fees for press releases and newswires; photocopying, postage, and clerical overtime; and overnight delivery and conference call fees.  (*See* Beige Decl., ECF No. 198, ¶ 77; Bernstein Decl., ECF No. 198-6, ¶ 7-8; Pomerantz Decl., ECF No. 198-7, ¶ 7-8.)

**Experts, Consultants, and Mediation**

Pomerantz seeks $43,416.69 and Bernstein seeks $44,412.56, for a total reimbursement of $87,829.25 in expenses for experts, consultants, and investigators.[2]  (Bernstein Decl., ECF No. 198-6, ¶ 7-8; Pomerantz Decl., ECF No. 198-7, ¶ 7-8.)  Pomerantz also claims an additional $2,250.00 for mediator fees.  (Pomerantz Decl., ¶ 7.)   Lead Counsel explain that these expenses were used to retain experts in economics to assist with quantifying damages and causation issues, provide market analysis for the

_____

[2] This category was initially listed as "experts, consultants, and mediation" in Lead Counsel's Motion.  At the Final Fairness hearing, Lead Counsel clarified that "mediation" was a typographical error that should have stated "investigator."

United States District Court
Central District of California

mediation, create a Plan of Allocation, investigate this action, and pay the mediator.  (*Id*. ¶ 8(a); *Id*. ¶ 8(a).)  The Court finds these costs reimbursable and approves $45,666.69 to Pomerantz and $44,412.56 to Bernstein.

**Filing Fees**

Pomerantz seeks $2,612.00 and Bernstein seeks $20.00 for a total reimbursement of $2,632.00 in filing fees.  (Bernstein Decl., ECF No. 198-6, ¶ 7-8; Pomerantz Decl., ECF No. 198-7, ¶ 7-8.)  Lead Counsel claim that this amount consists of expenses paid to courts in connection with certificates of good standing necessary for pro hac vice applications. (Bernstein Decl., ECF No. 198-6, ¶ 8(b); Pomerantz Decl., ECF No. 198-7, ¶ 8(b).)  Lead Counsel clarified at the Final Fairness hearing that the amount also includes filing fees for the Complaint and the pro hac vice applications submitted in this action.  The Court approves the amounts sought as they are reasonable and were necessarily incurred.

**Online Legal and Factual Research**

Pomerantz seeks $1,605.71 and Bernstein seeks $32,026.10 for a total reimbursement of $33,631.81 in online legal and factual research fees. (Bernstein Decl., ECF No. 198-6, ¶ 7-8; Pomerantz Decl., ECF No. 198-7, ¶ 7-8.)  These expenses were used for legal and factual research conducted through databases by Westlaw, Lexis Nexis, Bloomberg and news services. (*Id*. ¶ 8(d); *Id*. ¶ 8(d).)  These expenses are reasonable and necessary for Lead Counsel's effective representation, and Lead Counsel will be reimbursed $33,631.81 in online legal and factual research costs.

United States District Court
Central District of California

**Work-Related Transportation, Hotels & Meals**

Pomerantz seeks $1,550.33 and Bernstein seeks $2,950.43 for a total reimbursement of $4,500.76[3] in expenses for work-related transportation, hotels and meals.  (Suppl. Beige Decl., ECF No. 204-1, ¶ 5; Suppl. Wernke Decl., ECF No. 204-2, ¶ 5.)  Reimbursement for transportation, hotels and meals is within the broad discretion of the court and may be reimbursed if they are "reasonable and necessary."  *See In re Media Vision Tech*, 913 F. Supp. at 1369.  Based on Lead Counsel's supplemental submission detailing the costs for meals, hotels, flights, and transportation (Suppl. Beige Decl., ECF No. 204-1, ¶ 7; Suppl. Wernke Decl., ECF No. 204-2, ¶ 7), the Court approves the reimbursement in the amount sought as they are reasonable and were necessarily incurred.

**Other Costs**

Bernstein seeks $891.60 in overnight delivery and conference call fees. (Bernstein Decl., ECF No. 198-6, ¶ 7-8.)  Pomerantz seeks $2,235.18 for photocopying, postage, and clerical overtime, and $2,171.87 for expenses on press releases and newswires.  (Pomerantz Decl., ECF No. 198-7, ¶ 7-8.)  Courts routinely reimburse Lead Counsel for reasonable costs for photocopying, postage, telephone costs, and delivery costs.  see *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1177 (S.D. Cal.

---

[3] This amount is adjusted to reflect the $5,000 reduction in anticipated costs associated with appearances at the Final Fairness hearing on November 7, 2022.  As the hearing was held remotely, Lead Counsel each reduced their original request by $2,500.00. (Suppl. Beige Decl., ECF No. 204-1, ¶ 5; Suppl. Wernke Decl., ECF No. 204-2, ¶ 5.)

2007); *In re Media Vision Tech.*, 913 F. Supp. at 1367-69.  The Court finds these costs reimbursable and approves the amounts.

**Notice and Administration Costs**

Lead Counsel seek reimbursement of $53,610.21 to the Claims Administrator, Strategic Claims Services, for the notice and administration costs associated with implementing the Notice program and administrating the settlement to date.  (ECF No. 199 at 6.)  The fees and expenses incurred by Strategic Claims Services are detailed in the Supplemental Declaration of Josephine Bravata.  (Suppl. Bravata Decl. Ex. A, ECF No. 199-4.)  The Settlement Agreement permits reimbursements "from the Settlement Fund up to $200,000, in Notice and Administration Costs actually incurred or paid. . ." (SA, ¶ 16.)  The Settlement Class was informed of this provision in the Notice and given the opportunity to object, and no class member has objected to this payment.  (Suppl. Bravata Decl., ECF No. 199-4, ¶ 8.)  Accordingly, the Court approves of the reimbursement of fees and expenses to Strategic Claims Services in the amount of $53,640.21.

Based on the above, the Court therefore **APPROVES** the reimbursement of costs and expenses to Lead Counsel in the amount of $136,142.47, and reimbursement of expenses to the Claims Administrator in the sum of $53,640.21

### D.  Lead Plaintiffs' Costs and Expenses under the PSLRA

Lead Counsel request for reimbursements in the amount of $14,100 to Lead Plaintiff Zhibin Zhang, and $18,000 each for Lead Plaintiffs Huaiyu

*United States District Court*
*Central District of California*

United States District Court
Central District of California

Zheng and Abdul Baker in connection with their representation of the Settlement Class, pursuant to the PSLRA, 15 U.S.C. § 78u-4(a)(4).  (ECF No. 197 at 21.)  Under the Settlement Agreement, the parties accounted for such requests by defining any "Fee and Expense Application" to include "any expenses of Lead Plaintiffs pursuant to 15 U.S.C. § 78u-4(a)(4) of the Private Securities Litigation Reform Act of 1995 ("PSLRA")." (SA ¶ 1(s); *see* SA ¶ 17.)

The PSLRA at 15 U.S.C. § 78u-4(a)(4) provides in pertinent part, that while class representatives are required to share the recovery in the same proportion as all other members of the class, "[n]othing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class."  15 U.S.C. § 78u-4(a)(4).  Courts have the discretion under PSLRA to grant payments to class representatives. *In re Heritage Bond Litig*., 2005 WL 1594389, at *4 (C.D. Cal. June 10, 2005).  For lead plaintiff to recover fees under § 78u-4(a)(4), courts have determined that "the lead plaintiff must provide meaningful evidence demonstrating that the requested amounts represent actual costs and expenses incurred directly as result of the litigation." *In re ESS Tech*., 2007 WL 3231729, at *2.

In its Preliminary Approval Order, the Court declined to rule on the reimbursements of costs and expenses because Lead Counsel did not provide any accounting of past costs or expenses.  (ECF No. 193 at 20.) Lead Plaintiffs have now submitted declarations detailing their time and

efforts spent on this action.  (Baker Decl, ECF No. 198-1; Zhang Decl, ECF No. 198-2; Zheng Decl., ECF No. 198-3.)  In support of Baker's request for $18,000, Baker states that a total of 15 hours were spent pursuing this action which consisted of: monitoring news about Funko; communicating and corresponding with Lead Counsel regarding the litigation, mediation and settlement; reviewing the initial Complaint, the FAC and the SAC, as well as the briefings and orders in this action; reviewing discovery requests served by Defendants; gathering and producing information to Lead Counsel regarding his Funko investments in response to Defendants' interrogatories and requests for production of documents.  (Baker Decl., ECF No. 198-1, ¶¶ 2-7.)  Baker is a board-certified fellowship-trained neurosurgeon who regularly charges $1,500 per hour for his work.  (Baker Decl., ECF No. 198-1, ¶ 6.)

Zhang represents that a total of 94 hours were spent participating in this action.  (Zhang Decl., ECF No. 198-2, ¶ 6.)  Zhang provides a detailed breakdown of those hours as follows: 14 hours monitoring news about Funko; 21 hours reviewing the initial Complaint, FAC, SAC, briefing including supplemental briefing and orders; 15 hours communicating and corresponding with Lead Counsel; 28.5 hours gathering and producing information regarding Funko investments; and 15.5 hours reviewing the mediation statement, the settlement and noticed document, and motions regarding the settlement.  (Id. ¶¶ 2-7.)  Zhang is a Software Engineer who regularly charges $150 per hour for his work. (Id. ¶ 6.)

Zheng represents that a total of 98 hours were spent pursuing the claims in this action.  (Zheng Decl., ECF No. 198-3, ¶ 6.)  Zheng also provides a detailed breakdown of those hours as follows: 10 hours monitoring news about Funko; 40 hours reviewing the initial Complaint, FAC, SAC, briefing including supplemental briefing and orders; 5 hours communicating and corresponding with Lead Counsel; 21 hours gathering and producing information regarding Funko investments; and 22 hours reviewing the mediation statement, the settlement and noticed document, and motions regarding the settlement.  (Id. ¶¶ 2-7.)  Zheng is a Supply Chain/Export Consultant who regularly charges $185 per hour for his work.  (Id. ¶ 6.)

The Court finds that Lead Plaintiffs have provided reasonable and sufficient information to receive reimbursements of their costs and expenses spent for this litigation.  Lead Plaintiffs' dedicated time and energy to this action that they would have otherwise devoted to their regular duties, which constituted a cost to Lead Plaintiffs.  Lead Plaintiffs' representation of the hours spent on this complex securities litigation is also reasonable.  Based on the fees that Lead Plaintiffs would ordinarily charge for their services and the hours expended on this litigation, the Court finds that the amounts requested are reasonable.  *See* 15 U.S.C. § 78u-4(a)(4) (including potential lost wages as part of an award of reasonable costs and expenses).  Further, the Court finds that the amounts requested are comparable to reimbursements in similar cases.  *See In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1173-74 (S.D. Cal. 2007) (finding that lead plaintiff's $40,000 reimbursement request was "fair and reasonable").

Accordingly, the Court **APPROVES** reimbursements of costs of $14,100 to Lead Plaintiff Zhibin Zhang, and $18,000 each for Lead Plaintiffs Huaiyu Zheng and Abdul Baker.

## IV.    CONCLUSION

For the reasons stated above, the Court **GRANTS** the Motion for Final Approval of the Settlement and **GRANTS** the Motion for Award of Attorneys' Fees, Expenses, and Reimbursement to Lead Plaintiffs.  It awards attorneys' fees in the amount of 25% of the Settlement Fund ($1,750,000), reimbursement of litigation costs to Lead Counsel in the amount of $136,142.47, reimbursements of fees and expenses to Strategic Claims Services in the amount of $53,610.21, and reimbursements of costs and expenses to Lead Plaintiffs in the amount of $14,100 to Lead Plaintiff Zhibin Zhang, and $18,000 each for Lead Plaintiffs Huaiyu Zheng and Abdul Baker.

**IT IS SO ORDERED.**

Dated:    12/13/22

Virginia A. Phillips
Senior United States District Judge